# Exhibit 1

| | |
|---|---|
| **ASSIGNMENT AGREEMENT № AA4** | **ДОГОВІР ВІДСТУПЛЕННЯ ПРАВ ВИМОГИ № AA4** |

*As of 05 February 2015*
*Kyiv (Ukraine)*

*Від 05 лютого 2015 року*
*місто Київ (Україна)*

**PARTY 1:** Legal entity that is incorporated in the state of Delaware and is acting in accordance with the laws of the United States of America, **CFSIT, Inc.**, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA, hereinafter - **"Initial Creditor"**, represented by Kristin Lee Wessels, acting under the power of attorney issued, notary certified and apostiled on 13 October 2014, and

**СТОРОНА 1:** Юридична особа, яка створена в штаті Делавер та діє за законодавством Сполучених Штатів Америки, **CFSIT, Inc.**, зареєстрована за адресою 1209 Орандж Стріт, Уілмінгтон, округ Ньюкасл, штат Делавер (1209 Orange Street, Wilmington, County of New Castle, State of Delaware), фактичне місцезнаходження: бульв. Ексельсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA), надалі за текстом - **"Первісний Кредитор"**, в особі Крістін Лі Весселс, яка діє на підставі Довіреності, виданої, нотаріально посвідченої та апостильованої 13 жовтня 2014 року, та

**PARTY 2:** Legal entity that is incorporated and is acting in accordance with the laws of Ukraine, **Limited Liability Company "YABLUNEVIY DAR"**, located at 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine, hereinafter - **"New Creditor"**, identification code 32475074, represented by Acting Executive Director R. V. Markiv, acting on the basis of the Charter,

**СТОРОНА 2:** Юридична особа, яка створена та діє за законодавством України, **Товариство з обмеженою відповідальністю «ЯБЛУНЕВИЙ ДАР»**, місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А, надалі за текстом - **"Новий Кредитор"**, ідентифікаційний код 32475074, в особі Тимчасово виконуючого обов'язки виконавчого директора Р. В. Марківа, який діє на підставі Статуту,

*hereinafter collectively – the **"Parties"**, and each individually referred to as a **"Party"**, have concluded the present Assignment Agreement, hereinafter – the **"Agreement"** as follows:*

*надалі за текстом разом - **"Сторони"**, а окремо **"Сторона"**, уклали цей Договір відступлення прав вимоги, надалі – **"Договір"**, про наступне:*

*ARTICLE 1.*
**SUBJECT MATTER OF THE AGREEMENT**

*СТАТТЯ 1.*
**ПРЕДМЕТ ДОГОВОРУ**

1.1. The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) under the following documentary instrument and all the related documentation as applicable (further — the **"Claims"**):

all claims of the creditor

1.1. Первісний Кредитор передає, а Новий Кредитор одержує всі та будь-які права вимоги (включаючи права на отримання надходжень та процентів) за наступним документарним інструментом та іншими пов'язаними з ним документами (надалі – **«Права вимоги»**):

всі права кредитора (бенефіціара) за

1

(beneficiary) under the following documentary instrument issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter -- the *"Debtor"*, for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

1) Irrevocable standby letter of credit No. LC/SB/016/042014 in the amount of 249,890.48 US Dollars;

1.2. The assignment of the Claims becomes effective on the date set forth above;

1.3. In consideration of the aforementioned assignment, the New Creditor agrees to make a payment in favour of the Initial Creditor of the face value of the Claims in United States Dollars (*"USD"*) (*i.e.* USD 249,890.48) within five (5) years from the date of execution of this Agreement under the conditions to be agreed by the Parties in a separate agreement.

### ARTICLE 2.
### RIGHTS AND OBLIGATIONS OF THE PARTIES

**2.1. Initial Creditor shall:**

2.1.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, transfer to the New Creditor all documents which confirm the Claims assigned hereunder to be reflected in a certificate of transfer and acceptance of documents to be signed by the Parties, unless such documents have been transferred by the Initial Creditor to the New Creditor before this Agreement came in to force;

наступним документарним інструментом, випущеним ПУБЛІЧНИМ АКЦІОНЕРНИМ ТОВАРИСТВОМ «ДЕЛЬТА БАНК», надалі за текстом – *«Боржник»*, на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до нього:

1) Безвідкличний резервний акредитив № LC/SB/016/042014 на суму 249 890,48 доларів США;

1.2. Відступлення Прав вимоги набирає чинності з дати зазначеної вище;

1.3. В якості оплати за вищезазначене відступлення Прав вимоги Новий Кредитор погоджується сплатити на користь Первісного Кредитора кошти у розмірі номінальної вартості Прав вимоги в доларах США (*«USD»*) (а саме 249 890,48 доларів США) впродовж 5 (п'яти) років з дати укладання цього Договору на умовах, що будуть погоджені Сторонами в окремому договорі.

### СТАТТЯ 2.
### ПРАВА ТА ОБОВ'ЯЗКИ СТОРІН

**2.1. Первісний Кредитор зобов'язаний:**

2.1.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, передати Новому Кредитору всі документи, що підтверджують Права вимоги, що передаються за цим Договором, про що Сторонами складається відповідний акт прийому-передачі документів, у випадку, якщо такі документи не були передані Первісним Кредитором Новому Кредиторові до моменту набрання чинності цим Договором;

2.1.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor;

2.1.3. perform other obligations as set out by the applicable laws.

**2.2. New Creditor shall:**

2.2.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, accept from the Initial Creditor all documents confirming the Claims assigned hereunder in accordance with the respective certificate of transfer and acceptance of documents;

2.2.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor.

## ARTICLE 3.
### REPRESENTATIONS

3.1. The Parties are companies duly established and validly existing under the laws of countries of their incorporation;

3.2. The Parties have full power and authority to conclude, execute and deliver this Agreement and to fully perform their obligations

2.1.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором;

2.1.3. виконувати інші обов'язки, передбачені законодавством, що застосовується.

**2.2. Новий Кредитор зобов'язаний:**

2.2.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, прийняти від Первісного Кредитора всі документи, які підтверджують Права вимоги, що відступаються за цим Договором, за відповідним актом прийому-передачі документів;

2.2.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором.

## СТАТТЯ 3.
### ЗАЯВИ

3.1. Сторони є юридичними особами, належним чином створеними та існуючими відповідно до законодавства країн їх реєстрації;

3.2. Сторони мають повний обсяг повноважень на укладення цього Договору та виконання в повному обсязі своїх обов'язків за цим Договором;

3

hereunder, and the persons signing this Agreement on their behalf are legally authorised by the Parties to do so;

3.3. All corporate consents required for the execution and performance of the Parties' obligations under this Agreement have been unconditionally and irrevocably granted and are in full force and effect;

3.4. The Initial Creditor represents that the Claims are valid and assignable; the Initial Creditor represents that it has provided the claim to the Debtor to make the Claims due;

3.5. The Parties entered into this Agreement and were induced to do so relying solely on the representations stated in Article 3;

3.6. The New Creditor acknowledges that it has made its own analysis of the Debtor and the above details and has reached its own decision to enter into this Agreement without reliance on the Initial Creditor or any Cargill entity, except for the representations contained in this Article 3;

3.7. The Parties hereby agreed that no recourse to the Initial Creditor shall apply in relation to the Claims assigned hereunder, except for by operation of law and/or if any of the representations stipulated by Article 3 have been breached by the Initial Creditor.

## ARTICLE 4.
## DISPUTE RESOLUTION

4.1. Any dispute arising out of or in connection with this Agreement including its validity or termination shall be referred to and finally settled by London Court of International Arbitration in

---

особи, що підписують цей Договір від імені Сторін, уповноважені на вчинення таких дій Сторонами;

3.3. Всі корпоративні погодження, необхідні для укладення та виконання зобов'язань Сторін за цим Договором, були безумовно та безвідклично отримані та є повністю чинними;

3.4. Первинний Кредитор заявляє, що Права вимоги є чинними та такими, що можуть бути відступлені; Первісний Кредитор заявляє, що ним надано Боржникові вимогу, зробивши Права вимоги такими, строк виконання яких настав;

3.5. Сторони при укладенні цього Договору покладались виключно на заяви, вказані в Статті 3;

3.6. Новий Кредитор підтверджує, що ним було зроблено власний аналіз Боржника та вищезазначених деталей, та прийнято самостійне рішення укласти цей Договір не покладаючись на Первинного Кредитора або будь-яку особу групи Каргілл, за виключенням заяв викладених в Статті 3;

3.7. Підписанням цього Договору Сторони погоджуються з тим, що по відношенню до Первісного Кредитора не застосовується право регресу у зв'язку з Правами вимоги, відступленими за цим Договором, крім як в силу закону та/або якщо будь-яка із заяв, визначених в Статті 3, буде порушена Первісним Кредитором.

## СТАТТЯ 4.
## ВРЕГУЛЮВАННЯ СПОРІВ

4.1. Будь-який спір, що виникає з цього Договору або у зв'язку з ним, включаючи будь-які питання стосовно його дії або розірвання, мають бути передані та остаточно вирішені Міжнародним арбітражним судом Лондону (London

4

accordance with its Rules which shall be incorporated into this Agreement by reference. The number of arbitrators – three (3), place of arbitration – London (the United Kingdom of Great Britain and Northern Ireland), language of proceedings – English. The arbitration award shall be final and binding on all Parties.

*ARTICLE 5.*
**FINAL PROVISIONS**

5.1.  This Agreement comes into effect from the moment of its conclusion and remains in effect until complete fulfillment of liabilities by the Parties.

5.2.  All appendices, amendments and/or addendums to the present Agreement have to be executed in the written form, signed by duly authorized representatives of the Parties and sealed with the stamp (if required/applicable) with obligatory reference to this Agreement. Such appendices, amendments and/or addendums shall be an integral part of the present Agreement from the moment of their execution in the abovementioned order;

5.3.  All notices under this Agreement shall be considered properly served in case they are made in writing and sent by courier, facsimile or hand delivered to the addresses of the Parties mentioned herein. The date of receipt of such notices shall be the date of their hand delivery or the date when transmitted electronically;

5.4.  This Agreement shall be governed by and construed in accordance with the laws of New York (excluding conflicts of laws principles);

5.5.  The New Creditor represents that it is registered as a payer of corporate

Court of International Arbitration) у відповідності до його Регламенту, який вважається включеним шляхом посилання у цьому пункті. Кількість арбітрів – 3 (три), місце арбітражного розгляду – Лондон (Сполучене Королівство Великобританії та Північної Ірландії), мова розгляду – англійська. Арбітражне рішення є остаточним та обов'язковим для всіх Сторін.

*СТАТТЯ 5.*
**ЗАКЛЮЧНІ ПОЛОЖЕННЯ**

5.1.  Цей Договір набирає чинності з моменту його укладення та діє до остаточного виконання Сторонами прийнятих на себе зобов'язань;

5.2.  Усі додатки, зміни та/або доповнення до цього Договору мають бути вчинені в письмовій формі, підписані належним чином уповноваженими на те представниками Сторін та скріплені відбитками печаток (якщо вимагається/застосовується), з обов'язковим посиланням на цей Договір. Такі додатки, зміни та/або доповнення з моменту їх вчинення у вищевказаному порядку є невід'ємними частинами даного Договору;

5.3.  Усі повідомлення за цим Договором будуть вважатися зробленими належним чином у разі, якщо вони здійснені у письмовій формі та надіслані кур'єром, факсом або вручені особисто за зазначеними адресами Сторін. Датою отримання таких повідомлень буде вважатися дата їх особистого вручення або дата передачі електронними засобами;

5.4.  Цей Договір регулюється та тлумачиться згідно з правом Нью-Йорку (за виключенням колізійних норм);

5.5.  Новий Кредитор підтверджує, що він є платником податку на прибуток на

profit tax on general terms in accordance with the Tax Code and applicable laws of Ukraine. The Initial Creditor represents that it is a tax resident of the United States of America;

загальних умовах відповідно до Податкового Кодексу України та застосовного законодавства України. Первісний Кредитор підтверджує, що він є податковим резидентом Сполучених Штатів Америки;

5.6. The invalidity of any separate provision of this Agreement shall not cause invalidation of the whole Agreement as long as the Agreement might have been concluded without such provisions. In case any provision of this Agreement is recognized invalid or contradictory to applicable laws of New York by the court or any competent state authority in each individual case this shall not impact the application of such provisions in all other cases and the validity of other provisions of the Agreement. In such case the Parties shall draft in good faith a new provision of the Agreement to reflect to the fullest extent the intention of the Parties at the time of making this Agreement;

5.6. Недійсність окремих положень цього Договору не спричиняє недійсність Договору в цілому, оскільки можна припустити, що цей Договір міг би бути укладений без включення до нього таких положень. Якщо будь-яке з положень цього Договору буде визнано судом чи іншим уповноваженим державним органом недійсним чи таким, що суперечить чинному праву Нью-Йорку, в кожному конкретному випадку, таке визнання не буде впливати на застосування таких положень у всіх інших випадках та на дійсність інших положень Договору. В такому випадку, Сторони зобов'язуються сумлінно розробити нове положення Договору такого змісту, який би у повній мірі відображав ті наміри, що існували в них в момент укладання цього Договору;

5.7. Each Party shall notify in writing another Party about change of any of its details within three (3) days;

5.7. У разі зміни реквізитів однієї з Сторін відповідна Сторона зобов'язана в триденний строк письмово повідомити про це другу Сторону;

5.8. This Agreement is made in three (3) original copies in English and Ukrainian languages, having equal legal force. In case of any discrepancies the English version prevails;

5.8. Цей Договір укладено в 3 (трьох) оригінальних примірниках українською та англійською мовою, які мають однакову юридичну силу. У випадку виникнення розбіжностей, переважну силу матиме текст, викладений англійською мовою;

5.9. All payments made under this Agreement, including but not exclusive to payments under a separate agreement to be entered into by the Parties as provided in clause 1.3 above, shall be made in immediately available funds, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature

5.9. Усі платежі, що мають бути вчинені згідно з цим Договором, включаючи але не обмежуючись платежами на підставі окремого договору, що має бути укладений Сторонами згідно з п. 1.3 цього Договору, повинні бути здійснені вільними грошовими коштами без відрахувань та зобов'язань по відрахуванню будь-яких існуючих або майбутніх податків, мит, зборів, включаючи збори, мита або податки на прибуток нерезидентів, встановлені

6

| PARTY 2: | СТОРОНА 2: |
|---|---|
| **NEW CREDITOR**<br>**Limited Liability Company**<br>**"YABLUNEVIY DAR"** | **НОВИЙ КРЕДИТОР**<br>**Товариство з обмеженою відповідальністю**<br>**«ЯБЛУНЕВИЙ ДАР»** |

| | |
|---|---|
| Registered address: 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine<br>Identification code 32475074<br>Current Account № 26006000014224 (980) in PJSC "Ukrsotsbank", MFO 300023 | Місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А<br>Ідентифікаційний код 32475074<br>Поточний рахунок № 26006000014224 (980) в ПАТ «Укрсоцбанк»<br>МФО 300023 |

**Acting Executive Director**      **Тимчасово виконуючий обов'язки виконавчого директора**

/ R. V. Markiv /      / Р. В. Марків /

In the presence of witness:      В присутності свідка:
(name) *Oleksiy Gusarov*      (ім'я) *Олексій Гусаров*
(address) *Kyiv reg., Vyshhorodskyi dist.,*      (адреса) *Київська обл., Вишгородський р-н,*
(occupation) *advocate Novi Petrivsti, m.*      (вид занять свідка) *адвокат сН. Петрівці, в/п. 2206 °к*

imposed by the government of Ukraine or any other political or taxing authority;

5.10. This Agreement represents the whole and only agreement between the Parties in relation to the Claims assignment and supersedes any previous agreement (whether written or oral) between the Parties in relation to its subject matter;

5.11. The Parties accept the legal power and validity of the signed Agreement received via fax or via e-mail, as well as of all the document related to it (annexes, additions, protocols, amendments, schedules, etc.), signed and received in the same manner, with subsequent confirmation by means of originals.

**IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as a Deed on the day, month and year first written above.**

**PARTY 1:**

**INITIAL CREDITOR**
**CFSIT, Inc.**

Address: 9350 Excelsior Boulevard, MS142-4B, Hopkins, MN 55343, USA

Account No.: CITIBANK N.A., NY, ACCOUNT No. 30501068, SWIFT CITIUS33

**Authorized person**

*Kristul Wisal* / **Kristin Lee Wessels** /

In the presence of witness:
(name)
(address)
(occupation)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA*

---

урядом України або будь-якими іншими державними або податковими органами;

5.10. Цей Договір становить повний та єдиний договір між Сторонами щодо відступлення Прав вимоги, а також замінює собою будь-які попередні договори (письмові та усні) між Сторонами щодо його предмета;

5.11. Сторони визнають юридичну силу та чинність підписаного Договору, отриманого за допомогою факсу або електронної пошти, так само як і будь-яких пов'язаних документів (додатків, доповнень, протоколів, графіків тощо), які підписані та отримані таким же шляхом, з подальшим підтвердженням оригіналами.

**НА ПІДТВЕРДЖЕННЯ ЦЬОГО Сторони належним чином уклали цей Договір в спеціальній письмовій формі у день, місяць і рік, зазначені на початку цього Договору.**

**СТОРОНА 1:**

**ПЕРВІСНИЙ КРЕДИТОР**
**CFSIT, Inc.**

Місцезнаходження: бульв. Екселсіор, 9350, MS 142-4В, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA)
Рахунок: CITIBANK N.A., NY, ACCOUNT No. 30501068, SWIFT CITIUS33

**Уповноважена особа**

*Kristin Wisal* / **Крістін Лі Весселс** /

В присутності свідка:
(ім'я)
(адреса)
(вид занять свідка)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA*

7

**ANNEX 1 TO THE ASSIGNMENT AGREEMENT NO. AA4**
**EXECUTED BY THE PARTIES AS OF FEBRUARY 5, 2015**

**July 07, 2015**

This Annex 1 ("Annex") to the Assignment Agreement (the **"Assignment Agreement"**) is made by and between among:

1)      CFSIT, Inc., a Delaware USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA ("CFSIT" or "Initial Creditor") and

2)      Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 ("YabDar" or "New Creditor"),

CFSIT and YabDar are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

**WHEREAS:**

*   CFSIT and YabDar are the Parties to the Assignment Agreement,

*   In accordance with Article 1.3 of the Assignment Agreement the Parties have agreed to execute the explicit payment terms under the Assignment Agreement in a separate agreement,

*   YabDar has requested CFSIT to provide deferred payment terms under the Assignment Agreement and CFSIT is willing to provide such deferred payment terms on the conditions stipulated in this Annex 1 (the "Senior Debt Facility").

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

**I. DEFINITIONS**

**YabDar**      Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500

**Dar Assets**    Means YabDar assets pledged in favour of Delta Bank as of February 5, 2015.

**Delta Bank**    means PUBLIC JOINT-STOCK COMPANY "DELTA BANK", a bank duly registered under the laws of Ukraine.

Capitalized terms used herein but not defined shall have the same meanings as defined in the Assignment Agreement between the Parties.

**II. SUBJECT MATTER OF THE AGREEMENT**

The Parties agree to amend and restate Clause 1.1. of Article 1 of the Assignment Agreement as follows:

1.1.    The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) (the "Claims") under

© 2015 CFSIT, Inc. All rights reserved.

1

1.a)   the following documentary instrument and all the related documentation as applicable: all claims of the creditor (beneficiary) under the following documentary instrument issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK" and all the related documentation, hereinafter – the "Debtor", for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

-   Irrevocable standby letter of credit No. LC/SB/016/042014 in the amount of USD 249,890.48;

1.b)   CFSIT"s 100% interest, which is equal to USD 249,890.48 in the outstanding payment claims of CFSIT on the Limited Liability Company Agronovocom, Kiev, Ukraine  in relation to the purchase of goods from CFSIT under Purchase Contact No. CFSIT288.11-6-S dated November 23, 2011, including any amendments thereto.

## II. PAYMENT TERMS

In consideration for the assignment of the Claims, YabDar agrees to pay in favour of CFSIT the amount of USD 249,890.48 (US Dollars Two Hundred Forty Nine Thousand Eight Hundred and Ninety and 48/100) (hereinafter – the "Senior Debt Amount" or "Consideration") in accordance with the terms and conditions set out below:

The repayment of the Senior Debt Amount shall be made in instalments on the following repayment dates (further collectively referred to as the "Repayment Dates"):

| | |
|---|---|
| 05 May 2018 | USD 12 494,53 |
| 05 Aug 2018 | USD 12 494,53 |
| 05 Nov 2018 | USD 12 494,52 |
| 05 Feb 2019 | USD 12 494,52 |
| 05 May 2019 | USD 12 494,53 |
| 05 Aug 2019 | USD 12 494,53 |
| 05 Nov 2019 | USD 12 494,52 |
| 05 Feb 2020 | USD 12 494,52 |
| 05 May 2020 | USD 37 483,57 |
| 05 Aug 2020 | USD 37 483,57 |
| 05 Nov 2020 | USD 37 483,57 |
| 05 Feb 2021 | USD 37 483,57 |

YabDar further agrees and acknowledges and hereby expresses its consent that upon the successful arrangement and provision of working capital financing by CFSI to T.B. Fruit Polska Sp. Z o.o. S.K.A., 109 Sandomierska str., 27-620 Dwikozy, Poland, the Polish affiliate of YabDar ("TB Fruit Poland") the Senior Debt Amount shall become interest bearing. The interest rate and interest periods shall be agreed by the Parties but in no case the interest rate shall be lower than 5% per annum and the interest period shall start to accrue on the outstanding Senior Debt Amount as of the date when the volume of working capital financing arranged for and/or provided to TB Fruit Poland reaches USD 40 million ("Interest Period Starting Date") and shall be payable every 180 days from the interest period starting date until the repayment of the Senior Debt Amount.

YabDar also agrees and acknowledges that YabDar shall be deemed to fulfil its payment obligations only when CFSIT gets money to its respective accounts.

2

© 2015 CFSIT, Inc. All rights reserved.

YabDar shall bear the risk and costs of getting all external authorizations for payments out of Ukraine (including but not limited to licenses, permits, registrations, approvals or any other authorizations needed under the applicable legislation or bank practice at the time of payment). In case payments under the Assignment Agreement and this Annex become explicitly restricted or forbidden by the law at the time of payment and shall stay restricted or forbidden more than 15 consecutive days from the scheduled date of payment, YabDar shall immediately procure such payments by and from its affiliate: Francoso Corporation Limited, a legal entity duly registered under the laws of Cyprus having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus. The Parties hereto have agreed that any restriction or ban on payments outside Ukraine shall not be considered a force majeure event and such restriction or ban shall not extend, suspend or stop YabDar obligation to pay.

## II. SECURITY OF PAYMENT

To secure YabDar's Senior Debt Amount payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause YabDar Assets to be pledged in favour of CFSIT to be of sufficient collateral value (meaning the three integral property complexes located in Ukraine) with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "Pledge"). YabDar undertakes to arrange for the said pledge as soon as reasonably possible after the release of YabDar Assets from the current liens made in favour of Delta Bank but in any case, no later than the first of the Repayment Dates. The collateral value shall be determined based on the following formula: market value of the respective complexes (based on most recent independent appraisal which shall be updated annually)*0.8.

YabDar undertakes to take all necessary actions required under the applicable legislation of Ukraine to cause the YabDar Assets to be pledged in favour of CFSIT and all necessary actions to perfect such Pledge.

YabDar undertakes that the YabDar Assets to be pledged in favour of CFSIT shall be made free and clear of any liens and/or any encumbrances.

If for any reason the Pledge cannot be arranged by YabDar by the first of the Repayment Dates, YabDar shall procure that CFSIT receives no later than the said Repayment Date one other adequate security in the form of either:

- Standby letter of credit issued in the form acceptable to CFSIT by a financial institution acceptable to CFSIT in the amount equal to the obligations of YabDar under the Assignment Agreement and this Annex with an expiry date of no earlier than the last of the Repayment Dates plus 30 calendar days; OR

- Irrevocable first demand payment guarantees to be issued by a guarantor or guarantors acceptable to CFSIT and in the form acceptable to CFSIT covering the amount equal to the payment obligations of YabDar under the Assignment Agreement and this Annex and with a validity period equal to the last of the Repayment Dates plus 30 calendar days; OR

- YabDar shall pledge or cause any of the Guarantors to pledge in favour of CFSIT its/their sales proceeds from the contracts with third parties in the amount equal to or greater than the payment obligations of YabDar under the Assignment Agreement and this Annex on each of the Repayment Dates.

YabDar shall also procure the issuance of the following guarantees to CFSIT by the following guarantors (hereinafter "the Guarantors") no later than 5 days from the date of this Annex:

© 2015 CFSIT, Inc. All rights reserved.

3

- First Demand suretyship to be issued by Mr. Taras Barshchovskyy, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSIT;

- First Demand payment guarantee to be issued by T.B. Fruit Polska Sp. z o.o. S.K.A., a legal entity duly registered under the laws of Poland having its registered address at 109 Sandomierska str., 27-620 Dwikozy, Poland, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSIT;

- First Demand payment guarantee to be issued by Francoso Corporation Limited, a legal entity duly incorporated under the laws of Cyprus, having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus ("Francoso Corporation Limited"), covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSIT.

## V. REPRESENTATIONS & WARRANTIES

In addition to the Representations in the Assignment Agreement, YabDar hereby further represents and warrants that:

a.   this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be YabDar's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and thereof, and such obligations rank at least <u>pari passu</u> in all respects with all their other similar obligations;

b.   it has disclosed all of its material liabilities, contingent or otherwise to CFSIT;

c.   this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be in proper legal form under the laws of Ukraine for the enforcement thereof against it in the courts of Ukraine, and to ensure the legality, validity, enforceability or admissibility in evidence of such documents in Ukraine, it is not necessary that such documents be filed or recorded with any court or other authority in Ukraine or that any stamp or similar tax be paid on or in respect of such documents;

d.   it has or will take all required measures to assure that it can effect timely repayment of the Senior Debt Amount as contemplated herein, in United States Dollars, and assure that this Annex and the Assignment Agreement, and all documents to be delivered hereunder, remain in effect, enforceable and in compliance with all applicable laws and regulations;

e.   there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar either (i) with respect to or arising out of this Annex or the Assignment Agreement, or the transactions related thereto;

f.   neither it nor any of its revenues or properties have any right of immunity from suit, court jurisdiction, attachment prior to judgment, execution of a judgment or from set-off, banker's lien, counterclaim or any other legal process or remedy with respect to its obligations hereunder or under the Assignment Agreement

g.   there are no legal or arbitral proceedings, or any proceedings by or before any

© 2015 CFSIT, Inc. All rights reserved.

4

governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar;

h.    YabDar has good and clear title to its production and operational assets and land, free and clear of any liens or encumbrances except for those created or granted under any security documents in favour of YabDar's lenders;

i.    it will provide evidence to CFSIT that it has obtained all required licenses, consents and authorizations for the YabDar Assets and those assets are in compliance with all applicable environmental and safety standards normally applied to such type of assets;

j.    it will provide evidence to CFSIT of its ownership of the land (or the terms of any lease rights) related to the YabDar production and operations facilities;

k.    it will maintain insurance on the YabDar's properties and assets in at least such amounts, against at least such risks and with such risk retention as are generally maintained, insured against or retained by other companies of established reputation engaged in the same or similar business;

l.    it will keep proper books of record and account in which full and correct entries in conformity with local GAAP shall be made of all dealings and transactions in relation to its business and activities.

m.    it will cause Francoso Corporation Limited to produce consolidated group financial statements under IFRS for each of the financial years from 2015 through 2021 (both years inclusive) and have them audited by of the reputable international audit firm agreed by the Parties;

n.    to provide CFSIT with the financials at first request as well as to provide any such additional financial and other information related to the performance of YabDar that may be reasonably requested by CFSIT;

u.    not to directly or indirectly, create, assume or suffer to exist any lien upon any property or asset now or hereafter acquired by YabDar to secure any debt which is *pari passu* with or subordinate in right of payment under the Senior Debt Amount unless the Senior Debt Amount is secured equally and rateably prior to the creation, incurrence or assumption of such lien. Notwithstanding the foregoing provisions of this section, the YabDar shall not permit, create, assume or suffer to exist any lien on the capital stock of YabDar.

## VI. DEFAULT

If YabDar or any of its affiliates alternatively shall:

a.    breach any representation or warranty made by YabDar (or any of its officers) under or in connection with this Annex or in any financial statement shall prove to have been incorrect, false or misleading in any material respect when made and such condition (if capable of remedy) remains unremedied for a period of thirty (30) days after the YabDar or CFSIT obtains knowledge thereof;

b.    fail to perform or observe any other term, covenant or agreement contained in Section V. (a) through and including (u) and/or referred to in this Annex;

© 2015 CFSIT, Inc. All rights reserved.

5

c.    generally not pay or admit its inability to pay its respective debts as such debts become due;

d.    shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail to generally pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

e.    become subject to an involuntary case or other proceeding shall be commenced against YabDar seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days; or an order for relief shall be entered against YabDar under any bankruptcy laws as now or hereafter in effect;

f.    any event shall occur that could be reasonably expected to have a Material Adverse Effect on the: (i) property, businesses, operations, financial condition, liabilities or capitalization of YabDar; (ii) ability of YabDar to perform any of its respective obligations under this Annex, (iii) validity or enforceability of this Annex,  or (iv) timely payment of the principal or any interest amount due hereunder;

g.    a Change of Ownership or sale or any other disposition of assets of total value equal or greater USD 1,000,000 shall occur, without a prior written consent of CFSIT;

h.    YabDar shall (i) default in the payment when due of any principal of or interest on any of its Debt (other than the Senior Debt Amount or (ii) any event specified in any note, agreement, indenture or other document evidencing or relating to any such debt shall occur, the result of which is to cause, or (with the giving of any notice or lapse of time or both) to permit the holder or holders of such debt (or a trustee or agent on behalf of such holder or holders) to cause such debt to become due and payable prior to its stated maturity; provided, however, that the aggregate amount of such Debt falling within (i) above (as to which the time for payment has not been extended by the relevant creditors) and any relevant payments falling within (ii) above equals or exceeds USD1,000,000 (US Dollars one million) for YabDar in aggregate;

i.    one or more judgments or orders from which no further appeal is permissible under applicable law for the payment of money aggregating in excess of USD1,000,000 (one million US dollars) (or its equivalent in another currency) shall be rendered against YabDar, and such judgment or order shall continue unsatisfied and in effect until the date by which payment must be made pursuant

© 2015 CFSIT, Inc. All rights reserved.

6

to such judgment or order;

j.    at any time during the term of this Annex, it is or becomes unlawful for the YabDar to perform its respective obligations pursuant to the terms and conditions contained in this Annex, or any of such obligations are not, or cease to be, legal, valid and binding on it and enforceable against YabDar;

j.    If any of the following events have occurred:

(i)    the whole or a substantial part of the assets of the YabDar, or any of its affiliates is confiscated or attached;

(ii)    any change occurs in the ownership or control of the YabDar or any of its affiliates, which, in the reasonable opinion of the CFSIT, constitutes a material adverse change affecting the financial condition or operations of the YabDar or any of its affiliates respectively;

(iii)    any competent governmental authority takes any action to condemn, seize, requisition or otherwise appropriate any substantial portion of the properties or assets of YabDar or any of its affiliates (either with or without payment of compensation), or any action relating to YabDar or any of its affiliates, which in the opinion of CFSIT, adversely affects YabDar's ability to pay its indebtedness under the Assignment Agreement,

then, in any such event CFSIT, may immediately proceed to protect and enforce its rights by an action at law, or other appropriate proceeding, including but not limited to, demanding and declaring this Annex, including all interest accrued thereon and all other amounts payable under this Annex to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by YabDar. YabDar hereby agrees to indemnify CFSIT for (i) all reasonable costs and expenses (including but not limited to attorney's fees) incurred by CFSIT in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom. Said indemnification shall survive the repayment in full of the Senior Debt Amount.

## VII. GENERAL PROVISIONS

a.    Any provision of this Annex that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

b.    The section headings in this Annex are for convenience of reference only and shall not affect the interpretation hereof.

c.    This Annex may be signed in counterparts with each counterpart deemed an original and both counterparts together constituting one and the same document.

d.    The parties hereto acknowledge to have had previous access to the contents of this Annex and that notwithstanding its English language have perfectly understood its exact content.

e.    All payments under this Annex are to be made in immediately available funds in United States Dollars, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority. The Parties agree that, in the event of any such deduction, withholding or tax payment,

© 2015 CFSIT, Inc. All rights reserved. 7

YabDar shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment CFSIT will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon YabDar's request, CFSIT agrees to provide such documentation, which to its best knowledge but without any assurances on its part, is required by to classify CFSIT as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and Ukraine. Payments are to be made to CFSIT's account as per Assignment Agreement.

If payments under this Annex are not made in full when due, then any outstanding amount due but unpaid hereunder shall accrue late interest at 11 % calculated per annum from the date relevant payment should have been made until the date payment is received in full.

f.    Any and all information in connection with the transaction(s) under the Assignment Agreement shall be treated as confidential by the YabDar, its officers, employees and representatives, and any of the YabDar's affiliates and shall not be disclosed to any third party in any form whatsoever without the CFSIT's prior express written consent, unless required by law or court order. If the YabDar is required by law or court order to disclose any such information, the YabDar shall provide the CFSIT prompt written notice of such requirement.

This Annex is executed on the first date written above and comes into force as of the effective date of the Assignment Agreement.

All the changes, annexes, additional agreements and amendments to the Assignment Agreement and this Annex will be valid only in done in writing and signed by the authorized representatives of all Parties.

This Annex supplements the Assignment Agreement and represents its integral part. All the provisions of the Assignment Agreement remain in full legal power and force unless specifically amended or ruled out by this Annex.

[SIGNATURE PAGE FOLLOWS]

8

© 2015 CFSIT, Inc. All rights reserved.

SIGNATURE PAGE

**Limited Liability Company "Yabluneviy dar"**
274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500
Bank details:
Beneficiary: LLC "Yabluneviy dar"
Account Number: 26008002005469
Beneficiary Bank: JSC Delta Bank, Kiev, Ukraine
SWIFT:DELKUAUK
Correspondent Bank: Deutsche Bank Trust Company Americas, New York, NY, USA
SWIFT: BKTRUS33

By: _____

Name: Roman Markiv

Title: Director

**CFSIT, Inc.**

1209 Orange Street, Wilmington, County of New Castle, State of Delaware with principal offices at 9350 Excelsior Boulevard, MS142-4B, Hopkins, Minnesota 55343, USA
Bank Details:
Beneficiary bank: Citibank, NA, New York, U.S.A.
SWIFT: CITIUS33XXX
ABA: 021000089
Bank Account: 30501068

By: _____

Name: _____

Title: **Jennifer Campbell**
**Authorized Signer**

© 2015 CFSIT, Inc. All rights reserved.

### Amendment № 1 to Assignment Agreement №AA4 as of 05 February 2015

**November 14, 2018**

This Amendment № 1 (the **"Amendment № 1"**) to Assignment Agreement №AA4 as of February 05, 2015 (the "**Assignment Agreement**") and to Annex 1 thereto of July 07, 2015 (the "**Annex**") is made on November 14, 2018 (the Assignment Agreement and the Annex, together, the "**Agreement**") by and between:

**CFSIT, Inc.,** registered at Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, DE, 19801, U.S.A. with principal place of business at 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A. , hereinafter referred to as "**CFSIT**" or the **"Initial Creditor"**, on one side, and

**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR" (ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР"),** registered at 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500, identification number 32475074 duly represented by Mr. Roman Markiv, acting based on Charter, hereinafter referred to as "**YabDar**" the **"New Creditor"**, on the other side.

The Initial Creditor and the New Creditor are individually referred to in this Amendment № 1 as a **"Party"** or collectively as the "**Parties**".

**WHEREAS:**

A. Under the Assignment Agreement the Initial Creditor assigned to the New Creditor and the New Creditor received the Claims. In consideration of the assignment of the Claims, the New Creditor agreed in the Annex to pay in favour of the New Creditor the Consideration in the amount of US Dollars 249,890.48 in 12 installments until February 05, 2021 with the first installment payable on May 05, 2018.

B. To secure the New Creditor's payment obligations under the Assignment Agreement, the New Creditor agreed in the Annex to provide the Initial Creditor with one or more pledges over the New Creditor's physical assets (collectively, "**Pledge**") then and currently subject to liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", with a total collateral value of more than 100% of the Consideration amount. The Annex required the New Creditor to provide the Pledge as soon as reasonably possible upon release of the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" but in any case, no later than May 05, 2018.

C. As of the date of this Amendment № 1 the New Creditor's physical assets have not yet been released from the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" nor pledged to the Initial Creditor.

D. The New Creditor has requested that the Initial Creditor extend the payment terms of the Consideration amount under the Agreement and the terms for provision of the Pledge to the Initial Creditor and the Initial Creditor is willing to provide the requested extension on the basis of the terms and conditions outlined in this Amendment № 1 below.

Taking the above into account, the Parties hereby have agreed as follows:

**AGREED TERMS:**

1. The Parties have agreed to supplement the Agreement with the following Definitions section.

DEFINITIONS:

Capitalized terms used herein but not defined shall have the same meanings as defined in the Agreement.

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

© 2018 CFSIT, Inc. All Rights Reserved.

"**Asset Disposition**" of any Person means the sale, lease or conveyance or other disposition of assets (including, without limitation, any capital stock of any TB Fruit Group company or subsidiary of such Person held directly or indirectly by such Person), whether owned on the date hereof of hereafter acquired, in one or more related transactions, outside of the ordinary course of business (other than a sale, lease, conveyance or other disposition by such Person or a subsidiary of such Person to such Person or a wholly owned subsidiary of such Person, including any such disposition by means of a merger, consolidation or similar transaction).

"**Business Day**" shall mean any day, other than a Saturday or Sunday, on which banks are not authorised to close in Kyiv (Ukraine) and New York (USA).

"**Cargill Entity**" shall mean any company or legal entity which from time to time directly or indirectly controls, is controlled by, or is under common control of the Initial Creditor, whether or not such company or other legal entity is in existence at the time this Amendment № 1 is signed by the Parties.

"**Change of Control Event**" means an event or series of events which:

(i) any Person, either individually or acting in concert with one or more other Persons, shall have acquired beneficial ownership (provided that a Person shall not be deemed to be the beneficial owner of shares tendered pursuant to a tender offer made by that Person or its Affiliate until the tendered shares are accepted for purchase), directly or indirectly, of equity interests of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company, or

(ii) *(1)* another corporation merges into TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company or *(2)* Mr. Taras Barshchovskyy, TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company conveys, transfers or leases all or substantially all its assets to any Person or group, in one transaction or a series of transactions, or

(iii) the failure at any time of TB Fruit Holding Establishment (Liechtenstein) legally and beneficially to own and control 100% of the issued and outstanding shares of capital stock of its subsidiaries held by TB Fruit Holding Establishment (Liechtenstein) as of the date of this Amendment №1, or the failure at any time of TB Fruit Holding Establishment (Liechtenstein) to have the ability to elect all the majority of the board of directors or other governing bodies of any of its subsidiaries, or

(iv) the failure of, at any time, Mr. Taras Barshchovskyy to legally and beneficially own and/or control 100% of the issued and outstanding share of capital stock of TB Fruit Holding Establishment (Liechtenstein), and/or any other TB Fruit Group company directly or indirectly owned or subsequently acquired by Mr. Taras Barshchovskyy.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**TB Fruit Group**" means and includes any and all Persons that directly or indirectly through one or more intermediaries, is controlled by *Mr. Taras Barshchovskyy* and/or controls, is controlled by, or is under common control with YabDar and/or any of the Guarantors. "Control" (including the terms "controlled by" and "under common control with") means the direct or indirect ownership or control of more than 50% of the voting rights or equity shares of such Persons.

Any reference in the Assignment Agreement to "this Agreement" and in the Annex to "this Annex" shall be deemed to be a reference to the Assignment Agreement and the Annex as amended, modified and/or supplemented from time to time (including by this Amendment № 1).

## 2. AMENDMENT TO THE ASSIGNMENT AGREEMENT:

Subject to terms and conditions of this Amendment № 1 the Parties agree:

© 2018 CFSIT, Inc. All Rights Reserved.

2.1. To amend and restate clause 5.3 of the Assignment Agreement as follows:

"5.3. (i) Subject to sub-clause (iv) of this clause 5.3., any notice or communication given to a Party under or in connection with this Agreement (and any amendment or supplement) shall be in writing and shall be delivered by hand, by third party courier service, by fax and/or by electronic mail, in each case to that Party's address, fax number or electronic mail address specified in, as applicable to that Party, as specified in this clause 5.3. (or to such other address, fax number or electronic mail address as that Party may notify to the other Party in accordance with this clause 5.3.).

a.  If to the Initial Creditor:
For the attention of Nancy Nelson
Address: 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A.
Fax number: + 41 22 703 2841
E-mail address: Nancy_Nelson@cargill.com

b.  If to the New Creditor:
For the attention of Roman Markiv
Address: 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500
Fax number: +38 03231 3-27-84
Email: r.markiv@tbfruit.com

(ii) Subject to sub-clause (iii) of this clause 5.3., delivery of a notice is deemed to have taken place (provided the requirements of sub-clause (i) of this clause 5.3. have been satisfied):

a. if delivered by hand, on the day and time the notice is delivered;
b. if sent by third party courier service, on the third Business Day after depositing such notice with the courier (excluding the date of deposit);

c. if sent by fax, on the earlier of the day and time shown in a transmission report indicating a satisfactory transmission and a confirmation of receipt obtained from the sender's facsimile machine; and

d. if sent by electronic mail, on the day and at the time that the electronic mail was read as shown in a read receipt, on the day and at the time the electronic mail was delivered as shown in a delivery receipt or on the day and at the time of receipt of an acknowledgement from the recipient indicating a satisfactory transmission (whichever is the earlier).

(iii) In the case of delivery by hand, by fax or by email, if the deemed receipt does not take place inside business hours (meaning 9.00 am to 5.30 pm on any day, other than a Saturday or Sunday, on which banks are not authorized to close in the place of deemed receipt), then deemed receipt will occur when business next starts in the place of receipt (and all references to time are to local time in the place of receipt).

(iv) This clause 5.3. does not apply to the service of any proceedings or other documents in any legal action."

2.2. To change numbering of Section II (*Payment Terms*) of the Annex to Section III (*Payment Terms*);

2.3. To change numbering of Section II (*Security of Payment*) of the Annex to Section IV (*Security of Payment*);

2.4. The table of Repayment Dates specified in the second paragraph of Section III (*Payment Terms*) of the Annex shall be replaced in its entirety and supplemented as follows:
"

| Repayment Date | Consideration amount due, USD |
|---|---|
| 15 February 2022 | *$16,659.37* |
| 15 May 2022 | *$16,659.37* |
| 15 November 2022 | *$16,659.37* |
| 15 February 2023 | *$16,659.37* |
| 15 May 2023 | *$16,659.37* |
| 15 November 2023 | *$16,659.37* |

© 2018 CFSIT, Inc. All Rights Reserved.

| 15 February 2024 | $16,659.37 |
| 15 May 2024 | $16,659.37 |
| 15 November 2024 | $16,659.36 |
| 15 February 2025 | $16,659.36 |
| 15 May 2025 | $16,659.36 |
| 15 November 2025 | $16,659.36 |
| 15 February 2026 | $16,659.36 |
| 15 May 2026 | $16,659.36 |
| 15 November 2026 | $16,659.36 |

The New Creditor irrevocably and unconditionally acknowledges and confirms its payment obligation as envisaged in the table above in the total amount of US Dollars 249,890.48, without prejudice to the Conditional Discount provisions as stated below."

2.5.    The provisions of Clause 2.4 of this Amendment № 1 and any reference to the Conditional Discount shall come into effect upon satisfaction (or waiver by the Initial Creditor) of each of the conditions precedent specified in Section 3 hereof .

2.6. To add a the following at the end of Section III (*Payment Terms*) of the Annex as follows:

"In the event the Repayment Date falls on a non-Business Day, the next following Business Day shall be considered as the Repayment Date.

Notwithstanding the above, if (a) the New Creditor fails to make any payment of Consideration when due for payment hereunder, or (b) any Affiliate of the New Creditor fails to make any payment of any indebtedness to any Cargill Entity when due, or (c) any other event of default as specified in Section VII (*Default*) of the Annex has occurred, then the Repayment Dates as specified in the Annex prior to the effectiveness of Amendment № 1 to the Assignment Agreement and this Annex shall be reinstated without any demand, protest or notice of any kind, all of which are hereby expressly waived by the New Creditor. The Initial Creditor retains full rights to enforce any and all payments in accordance to such an original payment schedule.

Subject to the provisions of this paragraph, the Initial Creditor agrees to provide a discount in the amount up to 15% of the Consideration ("**Conditional Discount**"). The Conditional Discount will be proportionally applied to the instalments of the Consideration payable by the New Creditor to the Initial Creditor in 2026 as follows:

| **Repayment Date** | **Consideration amount due, USD** | **Conditional Discount amount, USD** |
| --- | --- | --- |
| 15 February 2026 | $16,659.36 | $12,494.52 |
| 15 May 2026 | $16,659.36 | $12,494.52 |
| 15 November 2026 | $16,659.36 | $12,494.53 |

The provision of the Conditional Discount is subject to (a) the full and timely repayment of (i) all amounts due on each and every Repayment Date up to and including the Repayment date of 15 November 2025, and (ii) all other indebtedness of TB Fruit Group companies to the Initial Creditor and/or any Cargill Entity, including the payment obligations of FRANCOSO CORPORATION LIMITED under the Raw Materials Purchase, Inventory and Receivables Financing Agreements No 02 2017 and No 03 2017 dated January 30, 2017 (as further amended) ("**RMPIR Financing Agreements**"); and (b) there having been no event of default as specified in Section VII (*Default*) of Annex."

2.7. The first paragraph of Section IV (*Security of Payment*) of Annex shall be replaced in its entirety with the following:

"To secure YabDar's payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause the assets (located at:
1. 274-a Lvivska str., Gorodok, Lviv region, 81500, Ukraine
2. 62 Kopitka str., Lypovets, Vinnytska region, 22500, Ukraine
3. 7 Gagarina str., New Ushitsya, Novouushitsky district, Khmelnytsky region, 32600, Ukraine
4. 3 Kamenetsky highway, Slobokivtsi, Yarmolinetsky district, Khmelnytsky region, 32162, Ukraine

© 2018 CFSIT, Inc. All Rights Reserved.

5. 5 Kharkiv str., Zatishya, Kharkiv district, Kharkiv region, 62406, Ukraine) or any other assets satisfactory to CFSIT ("**YabDar Assets**") to be pledged in favour of CFSIT with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "**Pledge**").

YabDar undertakes to arrange for the Pledge as soon as reasonably possible after the release of the YabDar Assets from the current liens in favour of Delta Bank but in any case, no later than December 31, 2019. The collateral value shall be determined based on the following formula: 80% of market value of the respective YabDar Assets (based on independent appraisal executed by an appraiser satisfactory to CFSIT at or immediately before the execution of the Pledge)".

2.8. The fourth paragraph of Section IV (*Security of Payment*) of Annex commencing with the words "If for any reason the Pledge" and ending with the words "and this Annex on each of the Repayment Dates", shall be replaced in its entirety with the following:

"If for any reason (a) the assets subject to the Pledge do not have a total collateral vale of more than 100% of the Senior Debt Amount outstanding, or (b) the Pledge, duly perfected, is not provided to Cargill by December 31, 2019, YabDar shall provide CFSIT with an additional and/or a substitute pledge acceptable to CFSIT".

2.9. To add Section VI (*Covenants*) right after Section V (*Representation and Warranties*) of the Annex as follows:

(a) "Unless CFSIT agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entities shall not be permitted to cause or permit a Change of Control Event.

If a Change of Control Event is agreed with CFSIT, Mr. Taras Barshchovskyy, YabDar and/or the respective TB Fruit Group entity shall give a written notice to CFSIT at least 30 days before such Change of Control Event stating:

   i.   that a Change of Control Event is to occur and that CFSIT has the right to require repayment of all the outstanding amounts under RMPIR Financing Agreements and the outstanding Consideration and other amounts under the Assignment Agreement at the time of the Change of Control Event. If, as a result of the Change of Control Event any of YabDar, Guarantors, Mr. Taras Barschovskyy or any other TB Fruit Group entity are to receive any cash proceeds, such cash proceeds shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts comprising the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.
   ii.  the circumstances and relevant facts regarding the Change of Control Event,
   iii. the purchase date in relation to such Change of Control Event (which shall be no earlier than 30 and no later than 60 days after such notice is given),
   iv.  whether the tenders will be irrevocable and the purchase price offered in relation to such Change of Control Event.

Failure to give the requisite notice to CFSIT within the time provided above shall constitute an event of default and an acceleration event under the Assignment Agreement allowing CFSIT to exercise all of its rights in the last paragraph of Section VII (*Default*) of the Annex.

(b) Unless CFSIT agrees in writing, YabDar, Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entity shall not be permitted to make Significant Asset Sales, where such Significant Asset Sale means an Asset Disposition involving assets with a fair market value in excess of US Dollars 5,000,000.00 and which is paid in cash or cash equivalents including payments in respect of deferred payment obligations when received in the form of cash or cash equivalents ("**Net Cash Proceeds**"). Net Cash Proceeds shall be net of (i) taxes payable as a result of such Significant Asset Sale, and (ii) payments made to retire indebtedness where payment of such indebtedness is secured by assets or properties which are the subject of such Significant Asset Sale. If an Asset Disposition occurs, the Net Cash Proceeds from such Significant Asset Sale shall be applied in the following priority to repay (i) any past due

© 2018 CFSIT, Inc. All Rights Reserved.

amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts under the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

(a) Unless CFSIT agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any of their Affiliates shall not together incur any capital expenditures in the in excess of US Dollars 2,500,000.00 per calendar year according to International Financial Reporting Standards effective on the date of this Amendment № 1. Notwithstanding the foregoing, this limitation does not cover the on-going investment projects in relation to the pectin production line (with its total planned investment of Euro 5.2 million of which Euro 4.77 million has already been reported as invested as of January 31, 2017) or construction of the management office building (with its total planned investment of Euro 0.5 million, of which Euro 0.43 million has already been reported as invested as of January 31, 2017).

2.10.    To change numbering of Section VI (*Default*) of the Annex to Section VII (*Default*).

2.11.    To amend and restate part b. of Section VII (*Default*) of the Annex as follows:

"b. fails to perform or observe any other term, covenant or agreement contained in Section V (*Representations & Warranties*) (a) through and including (u), in Section VI (*Covenants*) or breaches any other term, covenant, agreement or undertaking under the Assignment Agreement or the Annex or any other assignment or annex to which any Cargill Entity and any member of the TB Fruit Group are party".

2.12.    To amend and restate part g. of Section VII (*Default*) of the Annex as follows:

"g. a Change of Control Event or Significant Asset Sale has occurred without prior written consent of CFSIT";

2.13.    To change numbering of Section VII (*General Provisions*) of the Annex to Section VIII (*General Provisions*).

## 3.  CONDITIONS PRECEDENT

The provisions of Clause 2.4 to this Amendment № 1 and the Conditional Discount are subject to the satisfaction (or waiver by the Initial Creditor) of each of the following conditions ("**Conditions Precedent**")

3.1.    The Initial Creditor has received from the Guarantors the originals of the duly executed amendments to the existing guarantees (guaranteeing the New Creditor's obligations under the Agreement) extending the term of the guarantees in a substance and form acceptable to the Initial Creditor.

3.2.    The Initial Creditor has received the original of the duly executed first-demand unconditional irrevocable guarantee issued by Mr. Taras Barschovskyy in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor in replacement of the existing Suretyship Agreement made on July 07, 2015.

3.3.    The Initial Creditor has received the originals of the duly executed first-demand unconditional irrevocable guarantees issued by the following companies of TB Fruit Group in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor.

- "T.B. FRUIT" S.R.L. (Moldova*)*;
- TB Fruit Polska Sp. z o.o. S.K.A. (Poland);
- LLC "Tank Trans Ukraine" (Ukraine);
- Tank Trans Polska Sp z o.o. (Poland);
- AMELIANA HOLDINGS LTD (Cyprus).

Collectively "T.B. FRUIT" S.R.L. (Moldova),  TB Fruit Polska Sp. z o.o. S.K.A. (Poland), LLC "Tank Trans Ukraine" (Ukraine), Tank Trans Polska Sp z o.o. (Poland), AMELIANA HOLDINGS LTD (Cyprus) are further referred to as "**New Guarantors**", each of them – "**New Guarantor**".

3.4.    The Initial Creditor has received the originals of the duly executed amendments to the Deed of Pledge of Shares in FRANCOSO CORPORATION LIMITED dated January 30, 2017 and Deed of Pledge of Shares in

© 2018 CFSIT, Inc. All Rights Reserved.

AMELIANA HOLDINGS LTD dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein) and Cargill Financial Services International, Inc. expanding the scope of the secured obligations and securing the New Creditor's payment obligations in favour of the Initial Creditor in a substance and form satisfactory to the Initial Creditor (each - "**Amendment to the Deed of Pledge of Shares**", collectively - "**Amendments to the Deeds of Pledge of Shares**").

3.4. The Initial Creditor has received the originals of the duly executed amendments to Escrow Agreement dated January 30, 2017 and Escrow Agreement dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein), Cargill Financial Services International, Inc. and Dr. K. Chrysostomides & Co. LLC (Cyprus) in a substance and form satisfactory to the Initial Creditor.

3.5. Within ten (10) calendar days after the date of execution of this Amendment № 1 the New Creditor undertakes that it will cause Dr. K. Chrysostomides & Co. LLC (Cyprus) to submit a certified copy of each Amendment to the Deed of Pledge of Shares to the Commissioner of Stamp Duty of the Republic of Cyprus for the obtainment of an verbal ruling as to whether stamp duty is payable thereon and if so, to which amount. At the request of the Initial Creditor the New Creditor shall furnish to the Initial Creditor a written confirmation of the above mentioned submission made to the Commissioner of Stamp Duty of the Republic of Cyprus.

## 4. GENERAL PROVISIONS, MUTUAL ACKNOWLEDGMENTS AND ASSURANCES

4.1. The Parties make the following representations and acknowledgements, as applicable, as of the date of this Amendment № 1:

(i) no Change of Control Event has occurred or is occurring in relation to the New Creditor and the New Creditor continues to be fully beneficially owned and controlled by Mr. Taras Barshchovskyy;

(ii) the New Creditor confirms that it has received and accepted from the Initial Creditor all the documentation (originals, certified copies and copies) in relation to the Claims assigned under the Agreement to the New Creditor's full and final satisfaction.

(iii) The New Creditor acknowledges that there are no other documents expected or pending to be provided by the Initial Creditor to the New Creditor;

(iv) the New Creditor confirms that it has obtained all necessary and material information and disclosures from the Initial Creditor in relation to the Claims and, without relying on the Initial Creditor, made its own analysis of the Claims and all such obtained information to the New Creditor's full and final satisfaction;

(v) the Parties further confirm and acknowledge, that the Initial Creditor in addition to the transfer of the documentation outlined in sub-clause ii) above has performed the following actions:

    (a) served a default and acceleration notice dated February 05, 2015 to the Debtor; and

    (b) informed the Debtor about the assignment in favour of the New Creditor no later than 3 (three) Business Days from the effective date of the Assignment Agreement.

Both Parties acknowledge and agree that the Initial Creditor with its above actions fully satisfied, complied with and performed all of its obligations under the Agreement in connection with the Claims and that no other actions were or are required or intended to be performed by the Initial Creditor under the Agreement.

4.2. This Amendment № 1 shall come in force on the date of its signing by the authorized persons of the Parties.

4.3. All other terms and conditions of the Agreement remain unchanged.

4.4. This Amendment № 1 shall be signed in two copies in English, one for each Party, both copies having equal legal power.

5.4. Any dispute arising out of or in connection with Amendment № 1 including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the

© 2018 CFSIT, Inc. All Rights Reserved.

London Court of International Arbitration (LCIA), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the Amendment № 1 shall be the substantive laws of New York (excluding conflicts of laws principles).

5.5. This Amendment № 1 is an integral part of the Agreement.

**The Initial Creditor:**
**CFSIT, Inc.**
9320 Excelsior Boulevard,
Hopkins, MN 55343, U.S.A.
Receiving Bank: JP Morgan Chase, N.A., New York
Swift Code: CHASUS33XXX
ABA: 021000021
Account No: 878359624

Authorized Signatory

Jennifer Campbell
Trade Finance Specialist

**The New Creditor:**
**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR"**
**(ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР"),**
274a, Lvivska str., Gorodok,
Lvivska oblast', Ukraine 81500,
Identification no. 32475074

US Dollars Account: 26009010003864
Beneficiary bank:
BANK PIVDENNYI, Odessa, Ukraine
SWIFT CODE: PIVDUA22
Intermediary:
THE BANK OF NEW YORK MELLON, New York, USA
SWIFT CODE: IRVTUS3N

Roman Markiv

Authorized Signatory

© 2018 CFSIT, Inc. All Rights Reserved.

## ASSIGNMENT AGREEMENT № AA5

*As of 05 February 2015*
*Kyiv (Ukraine)*

**PARTY 1:** Legal entity that is incorporated in the state of Delaware and is acting in accordance with the laws of the United States of America, **Cargill Financial Services International, Inc.**, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA, hereinafter - *"Initial Creditor"*, represented by Kristin Lee Wessels, acting under the power of attorney issued, notary certified and apostiled on 13 October 2014, and

**PARTY 2:** Legal entity that is incorporated and is acting in accordance with the laws of Ukraine, **Limited Liability Company "YABLUNEVIY DAR"**, located at 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine, hereinafter - *"New Creditor"*, identification code 32475074, represented by Acting Executive Director R. V. Markiv, acting on the basis of the Charter,

*hereinafter collectively – the **"Parties"**, and each individually referred to as a **"Party"**, have concluded the present Assignment Agreement, hereinafter – the **"Agreement"** as follows:*

### ARTICLE 1.
### SUBJECT MATTER OF THE AGREEMENT

1.1.    The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) under the following documentary instruments and all the related documentation as applicable (further – the **"Claims"**):

## ДОГОВІР ВІДСТУПЛЕННЯ ПРАВ ВИМОГИ № AA5

*Від 05 лютого 2015 року*
*місто Київ (Україна)*

**СТОРОНА 1:** Юридична особа, яка створена в штаті Делавер та діє за законодавством Сполучених Штатів Америки, **Каргілл Файненшіал Сервісіс Інтернешнл, Інк. (Cargill Financial Services International, Inc.)**, зареєстрована за адресою 1209 Орандж Стріт, Уілмінгтон, округ Ньюкасл, штат Делавер (1209 Orange Street, Wilmington, County of New Castle, State of Delaware), фактичне місцезнаходження: бульв. Ексельсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA), надалі за текстом - *"Первісний Кредитор"*, в особі Крістін Лі Вессел, яка діє на підставі Довіреності, виданої, нотаріально посвідченої та апостильованої 13 жовтня 2014 року, та

**СТОРОНА 2:** Юридична особа, яка створена та діє за законодавством України, **Товариство з обмеженою відповідальністю «ЯБЛУНЕВИЙ ДАР»**, місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А, надалі за текстом - *"Новий Кредитор"*, ідентифікаційний код 32475074, в особі Тимчасово виконуючого обов'язки виконавчого директора Р. В. Марківа, який діє на підставі Статуту,

*надалі за текстом разом - **"Сторони"**, а окремо **"Сторона"**, уклали цей Договір відступлення прав вимоги, надалі – **"Договір"**, про наступне:*

### СТАТТЯ 1.
### ПРЕДМЕТ ДОГОВОРУ

1.1.    Первісний Кредитор передає, а Новий Кредитор одержує всі та будь-які права вимоги (включаючи права на отримання надходжень та процентів) за наступними документарними інструментами та іншими пов'язаними з ними документами (надалі – **«Права вимоги»**):

1

all claims of the creditor (beneficiary) under the following documentary instruments issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the *"Debtor"*, for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

1) Irrevocable letter of credit No. LC/IM/12/112013 in the amount of 4,999,280.00 US Dollars;

2) Irrevocable letter of credit No. LC/IM/14/122013 in the amount of 10,598,390.00 US Dollars;

1.2. The assignment of the Claims becomes effective on the date set forth above;

1.3. In consideration of the aforementioned assignment, the New Creditor agrees to make a payment in favour of the Initial Creditor of the face value of the Claims in United States Dollars (*"USD"*) (*i.e.* USD 15,597,670.00) within five (5) years from the date of execution of this Agreement under the conditions to be agreed by the Parties in a separate agreement.

### ARTICLE 2.
### RIGHTS AND OBLIGATIONS OF THE PARTIES

2.1. **Initial Creditor shall**:

2.1.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, transfer to the New Creditor all documents which confirm the Claims assigned hereunder to be reflected in a certificate of transfer and acceptance of documents to be signed by the Parties, unless such documents have been transferred by the Initial

всі права кредитора (бенефіціара) за наступними документарними інструментами, випущеними ПУБЛІЧНИМ АКЦІОНЕРНИМ ТОВАРИСТВОМ «ДЕЛЬТА БАНК», надалі за текстом – *«Боржник»*, на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до них:

1) Безвідкличний акредитив № LC/IM/12/112013 на суму 4 999 280,00 доларів США;

2) Безвідкличний акредитив № LC/IM/14/122013 на суму 10 598 390,00 доларів США;

1.2. Відступлення Прав вимоги набирає чинності з дати зазначеної вище;

1.3. В якості оплати за вищезазначене відступлення Прав вимоги Новий Кредитор погоджується сплатити на користь Первісного Кредитора кошти у розмірі номінальної вартості Прав вимоги в доларах США (*«USD»*) (а саме 15 597 670,00 доларів США) впродовж 5 (п'яти) років з дати укладення цього Договору на умовах, що будуть погоджені Сторонами в окремому договорі.

### СТАТТЯ 2.
### ПРАВА ТА ОБОВ'ЯЗКИ СТОРІН

2.1. **Первісний Кредитор зобов'язаний**:

2.1.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, передати Новому Кредитору всі документи, що підтверджують Права вимоги, що передаються за цим Договором, про що Сторонами складається відповідний акт прийому-передачі документів, у випадку, якщо такі документи не були передані Первісним Кредитором Новому Кредиторові до моменту набрання чинності цим

Creditor to the New Creditor before this Agreement came in to force;

2.1.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor;

2.1.3. perform other obligations as set out by the applicable laws.

**2.2. New Creditor shall:**

2.2.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, accept from the Initial Creditor all documents confirming the Claims assigned hereunder in accordance with the respective certificate of transfer and acceptance of documents;

2.2.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor.

*ARTICLE 3.*
**REPRESENTATIONS**

3.1. The Parties are companies duly established and validly existing under the laws of countries of their incorporation;

Договором;

2.1.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором;

2.1.3. виконувати інші обов'язки, передбачені законодавством, що застосовується.

**2.2. Новий Кредитор зобов'язаний:**

2.2.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, прийняти від Первісного Кредитора всі документи, які підтверджують Права вимоги, що відступаються за цим Договором, за відповідним актом прийому-передачі документів;

2.2.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором.

*СТАТТЯ 3.*
**ЗАЯВИ**

3.1. Сторони є юридичними особами, належним чином створеними та існуючими відповідно до законодавства країн їх реєстрації;

3

3.2. The Parties have full power and authority to conclude, execute and deliver this Agreement and to fully perform their obligations hereunder, and the persons signing this Agreement on their behalf are legally authorised by the Parties to do so;

3.3. All corporate consents required for the execution and performance of the Parties' obligations under this Agreement have been unconditionally and irrevocably granted and are in full force and effect;

3.4. The Initial Creditor represents that the Claims are valid and assignable; the Initial Creditor represents that it has provided the claims to the Debtor to make the Claims due;

3.5. The Parties entered into this Agreement and were induced to do so relying solely on the representations stated in Article 3;

3.6. The New Creditor acknowledges that it has made its own analysis of the Debtor and the above details and has reached its own decision to enter into this Agreement without reliance on the Initial Creditor or any Cargill entity, except for the representations contained in this Article 3;

3.7. The Parties hereby agreed that no recourse to the Initial Creditor shall apply in relation to the Claims assigned hereunder, except for by operation of law and/or if any of the representations stipulated by Article 3 have been breached by the Initial Creditor.

### ARTICLE 4.
### DISPUTE RESOLUTION

4.1. Any dispute arising out of or in

---

3.2. Сторони мають повний обсяг повноважень на укладання цього Договору та виконання в повному обсязі своїх обов'язків за цим Договором; особи, що підписують цей Договір від імені Сторін, уповноважені на вчинення таких дій Сторонами;

3.3. Всі корпоративні погодження, необхідні для укладання та виконання зобов'язань Сторін за цим Договором, були безумовно та безвідклично отримані та є повністю чинними;

3.4. Первинний Кредитор заявляє, що Права вимоги є чинними та такими, що можуть бути відступлені; Первісний Кредитор заявляє, що ним надано Боржникові вимоги, зробивши Права вимоги такими, строк виконання яких настав;

3.5. Сторони при укладенні цього Договору покладались виключно на заяви, вказані в Статті 3;

3.6. Новий Кредитор підтверджує, що ним було зроблено власний аналіз Боржника та вищезазначених деталей, та прийнято самостійне рішення укласти цей Договір не покладаючись на Первинного Кредитора або будь-яку особу групи Каргілл, за виключенням заяв викладених в Статті 3;

3.7. Підписанням цього Договору Сторони погоджуються з тим, що по відношенню до Первісного Кредитора не застосовується право регресу у зв'язку з Правами вимоги, відступленими за цим Договором, крім як в силу закону та/або якщо будь-яка із заяв, визначених в Статті 3, буде порушена Первісним Кредитором.

### СТАТТЯ 4.
### ВРЕГУЛЮВАННЯ СПОРІВ

4.1. Будь-який спір, що виникає з цього

4

connection with this Agreement including its validity or termination shall be referred to and finally settled by London Court of International Arbitration in accordance with its Rules which shall be incorporated into this Agreement by reference. The number of arbitrators – three (3), place of arbitration – London (the United Kingdom of Great Britain and Northern Ireland), language of proceedings – English. The arbitration award shall be final and binding on all Parties.

### ARTICLE 5.
### FINAL PROVISIONS

5.1. This Agreement comes into effect from the moment of its conclusion and remains in effect until complete fulfillment of liabilities by the Parties.

5.2. All appendices, amendments and/or addendums to the present Agreement have to be executed in the written form, signed by duly authorized representatives of the Parties and sealed with the stamp (if required/applicable) with obligatory reference to this Agreement. Such appendices, amendments and/or addendums shall be an integral part of the present Agreement from the moment of their execution in the abovementioned order;

5.3. All notices under this Agreement shall be considered properly served in case they are made in writing and sent by courier, facsimile or hand delivered to the addresses of the Parties mentioned herein. The date of receipt of such notices shall be the date of their hand delivery or the date when transmitted electronically;

5.4. This Agreement shall be governed by and construed in accordance with the laws of New York

Договору або у зв'язку з ним, включаючи будь-які питання стосовно його дії або розірвання, мають бути передані та остаточно вирішені Міжнародним арбітражним судом Лондону (London Court of International Arbitration) у відповідності до його Регламенту, який вважається включеним шляхом послання у цьому пункті. Кількість арбітрів – 3 (три), місце арбітражного розгляду – Лондон (Сполучене Королівство Великобританії та Північної Ірландії), мова розгляду – англійська. Арбітражне рішення є остаточним та обов'язковим для всіх Сторін.

### СТАТТЯ 5.
### ЗАКЛЮЧНІ ПОЛОЖЕННЯ

5.1. Цей Договір набирає чинності з моменту його укладення та діє до остаточного виконання Сторонами прийнятих на себе зобов'язань;

5.2. Усі додатки, зміни та/або доповнення до цього Договору мають бути вчинені в письмовій формі, підписані належним чином уповноваженими на те представниками Сторін та скріплені відбитками печаток (якщо вимагається/застосовується), з обов'язковим посиланням на цей Договір. Такі додатки, зміни та/або доповнення з моменту їх вчинення у вищевказаному порядку є невід'ємними частинами даного Договору;

5.3. Усі повідомлення за цим Договором будуть вважатися зробленими належним чином у разі, якщо вони здійснені у письмовій формі та надіслані кур'єром, факсом або вручені особисто за зазначеними адресами Сторін. Датою отримання таких повідомлень буде вважатися дата їх особистого вручення або дата передачі електронними засобами;

5.4. Цей Договір регулюється та тлумачиться згідно з правом Нью-Йорку (за виключенням колізійних норм);

(excluding conflicts of laws principles);

5.5. The New Creditor represents that it is registered as a payer of corporate profit tax on general terms in accordance with the Tax Code and applicable laws of Ukraine. The Initial Creditor represents that it is a tax resident of the United States of America;

5.6. The invalidity of any separate provision of this Agreement shall not cause invalidation of the whole Agreement as long as the Agreement might have been concluded without such provisions. In case any provision of this Agreement is recognized invalid or contradictory to applicable laws of New York by the court or any competent state authority in each individual case this shall not impact the application of such provisions in all other cases and the validity of other provisions of the Agreement. In such case the Parties shall draft in good faith a new provision of the Agreement to reflect to the fullest extent the intention of the Parties at the time of making this Agreement;

5.7. Each Party shall notify in writing another Party about change of any of its details within three (3) days;

5.8. This Agreement is made in three (3) original copies in English and Ukrainian languages, having equal legal force. In case of any discrepancies the English version prevails;

5.9. All payments made under this Agreement, including but not exclusive to payments under a separate agreement to be entered into by the Parties as provided in clause 1.3 above, shall be made in immediately available funds,

5.5. Новий Кредитор підтверджує, що він є платником податку на прибуток на загальних умовах відповідно до Податкового Кодексу України та застосовного законодавства України. Первісний Кредитор підтверджує, що він є податковим резидентом Сполучених Штатів Америки;

5.6. Недійсність окремих положень цього Договору не спричиняє недійсність Договору в цілому, оскільки можна припустити, що цей Договір міг би бути укладений без включення до нього таких положень. Якщо будь-яке з положень цього Договору буде визнано судом чи іншим уповноваженим державним органом недійсним чи таким, що суперечить чинному праву Нью-Йорку, в кожному конкретному випадку, таке визнання не буде впливати на застосування таких положень у всіх інших випадках та на дійсність інших положень Договору. В такому випадку, Сторони зобов'язуються сумлінно розробити нове положення Договору такого змісту, який би у повній мірі відображав ті наміри, що існували в них в момент укладання цього Договору;

5.7. У разі зміни реквізитів однієї з Сторін відповідна Сторона зобов'язана в триденний строк письмово повідомити про це другу Сторону;

5.8. Цей Договір укладено в 3 (трьох) оригінальних примірниках українською та англійською мовою, які мають однакову юридичну силу. У випадку виникнення розбіжностей, переважну силу матиме текст, викладений англійською мовою;

5.9. Усі платежі, що мають бути вчинені згідно з цим Договором, включаючи але не обмежуючись платежами на підставі окремого договору, що має бути укладений Сторонами згідно з п. 1.3 цього Договору, повинні бути здійснені вільними грошовими коштами без

without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority;

5.10. This Agreement represents the whole and only agreement between the Parties in relation to the Claims assignment and supersedes any previous agreement (whether written or oral) between the Parties in relation to its subject matter;

5.11. The Parties accept the legal power and validity of the signed Agreement received via fax or via e-mail, as well as of all the document related to it (annexes, additions, protocols, amendments, schedules, etc.), signed and received in the same manner, with subsequent confirmation by means of originals.

**IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as a Deed on the day, month and year first written above.**

### PARTY 1:

**INITIAL CREDITOR**
**Cargill Financial Services International, Inc.**

Address: 9350 Excelsior Boulevard, MS142-4B, Hopkins, MN 55343, USA Account No.: CITIBANK N.A., NEW YORK, ABA 021000089, ACCOUNT No. 38490869, SWIFT CITIUS33

Authorized person

_Kristin Wessels_ / **Kristin Lee Wessels** /

---

відрахувань та зобов'язань по відрахуванню будь-яких існуючих або майбутніх податків, мит, зборів, включаючи збори, мита або податки на прибуток нерезидентів, встановлені урядом України або будь-якими іншими державними або податковими органами;

5.10. Цей Договір становить повний та єдиний договір між Сторонами щодо відступлення Прав вимоги, а також замінює собою будь-які попередні договори (письмові та усні) між Сторонами щодо його предмета;

5.11. Сторони визнають юридичну силу та чинність підписаного Договору, отриманого за допомогою факсу або електронної пошти, так само як і будь-яких пов'язаних документів (додатків, доповнень, протоколів, графіків тощо), які підписані та отримані таким же шляхом, з подальшим підтвердженням оригіналами.

**НА ПІДТВЕРДЖЕННЯ ЦЬОГО Сторони належним чином уклали цей Договір в спеціальній письмовій формі у день, місяць і рік, зазначені на початку цього Договору.**

### СТОРОНА 1:

**ПЕРВІСНИЙ КРЕДИТОР**
**Каргілл Файненшіал Сервісіз Інтернешнл, Інк.**
**(Cargill Financial Services International Inc.)**

Місцезнаходження: бульв. Екселсіор, 9350, MS 142-4В, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4В, Hopkins, MN 55343, USA)
Рахунок: CITIBANK N.A., NEW YORK, ABA 021000089, ACCOUNT No. 38490869, SWIFT CITIUS33

Уповноважена особа

_Kristin Wessels_ / **Крістін Лі Весселс** /

In the presence of witness:
(name)
(address)
(occupation)

*Nancy R. Nelson*
*Nancy Lou-Larsen Nelson*
*Tradefinance Specialist*
*Hopkins, MD USA* **PARTY 2:**

В присутності свідка:
(ім'я)
(адреса)
(вид занять свідка)

*Nancy R. Nelson*
*Nancy Lou-Larsen Nelson*
*Tradefinance Specialist*
*Hopkins, MD USA* **СТОРОНА 2:**

| | |
|---|---|
| **NEW CREDITOR**<br>**Limited Liability Company**<br>**"YABLUNEVIY DAR"** | **НОВИЙ КРЕДИТОР**<br>**Товариство з обмеженою відповідальністю**<br>**«ЯБЛУНЕВИЙ ДАР»** |
| Registered address: 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine<br>Identification code 32475074<br>Current Account № 26006000014224 (980) in PJSC "Ukrsotsbank", MFO 300023 | Місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А<br>Ідентифікаційний код 32475074<br>Поточний рахунок № 26006000014224 (980) в ПАТ «Укрсоцбанк»<br>МФО 300023 |

**Acting Executive Director**

/ R. V. Markiv /

**Тимчасово виконуючий обов'язки виконавчого директора**

/ Р. В. Марків /

In the presence of witness:
(name) *Oleksiy Gusarov*
(address) *Kyiv reg., Vyshgorodskyy dist., Novi*
(occupation) *advocate Petrivtsi, n/c 2208 "A"*

В присутності свідка:
(ім'я) *Алексій Гусаров*
(адреса) *Київська обл., Вишгородський р-н, с. Н. Петрівці,*
(вид занять свідка) *адвокат б/н 2208 "А"*

8

**ANNEX 1 TO THE ASSIGNMENT AGREEMENT NO. AA5
EXECUTED BY THE PARTIES AS OF FEBRUARY 5, 2015**

July 07, 2015

This Annex 1 ("Annex") to the Assignment Agreement (the **"Assignment Agreement"**) is made by and between among:

1)      Cargill Financial Services International, Inc., a Delaware USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA ("CFSI" or "Initial Creditor") and

2)      Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 ("YabDar" or "New Creditor"),

CFSI and YabDar are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

**WHEREAS:**

- CFSI and YabDar are the Parties to the Assignment Agreement,

- In accordance with Article 1.3 of the Assignment Agreement the Parties have agreed to execute the explicit payment terms under the Assignment Agreement in a separate agreement,

- YabDar has requested CFSI to provide deferred payment terms under the Assignment Agreement and CFSI is willing to provide such deferred payment terms on the conditions stipulated in this Annex 1 (the "Senior Debt Facility").

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

**I. DEFINITIONS**

**YabDar**      Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500

**Dar Assets**      Means YabDar assets pledged in favour of Delta Bank as of February 5, 2015.

**Delta Bank**      means PUBLIC JOINT-STOCK COMPANY "DELTA BANK", a bank duly registered under the laws of Ukraine.

Capitalized terms used herein but not defined shall have the same meanings as defined in the Assignment Agreement between the Parties.

**II. SUBJECT MATTER OF THE AGREEMENT**

The Parties agree to amend and restate Clause 1.1. of Article 1 of the Assignment Agreement as follows:

1.1.      The Initial Creditor assigns and the New Creditor receives any and all rights of claim

© 2015 Cargill Financial Services International, Inc. All rights reserved.

1

(including proceeds and interest) (the "Claims") under

1.a)  the following documentary instrument and all the related documentation as applicable: all claims of the creditor (beneficiary) under the following documentary instruments issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the "Debtor", for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

Irrevocable letter of credit No. LC/IM/12/112013 in the amount of 4,999,280.00 US Dollars;

Irrevocable letter of credit No. LC/IM/14/122013 in the amount of 10,598,390.00 US Dollars;

1.b)  CFSI's 100% interest, which is equal to USD 4,999,280.00 in the outstanding payment claims of CFSI on the Limited Liability Company "YABLUNEVIY DAR", Gorodok, Ukraine in relation to the Trade Related Loan Agreement 1650 2013 dated October 08, 2013, including any amendments thereto;

CFSI's 100% interest, which is equal to USD 10,598,390.00 in the outstanding payment claims of CFSI on the Limited Liability Company "YABLUNEVIY DAR", Gorodok, Ukraine in relation to the Trade Related Loan Agreement 1661 2013 dated December 09, 2013, including any amendments thereto.

## II. PAYMENT TERMS

In consideration for the assignment of the Claims, YabDar agrees to pay in favour of CFSI the amount of USD 15,597,670.00 (US Dollars Fifteen Million Five Hundred Ninety Seven Thousand Six Hundred Seventy and 00/100) (hereinafter – the "Senior Debt Amount" or "Consideration") in accordance with the terms and conditions set out below:

The repayment of the Senior Debt Amount shall be made in instalments on the following repayment dates (further collectively referred to as the "Repayment Dates"):

| | |
|---|---|
| 05 May 2018 | USD 779 883,50 |
| 05 Aug 2018 | USD 779 883,50 |
| 05 Nov 2018 | USD 779 883,50 |
| 05 Feb 2019 | USD 779 883,50 |
| 05 May 2019 | USD 779 883,50 |
| 05 Aug 2019 | USD 779 883,50 |
| 05 Nov 2019 | USD 779 883,50 |
| 05 Feb 2020 | USD 779 883,50 |
| 05 May 2020 | USD 2 339 650,50 |
| 05 Aug 2020 | USD 2 339 650,50 |
| 05 Nov 2020 | USD 2 339 650,50 |
| 05 Feb 2021 | USD 2 339 650,50 |

YabDar further agrees and acknowledges and hereby expresses its consent that upon the successful arrangement and provision of working capital financing by CFSI to T.B. Fruit Polska Sp. Z o.o. S.K.A., 109 Sandomierska str., 27-620 Dwikozy, Poland, the Polish affiliate of YabDar ("TB Fruit Poland") the Senior Debt Amount shall become interest bearing. The interest rate and interest periods shall be agreed by the Parties but in no case the interest rate shall be lower than 5% per annum and the interest period shall start to accrue on the outstanding Senior Debt Amount as of the date when the volume of working capital financing arranged for and/or provided to TB Fruit Poland reaches USD 40 million ("Interest Period Starting Date") and shall be payable every 180 days from the interest period starting date until the repayment of the

2

© 2015 Cargill Financial Services International, Inc. All rights reserved.

Senior Debt Amount.

YabDar also agrees and acknowledges that YabDar shall be deemed to fulfil its payment obligations only when CFSI gets money to its respective accounts.

YabDar shall bear the risk and costs of getting all external authorizations for payments out of Ukraine (including but not limited to licenses, permits, registrations, approvals or any other authorizations needed under the applicable legislation or bank practice at the time of payment). In case payments under the Assignment Agreement and this Annex become explicitly restricted or forbidden by the law at the time of payment and shall stay restricted or forbidden more than 15 consecutive days from the scheduled date of payment, YabDar shall immediately procure such payments by and from its affiliate: Francoso Corporation Limited, a legal entity duly registered under the laws of Cyprus having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus. The Parties hereto have agreed that any restriction or ban on payments outside Ukraine shall not be considered a force majeure event and such restriction or ban shall not extend, suspend or stop YabDar obligation to pay.

## II. SECURITY OF PAYMENT

To secure YabDar's Senior Debt Amount payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause YabDar Assets to be pledged in favour of CFSI to be of sufficient collateral value (meaning the three integral property complexes located in Ukraine) with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "Pledge"). YabDar undertakes to arrange for the said pledge as soon as reasonably possible after the release of YabDar Assets from the current liens made in favour of Delta Bank but in any case, no later than the first of the Repayment Dates. The collateral value shall be determined based on the following formula: market value of the respective complexes (based on most recent independent appraisal which shall be updated annually)*0.8.

YabDar undertakes to take all necessary actions required under the applicable legislation of Ukraine to cause the YabDar Assets to be pledged in favour of CFSI and all necessary actions to perfect such Pledge.

YabDar undertakes that the YabDar Assets to be pledged in favour of CFSI shall be made free and clear of any liens and/or any encumbrances.

If for any reason the Pledge cannot be arranged by YabDar by the first of the Repayment Dates, YabDar shall procure that CFSI receives no later than the said Repayment Date one other adequate security in the form of either:

- Standby letter of credit issued in the form acceptable to CFSI by a financial institution acceptable to CFSI in the amount equal to the obligations of YabDar under the Assignment Agreement and this Annex with an expiry date of no earlier than the last of the Repayment Dates plus 30 calendar days; OR

- Irrevocable first demand payment guarantees to be issued by a guarantor or guarantors acceptable to CFSI and in the form acceptable to CFSI covering the amount equal to the payment obligations of YabDar under the Assignment Agreement and this Annex and with a validity period equal to the last of the Repayment Dates plus 30 calendar days; OR

- YabDar shall pledge or cause any of the Guarantors to pledge in favour of CFSI its/their

3

© 2015 Cargill Financial Services International, Inc. All rights reserved.

sales proceeds from the contracts with third parties in the amount equal to or greater than the payment obligations of YabDar under the Assignment Agreement and this Annex on each of the Repayment Dates.

YabDar shall also procure the issuance of the following guarantees to CFSI by the following guarantors (hereinafter "the Guarantors") no later than 5 days from the date of this Annex:

- First Demand suretyship to be issued by Mr. Taras Barshchovskyy, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSI;

- First Demand payment guarantee to be issued by T.B. Fruit Polska Sp. z o.o. S.K.A., a legal entity duly registered under the laws of Poland having its registered address at 109 Sandomierska str., 27-620 Dwikozy, Poland, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSI;

- First Demand payment guarantee to be issued by Francoso Corporation Limited, a legal entity duly incorporated under the laws of Cyprus, having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus ("Francoso Corporation Limited"), covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSI.

## V. REPRESENTATIONS & WARRANTIES

In addition to the Representations in the Assignment Agreement, YabDar hereby further represents and warrants that:

a.     this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be YabDar's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and thereof, and such obligations rank at least pari passu in all respects with all their other similar obligations;

b.     it has disclosed all of its material liabilities, contingent or otherwise to CFSI;

c.     this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be in proper legal form under the laws of Ukraine for the enforcement thereof against it in the courts of Ukraine, and to ensure the legality, validity, enforceability or admissibility in evidence of such documents in Ukraine, it is not necessary that such documents be filed or recorded with any court or other authority in Ukraine or that any stamp or similar tax be paid on or in respect of such documents;

d.     it has or will take all required measures to assure that it can effect timely repayment of the Senior Debt Amount as contemplated herein, in United States Dollars, and assure that this Annex and the Assignment Agreement, and all documents to be delivered hereunder, remain in effect, enforceable and in compliance with all applicable laws and regulations;

e.     there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar either (i) with respect to or arising out of this Annex or the Assignment Agreement, or the transactions related thereto;

4

© 2015 Cargill Financial Services International, Inc. All rights reserved.

f.      neither it nor any of its revenues or properties have any right of immunity from suit, court jurisdiction, attachment prior to judgment, execution of a judgment or from set-off, banker's lien, counterclaim or any other legal process or remedy with respect to its obligations hereunder or under the Assignment Agreement

g.      there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar;

h.      YabDar has good and clear title to its production and operational assets and land, free and clear of any liens or encumbrances except for those created or granted under any security documents in favour of YabDar's lenders;

i.      it will provide evidence to CFSI that it has obtained all required licenses, consents and authorizations for the YabDar Assets and those assets are in compliance with all applicable environmental and safety standards normally applied to such type of assets;

j.      it will provide evidence to CFSI of its ownership of the land (or the terms of any lease rights) related to the YabDar production and operations facilities;

k.      it will maintain insurance on the YabDar's properties and assets in at least such amounts, against at least such risks and with such risk retention as are generally maintained, insured against or retained by other companies of established reputation engaged in the same or similar business;

l.      it will keep proper books of record and account in which full and correct entries in conformity with local GAAP shall be made of all dealings and transactions in relation to its business and activities.

m.      it will cause Francoso Corporation Limited to produce consolidated group financial statements under IFRS for each of the financial years from 2015 through 2021 (both years inclusive) and have them audited by of the reputable international audit firm agreed by the Parties;

n.      to provide CFSI with the financials at first request as well as to provide any such additional financial and other information related to the performance of YabDar that may be reasonably requested by CFSI;

u.      not to directly or indirectly, create, assume or suffer to exist any lien upon any property or asset now or hereafter acquired by YabDar to secure any debt which is *pari passu* with or subordinate in right of payment under the Senior Debt Amount unless the Senior Debt Amount is secured equally and rateably prior to the creation, incurrence or assumption of such lien. Notwithstanding the foregoing provisions of this section, the YabDar shall not permit, create, assume or suffer to exist any lien on the capital stock of YabDar.

## VI. DEFAULT

If YabDar or any of its affiliates alternatively shall:

a.      breach any representation or warranty made by YabDar (or any of its officers) under or in connection with this Annex or in any financial statement shall prove to

5

© 2015 Cargill Financial Services International, Inc. All rights reserved.

have been incorrect, false or misleading in any material respect when made and such condition (if capable of remedy) remains unremedied for a period of thirty (30) days after the YabDar or CFSI obtains knowledge thereof;

b.   fail to perform or observe any other term, covenant or agreement contained in Section V. (a) through and including (u) and/or referred to in this Annex;

c.   generally not pay or admit its inability to pay its respective debts as such debts become due;

d.   shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail to generally pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

e.   become subject to an involuntary case or other proceeding shall be commenced against YabDar seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days; or an order for relief shall be entered against YabDar under any bankruptcy laws as now or hereafter in effect;

f.   any event shall occur that could be reasonably expected to have a Material Adverse Effect on the: (i) property, businesses, operations, financial condition, liabilities or capitalization of YabDar; (ii) ability of YabDar to perform any of its respective obligations under this Annex, (iii) validity or enforceability of this Annex, or (iv) timely payment of the principal or any interest amount due hereunder;

g.   a Change of Ownership or sale or any other disposition of assets of total value equal or greater USD 1,000,000 shall occur, without a prior written consent of CFSI;

h.   YabDar shall (i) default in the payment when due of any principal of or interest on any of its Debt (other than the Senior Debt Amount or (ii) any event specified in any note, agreement, indenture or other document evidencing or relating to any such debt shall occur, the result of which is to cause, or (with the giving of any notice or lapse of time or both) to permit the holder or holders of such debt (or a trustee or agent on behalf of such holder or holders) to cause such debt to become due and payable prior to its stated maturity; provided, however, that the aggregate amount of such Debt falling within (i) above (as to which the time for payment has not been extended by the relevant creditors) and any relevant payments falling within (ii) above equals or exceeds USD1,000,000 (US Dollars one million) for YabDar in aggregate;

© 2015 Cargill Financial Services International, Inc. All rights reserved.

6

i.   one or more judgments or orders from which no further appeal is permissible under applicable law for the payment of money aggregating in excess of USD1,000,000 (one million US dollars) (or its equivalent in another currency) shall be rendered against YabDar, and such judgment or order shall continue unsatisfied and in effect until the date by which payment must be made pursuant to such judgment or order;

j.   at any time during the term of this Annex, it is or becomes unlawful for the YabDar to perform its respective obligations pursuant to the terms and conditions contained in this Annex, or any of such obligations are not, or cease to be, legal, valid and binding on it and enforceable against YabDar;

j.   If any of the following events have occurred:

   (i)   the whole or a substantial part of the assets of the YabDar, or any of its affiliates is confiscated or attached;

   (ii)  any change occurs in the ownership or control of the YabDar or any of its affiliates, which, in the reasonable opinion of the CFSI, constitutes a material adverse change affecting the financial condition or operations of the YabDar or any of its affiliates respectively;

   (iii) any competent governmental authority takes any action to condemn, seize, requisition or otherwise appropriate any substantial portion of the properties or assets of YabDar or any of its affiliates (either with or without payment of compensation), or any action relating to YabDar or any of its affiliates, which in the opinion of CFSI, adversely affects YabDar's ability to pay its indebtedness under the Assignment Agreement,

then, in any such event CFSI, may immediately proceed to protect and enforce its rights by an action at law, or other appropriate proceeding, including but not limited to, demanding and declaring this Annex, including all interest accrued thereon and all other amounts payable under this Annex to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by YabDar. YabDar hereby agrees to indemnify CFSI for (i) all reasonable costs and expenses (including but not limited to attorney's fees) incurred by CFSI in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom. Said indemnification shall survive the repayment in full of the Senior Debt Amount.

## VII. GENERAL PROVISIONS

a.   Any provision of this Annex that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

b.   The section headings in this Annex are for convenience of reference only and shall not affect the interpretation hereof.

c.   This Annex may be signed in counterparts with each counterpart deemed an original and both counterparts together constituting one and the same document.

d.   The parties hereto acknowledge to have had previous access to the contents of this Annex and that notwithstanding its English language have perfectly understood its exact content.

© 2015 Cargill Financial Services International, Inc. All rights reserved.

7

e.      All payments under this Annex are to be made in immediately available funds in United States Dollars, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority. The Parties agree that, in the event of any such deduction, withholding or tax payment, YabDar shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment CFSI will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon YabDar's request, CFSI agrees to provide such documentation, which to its best knowledge but without any assurances on its part, is required by to classify CFSI as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and Ukraine. Payments are to be made to CFSI's account as per Assignment Agreement.

If payments under this Annex are not made in full when due, then any outstanding amount due but unpaid hereunder shall accrue late interest at 11 % calculated per annum from the date relevant payment should have been made until the date payment is received in full.

f.      Any and all information in connection with the transaction(s) under the Assignment Agreement shall be treated as confidential by the YabDar, its officers, employees and representatives, and any of the YabDar's affiliates and shall not be disclosed to any third party in any form whatsoever without the CFSI's prior express written consent, unless required by law or court order. If the YabDar is required by law or court order to disclose any such information, the YabDar shall provide the CFSI prompt written notice of such requirement.

This Annex is executed on the first date written above and comes into force as of the effective date of the Assignment Agreement.

All the changes, annexes, additional agreements and amendments to the Assignment Agreement and this Annex will be valid only in done in writing and signed by the authorized representatives of all Parties.

This Annex supplements the Assignment Agreement and represents its integral part. All the provisions of the Assignment Agreement remain in full legal power and force unless specifically amended or ruled out by this Annex.

            [SIGNATURE PAGE FOLLOWS]

8

© 2015 Cargill Financial Services International, Inc. All rights reserved.

## SIGNATURE PAGE

**Limited Liability Company "Yabluneviy dar"**
274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500
Bank details:
Beneficiary: LLC "Yabluneviy dar"
Account Number: 26008002005469
Beneficiary Bank: JSC Delta Bank, Kiev, Ukraine
SWIFT:DELKUAUK
Correspondent Bank: Deutsche Bank Trust Company Americas, New York, NY, USA
SWIFT: BKTRUS33

By: _____
Name: _____
Title: _____

**Cargill Financial Services International, Inc.**

1209 Orange Street, Wilmington, County of New Castle, State of Delaware with principal offices at 9350 Excelsior Boulevard, MS142-4B, Hopkins, Minnesota 55343, USA
Bank Details:
Beneficiary bank:  Citibank, NA, New York , U.S.A.
SWIFT:  CITIUS33XXX
ABA: 021000089
Bank Account:  38490869

By: _____
Name:        Nancy L. Nelson
Title:        Authorized Signer

© 2015 Cargill Financial Services International, Inc. All rights reserved.

9

### Amendment № 1 to Assignment Agreement №AA5 as of 05 February 2015

**November 14, 2018**

This Amendment № 1 (the **"Amendment № 1 "**) to Assignment Agreement №AA5 as of February 05, 2015 (the "**Assignment Agreement**") and to Annex 1 thereto of July 07, 2015 (the "**Annex**") is made on November 14, 2018 (the Assignment Agreement and the Annex, together, the "**Agreement**") by and between:

**Cargill Financial Services International, Inc.,** registered at Corporation Trust Center, 1209 Orange Street, Citi of Wilmington, County of New Castle, DE, 19801, U.S.A. with principal place of business at 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A. , hereinafter referred to as "**CFSI**" or the **"Initial Creditor"**, on one side, and

**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR" (ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР")**, registered at 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500, identification number 32475074 duly represented by Mr. Roman Markiv, acting based on Charter, hereinafter referred to as " **YabDar**" the "**New Creditor**", on the other side.

The Initial Creditor and the New Creditor are individually referred to in this Amendment № 1 as a "**Party**" or collectively as the "**Parties**".

**WHEREAS:**

A. Under the Assignment Agreement the Initial Creditor assigned to the New Creditor and the New Creditor received the Claims. In consideration of the assignment of the Claims, the New Creditor agreed in the Annex to pay in favour of the New Creditor the Consideration in the amount of US Dollars 15,597,670.00 in 12 installments until February 05, 2021 with the first installment payable on May 05, 2018.

B. To secure the New Creditor's payment obligations under the Assignment Agreement, the New Creditor agreed in the Annex to provide the Initial Creditor with one or more pledges over the New Creditor's physical assets (collectively, "**Pledge**") then and currently subject to liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", with a total collateral value of more than 100% of the Consideration amount. The Annex required the New Creditor to provide the Pledge as soon as reasonably possible upon release of the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", but in any case, no later than May 05, 2018.

C. As of the date of this Amendment № 1 the New Creditor's physical assets have not yet been released from the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" nor pledged to the Initial Creditor.

D. The New Creditor has requested that the Initial Creditor extend the payment terms of the Consideration amount under the Agreement and the terms for provision of the Pledge to the Initial Creditor and the Initial Creditor is willing to provide the requested extension on the basis of the terms and conditions outlined in this Amendment № 1 below.

Taking the above into account, the Parties hereby have agreed as follows:

**AGREED TERMS:**

1. The Parties have agreed to supplement the Agreement with the following Definitions section.

DEFINITIONS:

Capitalized terms used herein but not defined shall have the same meanings as defined in the Agreement.

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

**"Asset Disposition"** of any Person means the sale, lease or conveyance or other disposition of assets (including, without limitation, any capital stock of any TB Fruit Group company or subsidiary of such Person held directly or indirectly by such Person), whether owned on the date hereof of hereafter acquired, in one or more related transactions, outside of the ordinary course of business (other than a sale, lease, conveyance or other disposition by such Person or a subsidiary of such Person to such Person or a wholly owned subsidiary of such Person, including any such disposition by means of a merger, consolidation or similar transaction).

"**Business Day**" shall mean any day, other than a Saturday or Sunday, on which banks are not authorised to close in Kyiv (Ukraine) and New York (USA).

"**Cargill Entity**" shall mean any company or legal entity which from time to time directly or indirectly controls, is controlled by, or is under common control of the Initial Creditor, whether or not such company or other legal entity is in existence at the time this Amendment № 1 is signed by the Parties.

**"Change of Control Event"** means an event or series of events which:

(i) any Person, either individually or acting in concert with one or more other Persons, shall have acquired beneficial ownership (provided that a Person shall not be deemed to be the beneficial owner of shares tendered pursuant to a tender offer made by that Person or its Affiliate until the tendered shares are accepted for purchase), directly or indirectly, of equity interests of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company, or

(ii) *(1)* another corporation merges into TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company or *(2)* Mr. Taras Barshchovskyy, TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company conveys, transfers or leases all or substantially all its assets to any Person or group, in one transaction or a series of transactions, or

(iii) the failure at any time of TB Fruit Holding Establishment (Liechtenstein) legally and beneficially to own and control 100% of the issued and outstanding shares of capital stock of its subsidiaries held by TB Fruit Holding Establishment (Liechtenstein) as of the date of this Amendment №1, or the failure at any time of TB Fruit Holding Establishment (Liechtenstein) to have the ability to elect all the majority of the board of directors or other governing bodies of any of its subsidiaries, or

(iv) the failure of, at any time, Mr. Taras Barshchovskyy to legally and beneficially own and/or control 100% of the issued and outstanding share of capital stock of TB Fruit Holding Establishment (Liechtenstein), and/or any other TB Fruit Group company directly or indirectly owned or subsequently acquired by Mr. Taras Barshchovskyy.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**TB Fruit Group**" means and includes any and all Persons that directly or indirectly through one or more intermediaries, is controlled by *Mr. Taras Barshchovskyy* and/or controls, is controlled by, or is under common control with YabDar and/or any of the Guarantors. "Control" (including the terms "controlled by" and "under common control with") means the direct or indirect ownership or control of more than 50% of the voting rights or equity shares of such Persons.

Any reference in the Assignment Agreement to "this Agreement" and in the Annex to "this Annex" shall be deemed to be a reference to the Assignment Agreement and the Annex as amended, modified and/or supplemented from time to time (including by this Amendment № 1).

## 2. AMENDMENT TO THE ASSIGNMENT AGREEMENT:

Subject to terms and conditions of this Amendment № 1 the Parties agree:

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

2.1. To amend and restate clause 5.3 of the Assignment Agreement as follows:

"5.3. (i) Subject to sub-clause (iv) of this clause 5.3., any notice or communication given to a Party under or in connection with this Agreement (and any amendment or supplement) shall be in writing and shall be delivered by hand, by third party courier service, by fax and/or by electronic mail, in each case to that Party's address, fax number or electronic mail address specified in, as applicable to that Party, as specified in this clause 5.3. (or to such other address, fax number or electronic mail address as that Party may notify to the other Party in accordance with this clause 5.3.).

a.  If to the Initial Creditor:
For the attention of Nancy Nelson
Address: 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A.
Fax number: + 41 22 703 2841
E-mail address: Nancy_Nelson@cargill.com

b.  If to the New Creditor:
For the attention of Roman Markiv
Address: 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500
Fax number: +38 03231 3-27-84
Email: r.markiv@tbfruit.com

(ii) Subject to sub-clause (iii) of this clause 5.3., delivery of a notice is deemed to have taken place (provided the requirements of sub-clause (i) of this clause 5.3. have been satisfied):

a. if delivered by hand, on the day and time the notice is delivered;
b. if sent by third party courier service, on the third Business Day after depositing such notice with the courier (excluding the date of deposit);

c. if sent by fax, on the earlier of the day and time shown in a transmission report indicating a satisfactory transmission and a confirmation of receipt obtained from the sender's facsimile machine; and

d. if sent by electronic mail, on the day and at the time that the electronic mail was read as shown in a read receipt, on the day and at the time the electronic mail was delivered as shown in a delivery receipt or on the day and at the time of receipt of an acknowledgement from the recipient indicating a satisfactory transmission (whichever is the earlier).

(iii) In the case of delivery by hand, by fax or by email, if the deemed receipt does not take place inside business hours (meaning 9.00 am to 5.30 pm on any day, other than a Saturday or Sunday, on which banks are not authorized to close in the place of deemed receipt), then deemed receipt will occur when business next starts in the place of receipt (and all references to time are to local time in the place of receipt).

(iv) This clause 5.3. does not apply to the service of any proceedings or other documents in any legal action."

2.2. To change numbering of Section II (*Payment Terms*) of the Annex to Section III (*Payment Terms*);

2.3. To change numbering of Section II (*Security of Payment*) of the Annex to Section IV (*Security of Payment*);

2.4. The table of Repayment Dates specified in the second paragraph of Section III (*Payment Terms*) of the Annex shall be replaced in its entirety and supplemented as follows:
"

| Repayment Date | Consideration amount due, USD |
|---|---|
| 15 February 2022 | $   1,039,844.67 |
| 15 May 2022 | $   1,039,844.67 |
| 15 November 2022 | $   1,039,844.67 |
| 15 February 2023 | $   1,039,844.67 |
| 15 May 2023 | $   1,039,844.67 |

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

| 15 November 2023 | $ 1,039,844.67 |
| 15 February 2024 | $ 1,039,844.67 |
| 15 May 2024 | $ 1,039,844.67 |
| 15 November 2024 | $ 1,039,844.67 |
| 15 February 2025 | $ 1,039,844.67 |
| 15 May 2025 | $ 1,039,844.66 |
| 15 November 2025 | $ 1,039,844.66 |
| 15 February 2026 | $ 1,039,844.66 |
| 15 May 2026 | $ 1,039,844.66 |
| 15 November 2026 | $ 1,039,844.66 |

The New Creditor irrevocably and unconditionally acknowledges and confirms its payment obligation as envisaged in the table above in the total amount of US Dollars 15,597,670.00, without prejudice to the Conditional Discount provisions as stated below."

2.5. The provisions of Clause 2.4 of this Amendment № 1 and any reference to the Conditional Discount shall come into effect upon satisfaction (or waiver by the Initial Creditor) of each of the conditions precedent specified in Section 3 hereof .

2.6. To add a the following at the end of Section III (*Payment Terms*) of the Annex as follows:

"In the event the Repayment Date falls on a non-Business Day, the next following Business Day shall be considered as the Repayment Date.

Notwithstanding the above, if (a) the New Creditor fails to make any payment of Consideration when due for payment hereunder, or (b) any Affiliate of the New Creditor fails to make any payment of any indebtedness to any Cargill Entity when due, or (c) any other event of default as specified in Section VII (*Default*) of the Annex has occurred, then the Repayment Dates as specified in the Annex prior to the effectiveness of Amendment № 1 to the Assignment Agreement and this Annex shall be reinstated without any demand, protest or notice of any kind, all of which are hereby expressly waived by the New Creditor. The Initial Creditor retains full rights to enforce any and all payments in accordance to such an original payment schedule.

Subject to the provisions of this paragraph, the Initial Creditor agrees to provide a discount in the amount up to 15% of the Consideration ("**Conditional Discount**"). The Conditional Discount will be proportionally applied to the instalments of the Consideration payable by the New Creditor to the Initial Creditor in 2026 as follows:

| **Repayment Date** | **Consideration amount due, USD** | **Conditional Discount amount, USD** |
| --- | --- | --- |
| 15 February 2026 | $ 1,039,844.66 | $ 779,883.50 |
| 15 May 2026 | $ 1,039,844.66 | $ 779,883.50 |
| 15 November 2026 | $ 1,039,844.66 | $ 779,883.50 |

The provision of the Conditional Discount is subject to **(a)** the full and timely repayment of (i) all amounts due on each and every Repayment Date up to and including the Repayment date of 15 November 2025, and (ii) all other indebtedness of TB Fruit Group companies to the Initial Creditor and/or any Cargill Entity, including the payment obligations of FRANCOSO CORPORATION LIMITED under the Raw Materials Purchase, Inventory and Receivables Financing Agreements No 02 2017 and No 03 2017 dated January 30, 2017 (as further amended) ("**RMPIR Financing Agreements**"); and **(b)** there having been no event of default as specified in Section VII (*Default*) of Annex."

2.7. The first paragraph of Section IV (*Security of Payment*) of Annex shall be replaced in its entirety with the following:

"To secure YabDar's payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause the assets (located at:
1. 274-a Lvivska str., Gorodok, Lviv region, 81500, Ukraine
2. 62 Kopitka str., Lypovets, Vinnytska region, 22500, Ukraine
3. 7 Gagarina str., New Ushitsya, Novouushitsky district, Khmelnytsky region, 32600, Ukraine

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

4. 3 Kamenetsky highway, Slobokivtsi, Yarmolinetsky district, Khmelnytsky region, 32162, Ukraine
5. 5 Kharkiv str., Zatishya, Kharkiv district, Kharkiv region, 62406, Ukraine)
or any other assets satisfactory to CFSI ("**YabDar Assets**") to be pledged in favour of CFSI with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "**Pledge**").

YabDar undertakes to arrange for the Pledge as soon as reasonably possible after the release of the YabDar Assets from the current liens in favour of Delta Bank but in any case, no later than December 31, 2019. The collateral value shall be determined based on the following formula: 80% of market value of the respective YabDar Assets (based on independent appraisal executed by an appraiser satisfactory to CFSI at or immediately before the execution of the Pledge)".

2.8. The fourth paragraph of Section IV (*Security of Payment*) of Annex commencing with the words "If for any reason the Pledge" and ending with the words "and this Annex on each of the Repayment Dates", shall be replaced in its entirety with the following:

"If for any reason (a) the assets subject to the Pledge do not have a total collateral vale of more than 100% of the Senior Debt Amount outstanding, or (b) the Pledge, duly perfected, is not provided to Cargill by December 31, 2019, YabDar shall provide CFSI with an additional and/or a substitute pledge acceptable to CFSI".

2.9. To add Section VI (*Covenants*) right after Section V (*Representation and Warranties*) of the Annex as follows:

(a) "Unless CFSI agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entities shall not be permitted to cause or permit a Change of Control Event.

If a Change of Control Event is agreed with CFSI, Mr. Taras Barshchovskyy, YabDar and/or the respective TB Fruit Group entity shall give a written notice to CFSI at least 30 days before such Change of Control Event stating:

i. that a Change of Control Event is to occur and that CFSI has the right to require repayment of all the outstanding amounts under RMPIR Financing Agreements and the outstanding Consideration and other amounts under the Assignment Agreement at the time of the Change of Control Event. If, as a result of the Change of Control Event any of YabDar, Guarantors, Mr. Taras Barschovskyy or any other TB Fruit Group entity are to receive any cash proceeds, such cash proceeds shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts comprising the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

ii. the circumstances and relevant facts regarding the Change of Control Event,

iii. the purchase date in relation to such Change of Control Event (which shall be no earlier than 30 and no later than 60 days after such notice is given),

iv. whether the tenders will be irrevocable and the purchase price offered in relation to such Change of Control Event.

Failure to give the requisite notice to CFSI within the time provided above shall constitute an event of default and an acceleration event under the Assignment Agreement allowing CFSI to exercise all of its rights in the last paragraph of Section VII (*Default*) of the Annex.

(b) Unless CFSI agrees in writing, YabDar, Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entity shall not be permitted to make Significant Asset Sales, where such Significant Asset Sale means an Asset Disposition involving assets with a fair market value in excess of US Dollars 5,000,000.00 and which is paid in cash or cash equivalents including payments in respect of deferred payment obligations when received in the form of cash or cash equivalents ("**Net Cash Proceeds**"). Net Cash Proceeds shall be net of (i) taxes payable as a result of such Significant Asset Sale, and (ii) payments made to retire indebtedness where payment of such indebtedness is secured by assets or properties which are the subject of such Significant Asset Sale. If an Asset Disposition occurs, the Net Cash Proceeds from such Significant Asset Sale shall be applied in the following priority to repay (i) any past due

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts under the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

(a) Unless CFSI agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any of their Affiliates shall not together incur any capital expenditures in the in excess of US Dollars 2,500,000.00 per calendar year according to International Financial Reporting Standards effective on the date of this Amendment № 1. Notwithstanding the foregoing, this limitation does not cover the on-going investment projects in relation to the pectin production line (with its total planned investment of Euro 5.2 million of which Euro 4.77 million has already been reported as invested as of January 31, 2017) or construction of the management office building (with its total planned investment of Euro 0.5 million, of which Euro 0.43 million has already been reported as invested as of January 31, 2017).

2.10.    To change numbering of Section VI (*Default*) of the Annex to Section VII (*Default*).

2.11.    To amend and restate part b. of Section VII (*Default*) of the Annex as follows:

"b. fails to perform or observe any other term, covenant or agreement contained in Section V (*Representations & Warranties*) (a) through and including (u), in Section VI (*Covenants*) or breaches any other term, covenant, agreement or undertaking under the Assignment Agreement or the Annex or any other assignment or annex to which any Cargill Entity and any member of the TB Fruit Group are party".

2.12.    To amend and restate part g. of Section VII (*Default*) of the Annex as follows:

"g. a Change of Control Event or Significant Asset Sale has occurred without prior written consent of CFSI";

2.13.    To change numbering of Section VII (*General Provisions*) of the Annex to Section VIII (*General Provisions*).

## 3.  CONDITIONS PRECEDENT

The provisions of Clause 2.4 to this Amendment № 1 and the Conditional Discount are subject to the satisfaction (or waiver by the Initial Creditor) of each of the following conditions ("**Conditions Precedent**")

3.1.    The Initial Creditor has received from the Guarantors the originals of the duly executed amendments to the existing guarantees (guaranteeing the New Creditor's obligations under the Agreement) extending the term of the guarantees in a substance and form acceptable to the Initial Creditor.

3.2.    The Initial Creditor has received the original of the duly executed first-demand unconditional irrevocable guarantee issued by Mr. Taras Barschovskyy in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor in replacement of the existing Suretyship Agreement made on July 07, 2015.

3.3.    The Initial Creditor has received the originals of the duly executed first-demand unconditional irrevocable guarantees issued by the following companies of TB Fruit Group in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor.
- "T.B. FRUIT" S.R.L. (Moldova*)*;
- TB Fruit Polska Sp. z o.o. S.K.A. (Poland);
- LLC "Tank Trans Ukraine" (Ukraine);
- Tank Trans Polska Sp z o.o. (Poland);
- AMELIANA HOLDINGS LTD (Cyprus).

Collectively "T.B. FRUIT" S.R.L. (Moldova),  TB Fruit Polska Sp. z o.o. S.K.A. (Poland), LLC "Tank Trans Ukraine" (Ukraine), Tank Trans Polska Sp z o.o. (Poland), AMELIANA HOLDINGS LTD (Cyprus) are further referred to as "**New Guarantors**", each of them – "**New Guarantor**".

3.4.    The Initial Creditor has received the originals of the duly executed amendments to the Deed of Pledge of Shares in FRANCOSO CORPORATION LIMITED dated January 30, 2017 and Deed of Pledge of Shares in

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

AMELIANA HOLDINGS LTD dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein) and Cargill Financial Services International, Inc. expanding the scope of the secured obligations and securing the New Creditor's payment obligations in favour of the Initial Creditor in a substance and form satisfactory to the Initial Creditor (each - "**Amendment to the Deed of Pledge of Shares**", collectively - "**Amendments to the Deeds of Pledge of Shares**").

3.4. The Initial Creditor has received the originals of the duly executed amendments to Escrow Agreement dated January 30, 2017 and Escrow Agreement dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein), Cargill Financial Services International, Inc. and Dr. K. Chrysostomides & Co. LLC (Cyprus) in a substance and form satisfactory to the Initial Creditor.

3.5. Within ten (10) calendar days after the date of execution of this Amendment № 1 the New Creditor undertakes that it will cause Dr. K. Chrysostomides & Co. LLC (Cyprus) to submit a certified copy of each Amendment to the Deed of Pledge of Shares to the Commissioner of Stamp Duty of the Republic of Cyprus for the obtainment of an verbal ruling as to whether stamp duty is payable thereon and if so, to which amount. At the request of the Initial Creditor the New Creditor shall furnish to the Initial Creditor a written confirmation of the above mentioned submission made to the Commissioner of Stamp Duty of the Republic of Cyprus.

### 4. GENERAL PROVISIONS, MUTUAL ACKNOWLEDGMENTS AND ASSURANCES

4.1. The Parties make the following representations and acknowledgements, as applicable, as of the date of this Amendment № 1:

(i) no Change of Control Event has occurred or is occurring in relation to the New Creditor and the New Creditor continues to be fully beneficially owned and controlled by Mr. Taras Barshchovskyy;

(ii) the New Creditor confirms that it has received and accepted from the Initial Creditor all the documentation (originals, certified copies and copies) in relation to the Claims assigned under the Agreement to the New Creditor's full and final satisfaction.

(iii) The New Creditor acknowledges that there are no other documents expected or pending to be provided by the Initial Creditor to the New Creditor;

(iv) the New Creditor confirms that it has obtained all necessary and material information and disclosures from the Initial Creditor in relation to the Claims and, without relying on the Initial Creditor, made its own analysis of the Claims and all such obtained information to the New Creditor's full and final satisfaction;

(v) the Parties further confirm and acknowledge, that the Initial Creditor in addition to the transfer of the documentation outlined in sub-clause ii) above has performed the following actions:

(a) served a default and acceleration notice dated February 05, 2015 to the Debtor; and

(b) informed the Debtor about the assignment in favour of the New Creditor no later than 3 (three) Business Days from the effective date of the Assignment Agreement.

Both Parties acknowledge and agree that the Initial Creditor with its above actions fully satisfied, complied with and performed all of its obligations under the Agreement in connection with the Claims and that no other actions were or are required or intended to be performed by the Initial Creditor under the Agreement.

4.2. This Amendment № 1 shall come in force on the date of its signing by the authorized persons of the Parties.

4.3. All other terms and conditions of the Agreement remain unchanged.

4.4. This Amendment № 1 shall be signed in two copies in English, one for each Party, both copies having equal legal power.

5.4. Any dispute arising out of or in connection with Amendment № 1 including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

London Court of International Arbitration (LCIA), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the Amendment № 1 shall be the substantive laws of New York (excluding conflicts of laws principles).

5.5. This Amendment № 1 is an integral part of the Agreement.

**The Initial Creditor:**
**Cargill Financial Services International, Inc.**
9320 Excelsior Boulevard,
Hopkins, MN 55343, U.S.A.
Receiving Bank: JP Morgan Chase, N.A., New York
Swift Code: CHASUS33XXX
ABA: 021000021
Account No: 878359491

Nancy L. Nelson
Trade Finance Specialist

Authorized Signatory

**The New Creditor:**
**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR"**
**(ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР")**
274a, Lvivska str., Gorodok,
Lvivska oblast', Ukraine 81500,
Identification no. 32475074

US Dollars Account: 26009010003864
Beneficiary bank:
BANK PIVDENNYI, Odessa, Ukraine
SWIFT CODE: PIVDUA22
Intermediary:
THE BANK OF NEW YORK MELLON, New York, USA
SWIFT CODE: IRVTUS3N

Roman Markiv

Authorized Signatory

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

| | |
|---|---|
| **ASSIGNMENT AGREEMENT № AA6** | **ДОГОВІР ВІДСТУПЛЕННЯ ПРАВ ВИМОГИ № AA6** |

*As of 05 February 2015*
*Kyiv (Ukraine)*

*Від 05 лютого 2015 року*
*місто Київ (Україна)*

**PARTY 1:** Legal entity that is incorporated in the state of Delaware and is acting in accordance with the laws of the United States of America, **CFSIT, Inc.**, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA, hereinafter - ***"Initial Creditor"***, represented by Kristin Lee Wessels, acting under the power of attorney issued, notary certified and apostiled on 13 October 2014, and

**СТОРОНА 1:** Юридична особа, яка створена в штаті Делавер та діє за законодавством Сполучених Штатів Америки, **CFSIT, Inc.**, зареєстрована за адресою 1209 Орандж Стріт, Уілмінгтон, округ Ньюкасл, штат Делавер (1209 Orange Street, Wilmington, County of New Castle, State of Delaware), фактичне місцезнаходження: бульв. Ексельсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA), надалі за текстом - ***"Первісний Кредитор"***, в особі Крістін Лі Весселс, яка діє на підставі Довіреності, виданої, нотаріально посвідченої та апостильованої 13 жовтня 2014 року, та

**PARTY 2:** Legal entity that is incorporated and is acting in accordance with the laws of Ukraine, **Limited Liability Company "YABLUNEVIY DAR"**, located at 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine, hereinafter - *"New Creditor"*, identification code 32475074, represented by Acting Executive Director R. V. Markiv, acting on the basis of the Charter,

**СТОРОНА 2:** Юридична особа, яка створена та діє за законодавством України, **Товариство з обмеженою відповідальністю «ЯБЛУНЕВИЙ ДАР»**, місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А, надалі за текстом - ***"Новий Кредитор"***, ідентифікаційний код 32475074, в особі Тимчасово виконуючого обов'язки виконавчого директора Р. В. Марківа, який діє на підставі Статуту,

*hereinafter collectively – the **"Parties"**, and each individually referred to as a **"Party"**, have concluded the present Assignment Agreement, hereinafter – the **"Agreement"** as follows:*

*надалі за текстом разом - **"Сторони"**, а окремо **"Сторона"**, уклали цей Договір відступлення прав вимоги, надалі – **"Договір"**, про наступне:*

*ARTICLE 1.*
**SUBJECT MATTER OF THE AGREEMENT**

*СТАТТЯ 1.*
**ПРЕДМЕТ ДОГОВОРУ**

1.1. The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) under the following documentary instruments and all the related documentation as applicable (further — the **"Claims"**):

1.1. Первісний Кредитор передає, а Новий Кредитор одержує всі та будь-які права вимоги (включаючи права на отримання надходжень та процентів) за наступними документарними інструментами та іншими пов'язаними з ними документами (надалі – «**Права вимоги**»):

all claims of the creditor

всі права кредитора (бенефіціара) за

1

(beneficiary) under the following documentary instruments issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the *"Debtor"*, for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

1) Irrevocable standby letter of credit No. LC/SB/027/062014 in the amount of 4,650,000.00 US Dollars;

2) Irrevocable standby letter of credit No. LC/SB/028/062014 in the amount of 4,652,500.00 US Dollars;

3) Irrevocable standby letter of credit No. LC/SB/026/042014 in the amount of 28,654,844.95 US Dollars;

1.2. The assignment of the Claims becomes effective on the date set forth above;

1.3. In consideration of the aforementioned assignment, the New Creditor agrees to make a payment in favour of the Initial Creditor of the face value of the Claims in United States Dollars (*"USD"*) (*i.e.* USD 37,957,344.95) within five (5) years from the date of execution of this Agreement under the conditions to be agreed by the Parties in a separate agreement.

## ARTICLE 2.
## RIGHTS AND OBLIGATIONS OF THE PARTIES

2.1. **Initial Creditor shall:**

    2.1.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, transfer to the New Creditor all documents which confirm the Claims assigned hereunder to be reflected in a certificate of

---

наступними документарними інструментами, випущеними ПУБЛІЧНИМ АКЦІОНЕРНИМ ТОВАРИСТВОМ «ДЕЛЬТА БАНК», надалі за текстом – *«Боржник»*, на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до них:

1) Безвідкличний резервний акредитив № LC/SB/027/062014 на суму 4 650 000,00 доларів США;

2) Безвідкличний резервний акредитив № LC/SB/028/062014 на суму 4 652 500,00 доларів США;

3) Безвідкличний резервний акредитив № LC/SB/026/042014 на суму 28 654 844,95 доларів США;

1.2. Відступлення Прав вимоги набирає чинності з дати зазначеної вище;

1.3. В якості оплати за вищезазначене відступлення Прав вимоги Новий Кредитор погоджується сплатити на користь Первісного Кредитора кошти у розмірі номінальної вартості Прав вимоги в доларах США (*«USD»*) (а саме 37 957 344,95 доларів США) впродовж 5 (п'яти) років з дати укладення цього Договору на умовах, що будуть погоджені Сторонами в окремому договорі.

## СТАТТЯ 2.
## ПРАВА ТА ОБОВ'ЯЗКИ СТОРІН

2.1. **Первісний Кредитор зобов'язаний:**

    2.1.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, передати Новому Кредитору всі документи, що підтверджують Права вимоги, що передаються за цим Договором, про що Сторонами складається відповідний акт прийому-передачі документів, у

2

transfer and acceptance of documents to be signed by the Parties, unless such documents have been transferred by the Initial Creditor to the New Creditor before this Agreement came in to force;

2.1.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor;

2.1.3. perform other obligations as set out by the applicable laws.

**2.2. New Creditor shall:**

2.2.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, accept from the Initial Creditor all documents confirming the Claims assigned hereunder in accordance with the respective certificate of transfer and acceptance of documents;

2.2.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor.

*ARTICLE 3.*
**REPRESENTATIONS**

випадку, якщо такі документи не були передані Первісним Кредитором Новому Кредиторові до моменту набрання чинності цим Договором;

2.1.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором;

2.1.3. виконувати інші обов'язки, передбачені законодавством, що застосовується.

**2.2. Новий Кредитор зобов'язаний:**

2.2.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, прийняти від Первісного Кредитора всі документи, які підтверджують Права вимоги, що відступаються за цим Договором, за відповідним актом прийому-передачі документів;

2.2.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором.

*СТАТТЯ 3.*
**ЗАЯВИ**

3

3.1. The Parties are companies duly established and validly existing under the laws of countries of their incorporation;

3.2. The Parties have full power and authority to conclude, execute and deliver this Agreement and to fully perform their obligations hereunder, and the persons signing this Agreement on their behalf are legally authorised by the Parties to do so;

3.3. All corporate consents required for the execution and performance of the Parties' obligations under this Agreement have been unconditionally and irrevocably granted and are in full force and effect;

3.4. The Initial Creditor represents that the Claims are valid and assignable; the Initial Creditor represents that it has provided notices of acceleration to the Debtor on the Claims for which the respective maturity date is beyond the effective date of this Agreement to make the Claims due;

3.5. The Parties entered into this Agreement and were induced to do so relying solely on the representations stated in Article 3;

3.6. The New Creditor acknowledges that it has made its own analysis of the Debtor and the above details and has reached its own decision to enter into this Agreement without reliance on the Initial Creditor or any Cargill entity, except for the representations contained in this Article 3;

3.7. The Parties hereby agreed that no recourse to the Initial Creditor shall apply in relation to the Claims assigned hereunder, except for by operation of law and/or if any of

3.1. Сторони є юридичними особами, належним чином створеними та існуючими відповідно до законодавства країн їх реєстрації;

3.2. Сторони мають повний обсяг повноважень на укладення цього Договору та виконання в повному обсязі своїх обов'язків за цим Договором; особи, що підписують цей Договір від імені Сторін, уповноважені на вчинення таких дій Сторонами;

3.3. Всі корпоративні погодження, необхідні для укладення та виконання зобов'язань Сторін за цим Договором, були безумовно та безвідклично отримані та є повністю чинними;

3.4. Первинний Кредитор заявляє, що Права вимоги є чинними та такими, що можуть бути відступлені; Первісний Кредитор заявляє, що ним надано Боржникові вимоги про дострокове виконання стосовно Прав вимоги, строк виконання яких знаходиться поза датою укладення цього Договору, зробивши їх такими, строк виконання яких настав;

3.5. Сторони при укладенні цього Договору покладались виключно на заяви, вказані в Статті 3;

3.6. Новий Кредитор підтверджує, що ним було зроблено власний аналіз Боржника та вищезазначених деталей, та прийнято самостійне рішення укласти цей Договір не покладаючись на Первинного Кредитора або будь-яку особу групи Каргілл, за виключенням заяв викладених в Статті 3;

3.7. Підписанням цього Договору Сторони погоджуються з тим, що по відношенню до Первісного Кредитора не застосовується право регресу у зв'язку з Правами вимоги, відступленими за цим

the representations stipulated by Article 3 have been breached by the Initial Creditor.

Договором, крім як в силу закону та/або якщо будь-яка із заяв, визначених в Статті 3, буде порушена Первісним Кредитором.

## ARTICLE 4.
## DISPUTE RESOLUTION

## СТАТТЯ 4.
## ВРЕГУЛЮВАННЯ СПОРІВ

4.1. Any dispute arising out of or in connection with this Agreement including its validity or termination shall be referred to and finally settled by London Court of International Arbitration in accordance with its Rules which shall be incorporated into this Agreement by reference. The number of arbitrators – three (3), place of arbitration – London (the United Kingdom of Great Britain and Northern Ireland), language of proceedings – English. The arbitration award shall be final and binding on all Parties.

4.1. Будь-який спір, що виникає з цього Договору або у зв'язку з ним, включаючи будь-які питання стосовно його дії або розірвання, мають бути передані та остаточно вирішені Міжнародним арбітражним судом Лондону (London Court of International Arbitration) у відповідності до його Регламенту, який вважається включеним шляхом послання у цьому пункті. Кількість арбітрів – 3 (три), місце арбітражного розгляду – Лондон (Сполучене Королівство Великобританії та Північної Ірландії), мова розгляду – англійська. Арбітражне рішення є остаточним та обов'язковим для всіх Сторін.

## ARTICLE 5.
## FINAL PROVISIONS

## СТАТТЯ 5.
## ЗАКЛЮЧНІ ПОЛОЖЕННЯ

5.1. This Agreement comes into effect from the moment of its conclusion and remains in effect until complete fulfillment of liabilities by the Parties.

5.1. Цей Договір набирає чинності з моменту його укладення та діє до остаточного виконання Сторонами прийнятих на себе зобов'язань;

5.2. All appendices, amendments and/or addendums to the present Agreement have to be executed in the written form, signed by duly authorized representatives of the Parties and sealed with the stamp (if required/applicable) with obligatory reference to this Agreement. Such appendices, amendments and/or addendums shall be an integral part of the present Agreement from the moment of their execution in the abovementioned order;

5.2. Усі додатки, зміни та/або доповнення до цього Договору мають бути вчинені в письмовій формі, підписані належним чином уповноваженими на те представниками Сторін та скріплені відбитками печаток (якщо вимагається/застосовується), з обов'язковим посиланням на цей Договір. Такі додатки, зміни та/або доповнення з моменту їх вчинення у вищевказаному порядку є невід'ємними частинами даного Договору;

5.3. All notices under this Agreement shall be considered properly served in case they are made in writing and sent by courier, facsimile or hand delivered to the addresses of

5.3. Усі повідомлення за цим Договором будуть вважатися зробленими належним чином у разі, якщо вони здійснені у письмовій формі та надіслані кур'єром, факсом або вручені особисто за

the Parties mentioned herein. The date of receipt of such notices shall be the date of their hand delivery or the date when transmitted electronically;

зазначеними адресами Сторін. Датою отримання таких повідомлень буде вважатися дата їх особистого вручення або дата передачі електронними засобами;

5.4. This Agreement shall be governed by and construed in accordance with the laws of New York (excluding conflicts of laws principles);

5.4. Цей Договір регулюється та тлумачиться згідно з правом Нью-Йорку (за виключенням колізійних норм);

5.5. The New Creditor represents that it is registered as a payer of corporate profit tax on general terms in accordance with the Tax Code and applicable laws of Ukraine. The Initial Creditor represents that it is a tax resident of the United States of America;

5.5. Новий Кредитор підтверджує, що він є платником податку на прибуток на загальних умовах відповідно до Податкового Кодексу України та застосовного законодавства України. Первісний Кредитор підтверджує, що він є податковим резидентом Сполучених Штатів Америки;

5.6. The invalidity of any separate provision of this Agreement shall not cause invalidation of the whole Agreement as long as the Agreement might have been concluded without such provisions. In case any provision of this Agreement is recognized invalid or contradictory to applicable laws of New York by the court or any competent state authority in each individual case this shall not impact the application of such provisions in all other cases and the validity of other provisions of the Agreement. In such case the Parties shall draft in good faith a new provision of the Agreement to reflect to the fullest extent the intention of the Parties at the time of making this Agreement;

5.6. Недійсність окремих положень цього Договору не спричиняє недійсність Договору в цілому, оскільки можна припустити, що цей Договір міг би бути укладений без включення до нього таких положень. Якщо будь-яке з положень цього Договору буде визнано судом чи іншим уповноваженим державним органом недійсним чи таким, що суперечить чинному праву Нью-Йорку, в кожному конкретному випадку, таке визнання не буде впливати на застосування таких положень у всіх інших випадках та на дійсність інших положень Договору. В такому випадку, Сторони зобов'язуються сумлінно розробити нове положення Договору такого змісту, який би у повній мірі відображав ті наміри, що існували в них в момент укладання цього Договору;

5.7. Each Party shall notify in writing another Party about change of any of its details within three (3) days;

5.7. У разі зміни реквізитів однієї з Сторін відповідна Сторона зобов'язана в триденний строк письмово повідомити про це другу Сторону;

5.8. This Agreement is made in three (3) original copies in English and Ukrainian languages, having equal legal force. In case of any discrepancies the English version prevails;

5.8. Цей Договір укладено в 3 (трьох) оригінальних примірниках українською та англійською мовою, які мають однакову юридичну силу. У випадку виникнення розбіжностей, переважну силу матиме текст, викладений

6

5.9. All payments made under this Agreement, including but not exclusive to payments under a separate agreement to be entered into by the Parties as provided in clause 1.3 above, shall be made in immediately available funds, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority;

5.10. This Agreement represents the whole and only agreement between the Parties in relation to the Claims assignment and supersedes any previous agreement (whether written or oral) between the Parties in relation to its subject matter;

5.11. The Parties accept the legal power and validity of the signed Agreement received via fax or via e-mail, as well as of all the document related to it (annexes, additions, protocols, amendments, schedules, etc.), signed and received in the same manner, with subsequent confirmation by means of originals.

**IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as a Deed on the day, month and year first written above.**

**PARTY 1:**

**INITIAL CREDITOR**
**CFSIT, Inc.**

Address: 9350 Excelsior Boulevard, MS142-4B, Hopkins, MN 55343, USA

Account No.: CITIBANK N.A., NY, ACCOUNT No. 30501068, SWIFT CITIUS33

---

англійською мовою;

5.9. Усі платежі, що мають бути вчинені згідно з цим Договором, включаючи але не обмежуючись платежами на підставі окремого договору, що має бути укладений Сторонами згідно з п. 1.3 цього Договору, повинні бути здійснені вільними грошовими коштами без відрахувань та зобов'язань по відрахуванню будь-яких існуючих або майбутніх податків, мит, зборів, включаючи збори, мита або податки на прибуток нерезидентів, встановлені урядом України або будь-якими іншими державними або податковими органами;

5.10. Цей Договір становить повний та єдиний договір між Сторонами щодо відступлення Прав вимоги, а також замінює собою будь-які попередні договори (письмові та усні) між Сторонами щодо його предмета;

5.11. Сторони визнають юридичну силу та чинність підписаного Договору, отриманого за допомогою факсу або електронної пошти, так само як і будь-яких пов'язаних документів (додатків, доповнень, протоколів, графіків тощо), які підписані та отримані таким же шляхом, з подальшим підтвердженням оригіналами.

**НА ПІДТВЕРДЖЕННЯ ЦЬОГО Сторони належним чином уклали цей Договір в спеціальній письмовій формі у день, місяць і рік, зазначені на початку цього Договору.**

**СТОРОНА 1:**

**ПЕРВІСНИЙ КРЕДИТОР**
**CFSIT, Inc.**

Місцезнаходження: бульв. Екселсіор, 9350, MS 142-4В, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA)
Рахунок: CITIBANK N.A., NY, ACCOUNT No. 30501068, SWIFT CITIUS33

| | |
|---|---|
| **Authorized person** | **Уповноважена особа** |

*Kristin Wessel* **Kristin Lee Wessels /** *Kristin Wessel* **Крістін Лі Весселс /**

| | |
|---|---|
| In the presence of witness:<br>(name)<br>(address)<br>(occupation) | В присутності свідка:<br>(ім'я)<br>(адреса)<br>(вид занять свідка) |

*Nancy L. Nelson*
*Nancy Dar-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA* **PARTY 2:**

*Nancy L. Nelson*
*Nancy Dar-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA* **СТОРОНА 2:**

| | |
|---|---|
| **NEW CREDITOR**<br>**Limited Liability Company**<br>**"YABLUNEVIY DAR"** | **НОВИЙ КРЕДИТОР**<br>**Товариство з обмеженою відповідальністю**<br>**«ЯБЛУНЕВИЙ ДАР»** |
| Registered address: 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine<br>Identification code 32475074<br>Current Account № 26006000014224 (980) in PJSC "Ukrsotsbank", MFO 300023 | Місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А<br>Ідентифікаційний код 32475074<br>Поточний рахунок № 26006000014224 (980) в ПАТ «Укрсоцбанк»<br>МФО 300023 |

| | |
|---|---|
| **Acting Executive Director** | **Тимчасово виконуючий обов'язки виконавчого директора** |

**/ R. V. Markiv /** **/ Р. В. Марків /**

| | |
|---|---|
| In the presence of witness:<br>(name) *Oleksiy Bucarov*<br>(address) *Lviv reg., Vynohradskyi rayon, Nov*<br>(occupation) *advocate Petibles, ml 2206 "A"* | В присутності свідка:<br>(ім'я) *Олексій Гуцалов*<br>(адреса) *Львівська обл., Винноградський р-н, с.м.Яблонові*<br>(вид занять свідка) *адвокат б/п. 2206 "А"* |

8

**ANNEX 1 TO THE ASSIGNMENT AGREEMENT NO. AA6
EXECUTED BY THE PARTIES AS OF FEBRUARY 5, 2015**

**July 07, 2015**

This Annex 1 ("Annex") to the Assignment Agreement (the **"Assignment Agreement"**) is made by and between among:

1)     CFSIT, Inc., a Delaware USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA ("CFSIT" or "Initial Creditor") and

2)     Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 ("YabDar" or "New Creditor"),

CFSIT and YabDar are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

**WHEREAS:**

- CFSIT and YabDar are the Parties to the Assignment Agreement,

- In accordance with Article 1.3 of the Assignment Agreement the Parties have agreed to execute the explicit payment terms under the Assignment Agreement in a separate agreement,

- YabDar has requested CFSIT to provide deferred payment terms under the Assignment Agreement and CFSIT is willing to provide such deferred payment terms on the conditions stipulated in this Annex 1 (the "Senior Debt Facility").

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## I. DEFINITIONS

**YabDar**     Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500

**Dar Assets**     Means YabDar assets pledged in favour of Delta Bank as of February 5, 2015.

**Delta Bank**     means PUBLIC JOINT-STOCK COMPANY "DELTA BANK", a bank duly registered under the laws of Ukraine.

Capitalized terms used herein but not defined shall have the same meanings as defined in the Assignment Agreement between the Parties.

## II. SUBJECT MATTER OF THE AGREEMENT

The Parties agree to amend and restate Clause 1.1. of Article 1 of the Assignment Agreement as follows:

1.1.     The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) (the "Claims") under

© 2015 CFSIT, Inc. All rights reserved.     1

1.a) the following documentary instrument and all the related documentation as applicable: all claims of the creditor (beneficiary) under the following documentary instruments issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the "Debtor", for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

Irrevocable standby letter of credit No. LC/SB/027/062014 in the amount of 4,650,000.00 US Dollars

Irrevocable standby letter of credit No. LC/SB/028/062014 in the amount of 4,652,500.00 US Dollars;

Irrevocable standby letter of credit No. LC/SB/026/042014 in the amount of 28,654,844.95 US Dollars

1.b) CFSIT's 63,9237% proportionate interest, which is equal to USD 9,302,500.00 in the outstanding payment claims of CFSIT on the Limited Liability Company Agronovocom, Kiev, Ukraine in relation to the purchase of goods from CFSIT under Purchase Contact No. CFSIT489.14-S effective as of 30 May 2014, including any amendments thereto and

CFSIT's 50% proportionate interest, which is equal to USD 28,654,844.95 in the outstanding payment claims of CFSIT on the Limited Liability Company Agronovocom, Kiev, Ukraine in relation to the purchase of goods from CFSIT under Purchase Contact No. CFSIT288.11-10-S effective as of 23 November 2011, including any amendments thereto.

## II. PAYMENT TERMS

In consideration for the assignment of the Claims, YabDar agrees to pay in favour of CFSIT the amount of USD 37,957,344.95 (US Dollars Thirty Seven Million Nine Hundred Fifty Seven Thousand Three Hundred Forty Four and 95/100) (hereinafter – the "Senior Debt Amount" or "Consideration") in accordance with the terms and conditions set out below:

The repayment of the Senior Debt Amount shall be made in instalments on the following repayment dates (further collectively referred to as the "Repayment Dates"):

| | |
|---|---|
| 05 May 2018 | USD 1 897 867,25 |
| 05 Aug 2018 | USD 1 897 867,25 |
| 05 Nov 2018 | USD 1 897 867,25 |
| 05 Feb 2019 | USD 1 897 867,24 |
| 05 May 2019 | USD 1 897 867,25 |
| 05 Aug 2019 | USD 1 897 867,25 |
| 05 Nov 2019 | USD 1 897 867,25 |
| 05 Feb 2020 | USD 1 897 867,24 |
| 05 May 2020 | USD 5 693 601,74 |
| 05 Aug 2020 | USD 5 693 601,74 |
| 05 Nov 2020 | USD 5 693 601,74 |
| 05 Feb 2021 | USD 5 693 601,75 |

YabDar further agrees and acknowledges and hereby expresses its consent that upon the successful arrangement and provision of working capital financing by CFSI to T.B. Fruit Polska Sp. Z o.o. S.K.A., 109 Sandomierska str., 27-620 Dwikozy, Poland, the Polish affiliate of YabDar ("TB Fruit Poland") the Senior Debt Amount shall become interest bearing. The interest rate and interest periods shall be agreed by the Parties but in no case the interest rate shall be lower than 5% per annum and the interest period shall start to accrue on the outstanding Senior Debt Amount as of the date when the volume of working capital financing arranged for and/or

© 2015 CFSIT, Inc. All rights reserved.

2

provided to TB Fruit Poland reaches USD 40 million ("Interest Period Starting Date") and shall be payable every 180 days from the interest period starting date until the repayment of the Senior Debt Amount.

YabDar also agrees and acknowledges that YabDar shall be deemed to fulfil its payment obligations only when CFSIT gets money to its respective accounts.

YabDar shall bear the risk and costs of getting all external authorizations for payments out of Ukraine (including but not limited to licenses, permits, registrations, approvals or any other authorizations needed under the applicable legislation or bank practice at the time of payment). In case payments under the Assignment Agreement and this Annex become explicitly restricted or forbidden by the law at the time of payment and shall stay restricted or forbidden more than 15 consecutive days from the scheduled date of payment, YabDar shall immediately procure such payments by and from its affiliate: Francoso Corporation Limited, a legal entity duly registered under the laws of Cyprus having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus. The Parties hereto have agreed that any restriction or ban on payments outside Ukraine shall not be considered a force majeure event and such restriction or ban shall not extend, suspend or stop YabDar obligation to pay.

## II. SECURITY OF PAYMENT

To secure YabDar's Senior Debt Amount payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause YabDar Assets to be pledged in favour of CFSIT to be of sufficient collateral value (meaning the three integral property complexes located in Ukraine) with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "Pledge"). YabDar undertakes to arrange for the said pledge as soon as reasonably possible after the release of YabDar Assets from the current liens made in favour of Delta Bank but in any case, no later than the first of the Repayment Dates. The collateral value shall be determined based on the following formula: market value of the respective complexes (based on most recent independent appraisal which shall be updated annually)*0.8.

YabDar undertakes to take all necessary actions required under the applicable legislation of Ukraine to cause the YabDar Assets to be pledged in favour of CFSIT and all necessary actions to perfect such Pledge.

YabDar undertakes that the YabDar Assets to be pledged in favour of CFSIT shall be made free and clear of any liens and/or any encumbrances.

If for any reason the Pledge cannot be arranged by YabDar by the first of the Repayment Dates, YabDar shall procure that CFSIT receives no later than the said Repayment Date one other adequate security in the form of either:

- Standby letter of credit issued in the form acceptable to CFSIT by a financial institution acceptable to CFSIT in the amount equal to the obligations of YabDar under the Assignment Agreement and this Annex with an expiry date of no earlier than the last of the Repayment Dates plus 30 calendar days; OR

- Irrevocable first demand payment guarantees to be issued by a guarantor or guarantors acceptable to CFSIT and in the form acceptable to CFSIT covering the amount equal to the payment obligations of YabDar under the Assignment Agreement and this Annex and

© 2015 CFSIT, Inc. All rights reserved.

3

with a validity period equal to the last of the Repayment Dates plus 30 calendar days; OR

- YabDar shall pledge or cause any of the Guarantors to pledge in favour of CFSIT its/their sales proceeds from the contracts with third parties in the amount equal to or greater than the payment obligations of YabDar under the Assignment Agreement and this Annex on each of the Repayment Dates.

YabDar shall also procure the issuance of the following guarantees to CFSIT by the following guarantors (hereinafter "the Guarantors") no later than 5 days from the date of this Annex:

- First Demand suretyship to be issued by Mr. Taras Barshchovskyy, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSIT;

- First Demand payment guarantee to be issued by T.B. Fruit Polska Sp. z o.o. S.K.A., a legal entity duly registered under the laws of Poland having its registered address at 109 Sandomierska str., 27-620 Dwikozy, Poland, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSIT;

- First Demand payment guarantee to be issued by Francoso Corporation Limited, a legal entity duly incorporated under the laws of Cyprus, having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus ("Francoso Corporation Limited"), covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSIT.

## V. REPRESENTATIONS & WARRANTIES

In addition to the Representations in the Assignment Agreement, YabDar hereby further represents and warrants that:

a. this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be YabDar's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and thereof, and such obligations rank at least pari passu in all respects with all their other similar obligations;

b. it has disclosed all of its material liabilities, contingent or otherwise to CFSIT;

c. this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be in proper legal form under the laws of Ukraine for the enforcement thereof against it in the courts of Ukraine, and to ensure the legality, validity, enforceability or admissibility in evidence of such documents in Ukraine, it is not necessary that such documents be filed or recorded with any court or other authority in Ukraine or that any stamp or similar tax be paid on or in respect of such documents;

d. it has or will take all required measures to assure that it can effect timely repayment of the Senior Debt Amount as contemplated herein, in United States Dollars, and assure that this Annex and the Assignment Agreement, and all documents to be delivered hereunder, remain in effect, enforceable and in compliance with all applicable laws and regulations;

e. there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's

© 2015 CFSIT, Inc. All rights reserved.

4

knowledge) threatened against YabDar either (i) with respect to or arising out of this Annex or the Assignment Agreement, or the transactions related thereto;

f.    neither it nor any of its revenues or properties have any right of immunity from suit, court jurisdiction, attachment prior to judgment, execution of a judgment or from set-off, banker's lien, counterclaim or any other legal process or remedy with respect to its obligations hereunder or under the Assignment Agreement

g.    there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar;

h.    YabDar has good and clear title to its production and operational assets and land, free and clear of any liens or encumbrances except for those created or granted under any security documents in favour of YabDar's lenders;

i.    it will provide evidence to CFSIT that it has obtained all required licenses, consents and authorizations for the YabDar Assets and those assets are in compliance with all applicable environmental and safety standards normally applied to such type of assets;

j.    it will provide evidence to CFSIT of its ownership of the land (or the terms of any lease rights) related to the YabDar production and operations facilities;

k.    it will maintain insurance on the YabDar's properties and assets in at least such amounts, against at least such risks and with such risk retention as are generally maintained, insured against or retained by other companies of established reputation engaged in the same or similar business;

l.    it will keep proper books of record and account in which full and correct entries in conformity with local GAAP shall be made of all dealings and transactions in relation to its business and activities.

m.    it will cause Francoso Corporation Limited to produce consolidated group financial statements under IFRS for each of the financial years from 2015 through 2021 (both years inclusive) and have them audited by of the reputable international audit firm agreed by the Parties;

n.    to provide CFSIT with the financials at first request as well as to provide any such additional financial and other information related to the performance of YabDar that may be reasonably requested by CFSIT;

u.    not to directly or indirectly, create, assume or suffer to exist any lien upon any property or asset now or hereafter acquired by YabDar to secure any debt which is *pari passu* with or subordinate in right of payment under the Senior Debt Amount unless the Senior Debt Amount is secured equally and rateably prior to the creation, incurrence or assumption of such lien. Notwithstanding the foregoing provisions of this section, the YabDar shall not permit, create, assume or suffer to exist any lien on the capital stock of YabDar.

© 2015 CFSIT, Inc. All rights reserved.

5

**VI. DEFAULT**

If YabDar or any of its affiliates alternatively shall:

a.　　breach any representation or warranty made by YabDar (or any of its officers) under or in connection with this Annex or in any financial statement shall prove to have been incorrect, false or misleading in any material respect when made and such condition (if capable of remedy) remains unremedied for a period of thirty (30) days after the YabDar or CFSIT obtains knowledge thereof;

b.　　fail to perform or observe any other term, covenant or agreement contained in Section V. (a) through and including (u) and/or referred to in this Annex;

c.　　generally not pay or admit its inability to pay its respective debts as such debts become due;

d.　　shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail to generally pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

e.　　become subject to an involuntary case or other proceeding shall be commenced against YabDar seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days; or an order for relief shall be entered against YabDar under any bankruptcy laws as now or hereafter in effect;

f.　　any event shall occur that could be reasonably expected to have a Material Adverse Effect on the: (i) property, businesses, operations, financial condition, liabilities or capitalization of YabDar; (ii) ability of YabDar to perform any of its respective obligations under this Annex, (iii) validity or enforceability of this Annex, or (iv) timely payment of the principal or any interest amount due hereunder;

g.　　a Change of Ownership or sale or any other disposition of assets of total value equal or greater USD 1,000,000 shall occur, without a prior written consent of CFSIT;

h.　　YabDar shall (i) default in the payment when due of any principal of or interest on any of its Debt (other than the Senior Debt Amount or (ii) any event specified in any note, agreement, indenture or other document evidencing or relating to any such debt shall occur, the result of which is to cause, or (with the giving of any notice or lapse of time or both) to permit the holder or holders of such debt (or a trustee or agent on behalf of such holder or holders) to cause such debt to become due and payable prior to its stated maturity; provided, however, that the

© 2015 CFSIT, Inc. All rights reserved.

6

aggregate amount of such Debt falling within (i) above (as to which the time for payment has not been extended by the relevant creditors) and any relevant payments falling within (ii) above equals or exceeds USD1,000,000 (US Dollars one million) for YabDar in aggregate;

i.    one or more judgments or orders from which no further appeal is permissible under applicable law for the payment of money aggregating in excess of USD1,000,000 (one million US dollars) (or its equivalent in another currency) shall be rendered against YabDar, and such judgment or order shall continue unsatisfied and in effect until the date by which payment must be made pursuant to such judgment or order;

j.    at any time during the term of this Annex, it is or becomes unlawful for the YabDar to perform its respective obligations pursuant to the terms and conditions contained in this Annex, or any of such obligations are not, or cease to be, legal, valid and binding on it and enforceable against YabDar;

j.    If any of the following events have occurred:

(i)    the whole or a substantial part of the assets of the YabDar, or any of its affiliates is confiscated or attached;

(ii)    any change occurs in the ownership or control of the YabDar or any of its affiliates, which, in the reasonable opinion of the CFSIT, constitutes a material adverse change affecting the financial condition or operations of the YabDar or any of its affiliates respectively;

(iii)    any competent governmental authority takes any action to condemn, seize, requisition or otherwise appropriate any substantial portion of the properties or assets of YabDar or any of its affiliates (either with or without payment of compensation), or any action relating to YabDar or any of its affiliates, which in the opinion of CFSIT, adversely affects YabDar's ability to pay its indebtedness under the Assignment Agreement,

then, in any such event CFSIT, may immediately proceed to protect and enforce its rights by an action at law, or other appropriate proceeding, including but not limited to, demanding and declaring this Annex, including all interest accrued thereon and all other amounts payable under this Annex to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by YabDar. YabDar hereby agrees to indemnify CFSIT for (i) all reasonable costs and expenses (including but not limited to attorney's fees) incurred by CFSIT in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom. Said indemnification shall survive the repayment in full of the Senior Debt Amount.

## VII. GENERAL PROVISIONS

a.    Any provision of this Annex that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

b.    The section headings in this Annex are for convenience of reference only and shall not affect the interpretation hereof.

7

© 2015 CFSIT, Inc. All rights reserved.

c. This Annex may be signed in counterparts with each counterpart deemed an original and both counterparts together constituting one and the same document.

d. The parties hereto acknowledge to have had previous access to the contents of this Annex and that notwithstanding its English language have perfectly understood its exact content.

e. All payments under this Annex are to be made in immediately available funds in United States Dollars, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority. The Parties agree that, in the event of any such deduction, withholding or tax payment, YabDar shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment CFSIT will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon YabDar's request, CFSIT agrees to provide such documentation, which to its best knowledge but without any assurances on its part, is required by to classify CFSIT as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and Ukraine. Payments are to be made to CFSIT's account as per Assignment Agreement.

If payments under this Annex are not made in full when due, then any outstanding amount due but unpaid hereunder shall accrue late interest at 11 % calculated per annum from the date relevant payment should have been made until the date payment is received in full.

f. Any and all information in connection with the transaction(s) under the Assignment Agreement shall be treated as confidential by the YabDar, its officers, employees and representatives, and any of the YabDar's affiliates and shall not be disclosed to any third party in any form whatsoever without the CFSIT's prior express written consent, unless required by law or court order. If the YabDar is required by law or court order to disclose any such information, the YabDar shall provide the CFSIT prompt written notice of such requirement.

This Annex is executed on the first date written above and comes into force as of the effective date of the Assignment Agreement.

All the changes, annexes, additional agreements and amendments to the Assignment Agreement and this Annex will be valid only in done in writing and signed by the authorized representatives of all Parties.

This Annex supplements the Assignment Agreement and represents its integral part. All the provisions of the Assignment Agreement remain in full legal power and force unless specifically amended or ruled out by this Annex.

[SIGNATURE PAGE FOLLOWS]

8

© 2015 CFSIT, Inc. All rights reserved.

## SIGNATURE PAGE

**Limited Liability Company "Yabluneviy dar"**
274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500
Bank details:
Beneficiary: LLC "Yabluneviy dar"
Account Number: 26008002005469
Beneficiary Bank: JSC Delta Bank, Kiev, Ukraine
SWIFT:DELKUAUK
Correspondent Bank: Deutsche Bank Trust Company Americas, New York, NY, USA
SWIFT: BKTRUS33

**CFSIT, Inc.**

1209 Orange Street, Wilmington, County of New Castle, State of Delaware with principal offices at 9350 Excelsior Boulevard, MS142-4B, Hopkins, Minnesota 55343, USA
Bank Details:
Beneficiary bank:  Citibank, NA, New York , U.S.A.
SWIFT:  CITIUS33XXX
ABA: 021000089
Bank Account:  30501068

By: _____

Name: Roman Markiv

Title: Director

By: _____

Name:

Title:

**Jennifer Campbell**
**Authorized Signer**

© 2015 CFSIT, Inc. All rights reserved.

# SURETYSHIP AGREEMENT

This Suretyship Agreement (this "**Suretyship Agreement**") is made on July 07, 2015 by

1. **Taras Barshchovskyy,** a Ukrainian national, residing at Bratkovychi, Ukraine, passport number KB076181 (which expression shall include any personal representatives, receiver, trustee in bankruptcy or any other person acting on his behalf) (the "**Surety**")

     in favour of

2. **CFSIT, Inc.,** a Delaware, USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA (the "**Beneficiary**")

## 1    SURETYSHIP AND INDEMNITY

1.1      In consideration of the Beneficiary having (i) entered into Assignment Agreement No **AA6** as of **February 05, 2015**, with Limited Liability Company "Yabluneviy dar", a legal entity incorporated under the laws of Ukraine, and having its registered office at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 (the "**Obligor**"), as amended, modified and/or supplemented from time to time (the "**Assignment Agreement**") and (ii) extended payment terms in accordance with the terms of the Assignment Agreement to the Obligor, the Surety, as primary obligor and not merely as surety, irrevocably and unconditionally secures by this Suretyship Agreement the due and punctual payment of all amounts payable by the Obligor to the Beneficiary under the Assignment Agreement (the "**Secured Obligations**") when the same shall become due and payable.  Upon each or any failure by the Obligor to pay punctually the Secured Obligations or any part thereof as provided under the Assignment Agreement, and upon first written demand (the "**Demand**") by the Beneficiary to the Surety, the Surety agrees to immediately pay the Secured Obligations to the Beneficiary.  Surety hereby acknowledges and agrees that the Secured Obligations may increase in amount due by reason of any modifications of the Assignment Agreement, Secured Obligations or otherwise.

1.2      Notwithstanding any provision in this Suretyship Agreement, the aggregate amount the Surety shall be required to pay under this Suretyship Agreement shall not exceed USD 37,957,344.95 (US Dollars Thirty Seven Million Nine Hundred Fifty Seven Thousand Three Hundred Forty Four and 95/100) plus the amount of any unpaid interest, fees and/or unpaid late payment interest as defined in the Assignment Agreement and the reasonable costs of enforcing the obligations of the Surety hereunder. In this connection, any payment to be made by the Surety to the Beneficiary, its successors and assigns under this Suretyship Agreement shall be made in US dollars without set-off or counterclaim whatsoever and free and clear of and without withholding or deduction for, or on account of, any present or future taxes, including interest, penalties and additions thereto, imposed, levied collected, withheld or assessed by or on behalf of or within Surety's Home State (as defined below) or by any other competent authority, unless required by law. The parties agree that, in the event of any such deduction, withholding or tax

i

© 2015 CFSIT, Inc. All rights reserved.

payment, the Surety shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment the Beneficiary will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon Surety's written request, the Beneficiary agrees to provide such documentation, which to the Beneficiary's best knowledge but without any assurances on its part, is required by Surety's Home State legislation or authorities to classify the Beneficiary as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and the Surety's Home State. Failure by the Beneficiary to provide such documentation shall not release the Surety of its obligations under this Clause 1.2. "*Surety's Home State*" means any country in which the Surety has its domicile, or is considered to be a tax resident.

1.3     The Surety's obligations under this Suretyship Agreement shall be absolute, irrevocable and unconditional irrespective of the validity or enforceability of any provision of the Assignment Agreement or any other provision of this Suretyship Agreement. This Suretyship Agreement is a continuing suretyship for payment and not collection and shall apply to all Secured Obligations.

1.4     If the Secured Obligations are not recoverable from the Obligor by reason of illegality, incapacity, the lack of authority, ineffectiveness of execution or any other reason, the Surety shall, notwithstanding any of the foregoing, remain liable under this Suretyship Agreement as if he were a principal obligor. The Surety, as principal obligor and as a separate and independent obligation and liability from his obligations under Clause 1.1 above, irrevocably and unconditionally agrees to indemnify the Beneficiary in full immediately and on demand against all losses, costs and expenses suffered or incurred by the Beneficiary arising from or in connection with the Assignment Agreement.

1.5     The Surety hereby expressly waives to the fullest extent permitted by applicable law any requirement for promptness, diligence, presentment, or protest and any requirement that the Beneficiary assert, exercise, refrain from exercising or exhaust any right, power, remedy or process against the Obligor under any promissory note or other agreement or instrument, or against any other person under any other suretyship of, or security for, any of the Secured Obligations.

1.6     The Surety agrees that, in the event of a formal dissolution or insolvency of the Obligor, or filing of any petitions or commencement of any actions relating to same, whether by the Obligor or any third party, the declaration by the Obligor or the Surety of its inability or failure to pay any amounts under the Assignment Agreement, or this Suretyship Agreement, (as applicable) as they become due or an assignment by the Obligor or the Surety for the benefit of creditors, or the commencement of any case or proceeding in respect of the Obligor or the Surety under any bankruptcy, insolvency, or similar laws, which if commenced by a party other than the Obligor or the Surety is not dismissed within sixty (60) days of its filing, and if such event shall occur at a time when any of the Secured Obligations of the Obligor may not then be due and payable, the Surety will pay to Beneficiary forthwith the full amount which would be payable hereunder by the Surety if all such Secured Obligations were then due and payable.

2     PRESERVATION OF RIGHTS

© 2015 CFSIT, Inc. All rights reserved.

2.1 Neither the obligations of the Surety herein contained nor the rights, powers and remedies conferred upon the Beneficiary by law shall be discharged, impaired or otherwise affected by:

        2.1.1 the bankruptcy or insolvency of the Obligor or any similar or equivalent proceedings against him;

        2.1.2 time or other indulgence being granted or agreed to be granted to the Obligor in respect of obligations under the Assignment Agreement and/or in relation to the Secured Obligations in which circumstances the obligations of the Surety shall be varied by the extent of the time or other indulgence;

        2.1.3 any amendment or supplement to, termination, novation or any variation, waiver or release of or in respect of the Assignment Agreement and/or any of the Secured Obligations; or

        2.1.4 any act or omission which would not have discharged or affected the liability of the Surety had it been a principal debtor instead of Surety or indemnitor or by anything done or omitted by any person which but for this provision might operate to exonerate or discharge the Surety or otherwise reduce or extinguish his liability under this Suretyship Agreement.

2.2 Insofar as the Surety acquires rights against the Obligor in consequence of the Surety performing its obligation hereunder, the Surety undertakes that it will not exercise such rights or seek to obtain collateral in respect of such rights while the Obligor is under any actual or contingent obligation under the Assignment Agreement. The Surety further undertakes that it will not seek to take any steps to obtain collateral in anticipation of acquiring such rights.

2.3 The obligations of the Surety under this Suretyship Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Obligor in respect of the Secured Obligations is rescinded or must be otherwise restored by the Beneficiary, whether as a result of any proceedings in bankruptcy or insolvency or otherwise, and the Surety agrees that he will immediately indemnify the Beneficiary on demand for all reasonable costs and expenses (including, without limitation, fees of counsel) incurred by the Beneficiary in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

2.4     Without limitation of the foregoing, when requested by the Beneficiary (if so required by applicable laws), the Surety shall apply for and shall obtain a license of the National Bank of Ukraine enabling him to make cross-border payments to the Beneficiary under this Suretyship Agreement.

# 3  DURATION OF SURETYSHIP

3

© 2015 CFSIT, Inc. All rights reserved.

This Suretyship Agreement will terminate on **31 May 2021**; provided, however, that such expiration shall not release the Surety from any obligation to the Beneficiary under this Suretyship Agreement until all amounts due under the Assignment Agreement have been paid in full or expire in accordance with the terms of the Assignment Agreement.

4   **REPRESENTATIONS, WARRANTIES AND COVENANTS**

The Surety represents, warrants and covenants that:

4.1  it is an adult individual and has the legal authority and capacity to enter into and perform this Suretyship Agreement;

4.2  the execution, delivery and performance of this Suretyship Agreement will not contravene any law or regulation to which the Surety is subject, and all governmental or other consents requisite for such execution, delivery and performance are in full force and effect. The execution, delivery and performance of this Suretyship Agreement does not require receipt of any regulatory authorizations (licenses, approvals, permits, etc.) which are required by applicable law;

4.3  the execution, delivery and performance of this Suretyship Agreement will not cause the Surety to be in breach or default under any agreement binding on it or any of its assets or require any consent under any indenture, note, mortgage, agreement or other instrument or arrangement to which the Surety is a party or by which it is bound;

4.4  this Suretyship Agreement constitutes and at all times shall constitute, a direct, unsecured and unsubordinated obligation of the Surety, ranking pari passu with all other present and future unsecured and unsubordinated obligations of the Surety;

4.5  this Suretyship Agreement has been duly executed by it and constitutes a valid obligation of the Surety, legally binding on it and enforceable in accordance with its terms in the courts of its place of incorporation;

4.6  the Surety has disclosed to the Beneficiary in writing all financial reports, other written information and other material information relevant to assure full and true disclosure required to permit the Beneficiary to evaluate the making of payment terms to the Obligor. All documents, reports and other written information pertaining to the Obligor or the Surety that have been furnished to the Beneficiary were prepared with due care and in good faith, are true, complete and correct in all material respects and do not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not materially misleading. There is no fact relating the Surety that is known to, or which by the exercise of due diligence could be known to, the Surety, the existence of which could reasonably be expected to cause the Beneficiary not to provide the payment terms to the Obligor;

4

© 2015 CFSIT, Inc. All rights reserved.

4.7 in acting as the Surety under this Suretyship Agreement it has complied and will continue to comply for the duration of this Suretyship Agreement with all necessary and applicable anti-money laundering procedures required for it to act as a Surety hereunder;

4.8 it has been provided with, and hereby acknowledges receipt and review of a duly certified copy of the Assignment Agreement; and

4.9 it will procure that, at all times during this Suretyship Agreement, the amount of Surety's own USD funds standing to the credit of its bank accounts is sufficient to perform the Surety's obligations hereunder.

## 5  CONTINUING SECURITY

The obligations of the Surety herein shall constitute and be continuing obligations and shall not be considered satisfied by any intermediate payment or other settlement of account. The said obligations shall continue in full force and effect until final payment in full of all amounts owing by the Obligor under the Assignment Agreement.

## 6  DEMANDS AND NOTICES

6.1 Any Demand or notice shall be written and in the English language.

6.2 Any Demand shall be accompanied by a statement from the Beneficiary stating that the sum demanded is due and payable but unpaid and such demand shall, in the absence of manifest error, be binding on the Surety.

6.3 Any Demand or notice shall be hand delivered to or sent by courier by way of a first-class international courier company to the recipient at its address stated in this clause (or such other address as may be notified in writing from time to time):

(A) In the case of the Surety:
2g Ivasyuka Str., 81500 Gorodok,
Lviv Region, Ukraine

(B) In the case of the Beneficiary:
9350 Excelsior Blvd.
Hopkins, MN 55343

Attention: Jennifer Campbell

6.4 Any notice, not being a Demand, may be sent by fax to the following fax numbers:

(A) In the case of the Surety:
Fax No: 38 - 03231 - 321 - 21

(B) In the case of the Beneficiary:
Fax No: 1-952-249-4416

5

© 2015 CFSIT, Inc. All rights reserved.

6.5 Any Demand or notice shall be deemed to have been duly served:-

    6.5.1  if delivered by hand, when delivered at the address referred to in Clause 6.3 above; or

    6.5.2  if sent by courier on the day of delivery to the address referred to in Clause 6.3 above; or

    6.5.3  in the case of a notice other than a Demand, if sent by facsimile, at the time when sent to the recipients fax number referred to in Clause 6.4 above.

## 7  PARTIAL INVALIDITY

If at any time any one or more of the provisions of this Suretyship Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction neither the legality, validity or enforceability of the remaining provisions of this Suretyship Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall be in any way impaired as a result.

## 8  AMENDMENT

No term or provision of this Suretyship Agreement shall be amended, modified, altered, waived or supplemented except in a written document signed by the Surety and the Beneficiary.

## 9  COSTS

Subject to Clause 1.2 above, the Surety shall immediately, on demand by the Beneficiary and on a full indemnity basis, pay to the Beneficiary the amount of all costs and expenses which the Beneficiary incurs under or in connection with this Suretyship Agreement.

## 10 Bank Details

Any payments under this Suretyship Agreement shall be made by the Surety to the following bank account of the Beneficiary, unless otherwise specified by the Beneficiary in writing:

Beneficiary bank:  Citibank, NA, New York, U.S.A.
SWIFT:  CITIUS33XXX
ABA:  021000089
Bank Account:  30501068

## 11 CONSENT TO SERVICE OF PROCESS

The Surety further irrevocably consents for himself, if for any reason there is no authorized agent for service of process in London, England, to the service of process out of the said courts by mailing copies thereof by registered air mail postage prepaid to it at its address specified herein; and in such a case the Beneficiary shall also

© 2015 CFSIT, Inc. All rights reserved.

send facsimile, or shall procure that there is also sent by facsimile, a copy of such process to the Surety.

## 12 ASSIGNMENT

The Surety may not assign its rights, interests or obligations hereunder to any other person. The Surety unconditionally agrees and consents that the rights of the Beneficiary under this Suretyship Agreement may be freely assigned by the Beneficiary in its sole discretion together with its rights under the Assignment Agreement with written notification to the Surety by the Beneficiary within three (3) Business Days of such assignment or transfer.

## 13 GOVERNING LAW AND ARBITRATION

Any dispute arising out of or in connection with this Suretyship Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitral proceedings shall be English. The governing law of this Suretyship Agreement shall be the substantive law of England and Wales.

**IN WITNESS WHEREOF,** this Suretyship Agreement has been executed as a deed by the Surety and has been signed by or on behalf of the Beneficiary with the intention that it be delivered on the date appearing at the beginning of this Suretyship Agreement.

**EXECUTED as a Deed**

**The Surety**

by [＿＿＿]
acting by [＿＿＿];

.......................................... TARAS BARSHCHOVSKYY,

[ADD NOTARY SIGNATURE BLOCK]

**The Beneficiary**
CFSIT Inc.
by ~~Cargill Financial Services International, Inc.~~
acting by [＿＿＿];

..........................................
[Title]

7

© 2015 CFSIT, Inc. All rights reserved.

**Amendment № 1 to Assignment Agreement №AA6 as of 05 February 2015**

**November 14, 2018**

This Amendment № 1 (the **"Amendment № 1 "**) to Assignment Agreement №AA6 as of February 05, 2015 (the "**Assignment Agreement**") and to Annex 1 thereto of July 07, 2015 (the "**Annex**") is made on November 14, 2018 (the Assignment Agreement and the Annex, together, the "**Agreement**") by and between:

**CFSIT, Inc.,** registered at Corporation Trust Center, 1209 Orange Street, Citi of Wilmington, County of New Castle, DE, 19801, U.S.A. with principal place of business at 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A. , hereinafter referred to as **"CFSIT"** or the **"Initial Creditor"**, on one side, and

**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR" (ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР")**, registered at 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500, identification number 32475074 duly represented by Mr. Roman Markiv, acting based on Charter, hereinafter referred to as **"YabDar"** the **"New Creditor"**, on the other side.

The Initial Creditor and the New Creditor are individually referred to in this Amendment № 1 as a **"Party"** or collectively as the "**Parties**".

**WHEREAS:**

A. Under the Assignment Agreement the Initial Creditor assigned to the New Creditor and the New Creditor received the Claims. In consideration of the assignment of the Claims, the New Creditor agreed in the Annex to pay in favour of the New Creditor the Consideration in the amount of US Dollars 37,957,344.95 in 12 installments until February 05, 2021 with the first installment payable on May 05, 2018.

B. To secure the New Creditor's payment obligations under the Assignment Agreement, the New Creditor agreed in the Annex to provide the Initial Creditor with one or more pledges over the New Creditor's physical assets (collectively, "**Pledge**") then and currently subject to liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", with a total collateral value of more than 100% of the Consideration amount. The Annex required the New Creditor to provide the Pledge as soon as reasonably possible upon release of the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" but in any case, no later than May 05, 2018.

C. As of the date of this Amendment № 1 the New Creditor's physical assets have not yet been released from the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" nor pledged to the Initial Creditor.

D. The New Creditor has requested that the Initial Creditor extend the payment terms of the Consideration amount under the Agreement and the terms for provision of the Pledge to the Initial Creditor and the Initial Creditor is willing to provide the requested extension on the basis of the terms and conditions outlined in this Amendment № 1 below.

Taking the above into account, the Parties hereby have agreed as follows:

**AGREED TERMS:**

1. The Parties have agreed to supplement the Agreement with the following Definitions section.

DEFINITIONS:

Capitalized terms used herein but not defined shall have the same meanings as defined in the Agreement.

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

© 2018 CFSIT, Inc. All Rights Reserved.

**"Asset Disposition"** of any Person means the sale, lease or conveyance or other disposition of assets (including, without limitation, any capital stock of any TB Fruit Group company or subsidiary of such Person held directly or indirectly by such Person), whether owned on the date hereof of hereafter acquired, in one or more related transactions, outside of the ordinary course of business (other than a sale, lease, conveyance or other disposition by such Person or a subsidiary of such Person to such Person or a wholly owned subsidiary of such Person, including any such disposition by means of a merger, consolidation or similar transaction).

"**Business Day**" shall mean any day, other than a Saturday or Sunday, on which banks are not authorised to close in Kyiv (Ukraine) and New York (USA).

"**Cargill Entity**" shall mean any company or legal entity which from time to time directly or indirectly controls, is controlled by, or is under common control of the Initial Creditor, whether or not such company or other legal entity is in existence at the time this Amendment № 1 is signed by the Parties.

**"Change of Control Event"** means an event or series of events which:

(i)     any Person, either individually or acting in concert with one or more other Persons, shall have acquired beneficial ownership (provided that a Person shall not be deemed to be the beneficial owner of shares tendered pursuant to a tender offer made by that Person or its Affiliate until the tendered shares are accepted for purchase), directly or indirectly, of equity interests of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company, or

(ii)    *(1)* another corporation merges into TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company or *(2)* Mr. Taras Barshchovskyy, TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company conveys, transfers or leases all or substantially all its assets to any Person or group, in one transaction or a series of transactions, or

(iii)   the failure at any time of TB Fruit Holding Establishment (Liechtenstein) legally and beneficially to own and control 100% of the issued and outstanding shares of capital stock of its subsidiaries held by TB Fruit Holding Establishment (Liechtenstein) as of the date of this Amendment №1, or the failure at any time of TB Fruit Holding Establishment (Liechtenstein) to have the ability to elect all the majority of the board of directors or other governing bodies of any of its subsidiaries, or

(iv)    the failure of, at any time, Mr. Taras Barshchovskyy to legally and beneficially own and/or control 100% of the issued and outstanding share of capital stock of TB Fruit Holding Establishment (Liechtenstein), and/or any other TB Fruit Group company directly or indirectly owned or subsequently acquired by Mr. Taras Barshchovskyy.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**TB Fruit Group**" means and includes any and all Persons that directly or indirectly through one or more intermediaries, is controlled by *Mr. Taras Barshchovskyy* and/or controls, is controlled by, or is under common control with YabDar and/or any of the Guarantors. "Control" (including the terms "controlled by" and "under common control with") means the direct or indirect ownership or control of more than 50% of the voting rights or equity shares of such Persons.

Any reference in the Assignment Agreement to "this Agreement" and in the Annex to "this Annex" shall be deemed to be a reference to the Assignment Agreement and the Annex as amended, modified and/or supplemented from time to time (including by this Amendment № 1).

## 2.   AMENDMENT TO THE ASSIGNMENT AGREEMENT:

Subject to terms and conditions of this Amendment № 1 the Parties agree:

© 2018 CFSIT, Inc. All Rights Reserved.

2.1. To amend and restate clause 5.3 of the Assignment Agreement as follows:

"5.3. (i) Subject to sub-clause (iv) of this clause 5.3., any notice or communication given to a Party under or in connection with this Agreement (and any amendment or supplement) shall be in writing and shall be delivered by hand, by third party courier service, by fax and/or by electronic mail, in each case to that Party's address, fax number or electronic mail address specified in, as applicable to that Party, as specified in this clause 5.3. (or to such other address, fax number or electronic mail address as that Party may notify to the other Party in accordance with this clause 5.3.).

a. If to the Initial Creditor:
For the attention of Nancy Nelson
Address: 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A.
Fax number: + 41 22 703 2841
E-mail address: Nancy_Nelson@cargill.com

b. If to the New Creditor:
For the attention of Roman Markiv
Address: 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500
Fax number :+38 03231 3-27-84

Email: r.markiv@tbfruit.com

(ii) Subject to sub-clause (iii) of this clause 5.3., delivery of a notice is deemed to have taken place (provided the requirements of sub-clause (i) of this clause 5.3. have been satisfied):

a. if delivered by hand, on the day and time the notice is delivered;
b. if sent by third party courier service, on the third Business Day after depositing such notice with the courier (excluding the date of deposit);

c. if sent by fax, on the earlier of the day and time shown in a transmission report indicating a satisfactory transmission and a confirmation of receipt obtained from the sender's facsimile machine; and

d. if sent by electronic mail, on the day and at the time that the electronic mail was read as shown in a read receipt, on the day and at the time the electronic mail was delivered as shown in a delivery receipt or on the day and at the time of receipt of an acknowledgement from the recipient indicating a satisfactory transmission (whichever is the earlier).

(iii) In the case of delivery by hand, by fax or by email, if the deemed receipt does not take place inside business hours (meaning 9.00 am to 5.30 pm on any day, other than a Saturday or Sunday, on which banks are not authorized to close in the place of deemed receipt), then deemed receipt will occur when business next starts in the place of receipt (and all references to time are to local time in the place of receipt).

(iv) This clause 5.3. does not apply to the service of any proceedings or other documents in any legal action."

2.2. To change numbering of Section II (*Payment Terms*) of the Annex to Section III (*Payment Terms*);

2.3. To change numbering of Section II (*Security of Payment*) of the Annex to Section IV (*Security of Payment*);

2.4. The table of Repayment Dates specified in the second paragraph of Section III (*Payment Terms*) of the Annex shall be replaced in its entirety and supplemented as follows:
"

| Repayment Date | Consideration amount due, USD |
|---|---|
| 15 February 2022 | $2,530,489.66 |
| 15 May 2022 | $2,530,489.66 |
| 15 November 2022 | $2,530,489.66 |
| 15 February 2023 | $2,530,489.66 |
| 15 May 2023 | $2,530,489.66 |

© 2018 CFSIT, Inc. All Rights Reserved.

| | |
|---|---|
| 15 November 2023 | $2,530,489.66 |
| 15 February 2024 | $2,530,489.66 |
| 15 May 2024 | $2,530,489.66 |
| 15 November 2024 | $2,530,489.66 |
| 15 February 2025 | $2,530,489.66 |
| 15 May 2025 | $2,530,489.67 |
| 15 November 2025 | $2,530,489.67 |
| 15 February 2026 | $2,530,489.67 |
| 15 May 2026 | $2,530,489.67 |
| 15 November 2026 | $2,530,489.67 |

The New Creditor irrevocably and unconditionally acknowledges and confirms its payment obligation as envisaged in the table above in the total amount of US Dollars 37,957,344.95, without prejudice to the Conditional Discount provisions as stated below."

2.5. The provisions of Clause 2.4 of this Amendment № 1 and any reference to the Conditional Discount shall come into effect upon satisfaction (or waiver by the Initial Creditor) of each of the conditions precedent specified in Section 3 hereof .

2.6. To add a the following at the end of Section III (*Payment Terms*) of the Annex as follows:

"In the event the Repayment Date falls on a non-Business Day, the next following Business Day shall be considered as the Repayment Date.

Notwithstanding the above, if (a) the New Creditor fails to make any payment of Consideration when due for payment hereunder, or (b) any Affiliate of the New Creditor fails to make any payment of any indebtedness to any Cargill Entity when due, or (c) any other event of default as specified in Section VII (*Default*) of the Annex has occurred, then the Repayment Dates as specified in the Annex prior to the effectiveness of Amendment № 1 to the Assignment Agreement and this Annex shall be reinstated without any demand, protest or notice of any kind, all of which are hereby expressly waived by the New Creditor. The Initial Creditor retains full rights to enforce any and all payments in accordance to such an original payment schedule.

Subject to the provisions of this paragraph, the Initial Creditor agrees to provide a discount in the amount up to 15% of the Consideration ("**Conditional Discount**"). The Conditional Discount will be proportionally applied to the instalments of the Consideration payable by the New Creditor to the Initial Creditor in 2026 as follows:

| **Repayment Date** | **Consideration amount due, USD** | **Conditional Discount amount, USD** |
|---|---|---|
| 15 February 2026 | $2,530,489.67 | $1,897,867.25 |
| 15 May 2026 | $2,530,489.67 | $1,897,867.25 |
| 15 November 2026 | $2,530,489.67 | $1,897,867.24 |

The provision of the Conditional Discount is subject to **(a)** the full and timely repayment of (i) all amounts due on each and every Repayment Date up to and including the Repayment date of 15 November 2025, and (ii) all other indebtedness of TB Fruit Group companies to the Initial Creditor and/or any Cargill Entity, including the payment obligations of FRANCOSO CORPORATION LIMITED under the Raw Materials Purchase, Inventory and Receivables Financing Agreements No 02 2017 and No 03 2017 dated January 30, 2017 (as further amended) ("**RMPIR Financing Agreements**"); and **(b)** there having been no event of default as specified in Section VII (*Default*) of Annex."

2.7. The first paragraph of Section IV (*Security of Payment*) of Annex shall be replaced in its entirety with the following:

"To secure YabDar's payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause the assets (located at:
1. 274-a Lvivska str., Gorodok, Lviv region, 81500, Ukraine
2. 62 Kopitka str., Lypovets, Vinnytska region, 22500, Ukraine
3. 7 Gagarina str., New Ushitsya, Novouushitsky district, Khmelnytsky region, 32600, Ukraine

© 2018 CFSIT, Inc. All Rights Reserved.

4. 3 Kamenetsky highway, Slobokivtsi, Yarmolinetsky district, Khmelnytsky region, 32162, Ukraine
5. 5 Kharkiv str., Zatishya, Kharkiv district, Kharkiv region, 62406, Ukraine)
or any other assets satisfactory to CFSIT ("**YabDar Assets**") to be pledged in favour of CFSIT with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "**Pledge**").

YabDar undertakes to arrange for the Pledge as soon as reasonably possible after the release of the YabDar Assets from the current liens in favour of Delta Bank but in any case, no later than December 31, 2019. The collateral value shall be determined based on the following formula: 80% of market value of the respective YabDar Assets (based on independent appraisal executed by an appraiser satisfactory to CFSIT at or immediately before the execution of the Pledge)".

2.8. The fourth paragraph of Section IV (*Security of Payment*) of Annex commencing with the words "If for any reason the Pledge" and ending with the words "and this Annex on each of the Repayment Dates", shall be replaced in its entirety with the following:

"If for any reason (a) the assets subject to the Pledge do not have a total collateral vale of more than 100% of the Senior Debt Amount outstanding, or (b) the Pledge, duly perfected, is not provided to Cargill by December 31, 2019, YabDar shall provide CFSIT with an additional and/or a substitute pledge acceptable to CFSIT".

2.9. To add Section VI (*Covenants*) right after Section V (*Representation and Warranties*) of the Annex as follows:

(a) "Unless CFSIT agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entities shall not be permitted to cause or permit a Change of Control Event.

If a Change of Control Event is agreed with CFSIT, Mr. Taras Barshchovskyy, YabDar and/or the respective TB Fruit Group entity shall give a written notice to CFSIT at least 30 days before such Change of Control Event stating:

i. that a Change of Control Event is to occur and that CFSIT has the right to require repayment of all the outstanding amounts under RMPIR Financing Agreements and the outstanding Consideration and other amounts under the Assignment Agreement at the time of the Change of Control Event. If, as a result of the Change of Control Event any of YabDar, Guarantors, Mr. Taras Barschovskyy or any other TB Fruit Group entity are to receive any cash proceeds, such cash proceeds shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts comprising the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

ii. the circumstances and relevant facts regarding the Change of Control Event,

iii. the purchase date in relation to such Change of Control Event (which shall be no earlier than 30 and no later than 60 days after such notice is given),

iv. whether the tenders will be irrevocable and the purchase price offered in relation to such Change of Control Event.

Failure to give the requisite notice to CFSIT within the time provided above shall constitute an event of default and an acceleration event under the Assignment Agreement allowing CFSIT to exercise all of its rights in the last paragraph of Section VII (*Default*) of the Annex.

(b) Unless CFSIT agrees in writing, YabDar, Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entity shall not be permitted to make Significant Asset Sales, where such Significant Asset Sale means an Asset Disposition involving assets with a fair market value in excess of US Dollars 5,000,000.00 and which is paid in cash or cash equivalents including payments in respect of deferred payment obligations when received in the form of cash or cash equivalents ("**Net Cash Proceeds**"). Net Cash Proceeds shall be net of (i) taxes payable as a result of such Significant Asset Sale, and (ii) payments made to retire indebtedness where payment of such indebtedness is secured by assets or properties which are the subject of such Significant Asset Sale. If an Asset Disposition occurs, the Net Cash Proceeds

© 2018 CFSIT, Inc. All Rights Reserved.

from such Significant Asset Sale shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts under the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

(a) Unless CFSIT agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any of their Affiliates shall not together incur any capital expenditures in the in excess of US Dollars 2,500,000.00 per calendar year according to International Financial Reporting Standards effective on the date of this Amendment № 1. Notwithstanding the foregoing, this limitation does not cover the on-going investment projects in relation to the pectin production line (with its total planned investment of Euro 5.2 million of which Euro 4.77 million has already been reported as invested as of January 31, 2017) or construction of the management office building (with its total planned investment of Euro 0.5 million, of which Euro 0.43 million has already been reported as invested as of January 31, 2017).

2.10.    To change numbering of Section VI (*Default*) of the Annex to Section VII (*Default*).

2.11.    To amend and restate part b. of Section VII (*Default*) of the Annex as follows:

"b. fails to perform or observe any other term, covenant or agreement contained in Section V (*Representations & Warranties*) (a) through and including (u), in Section VI (*Covenants*) or breaches any other term, covenant, agreement or undertaking under the Assignment Agreement or the Annex or any other assignment or annex to which any Cargill Entity and any member of the TB Fruit Group are party".

2.12.    To amend and restate part g. of Section VII (*Default*) of the Annex as follows:

"g. a Change of Control Event or Significant Asset Sale has occurred without prior written consent of CFSIT";

2.13.    To change numbering of Section VII (*General Provisions*) of the Annex to Section VIII (*General Provisions*).

## 3. CONDITIONS PRECEDENT

The provisions of Clause 2.4 to this Amendment № 1 and the Conditional Discount are subject to the satisfaction (or waiver by the Initial Creditor) of each of the following conditions ("**Conditions Precedent**")

3.1.    The Initial Creditor has received from the Guarantors the originals of the duly executed amendments to the existing guarantees (guaranteeing the New Creditor's obligations under the Agreement) extending the term of the guarantees in a substance and form acceptable to the Initial Creditor.

3.2.    The Initial Creditor has received the original of the duly executed first-demand unconditional irrevocable guarantee issued by Mr. Taras Barschovskyy in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor in replacement of the existing Suretyship Agreement made on July 07, 2015.

3.3.    The Initial Creditor has received the originals of the duly executed first-demand unconditional irrevocable guarantees issued by the following companies of TB Fruit Group in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor.
    - "T.B. FRUIT" S.R.L. (Moldova*)*;
    - TB Fruit Polska Sp. z o.o. S.K.A. (Poland);
    - LLC "Tank Trans Ukraine" (Ukraine);
    - Tank Trans Polska Sp z o.o. (Poland);
    - AMELIANA HOLDINGS LTD (Cyprus).

Collectively "T.B. FRUIT" S.R.L. (Moldova), TB Fruit Polska Sp. z o.o. S.K.A. (Poland), LLC "Tank Trans Ukraine" (Ukraine), Tank Trans Polska Sp z o.o. (Poland), AMELIANA HOLDINGS LTD (Cyprus) are further referred to as "**New Guarantors**", each of them – "**New Guarantor**".

© 2018 CFSIT, Inc. All Rights Reserved

3.4.     The Initial Creditor has received the originals of the duly executed amendments to the Deed of Pledge of Shares in FRANCOSO CORPORATION LIMITED dated January 30, 2017 and Deed of Pledge of Shares in AMELIANA HOLDINGS LTD dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein) and Cargill Financial Services International, Inc. expanding the scope of the secured obligations and securing the New Creditor's payment obligations in favour of the Initial Creditor in a substance and form satisfactory to the Initial Creditor (each - "**Amendment to the Deed of Pledge of Shares**", collectively - "**Amendments to the Deeds of Pledge of Shares**").

3.4. The Initial Creditor has received the originals of the duly executed amendments to Escrow Agreement dated January 30, 2017 and Escrow Agreement dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein), Cargill Financial Services International, Inc. and Dr. K. Chrysostomides & Co. LLC (Cyprus) in a substance and form satisfactory to the Initial Creditor.

3.5. Within ten (10) calendar days after the date of execution of this Amendment № 1 the New Creditor undertakes that it will cause Dr. K. Chrysostomides & Co. LLC (Cyprus) to submit a certified copy of each Amendment to the Deed of Pledge of Shares to the Commissioner of Stamp Duty of the Republic of Cyprus for the obtainment of an verbal ruling as to whether stamp duty is payable thereon and if so, to which amount. At the request of the Initial Creditor the New Creditor shall furnish to the Initial Creditor a written confirmation of the above mentioned submission made to the Commissioner of Stamp Duty of the Republic of Cyprus.

## 4. GENERAL PROVISIONS, MUTUAL ACKNOWLEDGMENTS AND ASSURANCES

4.1. The Parties make the following representations and acknowledgements, as applicable, as of the date of this Amendment № 1:

(i) no Change of Control Event has occurred or is occurring in relation to the New Creditor and the New Creditor continues to be fully beneficially owned and controlled by Mr. Taras Barshchovskyy;

(ii) the New Creditor confirms that it has received and accepted from the Initial Creditor all the documentation (originals, certified copies and copies) in relation to the Claims assigned under the Agreement to the New Creditor's full and final satisfaction.

(iii) The New Creditor acknowledges that there are no other documents expected or pending to be provided by the Initial Creditor to the New Creditor;

(iv) the New Creditor confirms that it has obtained all necessary and material information and disclosures from the Initial Creditor in relation to the Claims and, without relying on the Initial Creditor, made its own analysis of the Claims and all such obtained information to the New Creditor's full and final satisfaction;

(v) the Parties further confirm and acknowledge, that the Initial Creditor in addition to the transfer of the documentation outlined in sub-clause ii) above has performed the following actions:

   (a) served a default and acceleration notice dated February 05, 2015 to the Debtor; and

   (b) informed the Debtor about the assignment in favour of the New Creditor no later than 3 (three) Business Days from the effective date of the Assignment Agreement.

Both Parties acknowledge and agree that the Initial Creditor with its above actions fully satisfied, complied with and performed all of its obligations under the Agreement in connection with the Claims and that no other actions were or are required or intended to be performed by the Initial Creditor under the Agreement.

4.2. This Amendment № 1 shall come in force on the date of its signing by the authorized persons of the Parties.

4.3. All other terms and conditions of the Agreement remain unchanged.

4.4. This Amendment № 1 shall be signed in two copies in English, one for each Party, both copies having equal legal power.

© 2018 CFSIT, Inc. All Rights Reserved.

5.4. Any dispute arising out of or in connection with Amendment № 1 including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration (LCIA), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the Amendment № 1 shall be the substantive laws of New York (excluding conflicts of laws principles).

5.5. This Amendment № 1 is an integral part of the Agreement.

**The Initial Creditor:**
**CFSIT, Inc.**
9320 Excelsior Boulevard,
Hopkins, MN 55343, U.S.A.
Receiving Bank: JP Morgan Chase, N.A., New York
Swift Code: CHASUS33XXX
ABA:  021000021
Account No: 878359624


Authorized Signatory

Jennifer Campbell
Trade Finance Specialist

**The New Creditor:**
**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR"**
**(ТОВАРИСТВО З ОБМЕЖЕНОЮ ВІДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР")**
274a, Lvivska str., Gorodok,
Lvivska oblast', Ukraine 81500,
Identification no. 32475074

US Dollars Account: 26009010003864
Beneficiary bank:
BANK PIVDENNYI, Odessa, Ukraine
SWIFT CODE: PIVDUA22
Intermediary:
THE BANK OF NEW YORK MELLON, New York, USA
SWIFT CODE: IRVTUS3N

Roman Markiv

Authorized Signatory

© 2018 CFSIT, Inc. All Rights Reserved.

ASSIGNMENT AGREEMENT № AA7

*As of 05 February 2015*
*Kyiv (Ukraine)*

**PARTY 1:** Legal entity that is incorporated in the state of Delaware and is acting in accordance with the laws of the United States of America, **Cargill Financial Services International, Inc.,** registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA, hereinafter - **"Initial Creditor"**, represented by Kristin Lee Wessels, acting under the power of attorney issued, notary certified and apostiled on 13 October 2014, and

**PARTY 2:** Legal entity that is incorporated and is acting in accordance with the laws of Ukraine, **Limited Liability Company "YABLUNEVIY DAR",** located at 274A Lvivska Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine, hereinafter - **"New Creditor"**, identification code 32475074, represented by Acting Executive Director R. V. Markiv, acting on the basis of the Charter,

*hereinafter collectively – the **"Parties"**, and each individually referred to as a **"Party"**, have concluded the present Assignment Agreement, hereinafter – the **"Agreement"** as follows:*

*ARTICLE 1.*
## SUBJECT MATTER OF THE AGREEMENT

1.1.   The Initial Creditor assigns and the New Creditor receives 89.6036342 % undivided interest in any and all rights of claim (including proceeds and interest) under the following documentary instrument and all the related documentation as applicable

---

ДОГОВІР ВІДСТУПЛЕННЯ ПРАВ ВИМОГИ № AA7

*Від 05 лютого 2015 року*
*місто Київ (Україна)*

**СТОРОНА 1:** Юридична особа, яка створена в штаті Делавер та діє за законодавством Сполучених Штатів Америки, **Каргілл Файненшіал Сервісіз Інтернешнл, Інк. (Cargill Financial Services International, Inc.),** зареєстрована за адресою 1209 Орандж Стріт, Уілмінгтон, округ Ньюкасл, штат Делавер (1209 Orange Street, Wilmington, County of New Castle, State of Delaware), фактичне місцезнаходження: бульв. Ексельсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA), надалі за текстом - **"Первісний Кредитор"**, в особі Крістін Лі Весселс, яка діє на підставі Довіреності, виданої, нотаріально посвідченої та апостильованої 13 жовтня 2014 року, та

**СТОРОНА 2:** Юридична особа, яка створена та діє за законодавством України, **Товариство з обмеженою відповідальністю «ЯБЛУНЕВИЙ ДАР»,** місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, м. Городок, вул. Львівська, 274А, надалі за текстом - **"Новий Кредитор"**, ідентифікаційний код 32475074, в особі Тимчасово виконуючого обов'язки виконавчого директора Р. В. Марківа, який діє на підставі Статуту,

*надалі за текстом разом - **"Сторони"**, а окремо **"Сторона"**, уклали цей Договір відступлення прав вимоги, надалі – **"Договір"**, про наступне:*

*СТАТТЯ 1.*
## ПРЕДМЕТ ДОГОВОРУ

1.1.   Первісний Кредитор передає, а Новий Кредитор одержує частину прав вимоги (включаючи права на отримання надходжень та процентів) у розмірі відносної частки 89,6036342% за наступним документарним інструментом та іншими пов'язаними з ним документами (надалі – **«Права вимоги»**):

1

(further – the *"Claims"*):

| | |
|---|---|
| all claims of the creditor (beneficiary) under the following documentary instrument issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the *"Debtor"*, for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto: 1) Irrevocable letter of credit No. LC/IM/08/092013 in the amount of 5,498,790.00 US Dollars; | всі права кредитора (бенефіціара) за наступним документарним інструментом, випущеним ПУБЛІЧНИМ АКЦІОНЕРНИМ ТОВАРИСТВОМ «ДЕЛЬТА БАНК», надалі за текстом – *«Боржник»*, на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до нього: 1) Безвідкличний акредитив № LC/IM/08/092013 на суму 5 498 790,00 доларів США; |

1.2. The assignment of the Claims becomes effective on the date set forth above;

1.2. Відступлення Прав вимоги набирає чинності з дати зазначеної вище;

1.3. In consideration of the aforementioned assignment, the New Creditor agrees to make a payment in favour of the Initial Creditor of the face value of the Claims in United States Dollars (*"USD"*) (*i.e.* USD 4,927,115.68) within five (5) years from the date of execution of this Agreement under the conditions to be agreed by the Parties in a separate agreement.

1.3. В якості оплати за вищезазначене відступлення Прав вимоги Новий Кредитор погоджується сплатити на користь Первісного Кредитора кошти у розмірі номінальної вартості Прав вимоги в доларах США (*«USD»*) (а саме 4 927 115,68 доларів США) впродовж 5 (п'яти) років з дати укладення цього Договору на умовах, що будуть погоджені Сторонами в окремому договорі.

### ARTICLE 2.
### RIGHTS AND OBLIGATIONS OF THE PARTIES

### СТАТТЯ 2.
### ПРАВА ТА ОБОВ'ЯЗКИ СТОРІН

2.1. **Initial Creditor shall:**

2.1. **Первісний Кредитор зобов'язаний:**

2.1.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, transfer to the New Creditor all documents which confirm the Claims assigned hereunder to be reflected in a certificate of transfer and acceptance of documents to be signed by the Parties, unless such documents have been transferred by the Initial Creditor to the New Creditor before this Agreement came in to

2.1.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, передати Новому Кредитору всі документи, що підтверджують Права вимоги, що передаються за цим Договором, про що Сторонами складається відповідний акт прийому-передачі документів, у випадку, якщо такі документи не були передані Первісним Кредитором Новому Кредиторові до моменту набрання чинності цим Договором;

2

force;

2.1.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor;

2.1.3. perform other obligations as set out by the applicable laws.

**2.2. New Creditor shall:**

2.2.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, accept from the Initial Creditor all documents confirming the Claims assigned hereunder in accordance with the respective certificate of transfer and acceptance of documents;

2.2.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor.

*ARTICLE 3.*
**REPRESENTATIONS**

3.1. The Parties are companies duly established and validly existing under the laws of countries of their incorporation;

3.2. The Parties have full power and authority to conclude, execute and

---

2.1.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором;

2.1.3. виконувати інші обов'язки, передбачені законодавством, що застосовується.

**2.2. Новий Кредитор зобов'язаний:**

2.2.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, прийняти від Первісного Кредитора всі документи, які підтверджують Права вимоги, що відступаються за цим Договором, за відповідним актом прийому-передачі документів;

2.2.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором.

*СТАТТЯ 3.*
**ЗАЯВИ**

3.1. Сторони є юридичними особами, належним чином створеними та існуючими відповідно до законодавства країн їх реєстрації;

3.2. Сторони мають повний обсяг повноважень на укладення цього

3

4.1. Any dispute arising out of or in connection with this Agreement including its validity or termination shall be referred to and finally settled by London Court of International Arbitration in accordance with its Rules which shall be incorporated into this Agreement by reference. The number of arbitrators – three (3), place of arbitration – London (the United Kingdom of Great Britain and Northern Ireland), language of proceedings – English. The arbitration award shall be final and binding on all Parties.

4.1. Будь-який спір, що виникає з цього Договору або у зв'язку з ним, включаючи будь-які питання стосовно його дії або розірвання, мають бути передані та остаточно вирішені Міжнародним арбітражним судом Лондону (London Court of International Arbitration) у відповідності до його Регламенту, який вважається включеним шляхом послання у цьому пункті. Кількість арбітрів – 3 (три), місце арбітражного розгляду – Лондон (Сполучене Королівство Великобританії та Північної Ірландії), мова розгляду – англійська. Арбітражне рішення є остаточним та обов'язковим для всіх Сторін.

## ARTICLE 5.
## FINAL PROVISIONS

## СТАТТЯ 5.
## ЗАКЛЮЧНІ ПОЛОЖЕННЯ

5.1. This Agreement comes into effect from the moment of its conclusion and remains in effect until complete fulfillment of liabilities by the Parties.

5.1. Цей Договір набирає чинності з моменту його укладення та діє до остаточного виконання Сторонами прийнятих на себе зобов'язань;

5.2. All appendices, amendments and/or addendums to the present Agreement have to be executed in the written form, signed by duly authorized representatives of the Parties and sealed with the stamp (if required/applicable) with obligatory reference to this Agreement. Such appendices, amendments and/or addendums shall be an integral part of the present Agreement from the moment of their execution in the abovementioned order;

5.2. Усі додатки, зміни та/або доповнення до цього Договору мають бути вчинені в письмовій формі, підписані належним чином уповноваженими на те представниками Сторін та скріплені відбитками печаток (якщо вимагається/застосовується), з обов'язковим посиланням на цей Договір. Такі додатки, зміни та/або доповнення з моменту їх вчинення у вищевказаному порядку є невід'ємними частинами даного Договору;

5.3. All notices under this Agreement shall be considered properly served in case they are made in writing and sent by courier, facsimile or hand delivered to the addresses of the Parties mentioned herein. Date of receipt of such notices shall be the date of their hand delivery or the date when transmitted electronically;

5.3. Усі повідомлення за цим Договором будуть вважатися зробленими належним чином у разі, якщо вони здійснені у письмовій формі та надіслані кур'єром, факсом або вручені особисто за зазначеними адресами Сторін. Датою отримання таких повідомлень буде вважатися дата їх особистого вручення або дата передачі електронними засобами;

5.4. This Agreement shall be governed by and construed in accordance with the laws of New York

5.4. Цей Договір регулюється та тлумачиться згідно з правом Нью-Йорку (за виключенням колізійних норм);

5

(excluding conflicts of laws principles);

5.5. The New Creditor represents that it is registered as a payer of corporate profit tax on general terms in accordance with the Tax Code and applicable laws of Ukraine. The Initial Creditor represents that it is a tax resident of the United States of America;

5.6. The invalidity of any separate provision of this Agreement shall not cause invalidation of the whole Agreement as long as the Agreement might have been concluded without such provisions. In case any provision of this Agreement is recognized invalid or contradictory to applicable laws of New York by the court or any competent state authority in each individual case this shall not impact the application of such provisions in all other cases and the validity of other provisions of the Agreement. In such case the Parties shall draft in good faith a new provision of the Agreement to reflect to the fullest extent the intention of the Parties at the time of making this Agreement;

5.7. Each Party shall notify in writing another Party about change of any of its details within three (3) days;

5.8. This Agreement is made in three (3) original copies in English and Ukrainian languages, having equal legal force. In case of any discrepancies the English version prevails;

5.9. All payments made under this Agreement, including but not exclusive to payments under a separate agreement to be entered into by the Parties as provided in clause 1.3 above, shall be made in immediately available funds,

5.5. Новий Кредитор підтверджує, що він є платником податку на прибуток на загальних умовах відповідно до Податкового Кодексу України та застосовного законодавства України. Первісний Кредитор підтверджує, що він є податковим резидентом Сполучених Штатів Америки;

5.6. Недійсність окремих положень цього Договору не спричиняє недійсність Договору в цілому, оскільки можна припустити, що цей Договір міг би бути укладений без включення до нього таких положень. Якщо будь-яке з положень цього Договору буде визнано судом чи іншим уповноваженим державним органом недійсним чи таким, що суперечить чинному праву Нью-Йорку, в кожному конкретному випадку, таке визнання не буде впливати на застосування таких положень у всіх інших випадках та на дійсність інших положень Договору. В такому випадку, Сторони зобов'язуються сумлінно розробити нове положення Договору такого змісту, який би у повній мірі відображав ті наміри, що існували в них в момент укладання цього Договору;

5.7. У разі зміни реквізитів однієї з Сторін відповідна Сторона зобов'язана в триденний строк письмово повідомити про це другу Сторону;

5.8. Цей Договір укладено в 3 (трьох) оригінальних примірниках українською та англійською мовою, які мають однакову юридичну силу. У випадку виникнення розбіжностей, переважну силу матиме текст, викладений англійською мовою;

5.9. Усі платежі, що мають бути вчинені згідно з цим Договором, включаючи але не обмежуючись платежами на підставі окремого договору, що має бути укладений Сторонами згідно з п. 1.3 цього Договору, повинні бути здійснені вільними грошовими коштами без

6

without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority;

5.10. This Agreement represents the whole and only agreement between the Parties in relation to the Claims assignment and supersedes any previous agreement (whether written or oral) between the Parties in relation to its subject matter;

5.11. The Parties accept the legal power and validity of the signed Agreement received via fax or via e-mail, as well as of all the document related to it (annexes, additions, protocols, amendments, schedules, etc.), signed and received in the same manner, with subsequent confirmation by means of originals.

**IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as a Deed on the day, month and year first written above.**

### PARTY 1:

**INITIAL CREDITOR**
**Cargill Financial Services International, Inc.**

Address: 9350 Excelsior Boulevard, MS142-4B, Hopkins, MN 55343, USA
Account No.: CITIBANK N.A., NEW YORK, ABA 021000089, ACCOUNT No. 38490869, SWIFT CITIUS33

**Authorized person**

_Kristin Wessel_ / **Kristin Lee Wessels** /

---

відрахувань та зобов'язань по відрахуванню будь-яких існуючих або майбутніх податків, мит, зборів, включаючи збори, мита або податки на прибуток нерезидентів, встановлені урядом України або будь-якими іншими державними або податковими органами;

5.10. Цей Договір становить повний та єдиний договір між Сторонами щодо відступлення Прав вимоги, а також замінює собою будь-які попередні договори (письмові та усні) між Сторонами щодо його предмета;

5.11. Сторони визнають юридичну силу та чинність підписаного Договору, отриманого за допомогою факсу або електронної пошти, так само як і будь-яких пов'язаних документів (додатків, доповнень, протоколів, графіків тощо), які підписані та отримані таким же шляхом, з подальшим підтвердженням оригіналами.

**НА ПІДТВЕРДЖЕННЯ ЦЬОГО Сторони належним чином уклали цей Договір в спеціальній письмовій формі у день, місяць і рік, зазначені на початку цього Договору.**

### СТОРОНА 1:

**ПЕРВІСНИЙ КРЕДИТОР**
**Каргілл Файненшіал Сервісіз Інтернешнл, Інк.**
**(Cargill Financial Services International Inc.)**

Місцезнаходження: бульв. Екселсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA)
Рахунок: CITIBANK N.A., NEW YORK, ABA 021000089, ACCOUNT No. 38490869, SWIFT CITIUS33

**Уповноважена особа**

_Kristin Wessel_ / **Крістін Лі Весселс** /

7

In the presence of witness:
(name)
(address)
(occupation)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA*

**PARTY 2:**

**NEW CREDITOR**
**Limited Liability Company**
**"YABLUNEVIY DAR"**

Registered address: 274A Lvivska Str.,
Gorodok, Gorodotskiy district, Lviv
region, 81500, Ukraine
Identification code 32475074
Current Account № 26006000014224
(980) in PJSC "Ukrsotsbank", MFO
300023

**Acting Executive Director**

/ R. V. Markiv /

In the presence of witness:
(name) *Aleksiy Gusarov*
(address) *Kyiv. reg. Vyshgorodskyi dirt, Novi*
(occupation) *advocate Petivtsi, m/u 2208 "A"*

---

В присутності свідка:
(ім'я)
(адреса)
(вид занять свідка)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA*

**СТОРОНА 2:**

**НОВИЙ КРЕДИТОР**
**Товариство з обмеженою відповідальністю**
**«ЯБЛУНЕВИЙ ДАР»**

Місцезнаходження: Україна, 81500, Львівська
обл., Городоцький район, м. Городок, вул.
Львівська, 274А
Ідентифікаційний код 32475074
Поточний рахунок № 26006000014224 (980) в
ПАТ «Укрсоцбанк»
МФО 300023

**Тимчасово виконуючий обов'язки**
**виконавчого директора**

/ Р. В. Марків /

В присутності свідка:
(ім'я) *Олексій Гусаров*
(адреса) *Київська обл. Вишгородський р-н, с. Н. Петрів*
(вид занять свідка) *адвокат ц', р/р. 2208 "А"*

8

ANNEX 1 TO THE ASSIGNMENT AGREEMENT NO. AA7
EXECUTED BY THE PARTIES AS OF FEBRUARY 5, 2015

**July 07, 2015**

This Annex 1 ("Annex") to the Assignment Agreement (the **"Assignment Agreement"**) is made by and between among:

1)      Cargill Financial Services International, Inc., a Delaware USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA ("CFSI" or "Initial Creditor") and

2)      Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 ("YabDar" or "New Creditor"),

CFSI and YabDar are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

**WHEREAS:**

- CFSI and YabDar are the Parties to the Assignment Agreement,

- In accordance with Article 1.3 of the Assignment Agreement the Parties have agreed to execute the explicit payment terms under the Assignment Agreement in a separate agreement,

- YabDar has requested CFSI to provide deferred payment terms under the Assignment Agreement and CFSI is willing to provide such deferred payment terms on the conditions stipulated in this Annex 1 (the "Senior Debt Facility").

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## I. DEFINITIONS

**YabDar**      Limited Liability Company "Yabluneviy dar", a legal entity duly incorporated under the laws of Ukraine, having its registered address at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500

**Dar Assets**      Means YabDar assets pledged in favour of Delta Bank as of February 5, 2015.

**Delta Bank**      means PUBLIC JOINT-STOCK COMPANY "DELTA BANK", a bank duly registered under the laws of Ukraine.

Capitalized terms used herein but not defined shall have the same meanings as defined in the Assignment Agreement between the Parties.

## II. SUBJECT MATTER OF THE AGREEMENT

The Parties agree to amend and restate Clause 1.1. of Article 1 of the Assignment Agreement as follows:

1.1.      The Initial Creditor assigns and the New Creditor receives any and all rights of claim

© 2015 Cargill Financial Services International, Inc. All rights reserved.

1

(including proceeds and interest) (the "Claims") under

1.a) the following documentary instrument and all the related documentation as applicable: all claims of the creditor (beneficiary) under the following documentary instrument issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the "Debtor", for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

89.6036342 % undivided interest in all claims of the creditor (beneficiary) under the Irrevocable letter of credit No. LC/IM/08/092013 in the amount of 5,498,790.00 US Dollars issued by the Debtor for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto;

1.b) CFSI's 89.6036342% proportionate interest, which is equal to USD 4,927,115.68 in the outstanding payment claims of CFSI on the Limited Liability Company "YABLUNEVIY DAR", Gorodok, Ukraine in relation to the Trade Related Loan Agreement 1643 2013 dated August 21, 2013, including any amendments thereto.

## II. PAYMENT TERMS

In consideration for the assignment of the Claims, YabDar agrees to pay in favour of CFSI the amount of USD 4,927,115.68 (US Dollars Four Million Nine Hundred Twenty Seven Thousand One Hundred Fifteen and 68/100) (hereinafter – the "Senior Debt Amount" or "Consideration") in accordance with the terms and conditions set out below:

The repayment of the Senior Debt Amount shall be made in instalments on the following repayment dates (further collectively referred to as the "Repayment Dates"):

| | |
|---|---|
| 05 May 2018 | USD 246 355,79 |
| 05 Aug 2018 | USD 246 355,79 |
| 05 Nov 2018 | USD 246 355,78 |
| 05 Feb 2019 | USD 246 355,78 |
| 05 May 2019 | USD 246 355,79 |
| 05 Aug 2019 | USD 246 355,79 |
| 05 Nov 2019 | USD 246 355,78 |
| 05 Feb 2020 | USD 246 355,78 |
| 05 May 2020 | USD 739 067,35 |
| 05 Aug 2020 | USD 739 067,35 |
| 05 Nov 2020 | USD 739 067,35 |
| 05 Feb 2021 | USD 739 067,35 |

YabDar further agrees and acknowledges and hereby expresses its consent that upon the successful arrangement and provision of working capital financing by CFSI to T.B. Fruit Polska Sp. Z o.o. S.K.A., 109 Sandomierska str., 27-620 Dwikozy, Poland, the Polish affiliate of YabDar ("TB Fruit Poland") the Senior Debt Amount shall become interest bearing. The interest rate and interest periods shall be agreed by the Parties but in no case the interest rate shall be lower than 5% per annum and the interest period shall start to accrue on the outstanding Senior Debt Amount as of the date when the volume of working capital financing arranged for and/or provided to TB Fruit Poland reaches USD 40 million ("Interest Period Starting Date") and shall be payable every 180 days from the interest period starting date until the repayment of the Senior Debt Amount.

YabDar also agrees and acknowledges that YabDar shall be deemed to fulfil its payment obligations only when CFSI gets money to its respective accounts.

© 2015 Cargill Financial Services International, Inc. All rights reserved.

2

YabDar shall bear the risk and costs of getting all external authorizations for payments out of Ukraine (including but not limited to licenses, permits, registrations, approvals or any other authorizations needed under the applicable legislation or bank practice at the time of payment). In case payments under the Assignment Agreement and this Annex become explicitly restricted or forbidden by the law at the time of payment and shall stay restricted or forbidden more than 15 consecutive days from the scheduled date of payment, YabDar shall immediately procure such payments by and from its affiliate: Francoso Corporation Limited, a legal entity duly registered under the laws of Cyprus having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus. The Parties hereto have agreed that any restriction or ban on payments outside Ukraine shall not be considered a force majeure event and such restriction or ban shall not extend, suspend or stop YabDar obligation to pay.

## II. SECURITY OF PAYMENT

To secure YabDar's Senior Debt Amount payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause YabDar Assets to be pledged in favour of CFSI to be of sufficient collateral value (meaning the three integral property complexes located in Ukraine) with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "Pledge"). YabDar undertakes to arrange for the said pledge as soon as reasonably possible after the release of YabDar Assets from the current liens made in favour of Delta Bank but in any case, no later than the first of the Repayment Dates. The collateral value shall be determined based on the following formula: market value of the respective complexes (based on most recent independent appraisal which shall be updated annually)*0.8.

YabDar undertakes to take all necessary actions required under the applicable legislation of Ukraine to cause the YabDar Assets to be pledged in favour of CFSI and all necessary actions to perfect such Pledge.

YabDar undertakes that the YabDar Assets to be pledged in favour of CFSI shall be made free and clear of any liens and/or any encumbrances.

If for any reason the Pledge cannot be arranged by YabDar by the first of the Repayment Dates, YabDar shall procure that CFSI receives no later than the said Repayment Date one other adequate security in the form of either:

- Standby letter of credit issued in the form acceptable to CFSI by a financial institution acceptable to CFSI in the amount equal to the obligations of YabDar under the Assignment Agreement and this Annex with an expiry date of no earlier than the last of the Repayment Dates plus 30 calendar days; OR

- Irrevocable first demand payment guarantees to be issued by a guarantor or guarantors acceptable to CFSI and in the form acceptable to CFSI covering the amount equal to the payment obligations of YabDar under the Assignment Agreement and this Annex and with a validity period equal to the last of the Repayment Dates plus 30 calendar days; OR

- YabDar shall pledge or cause any of the Guarantors to pledge in favour of CFSI its/their sales proceeds from the contracts with third parties in the amount equal to or greater than the payment obligations of YabDar under the Assignment Agreement and this Annex on each of the Repayment Dates.

© 2015 Cargill Financial Services International, Inc. All rights reserved.

3

YabDar shall also procure the issuance of the following guarantees to CFSI by the following guarantors (hereinafter "the Guarantors") no later than 5 days from the date of this Annex:

- First Demand suretyship to be issued by Mr. Taras Barshchovskyy, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSI;

- First Demand payment guarantee to be issued by T.B. Fruit Polska Sp. z o.o. S.K.A., a legal entity duly registered under the laws of Poland having its registered address at 109 Sandomierska str., 27-620 Dwikozy, Poland, covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSI;

- First Demand payment guarantee to be issued by Francoso Corporation Limited, a legal entity duly incorporated under the laws of Cyprus, having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus ("Francoso Corporation Limited"), covering 100% of obligations of YabDar under the Assignment Agreement and this Annex and in the format acceptable to CFSI.

## V. REPRESENTATIONS & WARRANTIES

In addition to the Representations in the Assignment Agreement, YabDar hereby further represents and warrants that:

a. this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be YabDar's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and thereof, and such obligations rank at least pari passu in all respects with all their other similar obligations;

b. it has disclosed all of its material liabilities, contingent or otherwise to CFSI;

c. this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be in proper legal form under the laws of Ukraine for the enforcement thereof against it in the courts of Ukraine, and to ensure the legality, validity, enforceability or admissibility in evidence of such documents in Ukraine, it is not necessary that such documents be filed or recorded with any court or other authority in Ukraine or that any stamp or similar tax be paid on or in respect of such documents;

d. it has or will take all required measures to assure that it can effect timely repayment of the Senior Debt Amount as contemplated herein, in United States Dollars, and assure that this Annex and the Assignment Agreement, and all documents to be delivered hereunder, remain in effect, enforceable and in compliance with all applicable laws and regulations;

e. there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar either (i) with respect to or arising out of this Annex or the Assignment Agreement, or the transactions related thereto;

f. neither it nor any of its revenues or properties have any right of immunity from suit, court jurisdiction, attachment prior to judgment, execution of a judgment or from set-off, banker's lien, counterclaim or any other legal process or remedy with respect to its obligations hereunder or under the Assignment Agreement

© 2015 Cargill Financial Services International, Inc. All rights reserved.

g.     there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to YabDar's knowledge) threatened against YabDar;

h.     YabDar has good and clear title to its production and operational assets and land, free and clear of any liens or encumbrances except for those created or granted under any security documents in favour of YabDar's lenders;

i.     it will provide evidence to CFSI that it has obtained all required licenses, consents and authorizations for the YabDar Assets and those assets are in compliance with all applicable environmental and safety standards normally applied to such type of assets;

j.     it will provide evidence to CFSI of its ownership of the land (or the terms of any lease rights) related to the YabDar production and operations facilities;

k.     it will maintain insurance on the YabDar's properties and assets in at least such amounts, against at least such risks and with such risk retention as are generally maintained, insured against or retained by other companies of established reputation engaged in the same or similar business;

l.     it will keep proper books of record and account in which full and correct entries in conformity with local GAAP shall be made of all dealings and transactions in relation to its business and activities.

m.     it will cause Francoso Corporation Limited to produce consolidated group financial statements under IFRS for each of the financial years from 2015 through 2021 (both years inclusive) and have them audited by of the reputable international audit firm agreed by the Parties;

n.     to provide CFSI with the financials at first request as well as to provide any such additional financial and other information related to the performance of YabDar that may be reasonably requested by CFSI;

u.     not to directly or indirectly, create, assume or suffer to exist any lien upon any property or asset now or hereafter acquired by YabDar to secure any debt which is *pari passu* with or subordinate in right of payment under the Senior Debt Amount unless the Senior Debt Amount is secured equally and rateably prior to the creation, incurrence or assumption of such lien. Notwithstanding the foregoing provisions of this section, the YabDar shall not permit, create, assume or suffer to exist any lien on the capital stock of YabDar.

## VI. DEFAULT

If YabDar or any of its affiliates alternatively shall:

a.     breach any representation or warranty made by YabDar (or any of its officers) under or in connection with this Annex or in any financial statement shall prove to have been incorrect, false or misleading in any material respect when made and such condition (if capable of remedy) remains unremedied for a period of thirty (30) days after the YabDar or CFSI obtains knowledge thereof;

b.     fail to perform or observe any other term, covenant or agreement contained in

© 2015 Cargill Financial Services International, Inc. All rights reserved.

5

Section V. (a) through and including (u) and/or referred to in this Annex;

c. generally not pay or admit its inability to pay its respective debts as such debts become due;

d. shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail to generally pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

e. become subject to an involuntary case or other proceeding shall be commenced against YabDar seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days; or an order for relief shall be entered against YabDar under any bankruptcy laws as now or hereafter in effect;

f. any event shall occur that could be reasonably expected to have a Material Adverse Effect on the: (i) property, businesses, operations, financial condition, liabilities or capitalization of YabDar; (ii) ability of YabDar to perform any of its respective obligations under this Annex, (iii) validity or enforceability of this Annex, or (iv) timely payment of the principal or any interest amount due hereunder;

g. a Change of Ownership or sale or any other disposition of assets of total value equal or greater USD 1,000,000 shall occur, without a prior written consent of CFSI;

h. YabDar shall (i) default in the payment when due of any principal of or interest on any of its Debt (other than the Senior Debt Amount or (ii) any event specified in any note, agreement, indenture or other document evidencing or relating to any such debt shall occur, the result of which is to cause, or (with the giving of any notice or lapse of time or both) to permit the holder or holders of such debt (or a trustee or agent on behalf of such holder or holders) to cause such debt to become due and payable prior to its stated maturity; provided, however, that the aggregate amount of such Debt falling within (i) above (as to which the time for payment has not been extended by the relevant creditors) and any relevant payments falling within (ii) above equals or exceeds USD1,000,000 (US Dollars one million) for YabDar in aggregate;

i. one or more judgments or orders from which no further appeal is permissible under applicable law for the payment of money aggregating in excess of USD1,000,000 (one million US dollars) (or its equivalent in another currency) shall be rendered against YabDar, and such judgment or order shall continue

© 2015 Cargill Financial Services International, Inc. All rights reserved.

6

unsatisfied and in effect until the date by which payment must be made pursuant to such judgment or order;

j.     at any time during the term of this Annex, it is or becomes unlawful for the YabDar to perform its respective obligations pursuant to the terms and conditions contained in this Annex, or any of such obligations are not, or cease to be, legal, valid and binding on it and enforceable against YabDar;

j.     If any of the following events have occurred:

    (i)     the whole or a substantial part of the assets of the YabDar, or any of its affiliates is confiscated or attached;

    (ii)     any change occurs in the ownership or control of the YabDar or any of its affiliates, which, in the reasonable opinion of the CFSI, constitutes a material adverse change affecting the financial condition or operations of the YabDar or any of its affiliates respectively;

    (iii)     any competent governmental authority takes any action to condemn, seize, requisition or otherwise appropriate any substantial portion of the properties or assets of YabDar or any of its affiliates (either with or without payment of compensation), or any action relating to YabDar or any of its affiliates, which in the opinion of CFSI, adversely affects YabDar's ability to pay its indebtedness under the Assignment Agreement,

then, in any such event CFSI, may immediately proceed to protect and enforce its rights by an action at law, or other appropriate proceeding, including but not limited to, demanding and declaring this Annex, including all interest accrued thereon and all other amounts payable under this Annex to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by YabDar. YabDar hereby agrees to indemnify CFSI for (i) all reasonable costs and expenses (including but not limited to attorney's fees) incurred by CFSI in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom. Said indemnification shall survive the repayment in full of the Senior Debt Amount.

### VII. GENERAL PROVISIONS

a.     Any provision of this Annex that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

b.     The section headings in this Annex are for convenience of reference only and shall not affect the interpretation hereof.

c.     This Annex may be signed in counterparts with each counterpart deemed an original and both counterparts together constituting one and the same document.

d.     The parties hereto acknowledge to have had previous access to the contents of this Annex and that notwithstanding its English language have perfectly understood its exact content.

e.     All payments under this Annex are to be made in immediately available funds in United States Dollars, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority.

© 2015 Cargill Financial Services International, Inc. All rights reserved.

The Parties agree that, in the event of any such deduction, withholding or tax payment, YabDar shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment CFSI will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon YabDar's request, CFSI agrees to provide such documentation, which to its best knowledge but without any assurances on its part, is required by to classify CFSI as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and Ukraine. Payments are to be made to CFSI's account as per Assignment Agreement.

If payments under this Annex are not made in full when due, then any outstanding amount due but unpaid hereunder shall accrue late interest at 11 % calculated per annum from the date relevant payment should have been made until the date payment is received in full.

f.      Any and all information in connection with the transaction(s) under the Assignment Agreement shall be treated as confidential by the YabDar, its officers, employees and representatives, and any of the YabDar's affiliates and shall not be disclosed to any third party in any form whatsoever without the CFSI's prior express written consent, unless required by law or court order. If the YabDar is required by law or court order to disclose any such information, the YabDar shall provide the CFSI prompt written notice of such requirement.

This Annex is executed on the first date written above and comes into force as of the effective date of the Assignment Agreement.

All the changes, annexes, additional agreements and amendments to the Assignment Agreement and this Annex will be valid only in done in writing and signed by the authorized representatives of all Parties.

This Annex supplements the Assignment Agreement and represents its integral part. All the provisions of the Assignment Agreement remain in full legal power and force unless specifically amended or ruled out by this Annex.

[SIGNATURE PAGE FOLLOWS]

8

© 2015 Cargill Financial Services International, Inc. All rights reserved.

**SIGNATURE PAGE**

**Limited Liability Company "Yabluneviy dar"**
274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500
Bank details:
Beneficiary: LLC "Yabluneviy dar"
Account Number: 26008002005469
Beneficiary Bank: JSC Delta Bank, Kiev, Ukraine
SWIFT:DELKUAUK
Correspondent Bank: Deutsche Bank Trust Company Americas, New York, NY, USA
SWIFT: BKTRUS33

By: _____

Name: _____

Title: _____

**Cargill Financial Services International, Inc.**

1209 Orange Street, Wilmington, County of New Castle, State of Delaware with principal offices at 9350 Excelsior Boulevard, MS142-4B, Hopkins, Minnesota 55343, USA
Bank Details:
Beneficiary bank:  Citibank, NA, New York , U.S.A.
SWIFT:  CITIUS33XXX
ABA:  021000089
Bank Account:  38490869

By: _____

Name: _____

Title:       Authorized Signer
             Nancy L. Nelson

© 2015 Cargill Financial Services International, Inc. All rights reserved.

# SURETYSHIP AGREEMENT

This Suretyship Agreement (this "*Suretyship Agreement*") is made on July 07, 2015 by

1. **Taras Barshchovskyy,** a Ukrainian national, residing at Bratkovychi, Ukraine, passport number KB076181 (which expression shall include any personal representatives, receiver, trustee in bankruptcy or any other person acting on his behalf) (the "*Surety*")

   in favour of

2. **Cargill Financial Services International, Inc.,** a Delaware, USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA (the "*Beneficiary*")

1   **SURETYSHIP AND INDEMNITY**

   1.1     In consideration of the Beneficiary having (i) entered into Assignment Agreement No AA7 as of **February 05, 2015**, with Limited Liability Company "Yabluneviy dar", a legal entity incorporated under the laws of Ukraine, and having its registered office at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 (the "*Obligor*"), as amended, modified and/or supplemented from time to time (the "*Assignment Agreement*") and (ii) extended payment terms in accordance with the terms of the Assignment Agreement to the Obligor, the Surety, as primary obligor and not merely as surety, irrevocably and unconditionally secures by this Suretyship Agreement the due and punctual payment of all amounts payable by the Obligor to the Beneficiary under the Assignment Agreement (the "*Secured Obligations*") when the same shall become due and payable.  Upon each or any failure by the Obligor to pay punctually the Secured Obligations or any part thereof as provided under the Assignment Agreement, and upon first written demand (the "*Demand*") by the Beneficiary to the Surety, the Surety agrees to immediately pay the Secured Obligations to the Beneficiary.  Surety hereby acknowledges and agrees that the Secured Obligations may increase in amount due by reason of any modifications of the Assignment Agreement, Secured Obligations or otherwise.

   1.2     Notwithstanding any provision in this Suretyship Agreement, the aggregate amount the Surety shall be required to pay under this Suretyship Agreement shall not exceed USD 4,927,115.68 (**US Dollars Four Million Nine Hundred Twenty Seven Thousand One Hundred Fifteen and 68/100**) plus the amount of any unpaid interest, fees and/or unpaid late payment interest as defined in the Assignment Agreement and the reasonable costs of enforcing the obligations of the Surety hereunder. In this connection, any payment to be made by the Surety to the Beneficiary, its successors and assigns under this Suretyship Agreement shall be made in US dollars without set-off or counterclaim whatsoever and free and clear of and without withholding or deduction for, or on account of, any present or future taxes, including interest, penalties and additions thereto, imposed, levied collected, withheld or assessed by or on behalf of or within Surety's Home State (as defined below) or by any other competent authority, unless required by law. The parties agree that, in the event of any such deduction, withholding or tax payment, the

1

© 2015 Cargill Financial Services International, Inc. All rights reserved.

Surety shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment the Beneficiary will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon Surety's written request, the Beneficiary agrees to provide such documentation, which to the Beneficiary's best knowledge but without any assurances on its part, is required by Surety's Home State legislation or authorities to classify the Beneficiary as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and the Surety's Home State. Failure by the Beneficiary to provide such documentation shall not release the Surety of its obligations under this Clause 1.2. "*Surety's Home State*" means any country in which the Surety has its domicile, or is considered to be a tax resident.

1.3      The Surety's obligations under this Suretyship Agreement shall be absolute, irrevocable and unconditional irrespective of the validity or enforceability of any provision of the Assignment Agreement or any other provision of this Suretyship Agreement. This Suretyship Agreement is a continuing suretyship for payment and not collection and shall apply to all Secured Obligations.

1.4      If the Secured Obligations are not recoverable from the Obligor by reason of illegality, incapacity, the lack of authority, ineffectiveness of execution or any other reason, the Surety shall, notwithstanding any of the foregoing, remain liable under this Suretyship Agreement as if he were a principal obligor. The Surety, as principal obligor and as a separate and independent obligation and liability from his obligations under Clause 1.1 above, irrevocably and unconditionally agrees to indemnify the Beneficiary in full immediately and on demand against all losses, costs and expenses suffered or incurred by the Beneficiary arising from or in connection with the Assignment Agreement.

1.5      The Surety hereby expressly waives to the fullest extent permitted by applicable law any requirement for promptness, diligence, presentment, or protest and any requirement that the Beneficiary assert, exercise, refrain from exercising or exhaust any right, power, remedy or process against the Obligor under any promissory note or other agreement or instrument, or against any other person under any other suretyship of, or security for, any of the Secured Obligations.

1.6      The Surety agrees that, in the event of a formal dissolution or insolvency of the Obligor, or filing of any petitions or commencement of any actions relating to same, whether by the Obligor or any third party, the declaration by the Obligor or the Surety of its inability or failure to pay any amounts under the Assignment Agreement, or this Suretyship Agreement, (as applicable) as they become due or an assignment by the Obligor or the Surety for the benefit of creditors, or the commencement of any case or proceeding in respect of the Obligor or the Surety under any bankruptcy, insolvency, or similar laws, which if commenced by a party other than the Obligor or the Surety is not dismissed within sixty (60) days of its filing, and if such event shall occur at a time when any of the Secured Obligations of the Obligor may not then be due and payable, the Surety will pay to Beneficiary forthwith the full amount which would be payable hereunder by the Surety if all such Secured Obligations were then due and payable.

**2      PRESERVATION OF RIGHTS**

© 2015 Cargill Financial Services International, Inc. All rights reserved.

2.1 Neither the obligations of the Surety herein contained nor the rights, powers and remedies conferred upon the Beneficiary by law shall be discharged, impaired or otherwise affected by:

2.1.1 the bankruptcy or insolvency of the Obligor or any similar or equivalent proceedings against him;

2.1.2 time or other indulgence being granted or agreed to be granted to the Obligor in respect of obligations under the Assignment Agreement and/or in relation to the Secured Obligations in which circumstances the obligations of the Surety shall be varied by the extent of the time or other indulgence;

2.1.3 any amendment or supplement to, termination, novation or any variation, waiver or release of or in respect of the Assignment Agreement and/or any of the Secured Obligations; or

2.1.4 any act or omission which would not have discharged or affected the liability of the Surety had it been a principal debtor instead of Surety or indemnitor or by anything done or omitted by any person which but for this provision might operate to exonerate or discharge the Surety or otherwise reduce or extinguish his liability under this Suretyship Agreement.

2.2 Insofar as the Surety acquires rights against the Obligor in consequence of the Surety performing its obligation hereunder, the Surety undertakes that it will not exercise such rights or seek to obtain collateral in respect of such rights while the Obligor is under any actual or contingent obligation under the Assignment Agreement. The Surety further undertakes that it will not seek to take any steps to obtain collateral in anticipation of acquiring such rights.

2.3 The obligations of the Surety under this Suretyship Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Obligor in respect of the Secured Obligations is rescinded or must be otherwise restored by the Beneficiary, whether as a result of any proceedings in bankruptcy or insolvency or otherwise, and the Surety agrees that he will immediately indemnify the Beneficiary on demand for all reasonable costs and expenses (including, without limitation, fees of counsel) incurred by the Beneficiary in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

2.4 Without limitation of the foregoing, when requested by the Beneficiary (if so required by applicable laws), the Surety shall apply for and shall obtain a license of the National Bank of Ukraine enabling him to make cross-border payments to the Beneficiary under this Suretyship Agreement.

## 3 DURATION OF SURETYSHIP

3

© 2015 Cargill Financial Services International, Inc. All rights reserved.

This Suretyship Agreement will terminate on **31 May 2021**; provided, however, that such expiration shall not release the Surety from any obligation to the Beneficiary under this Suretyship Agreement until all amounts due under the Assignment Agreement have been paid in full or expire in accordance with the terms of the Assignment Agreement.

## 4  REPRESENTATIONS, WARRANTIES AND COVENANTS

The Surety represents, warrants and covenants that:

4.1  it is an adult individual and has the legal authority and capacity to enter into and perform this Suretyship Agreement;

4.2  the execution, delivery and performance of this Suretyship Agreement will not contravene any law or regulation to which the Surety is subject, and all governmental or other consents requisite for such execution, delivery and performance are in full force and effect. The execution, delivery and performance of this Suretyship Agreement does not require receipt of any regulatory authorizations (licenses, approvals, permits, etc.) which are required by applicable law;

4.3  the execution, delivery and performance of this Suretyship Agreement will not cause the Surety to be in breach or default under any agreement binding on it or any of its assets or require any consent under any indenture, note, mortgage, agreement or other instrument or arrangement to which the Surety is a party or by which it is bound;

4.4  this Suretyship Agreement constitutes and at all times shall constitute, a direct, unsecured and unsubordinated obligation of the Surety, ranking pari passu with all other present and future unsecured and unsubordinated obligations of the Surety;

4.5  this Suretyship Agreement has been duly executed by it and constitutes a valid obligation of the Surety, legally binding on it and enforceable in accordance with its terms in the courts of its place of incorporation;

4.6  the Surety has disclosed to the Beneficiary in writing all financial reports, other written information and other material information relevant to assure full and true disclosure required to permit the Beneficiary to evaluate the making of payment terms to the Obligor.  All documents, reports and other written information pertaining to the Obligor or the Surety that have been furnished to the Beneficiary were prepared with due care and in good faith, are true, complete and correct in all material respects and do not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not materially misleading. There is no fact relating to the Surety that is known to, or which by the exercise of due diligence could be known to, the Surety, the existence of which could reasonably be expected to cause the Beneficiary not to provide the payment terms to the Obligor;

4

© 2015 Cargill Financial Services International, Inc. All rights reserved.



4.7 in acting as the Surety under this Suretyship Agreement it has complied and will continue to comply for the duration of this Suretyship Agreement with all necessary and applicable anti-money laundering procedures required for it to act as a Surety hereunder;

4.8 it has been provided with, and hereby acknowledges receipt and review of a duly certified copy of the Assignment Agreement; and

4.9 it will procure that, at all times during this Suretyship Agreement, the amount of Surety's own USD funds standing to the credit of its bank accounts is sufficient to perform the Surety's obligations hereunder.

## 5 CONTINUING SECURITY

The obligations of the Surety herein shall constitute and be continuing obligations and shall not be considered satisfied by any intermediate payment or other settlement of account. The said obligations shall continue in full force and effect until final payment in full of all amounts owing by the Obligor under the Assignment Agreement.

## 6 DEMANDS AND NOTICES

6.1 Any Demand or notice shall be written and in the English language.

6.2 Any Demand shall be accompanied by a statement from the Beneficiary stating that the sum demanded is due and payable but unpaid and such demand shall, in the absence of manifest error, be binding on the Surety.

6.3 Any Demand or notice shall be hand delivered to or sent by courier by way of a first-class international courier company to the recipient at its address stated in this clause (or such other address as may be notified in writing from time to time):

(A) In the case of the Surety:
2g Ivasyuka Str., 81500 Gorodok,
Lviv Region, Ukraine

(B) In the case of the Beneficiary:
9350 Excelsior Blvd.
Hopkins, MN 55343

Attention: Jennifer Campbell

6.4 Any notice, not being a Demand, may be sent by fax to the following fax numbers:

(A) In the case of the Surety:
Fax No: 38 - 03231 - 321 - 21

(B) In the case of the Beneficiary:
Fax No: 1-952-249-4416

5

© 2015 Cargill Financial Services International, Inc. All rights reserved.

6.5 Any Demand or notice shall be deemed to have been duly served:-

    6.5.1  if delivered by hand, when delivered at the address referred to in Clause 6.3 above; or

    6.5.2  if sent by courier on the day of delivery to the address referred to in Clause 6.3 above; or

    6.5.3  in the case of a notice other than a Demand, if sent by facsimile, at the time when sent to the recipients fax number referred to in Clause 6.4 above.

## 7  PARTIAL INVALIDITY

If at any time any one or more of the provisions of this Suretyship Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction neither the legality, validity or enforceability of the remaining provisions of this Suretyship Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall be in any way impaired as a result.

## 8  AMENDMENT

No term or provision of this Suretyship Agreement shall be amended, modified, altered, waived or supplemented except in a written document signed by the Surety and the Beneficiary.

## 9  COSTS

Subject to Clause 1.2 above, the Surety shall immediately, on demand by the Beneficiary and on a full indemnity basis, pay to the Beneficiary the amount of all costs and expenses which the Beneficiary incurs under or in connection with this Suretyship Agreement.

## 10 Bank Details

Any payments under this Suretyship Agreement shall be made by the Surety to the following bank account of the Beneficiary, unless otherwise specified by the Beneficiary in writing:

Beneficiary bank: Citibank, NA, New York, U.S.A.
SWIFT: CITIUS33XXX
ABA: 021000089
Bank Account: 38490869

## 11 CONSENT TO SERVICE OF PROCESS

The Surety further irrevocably consents for himself, if for any reason there is no authorized agent for service of process in London, England, to the service of process out of the said courts by mailing copies thereof by registered air mail postage prepaid to it at its address specified herein; and in such a case the Beneficiary shall also

6

© 2015 Cargill Financial Services International, Inc. All rights reserved.

send facsimile, or shall procure that there is also sent by facsimile, a copy of such process to the Surety.

## 12  ASSIGNMENT

The Surety may not assign its rights, interests or obligations hereunder to any other person. The Surety unconditionally agrees and consents that the rights of the Beneficiary under this Suretyship Agreement may be freely assigned by the Beneficiary in its sole discretion together with its rights under the Assignment Agreement with written notification to the Surety by the Beneficiary within three (3) Business Days of such assignment or transfer.

## 13  GOVERNING LAW AND ARBITRATION

Any dispute arising out of or in connection with this Suretyship Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitral proceedings shall be English. The governing law of this Suretyship Agreement shall be the substantive law of England and Wales.

**IN WITNESS WHEREOF,** this Suretyship Agreement has been executed as a deed by the Surety and has been signed by or on behalf of the Beneficiary with the intention that it be delivered on the date appearing at the beginning of this Suretyship Agreement.

**EXECUTED as a Deed**

**The Surety**

by [____]
acting by [____];

Torres Boer SHCHOUSEVY.

[ADD NOTARY SIGNATURE BLOCK]

**The Beneficiary**

by Cargill Financial Services International, Inc.
acting by [_____];

[Title]   Nancy L. Nelson
Authorized Signer

7

© 2015 Cargill Financial Services International, Inc. All rights reserved.

**Amendment № 1 to Assignment Agreement №AA7 as of 05 February 2015**

**November 14, 2018**

This Amendment № 1 (the **"Amendment № 1 "**) to Assignment Agreement №AA7 as of February 05, 2015 (the "**Assignment Agreement**") and to Annex 1 thereto of July 07, 2015 (the "**Annex**") is made on November 14, 2018 (the Assignment Agreement and the Annex, together, the "**Agreement**") by and between:

**Cargill Financial Services International, Inc.,** registered at Corporation Trust Center, 1209 Orange Street, Citi of Wilmington, County of New Castle, DE, 19801, U.S.A. with principal place of business at 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A. , hereinafter referred to as "**CFSI**" or the **"Initial Creditor"**, on one side, and

**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR" (ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР"),** registered at 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500, identification number 32475074 duly represented by Mr. Roman Markiv, acting based on Charter, hereinafter referred to as " **YabDar**" the **"New Creditor"**, on the other side.

The Initial Creditor and the New Creditor are individually referred to in this Amendment № 1 as a **"Party"** or collectively as the **"Parties"**.

**WHEREAS:**

A. Under the Assignment Agreement the Initial Creditor assigned to the New Creditor and the New Creditor received the Claims. In consideration of the assignment of the Claims, the New Creditor agreed in the Annex to pay in favour of the New Creditor the Consideration in the amount of US Dollars 4,927,115.68 in 12 installments until February 05, 2021 with the first installment payable on May 05, 2018.

B. To secure the New Creditor's payment obligations under the Assignment Agreement, the New Creditor agreed in the Annex to provide the Initial Creditor with one or more pledges over the New Creditor's physical assets (collectively, "**Pledge**") then and currently subject to liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", with a total collateral value of more than 100% of the Consideration amount. The Annex required the New Creditor to provide the Pledge as soon as reasonably possible upon release of the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", but in any case, no later than May 05, 2018.

C. As of the date of this Amendment № 1 the New Creditor's physical assets have not yet been released from the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" nor pledged to the Initial Creditor.

D. The New Creditor has requested that the Initial Creditor extend the payment terms of the Consideration amount under the Agreement and the terms for provision of the Pledge to the Initial Creditor and the Initial Creditor is willing to provide the requested extension on the basis of the terms and conditions outlined in this Amendment № 1 below.

Taking the above into account, the Parties hereby have agreed as follows:

**AGREED TERMS:**

1. The Parties have agreed to supplement the Agreement with the following Definitions section.

DEFINITIONS:

Capitalized terms used herein but not defined shall have the same meanings as defined in the Agreement.

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

"**Asset Disposition**" of any Person means the sale, lease or conveyance or other disposition of assets (including, without limitation, any capital stock of any TB Fruit Group company or subsidiary of such Person held directly or indirectly by such Person), whether owned on the date hereof of hereafter acquired, in one or more related transactions, outside of the ordinary course of business (other than a sale, lease, conveyance or other disposition by such Person or a subsidiary of such Person to such Person or a wholly owned subsidiary of such Person, including any such disposition by means of a merger, consolidation or similar transaction).

"**Business Day**" shall mean any day, other than a Saturday or Sunday, on which banks are not authorised to close in Kyiv (Ukraine) and New York (USA).

"**Cargill Entity**" shall mean any company or legal entity which from time to time directly or indirectly controls, is controlled by, or is under common control of the Initial Creditor, whether or not such company or other legal entity is in existence at the time this Amendment № 1 is signed by the Parties.

"**Change of Control Event**" means an event or series of events which:

(i) any Person, either individually or acting in concert with one or more other Persons, shall have acquired beneficial ownership (provided that a Person shall not be deemed to be the beneficial owner of shares tendered pursuant to a tender offer made by that Person or its Affiliate until the tendered shares are accepted for purchase), directly or indirectly, of equity interests of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company, or

(ii) *(1)* another corporation merges into of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company or *(2)* Mr. Taras Barshchovskyy, TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company conveys, transfers or leases all or substantially all its assets to any Person or group, in one transaction or a series of transactions, or

(iii) the failure at any time of TB Fruit Holding Establishment (Liechtenstein) legally and beneficially to own and control 100% of the issued and outstanding shares of capital stock of its subsidiaries held by TB Fruit Holding Establishment (Liechtenstein) as of the date of this Amendment №1, or the failure at any time of TB Fruit Holding Establishment (Liechtenstein) to have the ability to elect all the majority of the board of directors or other governing bodies of any of its subsidiaries, or

(iv) the failure of, at any time, Mr. Taras Barshchovskyy to legally and beneficially own and/or control 100% of the issued and outstanding share of capital stock of TB Fruit Holding Establishment (Liechtenstein), and/or any other TB Fruit Group company directly or indirectly owned or subsequently acquired by Mr. Taras Barshchovskyy.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**TB Fruit Group**" means and includes any and all Persons that directly or indirectly through one or more intermediaries, is controlled by *Mr. Taras Barshchovskyy* and/or controls, is controlled by, or is under common control with YabDar and/or any of the Guarantors. "Control" (including the terms "controlled by" and "under common control with") means the direct or indirect ownership or control of more than 50% of the voting rights or equity shares of such Persons.

Any reference in the Assignment Agreement to "this Agreement" and in the Annex to "this Annex" shall be deemed to be a reference to the Assignment Agreement and the Annex as amended, modified and/or supplemented from time to time (including by this Amendment № 1).

## 2. AMENDMENT TO THE ASSIGNMENT AGREEMENT:

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

Subject to terms and conditions of this Amendment № 1 the Parties agree:

2.1. To amend and restate clause 5.3 of the Assignment Agreement as follows:

"5.3. (i) Subject to sub-clause (iv) of this clause 5.3., any notice or communication given to a Party under or in connection with this Agreement (and any amendment or supplement) shall be in writing and shall be delivered by hand, by third party courier service, by fax and/or by electronic mail, in each case to that Party's address, fax number or electronic mail address specified in, as applicable to that Party, as specified in this clause 5.3. (or to such other address, fax number or electronic mail address as that Party may notify to the other Party in accordance with this clause 5.3.).

a. If to the Initial Creditor:
For the attention of Nancy Nelson
Address: 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A.
Fax number: + 41 22 703 2841
E-mail address: Nancy_Nelson@cargill.com

b. If to the New Creditor:
For the attention of Roman Markiv
Address: 274a, Lvivska str., Gorodok, Lvivska oblast', Ukraine 81500
Fax number: +38 03231 3-27-84
Email: r.markiv@tbfruit.com

(ii) Subject to sub-clause (iii) of this clause 5.3., delivery of a notice is deemed to have taken place (provided the requirements of sub-clause (i) of this clause 5.3. have been satisfied):

a. if delivered by hand, on the day and time the notice is delivered;
b. if sent by third party courier service, on the third Business Day after depositing such notice with the courier (excluding the date of deposit);

c. if sent by fax, on the earlier of the day and time shown in a transmission report indicating a satisfactory transmission and a confirmation of receipt obtained from the sender's facsimile machine; and

d. if sent by electronic mail, on the day and at the time that the electronic mail was read as shown in a read receipt, on the day and at the time the electronic mail was delivered as shown in a delivery receipt or on the day and at the time of receipt of an acknowledgement from the recipient indicating a satisfactory transmission (whichever is the earlier).

(iii) In the case of delivery by hand, by fax or by email, if the deemed receipt does not take place inside business hours (meaning 9.00 am to 5.30 pm on any day, other than a Saturday or Sunday, on which banks are not authorized to close in the place of deemed receipt), then deemed receipt will occur when business next starts in the place of receipt (and all references to time are to local time in the place of receipt).

(iv) This clause 5.3. does not apply to the service of any proceedings or other documents in any legal action."

2.2. To change numbering of Section II (*Payment Terms*) of the Annex to Section III (*Payment Terms*);

2.3. To change numbering of Section II (*Security of Payment*) of the Annex to Section IV (*Security of Payment*);

2.4. The table of Repayment Dates specified in the second paragraph of Section III (*Payment Terms*) of the Annex shall be replaced in its entirety and supplemented as follows:
"

| Repayment Date | Consideration amount due, USD |
| --- | --- |
| 15 February 2022 | $328,474.38 |
| 15 May 2022 | $328,474.38 |
| 15 November 2022 | $328,474.38 |
| 15 February 2023 | $328,474.38 |

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

| 15 May 2023 | *$328,474.38* |
| 15 November 2023 | *$328,474.38* |
| 15 February 2024 | *$328,474.38* |
| 15 May 2024 | *$328,474.38* |
| 15 November 2024 | *$328,474.38* |
| 15 February 2025 | *$328,474.38* |
| 15 May 2025 | *$328,474.38* |
| 15 November 2025 | *$328,474.38* |
| 15 February 2026 | *$328,474.38* |
| 15 May 2026 | *$328,474.37* |
| 15 November 2026 | *$328,474.37* |

The New Creditor irrevocably and unconditionally acknowledges and confirms its payment obligation as envisaged in the table above in the total amount of US Dollars 4,927,115.68, without prejudice to the Conditional Discount provisions as stated below."

2.5.    The provisions of Clause 2.4 of this Amendment № 1and any reference to the Conditional Discount shall come into effect upon satisfaction (or waiver by the Initial Creditor) of each of the conditions precedent specified in Section 3 hereof .

2.6. To add a the following at the end of Section III (*Payment Terms*) of the Annex as follows:

"In the event the Repayment Date falls on a non-Business Day, the next following Business Day shall be considered as the Repayment Date.

Notwithstanding the above, if (a) the New Creditor fails to make any payment of Consideration when due for payment hereunder, or (b) any Affiliate of the New Creditor fails to make any payment of any indebtedness to any Cargill Entity when due, or (c) any other event of default as specified in Section VII (*Default*) of the Annex has occurred, then the Repayment Dates as specified in the Annex prior to the effectiveness of Amendment № 1 to the Assignment Agreement and this Annex shall be reinstated without any demand, protest or notice of any kind, all of which are hereby expressly waived by the New Creditor. The Initial Creditor retains full rights to enforce any and all payments in accordance to such an original payment schedule.

Subject to the provisions of this paragraph, the Initial Creditor agrees to provide a discount in the amount up to 15% of the Consideration ("**Conditional Discount**"). The Conditional Discount will be proportionally applied to the instalments of the Consideration payable by the New Creditor to the Initial Creditor in 2026 as follows:

| **Repayment Date** | **Consideration amount due, USD** | **Conditional Discount amount, USD** |
|---|---|---|
| 15 February 2026 | *$328,474.38* | *$246,355.78* |
| 15 May 2026 | *$328,474.37* | *$246,355.78* |
| 15 November 2026 | *$328,474.37* | *$246,355.79* |

The provision of the Conditional Discount is subject to **(a)** the full and timely repayment of (i) all amounts due on each and every Repayment Date up to and including the Repayment date of 15 November 2025, and (ii) all other indebtedness of TB Fruit Group companies to the Initial Creditor and/or any Cargill Entity, including the payment obligations of FRANCOSO CORPORATION LIMITED under the Raw Materials Purchase, Inventory and Receivables Financing Agreements No 02 2017 and No 03 2017 dated January 30, 2017 (as further amended) ("**RMPIR Financing Agreements**"); and **(b)** there having been no event of default as specified in Section VII (*Default*) of Annex."

2.7. The first paragraph of Section IV (*Security of Payment*) of Annex shall be replaced in its entirety with the following:

"To secure YabDar's payment obligations under the Assignment Agreement and this Annex, YabDar hereby undertakes and commits to cause the assets (located at:
1. 274-a Lvivska str., Gorodok, Lviv region, 81500, Ukraine
2. 62 Kopitka str., Lypovets, Vinnytska region, 22500, Ukraine

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

3. 7 Gagarina str., New Ushitsya, Novouushitsky district, Khmelnytsky region, 32600, Ukraine
4. 3 Kamenetsky highway, Slobokivtsi, Yarmolinetsky district, Khmelnytsky region, 32162, Ukraine
5. 5 Kharkiv str., Zatishya, Kharkiv district, Kharkiv region, 62406, Ukraine)

or any other assets satisfactory to CFSI ("**YabDar Assets**") to be pledged in favour of CFSI with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "**Pledge**").

YabDar undertakes to arrange for the Pledge as soon as reasonably possible after the release of the YabDar Assets from the current liens in favour of Delta Bank but in any case, no later than December 31, 2019. The collateral value shall be determined based on the following formula: 80% of market value of the respective YabDar Assets (based on independent appraisal executed by an appraiser satisfactory to CFSI at or immediately before the execution of the Pledge)".

2.8. The fourth paragraph of Section IV (*Security of Payment*) of Annex commencing with the words "If for any reason the Pledge" and ending with the words "and this Annex on each of the Repayment Dates", shall be replaced in its entirety with the following:

"If for any reason (a) the assets subject to the Pledge do not have a total collateral vale of more than 100% of the Senior Debt Amount outstanding, or (b) the Pledge, duly perfected, is not provided to Cargill by December 31, 2019, YabDar shall provide CFSI with an additional and/or a substitute pledge acceptable to CFSI".

2.9. To add Section VI (*Covenants*) right after Section V (*Representation and Warranties*) of the Annex as follows:

(a) "Unless CFSI agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entities shall not be permitted to cause or permit a Change of Control Event.

If a Change of Control Event is agreed with CFSI, Mr. Taras Barshchovskyy, YabDar and/or the respective TB Fruit Group entity shall give a written notice to CFSI at least 30 days before such Change of Control Event stating:

i. that a Change of Control Event is to occur and that CFSI has the right to require repayment of all the outstanding amounts under RMPIR Financing Agreements and the outstanding Consideration and other amounts under the Assignment Agreement at the time of the Change of Control Event. If, as a result of the Change of Control Event any of YabDar, Guarantors, Mr. Taras Barschovskyy or any other TB Fruit Group entity are to receive any cash proceeds, such cash proceeds shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts comprising the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

ii. the circumstances and relevant facts regarding the Change of Control Event,

iii. the purchase date in relation to such Change of Control Event (which shall be no earlier than 30 and no later than 60 days after such notice is given),

iv. whether the tenders will be irrevocable and the purchase price offered in relation to such Change of Control Event.

Failure to give the requisite notice to CFSI within the time provided above shall constitute an event of default and an acceleration event under the Assignment Agreement allowing CFSI to exercise all of its rights in the last paragraph of Section VII (*Default*) of the Annex.

(b) Unless CFSI agrees in writing, YabDar, Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entity shall not be permitted to make Significant Asset Sales, where such Significant Asset Sale means an Asset Disposition involving assets with a fair market value in excess of US Dollars 5,000,000.00 and which is paid in cash or cash equivalents including payments in respect of deferred payment obligations when received in the form of cash or cash equivalents ("**Net Cash Proceeds**"). Net Cash Proceeds shall be net of (i) taxes payable as a result of such Significant Asset Sale, and (ii) payments made to retire indebtedness where payment of such indebtedness is secured by assets or properties which are the subject of such Significant Asset Sale. If an Asset Disposition occurs, the Net Cash Proceeds

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

from such Significant Asset Sale shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts under the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

(a) Unless CFSI agrees in writing, YabDar, the Guarantors, Mr. Taras Barshchovskyy and any of their Affiliates shall not together incur any capital expenditures in the in excess of US Dollars 2,500,000.00 per calendar year according to International Financial Reporting Standards effective on the date of this Amendment № 1. Notwithstanding the foregoing, this limitation does not cover the on-going investment projects in relation to the pectin production line (with its total planned investment of Euro 5.2 million of which Euro 4.77 million has already been reported as invested as of January 31, 2017) or construction of the management office building (with its total planned investment of Euro 0.5 million, of which Euro 0.43 million has already been reported as invested as of January 31, 2017).

2.10.    To change numbering of Section VI (*Default*) of the Annex to Section VII (*Default*).

2.11.    To amend and restate part b. of Section VII (*Default*) of the Annex as follows:

"b. fails to perform or observe any other term, covenant or agreement contained in Section V (*Representations & Warranties*) (a) through and including (u), in Section VI (*Covenants*) or breaches any other term, covenant, agreement or undertaking under the Assignment Agreement or the Annex or any other assignment or annex to which any Cargill Entity and any member of the TB Fruit Group are party".

2.12.    To amend and restate part g. of Section VII (*Default*) of the Annex as follows:

"g. a Change of Control Event or Significant Asset Sale has occurred without prior written consent of CFSI";

2.13.    To change numbering of Section VII (*General Provisions*) of the Annex to Section VIII (*General Provisions*).

## 3.  CONDITIONS PRECEDENT

The provisions of Clause 2.4 to this Amendment № 1 and the Conditional Discount are subject to the satisfaction (or waiver by the Initial Creditor) of each of the following conditions ("**Conditions Precedent**")

3.1.    The Initial Creditor has received from the Guarantors the originals of the duly executed amendments to the existing guarantees (guaranteeing the New Creditor's obligations under the Agreement) extending the term of the guarantees in a substance and form acceptable to the Initial Creditor.

3.2.    The Initial Creditor has received the original of the duly executed first-demand unconditional irrevocable guarantee issued by Mr. Taras Barschovskyy in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor in replacement of the existing Suretyship Agreement made on July 07, 2015.

3.3.    The Initial Creditor has received the originals of the duly executed first-demand unconditional irrevocable guarantees issued by the following companies of TB Fruit Group in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor.

- "T.B. FRUIT" S.R.L. (Moldova*)*;
- TB Fruit Polska Sp. z o.o. S.K.A. (Poland);
- LLC "Tank Trans Ukraine" (Ukraine);
- Tank Trans Polska Sp z o.o. (Poland);
- AMELIANA HOLDINGS LTD (Cyprus).

Collectively "T.B. FRUIT" S.R.L. (Moldova), TB Fruit Polska Sp. z o.o. S.K.A. (Poland), LLC "Tank Trans Ukraine" (Ukraine), Tank Trans Polska Sp z o.o. (Poland), AMELIANA HOLDINGS LTD (Cyprus) are further referred to as "**New Guarantors**", each of them – "**New Guarantor**".

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

3.4.　　The Initial Creditor has received the originals of the duly executed amendments to the Deed of Pledge of Shares in FRANCOSO CORPORATION LIMITED dated January 30, 2017 and Deed of Pledge of Shares in AMELIANA HOLDINGS LTD dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein) and Cargill Financial Services International, Inc. expanding the scope of the secured obligations and securing the New Creditor's payment obligations in favour of the Initial Creditor in a substance and form satisfactory to the Initial Creditor (each - "**Amendment to the Deed of Pledge of Shares**", collectively - "**Amendments to the Deeds of Pledge of Shares**").

3.4. The Initial Creditor has received the originals of the duly executed amendments to Escrow Agreement dated January 30, 2017 and Escrow Agreement dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein), Cargill Financial Services International, Inc. and Dr. K. Chrysostomides & Co. LLC (Cyprus) in a substance and form satisfactory to the Initial Creditor.

3.5. Within ten (10) calendar days after the date of execution of this Amendment № 1 the New Creditor undertakes that it will cause Dr. K. Chrysostomides & Co. LLC (Cyprus) to submit a certified copy of each Amendment to the Deed of Pledge of Shares to the Commissioner of Stamp Duty of the Republic of Cyprus for the obtainment of an verbal ruling as to whether stamp duty is payable thereon and if so, to which amount. At the request of the Initial Creditor the New Creditor shall furnish to the Initial Creditor a written confirmation of the above mentioned submission made to the Commissioner of Stamp Duty of the Republic of Cyprus.

## 4. GENERAL PROVISIONS, MUTUAL ACKNOWLEDGMENTS AND ASSURANCES

4.1. The Parties make the following representations and acknowledgements, as applicable, as of the date of this Amendment № 1:

(i) no Change of Control Event has occurred or is occurring in relation to the New Creditor and the New Creditor continues to be fully beneficially owned and controlled by Mr. Taras Barshchovskyy;

(ii) the New Creditor confirms that it has received and accepted from the Initial Creditor all the documentation (originals, certified copies and copies) in relation to the Claims assigned under the Agreement to the New Creditor's full and final satisfaction.

(iii) The New Creditor acknowledges that there are no other documents expected or pending to be provided by the Initial Creditor to the New Creditor;

(iv) the New Creditor confirms that it has obtained all necessary and material information and disclosures from the Initial Creditor in relation to the Claims and, without relying on the Initial Creditor, made its own analysis of the Claims and all such obtained information to the New Creditor's full and final satisfaction;

(v) the Parties further confirm and acknowledge, that the Initial Creditor in addition to the transfer of the documentation outlined in sub-clause ii) above has performed the following actions:

(a) served a default and acceleration notice dated February 05, 2015 to the Debtor; and

(b) informed the Debtor about the assignment in favour of the New Creditor no later than 3 (three) Business Days from the effective date of the Assignment Agreement.

Both Parties acknowledge and agree that the Initial Creditor with its above actions fully satisfied, complied with and performed all of its obligations under the Agreement in connection with the Claims and that no other actions were or are required or intended to be performed by the Initial Creditor under the Agreement.

4.2. This Amendment № 1 shall come in force on the date of its signing by the authorized persons of the Parties.

4.3. All other terms and conditions of the Agreement remain unchanged.

4.4. This Amendment № 1 shall be signed in two copies in English, one for each Party, both copies having equal legal power.

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

5.4. Any dispute arising out of or in connection with Amendment № 1 including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration (LCIA), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the Amendment № 1 shall be the substantive laws of New York (excluding conflicts of laws principles).

5.5. This Amendment № 1 is an integral part of the Agreement.

**The Initial Creditor:**
**Cargill Financial Services International, Inc.**
9320 Excelsior Boulevard,
Hopkins, MN 55343, U.S.A.
Receiving Bank: JP Morgan Chase, N.A., New York
Swift Code: CHASUS33XXX
ABA: 021000021
Account No: 878359491

Nancy L. Nelson
Trade Finance Specialist
Authorized Signatory

**The New Creditor:**
**LIMITED LIABILITY COMPANY "YABLUNEVIY DAR"**
**(ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ЯБЛУНЕВЫЙ ДАР")**
274a, Lvivska str., Gorodok,
Lvivska oblast', Ukraine 81500,
Identification no. 32475074

US Dollars Account: 26009010003864
Beneficiary bank:
BANK PIVDENNYI, Odessa, Ukraine
SWIFT CODE: PIVDUA22
Intermediary:
THE BANK OF NEW YORK MELLON, New York, USA
SWIFT CODE: IRVTUS3N

Roman Markiv

Authorized Signatory

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

**ASSIGNMENT AGREEMENT № AA8**

*As of 05 February 2015*
*Kyiv (Ukraine)*

**PARTY 1:** Legal entity that is incorporated in the state of Delaware and is acting in accordance with the laws of the United States of America, **CFSIT, Inc.**, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA, hereinafter - *"Initial Creditor"*, represented by Kristin Lee Wessels, acting under the power of attorney issued, notary certified and apostiled on 13 October 2014, and

**PARTY 2:** Legal entity that is incorporated and is acting in accordance with the laws of Ukraine, **Limited Liability Company "TANK TRANS"**, located at 2Г Ivasiuka Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine, hereinafter - *"New Creditor"*, identification code 32115067, represented by Kulak Igor Oleksandrovych, acting on the basis of the power of attorney issued on 05 February 2015,

*hereinafter collectively – the "Parties", and each individually referred to as a "Party", have concluded the present Assignment Agreement, hereinafter – the "Agreement" as follows:*

### ARTICLE 1.
### SUBJECT MATTER OF THE AGREEMENT

1.1. The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) under the following documentary instruments and all the related documentation as applicable (further – the *"Claims"*):

---

**ДОГОВІР ВІДСТУПЛЕННЯ ПРАВ ВИМОГИ № AA8**

*Від 05 лютого 2015 року*
*місто Київ (Україна)*

**СТОРОНА 1:** Юридична особа, яка створена в штаті Делавер та діє за законодавством Сполучених Штатів Америки, **CFSIT, Inc.**, зареєстрована за адресою 1209 Орандж Стріт, Уілмінгтон, округ Нью-касл, штат Делавер (1209 Orange Street, Wilmington, County of New Castle, State of Delaware), фактичне місцезнаходження: бульв. Ексельсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA), надалі за текстом - *"Первісний Кредитор"*, в особі Крістін Лі Весселе, яка діє на підставі Довіреності, виданої, нотаріально посвідченої та апостильованої 13 жовтня 2014 року, та

**СТОРОНА 2:** Юридична особа, яка створена та діє за законодавством України, **ТОВАРИСТВО З ОБМЕЖЕНОЮ ВІДПОВІДАЛЬНІСТЮ «ТАНК ТРАНС»**, місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, місто Городок, вул. Івасюка, будинок 2Г, надалі за текстом - *"Новий Кредитор"*, ідентифікаційний код 32115067, в особі Кулака Ігоря Олександровича, який діє на підставі Довіреності, виданої 05 лютого 2015 року,

*надалі за текстом разом - "Сторони", а окремо "Сторона", уклали цей Договір відступлення прав вимоги, надалі – "Договір", про наступне:*

### СТАТТЯ 1.
### ПРЕДМЕТ ДОГОВОРУ

1.1. Первісний Кредитор передає, а Новий Кредитор одержує всі та будь-які права вимоги (включаючи права на отримання надходжень та процентів) за наступними документарними інструментами та іншими пов'язаними з ними документами (надалі *«Права вимоги»*):

1

all claims of the creditor (beneficiary) under the following documentary instruments issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the **"Debtor"**, for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

1) Irrevocable standby letter of credit No. LC/SB/018/042014 in the amount of 979,962.45 US Dollars;

2) Irrevocable standby letter of credit No. LC/SB/019/042014 in the amount of 688,832.27 US Dollars;

3) Irrevocable standby letter of credit No. LC/SB/020/042014 in the amount of 788,885.60 US Dollars;

4) Irrevocable standby letter of credit No. LC/SB/022/042014 in the amount of 222,505.16 US Dollars;

5) Irrevocable standby letter of credit No. LC/SB/023/042014 in the amount of 839,450.34 US Dollars;

всі права кредитора (бенефіціара) за наступними документарними інструментами, випущеними ПУБЛІЧНИМ АКЦІОНЕРНИМ ТОВАРИСТВОМ «ДЕЛЬТА БАНК», надалі за текстом – **«Боржник»**, на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до них:

1) Безвідкличний резервний акредитив № LC/SB/018/042014 на суму 979 962,45 доларів США;

2) Безвідкличний резервний акредитив № LC/SB/019/042014 на суму 688 832,27 доларів США;

3) Безвідкличний резервний акредитив № LC/SB/020/042014 на суму 788 885,60 доларів США;

4) Безвідкличний резервний акредитив № LC/SB/022/042014 на суму 222 505,16 доларів США;

5) Безвідкличний резервний акредитив № LC/SB/023/042014 на суму 839 450,34 доларів США;

1.2. The assignment of the Claims becomes effective on the date set forth above;

1.2. Відступлення Прав вимоги набирає чинності з дати зазначеної вище;

1.3. In consideration of the aforementioned assignment, the New Creditor agrees to make a payment in favour of the Initial Creditor of the face value of the Claims in United States Dollars (**"USD"**) (*i.e.* USD 3,519,635.82) within five (5) years from the date of execution of this Agreement under the conditions to be agreed by the Parties in a separate agreement.

1.3. В якості оплати за вищезазначене відступлення Прав вимоги Новий Кредитор погоджується сплатити на користь Первісного Кредитора кошти у розмірі номінальної вартості Прав вимоги в доларах США (**«USD»**) (а саме 3 519 635,82 доларів США) впродовж 5 (п'яти) років з дати укладення цього Договору на умовах, що будуть погоджені Сторонами в окремому договорі.

## ARTICLE 2.
## RIGHTS AND OBLIGATIONS OF

## СТАТТЯ 2.
## ПРАВА ТА ОБОВ'ЯЗКИ СТОРІН

2

## THE PARTIES

**2.1. Initial Creditor shall:**

2.1.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, transfer to the New Creditor all documents which confirm the Claims assigned hereunder to be reflected in a certificate of transfer and acceptance of documents to be signed by the Parties, unless such documents have been transferred by the Initial Creditor to the New Creditor before this Agreement came in to force;

2.1.2. inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor;

2.1.3. perform other obligations as set out by the applicable laws.

**2.2. New Creditor shall:**

2.2.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, accept from the Initial Creditor all documents confirming the Claims assigned hereunder in accordance with the respective certificate of transfer and acceptance of documents;

2.2.2. inform the Debtor about the assignment in favor of the New Creditor of the

**2.1. Первісний Кредитор зобов'язаний:**

2.1.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, передати Новому Кредитору всі документи, що підтверджують Права вимоги, що передаються за цим Договором, про що Сторонами складається відповідний акт прийому-передачі документів, у випадку, якщо такі документи не були передані Первісним Кредитором Новому Кредиторові до моменту набрання чинності цим Договором;

2.1.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором;

2.1.3. виконувати інші обов'язки, передбачені законодавством, що застосовується.

**2.2. Новий Кредитор зобов'язаний:**

2.2.1. за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, прийняти від Первісного Кредитора всі документи, які підтверджують Права вимоги, що відступаються за цим Договором, за відповідним актом прийому-передачі документів;

2.2.2. повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не

3

Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor.

пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором.

*ARTICLE 3.*
**REPRESENTATIONS**

*СТАТТЯ 3.*
**ЗАЯВИ**

3.1. The Parties are companies duly established and validly existing under the laws of countries of their incorporation;

3.1. Сторони є юридичними особами, належним чином створеними та існуючими відповідно до законодавства країн їх реєстрації;

3.2. The Parties have full power and authority to conclude, execute and deliver this Agreement and to fully perform their obligations hereunder, and the persons signing this Agreement on their behalf are legally authorised by the Parties to do so;

3.2. Сторони мають повний обсяг повноважень на укладення цього Договору та виконання в повному обсязі своїх обов'язків за цим Договором; особи, що підписують цей Договір від імені Сторін, уповноважені на вчинення таких дій Сторонами;

3.3. All corporate consents required for the execution and performance of the Parties' obligations under this Agreement have been unconditionally and irrevocably granted and are in full force and effect;

3.3. Всі корпоративні погодження, необхідні для укладення та виконання зобов'язань Сторін за цим Договором, були безумовно та безвідклично отримані та є повністю чинними;

3.4. The Initial Creditor represents that the Claims are valid and assignable; the Initial Creditor represents that it has provided notices of acceleration to the Debtor on the Claims for which the respective maturity date is beyond the effective date of this Agreement to make the Claims due;

3.4. Первинний Кредитор заявляє, що Права вимоги є чинними та такими, що можуть бути відступлені; Первісний Кредитор заявляє, що ним надано Боржникові вимоги про дострокове виконання стосовно Прав вимоги, строк виконання яких знаходиться поза датою укладення цього Договору, зробивши їх такими, строк виконання яких настав;

3.5. The Parties entered into this Agreement and were induced to do so relying solely on the representations stated in Article 3;

3.5. Сторони при укладенні цього Договору покладались виключно на заяви, вказані в Статті 3;

3.6. The New Creditor acknowledges that it has made its own analysis of the Debtor and the above details and has reached its own decision to enter into this Agreement without

3.6. Новий Кредитор підтверджує, що ним було зроблено власний аналіз Боржника та вищезазначених деталей, та прийнято самостійне рішення укласти цей Договір не покладаючись на Первинного

4

reliance on the Initial Creditor or any Cargill entity, except for the representations contained in this Article 3;

3.7. The Parties hereby agreed that no recourse to the Initial Creditor shall apply in relation to the Claims assigned hereunder, except for by operation of law and/or if any of the representations stipulated by Article 3 have been breached by the Initial Creditor.

## ARTICLE 4.
## DISPUTE RESOLUTION

4.1. Any dispute arising out of or in connection with this Agreement including its validity or termination shall be referred to and finally settled by London Court of International Arbitration in accordance with its Rules which shall be incorporated into this Agreement by reference. The number of arbitrators – three (3), place of arbitration – London (the United Kingdom of Great Britain and Northern Ireland), language of proceedings – English. The arbitration award shall be final and binding on all Parties.

## ARTICLE 5.
## FINAL PROVISIONS

5.1. This Agreement comes into effect from the moment of its conclusion and remains in effect until complete fulfillment of liabilities by the Parties.

5.2. All appendices, amendments and/or addendums to the present Agreement have to be executed in the written form, signed by duly authorized representatives of the Parties and sealed with the stamp (if required/applicable) with obligatory reference to this Agreement. Such appendices, amendments and/or addendums shall be an integral part of the

---

Кредитора або будь-яку особу групи Каргілл, за виключенням заяв викладених в Статті 3;

3.7. Підписанням цього Договору Сторони погоджуються з тим, що по відношенню до Первісного Кредитора не застосовується право регресу у зв'язку з Правами вимоги, відступленими за цим Договором, крім як в силу закону та/або якщо будь-яка із заяв, визначених в Статті 3, буде порушена Первісним Кредитором.

## СТАТТЯ 4.
## ВРЕГУЛЮВАННЯ СПОРІВ

4.1. Будь-який спір, що виникає з цього Договору або у зв'язку з ним, включаючи будь-які питання стосовно його дії або розірвання, мають бути передані та остаточно вирішені Міжнародним арбітражним судом Лондону (London Court of International Arbitration) у відповідності до його Регламенту, який вважається включеним шляхом посилання у цьому пункті. Кількість арбітрів – 3 (три), місце арбітражного розгляду – Лондон (Сполучене Королівство Великобританії та Північної Ірландії), мова розгляду – англійська. Арбітражне рішення є остаточним та обов'язковим для всіх Сторін.

## СТАТТЯ 5.
## ЗАКЛЮЧНІ ПОЛОЖЕННЯ

5.1. Цей Договір набирає чинності з моменту його укладення та діє до остаточного виконання Сторонами прийнятих на себе зобов'язань;

5.2. Усі додатки, зміни та/або доповнення до цього Договору мають бути вчинені в письмовій формі, підписані належним чином уповноваженими на те представниками Сторін та скріплені відбитками печаток (якщо вимагається/застосовується), з обов'язковим посиланням на цей Договір. Такі додатки, зміни та/або доповнення з моменту їх вчинення у вищевказаному порядку є невід'ємними частинами

present Agreement from the moment of their execution in the abovementioned order;

5.3. All notices under this Agreement shall be considered properly served in case they are made in writing and sent by courier, facsimile or hand delivered to the addresses of the Parties mentioned herein. The date of receipt of such notices shall be the date of their hand delivery or the date when transmitted electronically;

5.4. This Agreement shall be governed by and construed in accordance with the laws of New York (excluding conflicts of laws principles);

5.5. The New Creditor represents that it is registered as a payer of corporate profit tax on general terms in accordance with the Tax Code and applicable laws of Ukraine. The Initial Creditor represents that it is a tax resident of the United States of America;

5.6. The invalidity of any separate provision of this Agreement shall not cause invalidation of the whole Agreement as long as the Agreement might have been concluded without such provisions. In case any provision of this Agreement is recognized invalid or contradictory to applicable laws of New York by the court or any competent state authority in each individual case this shall not impact the application of such provisions in all other cases and the validity of other provisions of the Agreement. In such case the Parties shall draft in good faith a new provision of the Agreement to reflect to the fullest extent the intention of the Parties at the time of making this Agreement;

5.7. Each Party shall notify in writing another Party about change of any of its details within three (3) days;

даного Договору;

5.3. Усі повідомлення за цим Договором будуть вважатися зробленими належним чином у разі, якщо вони здійснені у письмовій формі та надіслані кур'єром, факсом або вручені особисто за зазначеними адресами Сторін. Датою отримання таких повідомлень буде вважатися дата їх особистого вручення або дата передачі електронними засобами;

5.4. Цей Договір регулюється та тлумачиться згідно з правом Нью-Йорку (за виключенням колізійних норм);

5.5. Новий Кредитор підтверджує, що він є платником податку на прибуток на загальних умовах відповідно до Податкового Кодексу України та застосовного законодавства України. Первісний Кредитор підтверджує, що він є податковим резидентом Сполучених Штатів Америки;

5.6. Недійсність окремих положень цього Договору не спричиняє недійсність Договору в цілому, оскільки можна припустити, що цей Договір міг би бути укладений без включення до нього таких положень. Якщо будь-яке з положень цього Договору буде визнано судом чи іншим уповноваженим державним органом недійсним чи таким, що суперечить чинному праву Нью-Йорку, в кожному конкретному випадку, таке визнання не буде впливати на застосування таких положень у всіх інших випадках та на дійсність інших положень Договору. В такому випадку, Сторони зобов'язуються сумлінно розробити нове положення Договору такого змісту, який би у повній мірі відображав ті наміри, що існували в них в момент укладання цього Договору;

5.7. У разі зміни реквізитів однієї з Сторін відповідна Сторона зобов'язана в триденний строк письмово повідомити

6

про це другу Сторону;

5.8. This Agreement is made in three (3) original copies in English and Ukrainian languages, having equal legal force. In case of any discrepancies the English version prevails;

5.8. Цей Договір укладено в 3 (трьох) оригінальних примірниках українською та англійською мовою, які мають однакову юридичну силу. У випадку виникнення розбіжностей, переважну силу матиме текст, викладений англійською мовою;

5.9. All payments made under this Agreement, including but not exclusive to payments under a separate agreement to be entered into by the Parties as provided in clause 1.3 above, shall be made in immediately available funds, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority;

5.9. Усі платежі, що мають бути вчинені згідно з цим Договором, включаючи але не обмежуючись платежами на підставі окремого договору, що має бути укладений Сторонами згідно з п. 1.3 цього Договору, повинні бути здійснені вільними грошовими коштами без відрахувань та зобов'язань по відрахуванню будь-яких існуючих або майбутніх податків, мит, зборів, включаючи збори, мита або податки на прибуток нерезидентів, встановлені урядом України або будь-якими іншими державними або податковими органами;

5.10. This Agreement represents the whole and only agreement between the Parties in relation to the Claims assignment and supersedes any previous agreement (whether written or oral) between the Parties in relation to its subject matter;

5.10. Цей Договір становить повний та єдиний договір між Сторонами щодо відступлення Прав вимоги, а також замінює собою будь-які попередні договори (письмові та усні) між Сторонами щодо його предмета;

5.11. The Parties accept the legal power and validity of the signed Agreement received via fax or via e-mail, as well as of all the document related to it (annexes, additions, protocols, amendments, schedules, etc.), signed and received in the same manner, with subsequent confirmation by means of originals.

5.11. Сторони визнають юридичну силу та чинність підписаного Договору, отриманого за допомогою факсу або електронної пошти, так само як і будь-яких пов'язаних документів (додатків, доповнень, протоколів, графіків тощо), які підписані та отримані таким же шляхом, з подальшим підтвердженням оригіналами.

**IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as a Deed on the day, month and year first written above.**

**НА ПІДТВЕРДЖЕННЯ ЦЬОГО Сторони належним чином уклали цей Договір в спеціальній письмовій формі у день, місяць і рік, зазначені на початку цього Договору.**

**PARTY 1:**

**СТОРОНА 1:**

**INITIAL CREDITOR
CFSIT, Inc.**

**ПЕРВІСНИЙ КРЕДИТОР
CFSIT, Inc.**

7

Address: 9350 Excelsior Boulevard, MS142-4B, Hopkins, MN 55343, USA

Account No.: CITIBANK N.A., NY, ACCOUNT No. 30501068, SWIFT CITIUS33

**Authorized person**

*Kristin Wessels* / **Kristin Lee Wessels** /

In the presence of witness:
(name)
(address)
(occupation)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA* **PARTY 2:**

**NEW CREDITOR**
**Limited Liability Company**
**"TANK TRANS"**

Registered address: 2Г Ivasiuka Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine
Identification code 32115067
Current Account № 26009000021345
in PJSC "Credit Agricole Bank"
MFO 300614

**Authorized person**

*/Igor Kulak/*

In the presence of witness:
(name) *Oleksiy Busarov*
(address) *Kyiv reg., Vyshgorodskiy dist.,*
(occupation) *advocate  Novi Petrivtsi, mkr 2205*

---

Місцезнаходження: бульв. Екселсіор, 9350, MS 142-4В, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA)
Рахунок: CITIBANK N.A., NY, ACCOUNT No. 30501068, SWIFT CITIUS33

**Уповноважена особа**

*Kristin Wessels* / **Крістін Лі Весселс** /

В присутності свідка:
(ім'я)
(адреса)
(вид занять свідка)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA* **СТОРОНА 2:**

**НОВИЙ КРЕДИТОР**
**Товариство з обмеженою відповідальністю**
**«ТАНК ТРАНС»**

Місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, місто Городок, вул. Івасюка, будинок 2Г
Ідентифікаційний код 32115067
Поточний рахунок № 26009000021345
в ПАТ «Креді Агріколь Банк»,
МФО 300614

**Уповноважена особа**

*/Ігор Кулак/*

В присутності свідка:
(ім'я) *Олексій Гусаров*
(адреса) *Київська обл., Вишгородський р-н, с.П.*
(вид занять свідка) *адвокат  Нов.Петр., б17. 22 05 "А"*

8

**ANNEX 1 TO THE ASSIGNMENT AGREEMENT NO. AA8
EXECUTED BY THE PARTIES AS OF FEBRUARY 5, 2015**

**July 07, 2015**

This Annex 1 ("Annex") to the Assignment Agreement (the **"Assignment Agreement"**) is made by and between among:

1)      CFSIT, Inc., a Delaware USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA ("CFSIT" or "Initial Creditor") and

2)      Limited Liability Company "TANK TRANS", a legal entity duly incorporated under the laws of Ukraine, having its registered address 2-G, V.Ivasyuka st., Gorodok, Lvivs'ka oblast', 81500, Ukraine ("TankTrans" or "New Creditor"),

CFSIT and TankTrans are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

**WHEREAS:**

- CFSIT and TankTrans are the Parties to the Assignment Agreement,

- In accordance with Article 1.3 of the Assignment Agreement the Parties have agreed to execute the explicit payment terms under the Assignment Agreement in a separate agreement,

- TankTrans has requested CFSIT to provide deferred payment terms under the Assignment Agreement and CFSIT is willing to provide such deferred payment terms on the conditions stipulated in this Annex 1 (the "Senior Debt Facility").

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## I. DEFINITIONS

**TankTrans** Limited Liability Company "TANK TRANS", a legal entity duly incorporated under the laws of Ukraine, having its registered address 2-G, V.Ivasyuka st., Gorodok, Lvivs'ka oblast', 81500, Ukraine

**Dar Assets**   Means TankTrans assets pledged in favour of Delta Bank as of February 5, 2015.

**Delta Bank**   means PUBLIC JOINT-STOCK COMPANY "DELTA BANK", a bank duly registered under the laws of Ukraine.

Capitalized terms used herein but not defined shall have the same meanings as defined in the Assignment Agreement between the Parties.

## II. SUBJECT MATTER OF THE AGREEMENT

The Parties agree to amend and restate Clause 1.1. of Article 1 of the Assignment Agreement as follows:

1.1.      The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) (the "Claims") under

© 2015 CFSIT, Inc. All rights reserved.

1

1.a)    the following documentary instrument and all the related documentation as applicable: all claims of the creditor (beneficiary) under the following documentary instruments issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the "Debtor", for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto:

- Irrevocable standby letter of credit No. LC/SB/018/042014 in the amount of 979,962.45 US Dollars;

- Irrevocable standby letter of credit No. LC/SB/019/042014 in the amount of 688,832.27 US Dollars;

- Irrevocable standby letter of credit No. LC/SB/020/042014 in the amount of 788,885.60 US Dollars;

- Irrevocable standby letter of credit No. LC/SB/022/042014 in the amount of 222,505.16 US Dollars;

- Irrevocable standby letter of credit No. LC/SB/023/042014 in the amount of 839,450.34 US Dollars

1.b)    CFSIT's 36,4299% proportionate interest, which is equal to USD 979,962.45 in the outstanding payment claims of CFSIT on the Limited Liability Company Agronovocom, Kiev, Ukraine in relation to the purchase of goods from CFSIT under Purchase Contact No. CFSIT288.11-7-S effective as of 23 November 2011, including any amendments thereto;

CFSIT's 53,5192% proportionate interest, which is equal to USD 1,477,717.87 in the outstanding payment claims of CFSIT on the Limited Liability Company Agronovocom, Kiev, Ukraine in relation to the purchase of goods from CFSIT under Purchase Contact No. CFSIT288.11-8-S effective as of 23 November 2011, including any amendments thereto.

CFSIT's 100% interest, which is equal to USD 1,061,955.50 in the outstanding payment claims of CFSIT on the Limited Liability Company Agronovocom, Kiev, Ukraine in relation to the purchase of goods from CFSIT under Purchase Contact No. CFSIT288.11-9-S effective as of 23 November 2011, including any amendments thereto.

## II. PAYMENT TERMS

In consideration for the assignment of the Claims, TankTrans agrees to pay in favour of CFSIT the amount of USD 3,519,635.82 (US Dollars Three Million Five Hundred Nineteen Thousand Six Hundred Thirty Five and 82/100) (hereinafter – the "Senior Debt Amount" or "Consideration") in accordance with the terms and conditions set out below:

The repayment of the Senior Debt Amount shall be made in instalments on the following repayment dates (further collectively referred to as the "Repayment Dates"):

| | |
|---|---|
| 05 May 2018 | USD 175 981,79 |
| 05 Aug 2018 | USD 175 981,79 |
| 05 Nov 2018 | USD 175 981,79 |
| 05 Feb 2019 | USD 175 981,79 |
| 05 May 2019 | USD 175 981,79 |
| 05 Aug 2019 | USD 175 981,79 |
| 05 Nov 2019 | USD 175 981,79 |
| 05 Feb 2020 | USD 175 981,79 |
| 05 May 2020 | USD 527 945,38 |
| 05 Aug 2020 | USD 527 945,38 |

© 2015 CFSIT, Inc. All rights reserved.     2

05 Nov 2020          USD 527 945,37
05 Feb 2021          USD 527 945,37

TankTrans further agrees and acknowledges and hereby expresses its consent that upon the successful arrangement and provision of working capital financing by CFSI to T.B. Fruit Polska Sp. Z o.o. S.K.A., 109 Sandomierska str., 27-620 Dwikozy, Poland, the Polish affiliate of TankTrans ("TB Fruit Poland") the Senior Debt Amount shall become interest bearing. The interest rate and interest periods shall be agreed by the Parties but in no case the interest rate shall be lower than 5% per annum and the interest period shall start to accrue on the outstanding Senior Debt Amount as of the date when the volume of working capital financing arranged for and/or provided to TB Fruit Poland reaches USD 40 million ("Interest Period Starting Date") and shall be payable every 180 days from the interest period starting date until the repayment of the Senior Debt Amount.

TankTrans also agrees and acknowledges that TankTrans shall be deemed to fulfil its payment obligations only when CFSIT gets money to its respective accounts.

TankTrans shall bear the risk and costs of getting all external authorizations for payments out of Ukraine (including but not limited to licenses, permits, registrations, approvals or any other authorizations needed under the applicable legislation or bank practice at the time of payment). In case payments under the Assignment Agreement and this Annex become explicitly restricted or forbidden by the law at the time of payment and shall stay restricted or forbidden more than 15 consecutive days from the scheduled date of payment, TankTrans shall immediately procure such payments by and from its affiliate: Francoso Corporation Limited, a legal entity duly registered under the laws of Cyprus having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus. The Parties hereto have agreed that any restriction or ban on payments outside Ukraine shall not be considered a force majeure event and such restriction or ban shall not extend, suspend or stop TankTrans obligation to pay.

## II. SECURITY OF PAYMENT

To secure TankTrans's Senior Debt Amount payment obligations under the Assignment Agreement and this Annex, TankTrans hereby undertakes and commits to cause TankTrans Assets to be pledged in favour of CFSIT to be of sufficient collateral value with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "Pledge"). TankTrans undertakes to arrange for the said pledge as soon as reasonably possible after the release of TankTrans Assets from the current liens made in favour of Delta Bank but in any case, no later than the first of the Repayment Dates. The collateral value shall be determined based on the following formula: market value of the respective complexes (based on most recent independent appraisal which shall be updated annually)*0.8.

TankTrans undertakes to take all necessary actions required under the applicable legislation of Ukraine to cause the TankTrans Assets to be pledged in favour of CFSIT and all necessary actions to perfect such Pledge.

TankTrans undertakes that the TankTrans Assets to be pledged in favour of CFSIT shall be made free and clear of any liens and/or any encumbrances.

If for any reason the Pledge cannot be arranged by TankTrans by the first of the Repayment Dates, TankTrans shall procure that CFSIT receives no later than the said Repayment Date one other adequate security in the form of either:

- Standby letter of credit issued in the form acceptable to CFSIT by a financial institution

© 2015 CFSIT, Inc. All rights reserved.

3

acceptable to CFSIT in the amount equal to the obligations of TankTrans under the Assignment Agreement and this Annex with an expiry date of no earlier than the last of the Repayment Dates plus 30 calendar days; OR

- Irrevocable first demand payment guarantees to be issued by a guarantor or guarantors acceptable to CFSIT and in the form acceptable to CFSIT covering the amount equal to the payment obligations of TankTrans under the Assignment Agreement and this Annex and with a validity period equal to the last of the Repayment Dates plus 30 calendar days; OR

- TankTrans shall pledge or cause any of the Guarantors to pledge in favour of CFSIT its/their sales proceeds from the contracts with third parties in the amount equal to or greater than the payment obligations of TankTrans under the Assignment Agreement and this Annex on each of the Repayment Dates.

TankTrans shall also procure the issuance of the following guarantees to CFSIT by the following guarantors (hereinafter "the Guarantors") no later than 5 days from the date of this Annex:

- First Demand suretyship to be issued by Mr. Taras Barshchovskyy, covering 100% of obligations of TankTrans under the Assignment Agreement and this Annex and in the format acceptable to CFSIT;

- First Demand payment guarantee to be issued by T.B. Fruit Polska Sp. z o.o. S.K.A., a legal entity duly registered under the laws of Poland having its registered address at 109 Sandomierska str., 27-620 Dwikozy, Poland, covering 100% of obligations of TankTrans under the Assignment Agreement and this Annex and in the format acceptable to CFSIT;

- First Demand payment guarantee to be issued by Francoso Corporation Limited, a legal entity duly incorporated under the laws of Cyprus, having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus ("Francoso Corporation Limited"), covering 100% of obligations of TankTrans under the Assignment Agreement and this Annex and in the format acceptable to CFSIT.

## V. REPRESENTATIONS & WARRANTIES

In addition to the Representations in the Assignment Agreement, TankTrans hereby further represents and warrants that:

a. this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be TankTrans's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and thereof, and such obligations rank at least pari passu in all respects with all their other similar obligations;

b. it has disclosed all of its material liabilities, contingent or otherwise to CFSIT;

c. this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be in proper legal form under the laws of Ukraine for the enforcement thereof against it in the courts of Ukraine, and to ensure the legality, validity, enforceability or admissibility in evidence of such documents in Ukraine, it is not necessary that such documents be filed or recorded with any court or other authority in Ukraine or that any stamp or similar tax be paid on or in respect of such documents;

d. it has or will take all required measures to assure that it can effect timely

© 2015 CFSIT, Inc. All rights reserved.

4

repayment of the Senior Debt Amount as contemplated herein, in United States Dollars, and assure that this Annex and the Assignment Agreement, and all documents to be delivered hereunder, remain in effect, enforceable and in compliance with all applicable laws and regulations;

e.  there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to TankTrans's knowledge) threatened against TankTrans either (i) with respect to or arising out of this Annex or the Assignment Agreement, or the transactions related thereto;

f.  neither it nor any of its revenues or properties have any right of immunity from suit, court jurisdiction, attachment prior to judgment, execution of a judgment or from set-off, banker's lien, counterclaim or any other legal process or remedy with respect to its obligations hereunder or under the Assignment Agreement

g.  there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to TankTrans's knowledge) threatened against TankTrans;

h.  TankTrans has good and clear title to its production and operational assets and land, free and clear of any liens or encumbrances except for those created or granted under any security documents in favour of TankTrans's lenders;

i.  it will provide evidence to CFSIT that it has obtained all required licenses, consents and authorizations for the TankTrans Assets and those assets are in compliance with all applicable environmental and safety standards normally applied to such type of assets;

j.  it will provide evidence to CFSIT of its ownership of the land (or the terms of any lease rights) related to the TankTrans production and operations facilities;

k.  it will maintain insurance on the TankTrans's properties and assets in at least such amounts, against at least such risks and with such risk retention as are generally maintained, insured against or retained by other companies of established reputation engaged in the same or similar business;

l.  it will keep proper books of record and account in which full and correct entries in conformity with local GAAP shall be made of all dealings and transactions in relation to its business and activities;

m.  it will cause Francoso Corporation Limited to produce consolidated group financial statements under IFRS for each of the financial years from 2015 through 2021 (both years inclusive) and have them audited by of the reputable international audit firm agreed by the Parties;

n.  to provide CFSIT with the financials at first request as well as to provide any such additional financial and other information related to the performance of TankTrans that may be reasonably requested by CFSIT;

u.  not to directly or indirectly, create, assume or suffer to exist any lien upon any property or asset now or hereafter acquired by TankTrans to secure any debt which is *pari passu* with or subordinate in right of payment under the Senior Debt

© 2015 CFSIT, Inc. All rights reserved.

5

Amount unless the Senior Debt Amount is secured equally and rateably prior to the creation, incurrence or assumption of such lien. Notwithstanding the foregoing provisions of this section, the TankTrans shall not permit, create, assume or suffer to exist any lien on the capital stock of TankTrans.

## VI. DEFAULT

If TankTrans or any of its affiliates alternatively shall:

a. breach any representation or warranty made by TankTrans (or any of its officers) under or in connection with this Annex or in any financial statement shall prove to have been incorrect, false or misleading in any material respect when made and such condition (if capable of remedy) remains unremedied for a period of thirty (30) days after the TankTrans or CFSIT obtains knowledge thereof;

b. fail to perform or observe any other term, covenant or agreement contained in Section V. (a) through and including (u) and/or referred to in this Annex;

c. generally not pay or admit its inability to pay its respective debts as such debts become due;

d. shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail to generally pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

e. become subject to an involuntary case or other proceeding shall be commenced against TankTrans seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days; or an order for relief shall be entered against TankTrans under any bankruptcy laws as now or hereafter in effect;

f. any event shall occur that could be reasonably expected to have a Material Adverse Effect on the: (i) property, businesses, operations, financial condition, liabilities or capitalization of TankTrans; (ii) ability of TankTrans to perform any of its respective obligations under this Annex, (iii) validity or enforceability of this Annex, or (iv) timely payment of the principal or any interest amount due hereunder;

g. a Change of Ownership or sale or any other disposition of assets of total value equal or greater USD 1,000,000 shall occur, without a prior written consent of CFSIT;

© 2015 CFSIT, Inc. All rights reserved.

6

h.   TankTrans shall (i) default in the payment when due of any principal of or interest on any of its Debt (other than the Senior Debt Amount or (ii) any event specified in any note, agreement, indenture or other document evidencing or relating to any such debt shall occur, the result of which is to cause, or (with the giving of any notice or lapse of time or both) to permit the holder or holders of such debt (or a trustee or agent on behalf of such holder or holders) to cause such debt to become due and payable prior to its stated maturity; provided, however, that the aggregate amount of such Debt falling within (i) above (as to which the time for payment has not been extended by the relevant creditors) and any relevant payments falling within (ii) above equals or exceeds USD1,000,000 (US Dollars one million) for TankTrans in aggregate;

i.   one or more judgments or orders from which no further appeal is permissible under applicable law for the payment of money aggregating in excess of USD1,000,000 (one million US dollars) (or its equivalent in another currency) shall be rendered against TankTrans, and such judgment or order shall continue unsatisfied and in effect until the date by which payment must be made pursuant to such judgment or order;

j.   at any time during the term of this Annex, it is or becomes unlawful for the TankTrans to perform its respective obligations pursuant to the terms and conditions contained in this Annex, or any of such obligations are not, or cease to be, legal, valid and binding on it and enforceable against TankTrans;

j.   If any of the following events have occurred:

   (i)   the whole or a substantial part of the assets of the TankTrans, or any of its affiliates is confiscated or attached;

   (ii)   any change occurs in the ownership or control of the TankTrans or any of its affiliates, which, in the reasonable opinion of the CFSIT, constitutes a material adverse change affecting the financial condition or operations of the TankTrans or any of its affiliates respectively;

   (iii)   any competent governmental authority takes any action to condemn, seize, requisition or otherwise appropriate any substantial portion of the properties or assets of TankTrans or any of its affiliates (either with or without payment of compensation), or any action relating to TankTrans or any of its affiliates, which in the opinion of CFSIT, adversely affects TankTrans's ability to pay its indebtedness under the Assignment Agreement,

then, in any such event CFSIT, may immediately proceed to protect and enforce its rights by an action at law, or other appropriate proceeding, including but not limited to, demanding and declaring this Annex, including all interest accrued thereon and all other amounts payable under this Annex to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by TankTrans. TankTrans hereby agrees to indemnify CFSIT for (i) all reasonable costs and expenses (including but not limited to attorney's fees) incurred by CFSIT in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom. Said indemnification shall survive the repayment in full of the Senior Debt Amount.

## VII. GENERAL PROVISIONS

© 2015 CFSIT, Inc. All rights reserved.

a. Any provision of this Annex that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

b. The section headings in this Annex are for convenience of reference only and shall not affect the interpretation hereof.

c. This Annex may be signed in counterparts with each counterpart deemed an original and both counterparts together constituting one and the same document.

d. The parties hereto acknowledge to have had previous access to the contents of this Annex and that notwithstanding its English language have perfectly understood its exact content.

e. All payments under this Annex are to be made in immediately available funds in United States Dollars, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority. The Parties agree that, in the event of any such deduction, withholding or tax payment, TankTrans shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment CFSIT will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon TankTrans's request, CFSIT agrees to provide such documentation, which to its best knowledge but without any assurances on its part, is required by to classify CFSIT as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and Ukraine. Payments are to be made to CFSIT's account as per Assignment Agreement.

If payments under this Annex are not made in full when due, then any outstanding amount due but unpaid hereunder shall accrue late interest at 11 % calculated per annum from the date relevant payment should have been made until the date payment is received in full.

f. Any and all information in connection with the transaction(s) under the Assignment Agreement shall be treated as confidential by the TankTrans, its officers, employees and representatives, and any of the TankTrans's affiliates and shall not be disclosed to any third party in any form whatsoever without the CFSIT's prior express written consent, unless required by law or court order. If the TankTrans is required by law or court order to disclose any such information, the TankTrans shall provide the CFSIT prompt written notice of such requirement.

This Annex is executed on the first date written above and comes into force as of the effective date of the Assignment Agreement.

All the changes, annexes, additional agreements and amendments to the Assignment Agreement and this Annex will be valid only in done in writing and signed by the authorized representatives of all Parties.

This Annex supplements the Assignment Agreement and represents its integral part. All the provisions of the Assignment Agreement remain in full legal power and force unless specifically amended or ruled out by this Annex.

[SIGNATURE PAGE FOLLOWS]

## SIGNATURE PAGE

**Limited Liability Company "TANK TRANS"**
2-G, V.Ivasyuka st., Gorodok, Lvivs'ka oblast', 81500, Ukraine
Identification code 32115067
Current Account № 26009000021345
in PJSC "Credit Agricole Bank"
MFO 300614

**CFSIT, Inc.**

1209 Orange Street, Wilmington, County of New Castle, State of Delaware with principal offices at 9350 Excelsior Boulevard, MS142-4B, Hopkins, Minnesota 55343, USA
Bank Details:
Beneficiary bank: Citibank, NA, New York , U.S.A.
SWIFT: CITIUS33XXX
ABA: 021000089
Bank Account: 30501068

By: _____

Name: Shpuk Audrij

Title: Director

By: _____

Name:

Title:

**Jennifer Campbell**
Authorized Signer

9

© 2015 CFSIT, Inc. All rights reserved.

# SURETYSHIP AGREEMENT

This Suretyship Agreement (this "*Suretyship Agreement*") is made on July 07, 2015 by

1. **Taras Barshchovskyy,** a Ukrainian national, residing at Bratkovychi, Ukraine, passport number KB076181 (which expression shall include any personal representatives, receiver, trustee in bankruptcy or any other person acting on his behalf) (the "*Surety*")

in favour of

2. **CFSIT, Inc.,** a Delaware, USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA (the "*Beneficiary*")

1  SURETYSHIP AND INDEMNITY

1.1      In consideration of the Beneficiary having (i) entered into Assignment Agreement No AA8 as of **February 05, 2015**, with Limited Liability Company "Yabluneviy dar", a legal entity incorporated under the laws of Ukraine, and having its registered office at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 (the "*Obligor*"), as amended, modified and/or supplemented from time to time (the "*Assignment Agreement*") and (ii) extended payment terms in accordance with the terms of the Assignment Agreement to the Obligor, the Surety, as primary obligor and not merely as surety, irrevocably and unconditionally secures by this Suretyship Agreement the due and punctual payment of all amounts payable by the Obligor to the Beneficiary under the Assignment Agreement (the "*Secured Obligations*") when the same shall become due and payable. Upon each or any failure by the Obligor to pay punctually the Secured Obligations or any part thereof as provided under the Assignment Agreement, and upon first written demand (the "*Demand*") by the Beneficiary to the Surety, the Surety agrees to immediately pay the Secured Obligations to the Beneficiary. Surety hereby acknowledges and agrees that the Secured Obligations may increase in amount due by reason of any modifications of the Assignment Agreement, Secured Obligations or otherwise.

1.2      Notwithstanding any provision in this Suretyship Agreement, the aggregate amount the Surety shall be required to pay under this Suretyship Agreement shall not exceed USD 3,519,635.82 (US Dollars Three Million Five Hundred Nineteen Thousand Six Hundred Thirty Five and 82/100) plus the amount of any unpaid interest, fees and/or unpaid late payment interest as defined in the Assignment Agreement and the reasonable costs of enforcing the obligations of the Surety hereunder. In this connection, any payment to be made by the Surety to the Beneficiary, its successors and assigns under this Suretyship Agreement shall be made in US dollars without set-off or counterclaim whatsoever and free and clear of and without withholding or deduction for, or on account of, any present or future taxes, including interest, penalties and additions thereto, imposed, levied collected, withheld or assessed by or on behalf of or within Surety's Home State (as defined below) or by any other competent authority, unless required by law. The parties agree that, in the event of any such deduction, withholding or tax payment, the

1

© 2015 CFSIT, Inc. All rights reserved.

Surety shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment the Beneficiary will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon Surety's written request, the Beneficiary agrees to provide such documentation, which to the Beneficiary's best knowledge but without any assurances on its part, is required by Surety's Home State legislation or authorities to classify the Beneficiary as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and the Surety's Home State. Failure by the Beneficiary to provide such documentation shall not release the Surety of its obligations under this Clause 1.2. "*Surety's Home State*" means any country in which the Surety has its domicile, or is considered to be a tax resident.

1.3    The Surety's obligations under this Suretyship Agreement shall be absolute, irrevocable and unconditional irrespective of the validity or enforceability of any provision of the Assignment Agreement or any other provision of this Suretyship Agreement. This Suretyship Agreement is a continuing suretyship for payment and not collection and shall apply to all Secured Obligations.

1.4    If the Secured Obligations are not recoverable from the Obligor by reason of illegality, incapacity, the lack of authority, ineffectiveness of execution or any other reason, the Surety shall, notwithstanding any of the foregoing, remain liable under this Suretyship Agreement as if he were a principal obligor. The Surety, as principal obligor and as a separate and independent obligation and liability from his obligations under Clause 1.1 above, irrevocably and unconditionally agrees to indemnify the Beneficiary in full immediately and on demand against all losses, costs and expenses suffered or incurred by the Beneficiary arising from or in connection with the Assignment Agreement.

1.5    The Surety hereby expressly waives to the fullest extent permitted by applicable law any requirement for promptness, diligence, presentment, or protest and any requirement that the Beneficiary assert, exercise, refrain from exercising or exhaust any right, power, remedy or process against the Obligor under any promissory note or other agreement or instrument, or against any other person under any other suretyship of, or security for, any of the Secured Obligations.

1.6    The Surety agrees that, in the event of a formal dissolution or insolvency of the Obligor, or filing of any petitions or commencement of any actions relating to same, whether by the Obligor or any third party, the declaration by the Obligor or the Surety of its inability or failure to pay any amounts under the Assignment Agreement, or this Suretyship Agreement, (as applicable) as they become due or an assignment by the Obligor or the Surety for the benefit of creditors, or the commencement of any case or proceeding in respect of the Obligor or the Surety under any bankruptcy, insolvency, or similar laws, which if commenced by a party other than the Obligor or the Surety is not dismissed within sixty (60) days of its filing, and if such event shall occur at a time when any of the Secured Obligations of the Obligor may not then be due and payable, the Surety will pay to Beneficiary forthwith the full amount which would be payable hereunder by the Surety if all such Secured Obligations were then due and payable.

2    PRESERVATION OF RIGHTS

2

© 2015 CFSIT, Inc. All rights reserved.

2.1 Neither the obligations of the Surety herein contained nor the rights, powers and remedies conferred upon the Beneficiary by law shall be discharged, impaired or otherwise affected by:

2.1.1 the bankruptcy or insolvency of the Obligor or any similar or equivalent proceedings against him;

2.1.2 time or other indulgence being granted or agreed to be granted to the Obligor in respect of obligations under the Assignment Agreement and/or in relation to the Secured Obligations in which circumstances the obligations of the Surety shall be varied by the extent of the time or other indulgence;

2.1.3 any amendment or supplement to, termination, novation or any variation, waiver or release of or in respect of the Assignment Agreement and/or any of the Secured Obligations; or

2.1.4 any act or omission which would not have discharged or affected the liability of the Surety had it been a principal debtor instead of Surety or indemnitor or by anything done or omitted by any person which but for this provision might operate to exonerate or discharge the Surety or otherwise reduce or extinguish his liability under this Suretyship Agreement.

2.2 Insofar as the Surety acquires rights against the Obligor in consequence of the Surety performing its obligation hereunder, the Surety undertakes that it will not exercise such rights or seek to obtain collateral in respect of such rights while the Obligor is under any actual or contingent obligation under the Assignment Agreement. The Surety further undertakes that it will not seek to take any steps to obtain collateral in anticipation of acquiring such rights.

2.3 The obligations of the Surety under this Suretyship Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Obligor in respect of the Secured Obligations is rescinded or must be otherwise restored by the Beneficiary, whether as a result of any proceedings in bankruptcy or insolvency or otherwise, and the Surety agrees that he will immediately indemnify the Beneficiary on demand for all reasonable costs and expenses (including, without limitation, fees of counsel) incurred by the Beneficiary in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

2.4     Without limitation of the foregoing, when requested by the Beneficiary (if so required by applicable laws), the Surety shall apply for and shall obtain a license of the National Bank of Ukraine enabling him to make cross-border payments to the Beneficiary under this Suretyship Agreement.

## 3   DURATION OF SURETYSHIP

3

© 2015 CFSIT, Inc. All rights reserved.

This Suretyship Agreement will terminate on **31 May 2021**; provided, however, that such expiration shall not release the Surety from any obligation to the Beneficiary under this Suretyship Agreement until all amounts due under the Assignment Agreement have been paid in full or expire in accordance with the terms of the Assignment Agreement.

4    REPRESENTATIONS, WARRANTIES AND COVENANTS

The Surety represents, warrants and covenants that:

4.1  it is an adult individual and has the legal authority and capacity to enter into and perform this Suretyship Agreement;

4.2  the execution, delivery and performance of this Suretyship Agreement will not contravene any law or regulation to which the Surety is subject, and all governmental or other consents requisite for such execution, delivery and performance are in full force and effect. The execution, delivery and performance of this Suretyship Agreement does not require receipt of any regulatory authorizations (licenses, approvals, permits, etc.) which are required by applicable law;

4.3  the execution, delivery and performance of this Suretyship Agreement will not cause the Surety to be in breach or default under any agreement binding on it or any of its assets or require any consent under any indenture, note, mortgage, agreement or other instrument or arrangement to which the Surety is a party or by which it is bound;

4.4  this Suretyship Agreement constitutes and at all times shall constitute, a direct, unsecured and unsubordinated obligation of the Surety, ranking pari passu with all other present and future unsecured and unsubordinated obligations of the Surety;

4.5  this Suretyship Agreement has been duly executed by it and constitutes a valid obligation of the Surety, legally binding on it and enforceable in accordance with its terms in the courts of its place of incorporation;

4.6  the Surety has disclosed to the Beneficiary in writing all financial reports, other written information and other material information relevant to assure full and true disclosure required to permit the Beneficiary to evaluate the making of payment terms to the Obligor. All documents, reports and other written information pertaining to the Obligor or the Surety that have been furnished to the Beneficiary were prepared with due care and in good faith, are true, complete and correct in all material respects and do not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not materially misleading. There is no fact relating to the Surety that is known to, or which by the exercise of due diligence could be known to, the Surety, the existence of which could reasonably be expected to cause the Beneficiary not to provide the payment terms to the Obligor;

4

© 2015 CFSIT, Inc. All rights reserved.

4.7 in acting as the Surety under this Suretyship Agreement it has complied and will continue to comply for the duration of this Suretyship Agreement with all necessary and applicable anti-money laundering procedures required for it to act as a Surety hereunder;

4.8 it has been provided with, and hereby acknowledges receipt and review of a duly certified copy of the Assignment Agreement; and

4.9 it will procure that, at all times during this Suretyship Agreement, the amount of Surety's own USD funds standing to the credit of its bank accounts is sufficient to perform the Surety's obligations hereunder.

## 5 CONTINUING SECURITY

The obligations of the Surety herein shall constitute and be continuing obligations and shall not be considered satisfied by any intermediate payment or other settlement of account. The said obligations shall continue in full force and effect until final payment in full of all amounts owing by the Obligor under the Assignment Agreement.

## 6 DEMANDS AND NOTICES

6.1 Any Demand or notice shall be written and in the English language.

6.2 Any Demand shall be accompanied by a statement from the Beneficiary stating that the sum demanded is due and payable but unpaid and such demand shall, in the absence of manifest error, be binding on the Surety.

6.3 Any Demand or notice shall be hand delivered to or sent by courier by way of a first-class international courier company to the recipient at its address stated in this clause (or such other address as may be notified in writing from time to time):

(A) In the case of the Surety:
2g Ivasyuka Str., 81500 Gorodok,
Lviv Region, Ukraine

(B) In the case of the Beneficiary:
9350 Excelsior Blvd.
Hopkins, MN 55343

Attention: Jennifer Campbell

6.4 Any notice, not being a Demand, may be sent by fax to the following fax numbers:

(A) In the case of the Surety:
Fax No: 38 - 03231 - 321 - 21

(B) In the case of the Beneficiary:
Fax No: 1-952-249-4416

© 2015 CFSIT, Inc. All rights reserved.

6.5 Any Demand or notice shall be deemed to have been duly served:-

    6.5.1  if delivered by hand, when delivered at the address referred to in Clause 6.3 above; or

    6.5.2  if sent by courier on the day of delivery to the address referred to in Clause 6.3 above; or

    6.5.3  in the case of a notice other than a Demand, if sent by facsimile, at the time when sent to the recipients fax number referred to in Clause 6.4 above.

## 7  PARTIAL INVALIDITY

If at any time any one or more of the provisions of this Suretyship Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction neither the legality, validity or enforceability of the remaining provisions of this Suretyship Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall be in any way impaired as a result.

## 8  AMENDMENT

No term or provision of this Suretyship Agreement shall be amended, modified, altered, waived or supplemented except in a written document signed by the Surety and the Beneficiary.

## 9  COSTS

Subject to Clause 1.2 above, the Surety shall immediately, on demand by the Beneficiary and on a full indemnity basis, pay to the Beneficiary the amount of all costs and expenses which the Beneficiary incurs under or in connection with this Suretyship Agreement.

## 10 Bank Details

Any payments under this Suretyship Agreement shall be made by the Surety to the following bank account of the Beneficiary, unless otherwise specified by the Beneficiary in writing:

Beneficiary bank: Citibank, NA, New York, U.S.A.
SWIFT: CITIUS33XXX
ABA: 021000089
Bank Account: 30501068

## 11 CONSENT TO SERVICE OF PROCESS

The Surety further irrevocably consents for himself, if for any reason there is no authorized agent for service of process in London, England, to the service of process out of the said courts by mailing copies thereof by registered air mail postage prepaid to it at its address specified herein; and in such a case the Beneficiary shall also

6

© 2015 CFSIT, Inc. All rights reserved.

send facsimile, or shall procure that there is also sent by facsimile, a copy of such process to the Surety.

## 12  ASSIGNMENT

The Surety may not assign its rights, interests or obligations hereunder to any other person.   The Surety unconditionally agrees and consents that the rights of the Beneficiary under this Suretyship Agreement may be freely assigned by the Beneficiary in its sole discretion together with its rights under the Assignment Agreement with written notification to the Surety by the Beneficiary within three (3) Business Days of such assignment or transfer.

## 13  GOVERNING LAW AND ARBITRATION

Any dispute arising out of or in connection with this Suretyship Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitral proceedings shall be English. The governing law of this Suretyship Agreement shall be the substantive law of England and Wales.

**IN WITNESS WHEREOF,** this Suretyship Agreement has been executed as a deed by the Surety and has been signed by or on behalf of the Beneficiary with the intention that it be delivered on the date appearing at the beginning of this Suretyship Agreement.

**EXECUTED** as a Deed

**The Surety**

by [_____]
acting by [_____];

[ADD NOTARY SIGNATURE BLOCK]

**The Beneficiary**

by Cargill Financial Services International, Inc.
acting by [_____];

[Title]

7

© 2015 CFSIT, Inc. All rights reserved.

**Amendment № 1 to Assignment Agreement №AA8 as of 05 February 2015**

**November 08, 2018**

This Amendment № 1 (the "**Amendment № 1** ") to Assignment Agreement №AA8 as of February 05, 2015 (the "**Assignment Agreement**") and to Annex 1 thereto of July 07, 2015 (the "**Annex**") is made on November 8, 2018 (the Assignment Agreement and the Annex, together, the "**Agreement**") by and between:

**CFSIT, Inc.,** registered at Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, DE, 19801, U.S.A. with principal place of business at 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A. , hereinafter referred to as "**CFSIT**"or the "**Initial Creditor**", on one side, and

**LIMITED LIABILITY COMPANY "TANK TRANS" (ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВIДАЛЬНIСТЮ "ТАНК ТРАНС"),** 2-G, V.Ivasyuka st., Gorodok, Lvivska oblast', 81500, Ukraine, identification number 32115067 duly represented by Mr. Andriy Shpuk, acting based on Charter, hereinafter referred to as "**TT**" the "**New Creditor**", on the other side.

The Initial Creditor and the New Creditor are individually referred to in this Amendment № 1 as a "**Party**" or collectively as the "**Parties**".

**WHEREAS:**

A. Under the Assignment Agreement the Initial Creditor assigned to the New Creditor and the New Creditor received the Claims. In consideration of the assignment of the Claims, the New Creditor agreed in the Annex to pay in favour of the New Creditor the Consideration in the amount of US Dollars 3,519,635.82 in 12 installments until February 05, 2021 with the first installment payable on May 05, 2018.

B. To secure the New Creditor's payment obligations under the Assignment Agreement, the New Creditor agreed in the Annex to provide the Initial Creditor with one or more pledges over the New Creditor's physical assets (collectively, "**Pledge**") then and currently subject to liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", with a total collateral value of more than 100% of the Consideration amount. The Annex required the New Creditor to provide the Pledge as soon as reasonably possible upon release of the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", but in any case, no later than May 05, 2018.

C. As of the date of this Amendment № 1 the New Creditor's physical assets have not yet been released from the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" nor pledged to the Initial Creditor.

D. The New Creditor has requested that the Initial Creditor extend the payment terms of the Consideration amount under the Agreement and the terms for provision of the Pledge to the Initial Creditor and the Initial Creditor is willing to provide the requested extension on the basis of the terms and conditions outlined in this Amendment № 1 below.

Taking the above into account, the Parties hereby have agreed as follows:

**AGREED TERMS:**

1. The Parties have agreed to supplement the Agreement with the following Definitions section.

DEFINITIONS:

Capitalized terms used herein but not defined shall have the same meanings as defined in the Agreement.

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

© 2018 CFSIT, Inc. All Rights Reserved.

"**Asset Disposition**" of any Person means the sale, lease or conveyance or other disposition of assets (including, without limitation, any capital stock of any TB Fruit Group company or subsidiary of such Person held directly or indirectly by such Person), whether owned on the date hereof of hereafter acquired, in one or more related transactions, outside of the ordinary course of business (other than a sale, lease, conveyance or other disposition by such Person or a subsidiary of such Person to such Person or a wholly owned subsidiary of such Person, including any such disposition by means of a merger, consolidation or similar transaction).

"**Business Day**" shall mean any day, other than a Saturday or Sunday, on which banks are not authorised to close in Kyiv (Ukraine) and New York (USA).

"**Cargill Entity**" shall mean any company or legal entity which from time to time directly or indirectly controls, is controlled by, or is under common control of the Initial Creditor, whether or not such company or other legal entity is in existence at the time this Amendment № 1 is signed by the Parties.

"**Change of Control Event**" means an event or series of events which:

(i)     any Person, either individually or acting in concert with one or more other Persons, shall have acquired beneficial ownership (provided that a Person shall not be deemed to be the beneficial owner of shares tendered pursuant to a tender offer made by that Person or its Affiliate until the tendered shares are accepted for purchase), directly or indirectly, of equity interests of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company, or

(ii)    *(1)* another corporation merges into of TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company or *(2)* Mr. Taras Barshchovskyy, TB Fruit Holding Establishment (Liechtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company conveys, transfers or leases all or substantially all its assets to any Person or group, in one transaction or a series of transactions, or

(iii)   the failure at any time of TB Fruit Holding Establishment (Liechtenstein) legally and beneficially to own and control 100% of the issued and outstanding shares of capital stock of its subsidiaries held by TB Fruit Holding Establishment (Liechtenstein) as of the date of this Amendment №1, or the failure at any time of TB Fruit Holding Establishment (Liechtenstein) to have the ability to elect all the majority of the board of directors or other governing bodies of any of its subsidiaries, or

(iv)    the failure of, at any time, Mr. Taras Barshchovskyy to legally and beneficially own and/or control 100% of the issued and outstanding share of capital stock of TB Fruit Holding Establishment (Liechtenstein), and/or any other TB Fruit Group company directly or indirectly owned or subsequently acquired by Mr. Taras Barshchovskyy.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**TB Fruit Group**" means and includes any and all Persons that directly or indirectly through one or more intermediaries, is controlled by *Mr. Taras Barshchovskyy* and/or controls, is controlled by, or is under common control with TT and/or any of the Guarantors. "Control" (including the terms "controlled by" and "under common control with") means the direct or indirect ownership or control of more than 50% of the voting rights or equity shares of such Persons.

Any reference in the Assignment Agreement to "this Agreement" and in the Annex to "this Annex" shall be deemed to be a reference to the Assignment Agreement and the Annex as amended, modified and/or supplemented from time to time (including by this Amendment № 1).

## 2.   AMENDMENT TO THE ASSIGNMENT AGREEMENT:

Subject to terms and conditions of this Amendment № 1 the Parties agree:

© 2018 CFSIT, Inc. All Rights Reserved.

2.1. To amend and restate clause 5.3 of the Assignment Agreement as follows:

"5.3. (i) Subject to sub-clause (iv) of this clause 5.3., any notice or communication given to a Party under or in connection with this Agreement (and any amendment or supplement) shall be in writing and shall be delivered by hand, by third party courier service, by fax and/or by electronic mail, in each case to that Party's address, fax number or electronic mail address specified in, as applicable to that Party, as specified in this clause 5.3. (or to such other address, fax number or electronic mail address as that Party may notify to the other Party in accordance with this clause 5.3.).

a. If to the Initial Creditor:
For the attention of Nancy Nelson
Address: 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A.
Fax number: + 41 22 703 2841
E-mail address: Nancy_Nelson@cargill.com

b. If to the New Creditor:
For the attention of Olena Semotiuk
Address: 2-G, V.lvasyuka st., Gorodok, Lvivska oblast', 81500, Ukraine
Fax: +38 03231 3-21-21
Email: o.semonova@tbfruit.com

(ii) Subject to sub-clause (iii) of this clause 5.3., delivery of a notice is deemed to have taken place (provided the requirements of sub-clause (i) of this clause 5.3. have been satisfied):

a. if delivered by hand, on the day and time the notice is delivered;
b. if sent by third party courier service, on the third Business Day after depositing such notice with the courier (excluding the date of deposit);

c. if sent by fax, on the earlier of the day and time shown in a transmission report indicating a satisfactory transmission and a confirmation of receipt obtained from the sender's facsimile machine; and

d. if sent by electronic mail, on the day and at the time that the electronic mail was read as shown in a read receipt, on the day and at the time the electronic mail was delivered as shown in a delivery receipt or on the day and at the time of receipt of an acknowledgement from the recipient indicating a satisfactory transmission (whichever is the earlier).

(iii) In the case of delivery by hand, by fax or by email, if the deemed receipt does not take place inside business hours (meaning 9.00 am to 5.30 pm on any day, other than a Saturday or Sunday, on which banks are not authorized to close in the place of deemed receipt), then deemed receipt will occur when business next starts in the place of receipt (and all references to time are to local time in the place of receipt).

(iv) This clause 5.3. does not apply to the service of any proceedings or other documents in any legal action."

2.2. To change numbering of Section II (*Payment Terms*) of the Annex to Section III (*Payment Terms*);

2.3. To change numbering of Section II (*Security of Payment*) of the Annex to Section IV (*Security of Payment*);

2.4. The table of Repayment Dates specified in the second paragraph of Section III (*Payment Terms*) of the Annex shall be replaced in its entirety and supplemented as follows:
"

| Repayment Date | Consideration amount due, USD |
|---|---|
| 15 February 2022 | $234,642.39 |
| 15 May 2022 | $234,642.39 |
| 15 November 2022 | $234,642.39 |
| 15 February 2023 | $234,642.39 |
| 15 May 2023 | $234,642.39 |

© 2018 CFSIT, Inc. All Rights Reserved.

| 15 November 2023 | $234,642.39 |
| 15 February 2024 | $234,642.39 |
| 15 May 2024 | $234,642.39 |
| 15 November 2024 | $234,642.39 |
| 15 February 2025 | $234,642.39 |
| 15 May 2025 | $234,642.39 |
| 15 November 2025 | $234,642.39 |
| 15 February 2026 | $234,642.38 |
| 15 May 2026 | $234,642.38 |
| 15 November 2026 | $234,642.38 |

The New Creditor irrevocably and unconditionally acknowledges and confirms its payment obligation as envisaged in the table above in the total amount of US Dollars 3,519,635.82, without prejudice to the Conditional Discount provisions as stated below."

2.5.    The provisions of Clause 2.4 of this Amendment № 1 and any reference to the Conditional Discount shall come into effect upon satisfaction (or waiver by the Initial Creditor) of each of the conditions precedent specified in Section 3 hereof.

2.6. To add a the following at the end of Section III (*Payment Terms*) of the Annex as follows:

"In the event the Repayment Date falls on a non-Business Day, the next following Business Day shall be considered as the Repayment Date.

Notwithstanding the above, if (a) the New Creditor fails to make any payment of Consideration when due for payment hereunder, or (b) any Affiliate of the New Creditor fails to make any payment of any indebtedness to any Cargill Entity when due, or (c) any other event of default as specified in Section VII (*Default*) of the Annex has occurred, then the Repayment Dates as specified in the Annex prior to the effectiveness of Amendment № 1 to the Assignment Agreement and this Annex shall be reinstated without any demand, protest or notice of any kind, all of which are hereby expressly waived by the New Creditor. The Initial Creditor retains full rights to enforce any and all payments in accordance to such an original payment schedule.

Subject to the provisions of this paragraph, the Initial Creditor agrees to provide a discount in the amount up to 15% of the Consideration ("**Conditional Discount**"). The Conditional Discount will be proportionally applied to the instalments of the Consideration payable by the New Creditor to the Initial Creditor in 2026 as follows:

| **Repayment Date** | **Consideration amount due, USD** | **Conditional Discount amount, USD** |
| --- | --- | --- |
| 15 February 2026 | $234,642.38 | $175,981.79 |
| 15 May 2026 | $234,642.38 | $175,981.79 |
| 15 November 2026 | $234,642.38 | $175,981.79 |

The provision of the Conditional Discount is subject to **(a)** the full and timely repayment of (i) all amounts due on each and every Repayment Date up to and including the Repayment date of 15 November 2025, and (ii) all other indebtedness of TB Fruit Group companies to the Initial Creditor and/or any Cargill Entity, including the payment obligations of FRANCOSO CORPORATION LIMITED under the Raw Materials Purchase, Inventory and Receivables Financing Agreements No 02 2017 and No 03 2017 dated January 30, 2017 (as further amended) ("**RMPIR Financing Agreements**"); and **(b)** there having been no event of default as specified in Section VII (*Default*) of Annex."

2.7. The first paragraph of Section IV (*Security of Payment*) of Annex shall be replaced in its entirety with the following:

"To secure TT's payment obligations under the Assignment Agreement and this Annex, TT hereby undertakes and commits to cause the assets (located at:
1. 274-a Lvivska str., Gorodok, Lviv region, 81500, Ukraine
2. 62 Kopitka str., Lypovets, Vinnytska region, 22500, Ukraine
3. 7 Gagarina str., New Ushitsya, Novouushitsky district, Khmelnytsky region, 32600, Ukraine

© 2018 CFSIT, Inc. All Rights Reserved.

4. 3 Kamenetsky highway, Slobokivtsi, Yarmolinetsky district, Khmelnytsky region, 32162, Ukraine
5. 5 Kharkiv str., Zatishya, Kharkiv district, Kharkiv region, 62406, Ukraine)
or any other assets satisfactory to CFSIT ("**TT Assets**") to be pledged in favour of CFSIT with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "**Pledge**").

TT undertakes to arrange for the Pledge as soon as reasonably possible after the release of the TT Assets from the current liens in favour of Delta Bank but in any case, no later than December 31, 2019. The collateral value shall be determined based on the following formula: 80% of market value of the respective TT Assets (based on independent appraisal executed by an appraiser satisfactory to CFSIT at or immediately before the execution of the Pledge)".

2.8. The fourth paragraph of Section IV (*Security of Payment*) of Annex commencing with the words "If for any reason the Pledge" and ending with the words "and this Annex on each of the Repayment Dates", shall be replaced in its entirety with the following:

"If for any reason (a) the assets subject to the Pledge do not have a total collateral vale of more than 100% of the Senior Debt Amount outstanding, or (b) the Pledge, duly perfected, is not provided to Cargill by December 31, 2019, TT shall provide CFSIT with an additional and/or a substitute pledge acceptable to CFSIT".

2.9. To add Section VI (*Covenants*) right after Section V (*Representation and Warranties*) of the Annex as follows:

(a) "Unless CFSIT agrees in writing, TT, the Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entities shall not be permitted to cause or permit a Change of Control Event.

If a Change of Control Event is agreed with CFSIT, Mr. Taras Barshchovskyy, TT and/or the respective TB Fruit Group entity shall give a written notice to CFSIT at least 30 days before such Change of Control Event stating:

    i.    that a Change of Control Event is to occur and that CFSIT has the right to require repayment of all the outstanding amounts under RMPIR Financing Agreements and the outstanding Consideration and other amounts under the Assignment Agreement at the time of the Change of Control Event. If, as a result of the Change of Control Event any of TT, Guarantors, Mr. Taras Barschovskyy or any other TB Fruit Group entity are to receive any cash proceeds, such cash proceeds shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts comprising the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

    ii.    the circumstances and relevant facts regarding the Change of Control Event,

    iii.    the purchase date in relation to such Change of Control Event (which shall be no earlier than 30 and no later than 60 days after such notice is given),

    iv.    whether the tenders will be irrevocable and the purchase price offered in relation to such Change of Control Event.

Failure to give the requisite notice to CFSIT within the time provided above shall constitute an event of default and an acceleration event under the Assignment Agreement allowing CFSIT to exercise all of its rights in the last paragraph of Section VII (*Default*) of the Annex.

(b) Unless CFSIT agrees in writing, TT, Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entity shall not be permitted to make Significant Asset Sales, where such Significant Asset Sale means an Asset Disposition involving assets with a fair market value in excess of US Dollars 5,000,000.00 and which is paid in cash or cash equivalents including payments in respect of deferred payment obligations when received in the form of cash or cash equivalents ("**Net Cash Proceeds**"). Net Cash Proceeds shall be net of (i) taxes payable as a result of such Significant Asset Sale, and (ii) payments made to retire indebtedness where payment of such indebtedness is secured by assets or properties which are the subject of such Significant Asset Sale. If an Asset Disposition occurs, the Net Cash Proceeds from such Significant Asset Sale shall be applied in the following priority to repay (i) any past due amounts

© 2018 CFSIT, Inc. All Rights Reserved.

outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts under the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

(a) Unless CFSIT agrees in writing, TT, the Guarantors, Mr. Taras Barshchovskyy and any of their Affiliates shall not together incur any capital expenditures in the in excess of US Dollars 2,500,000.00 per calendar year according to International Financial Reporting Standards effective on the date of this Amendment № 1. Notwithstanding the foregoing, this limitation does not cover the on-going investment projects in relation to the pectin production line (with its total planned investment of Euro 5.2 million of which Euro 4.77 million has already been reported as invested as of January 31, 2017) or construction of the management office building (with its total planned investment of Euro 0.5 million, of which Euro 0.43 million has already been reported as invested as of January 31, 2017).

2.10.   To change numbering of Section VI (*Default*) of the Annex to Section VII (*Default*).

2.11.   To amend and restate part b. of Section VII (*Default*) of the Annex as follows:

"b. fails to perform or observe any other term, covenant or agreement contained in Section V (*Representations & Warranties*) (a) through and including (u), in Section VI (*Covenants*) or breaches any other term, covenant, agreement or undertaking under the Assignment Agreement or the Annex or any other assignment or annex to which any Cargill Entity and any member of the TB Fruit Group are party".

2.12.   To amend and restate part g. of Section VII (*Default*) of the Annex as follows:

"g. a Change of Control Event or Significant Asset Sale has occurred without prior written consent of CFSIT";

2.13.   To change numbering of Section VII (*General Provisions*) of the Annex to Section VIII (*General Provisions*).

## 3.  CONDITIONS PRECEDENT

The provisions of Clause 2.4 to this Amendment № 1 and the Conditional Discount are subject to the satisfaction (or waiver by the Initial Creditor) of each of the following conditions ("**Conditions Precedent**")

3.1.    The Initial Creditor has received from the Guarantors the originals of the duly executed amendments to the existing guarantees (guaranteeing the New Creditor's obligations under the Agreement) extending the term of the guarantees in a substance and form acceptable to the Initial Creditor.

3.2.    The Initial Creditor has received the original of the duly executed first-demand unconditional irrevocable guarantee issued by Mr. Taras Barschovskyy in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor in replacement of the existing Suretyship Agreement made on July 07, 2015.

3.3.    The Initial Creditor has received the originals of the duly executed first-demand unconditional irrevocable guarantees issued by the following companies of TB Fruit Group in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor.
   - "T.B. FRUIT" S.R.L. (Moldova*)*;
   - TB Fruit Polska Sp. z o.o. S.K.A. (Poland);
   - LLC "Tank Trans Ukraine" (Ukraine);
   - Tank Trans Polska Sp z o.o. (Poland);
   - AMELIANA HOLDINGS LTD (Cyprus).

Collectively "T.B. FRUIT" S.R.L. (Moldova),  TB Fruit Polska Sp. z o.o. S.K.A. (Poland), LLC "Tank Trans Ukraine" (Ukraine), Tank Trans Polska Sp z o.o. (Poland), AMELIANA HOLDINGS LTD (Cyprus) are further referred to as "**New Guarantors**", each of them – "**New Guarantor**".

3.4.    The Initial Creditor has received the originals of the duly executed amendments to the Deed of Pledge of Shares in FRANCOSO CORPORATION LIMITED dated January 30, 2017 and Deed of Pledge of Shares in

© 2018 CFSIT, Inc. All Rights Reserved.

AMELIANA HOLDINGS LTD dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein) and Cargill Financial Services International, Inc. expanding the scope of the secured obligations and securing the New Creditor's payment obligations in favour of the Initial Creditor in a substance and form satisfactory to the Initial Creditor (each - "**Amendment to the Deed of Pledge of Shares**", collectively - "**Amendments to the Deeds of Pledge of Shares**").

3.4. The Initial Creditor has received the originals of the duly executed amendments to Escrow Agreement dated January 30, 2017 and Escrow Agreement dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein), Cargill Financial Services International, Inc. and Dr. K. Chrysostomides & Co. LLC (Cyprus) in a substance and form satisfactory to the Initial Creditor.

3.5. Within ten (10) calendar days after the date of execution of this Amendment № 1 the New Creditor undertakes that it will cause Dr. K. Chrysostomides & Co. LLC (Cyprus) to submit a certified copy of each Amendment to the Deed of Pledge of Shares to the Commissioner of Stamp Duty of the Republic of Cyprus for the obtainment of an verbal ruling as to whether stamp duty is payable thereon and if so, to which amount. At the request of the Initial Creditor the New Creditor shall furnish to the Initial Creditor a written confirmation of the above mentioned submission made to the Commissioner of Stamp Duty of the Republic of Cyprus.

## 4. GENERAL PROVISIONS, MUTUAL ACKNOWLEDGMENTS AND ASSURANCES

4.1. The Parties make the following representations and acknowledgements, as applicable, as of the date of this Amendment № 1:

(i) no Change of Control Event has occurred or is occurring in relation to the New Creditor and the New Creditor continues to be fully beneficially owned and controlled by Mr. Taras Barshchovskyy;

(ii) the New Creditor confirms that it has received and accepted from the Initial Creditor all the documentation (originals, certified copies and copies) in relation to the Claims assigned under the Agreement to the New Creditor's full and final satisfaction.

(iii) The New Creditor acknowledges that there are no other documents expected or pending to be provided by the Initial Creditor to the New Creditor;

(iv) the New Creditor confirms that it has obtained all necessary and material information and disclosures from the Initial Creditor in relation to the Claims and, without relying on the Initial Creditor, made its own analysis of the Claims and all such obtained information to the New Creditor's full and final satisfaction;

(v) the Parties further confirm and acknowledge, that the Initial Creditor in addition to the transfer of the documentation outlined in sub-clause ii) above has performed the following actions:

(a) served a default and acceleration notice dated February 05, 2015 to the Debtor; and

(b) informed the Debtor about the assignment in favour of the New Creditor no later than 3 (three) Business Days from the effective date of the Assignment Agreement.

Both Parties acknowledge and agree that the Initial Creditor with its above actions fully satisfied, complied with and performed all of its obligations under the Agreement in connection with the Claims and that no other actions were or are required or intended to be performed by the Initial Creditor under the Agreement.

4.2. This Amendment № 1 shall come in force on the date of its signing by the authorized persons of the Parties.

4.3. All other terms and conditions of the Agreement remain unchanged.

4.4. This Amendment № 1 shall be signed in two copies in English, one for each Party, both copies having equal legal power.

5.4. Any dispute arising out of or in connection with Amendment № 1 including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the

© 2018 CFSIT, Inc. All Rights Reserved.

London Court of International Arbitration (LCIA), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the Amendment № 1 shall be the substantive laws of New York (excluding conflicts of laws principles).

5.5. This Amendment № 1 is an integral part of the Agreement.

**The Initial Creditor:**
**CFSIT, Inc.**
9320 Excelsior Boulevard,
Hopkins, MN 55343, U.S.A.
Receiving Bank: JP Morgan Chase, N.A., New York
Swift Code: CHASUS33XXX
ABA:  021000021
Account No: 878359624

_____
Authorized Signatory

Jennifer Campbell
Trade Finance Specialist

**The New Creditor:**
**LIMITED LIABILITY COMPANY  "TANK TRANS"**
**(ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ТАНК ТРАНС")**
2-G, V.Ivasyuka st.,
Gorodok, Lvivska oblast',
81500, Ukraine
Identification number: 32115067

US Dollars Account: 2600040384840
Intermediary Bank :
RAIFFEISEN BANK  INTERNATIONAL AG,
Wien, Austria
SWIFT: RZBAATWW
Beneficiary's Bank :
acc. № 07055078273
PJSC JSB  "LVIV", Lviv , Ukraine
SWIFT: LVIVUA2X

_____  Shpuk A.B.
Authorized Signatory

**ASSIGNMENT AGREEMENT № AA9**

**ДОГОВІР ВІДСТУПЛЕННЯ ПРАВ ВИМОГИ № AA9**

*As of 05 February 2015*
*Kyiv (Ukraine)*

*Від 05 лютого 2015 року*
*місто Київ (Україна)*

**PARTY 1:** Legal entity that is incorporated in the state of Delaware and is acting in accordance with the laws of the United States of America, **Cargill Financial Services International, Inc.,** registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA, hereinafter - **"Initial Creditor",** represented by Kristin Lee Wessels, acting under the power of attorney issued, notary certified and apostiled on 13 October 2014, and

**СТОРОНА 1:** Юридична особа, яка створена в штаті Делавер та діє за законодавством Сполучених Штатів Америки, **Каргілл Файненшіал Сервісіс Інтернешнл, Інк. (Cargill Financial Services International, Inc.),** зареєстрована за адресою 1209 Орандж Стріт, Уілмінгтон, округ Ньюкасл, штат Делавер (1209 Orange Street, Wilmington, County of New Castle, State of Delaware), фактичне місцезнаходження: бульв. Ексельсіор, 9350, MS 142-4B, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA), надалі за текстом - **"Первісний Кредитор",** в особі Крістін Лі Весселс, яка діє на підставі Довіреності, виданої, нотаріально посвідченої та апостильованої 13 жовтня 2014 року, та

**PARTY 2:** Legal entity that is incorporated and is acting in accordance with the laws of Ukraine, **Limited Liability Company «TANK TRANS»,** located at 21' Ivasiuka Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine, hereinafter - **"New Creditor",** identification code 32115067, represented by Kulak Igor Oleksandrovych, acting on the basis of the power of attorney issued on 05 February 2015,

**СТОРОНА 2:** Юридична особа, яка створена та діє за законодавством України, **ТОВАРИСТВО З ОБМЕЖЕНОЮ ВІДПОВІДАЛЬНІСТЮ «ТАНК ТРАНС»,** місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, місто Городок, вул. Івасюка, будинок 21', надалі за текстом **"Новий Кредитор",** ідентифікаційний код 32115067, в особі Кулака Ігоря Олександровича, який діє на підставі Довіреності, виданої 05 лютого 2015 року,

*hereinafter collectively – the **"Parties",** and each individually referred to as a **"Party",** have concluded the present Assignment Agreement, hereinafter – the **"Agreement"** as follows:*

*надалі за текстом разом - **"Сторони",** а окремо **"Сторона",** уклали цей Договір відступлення прав вимоги, надалі – **"Договір",** про наступне:*

*ARTICLE 1.*
**SUBJECT MATTER OF THE AGREEMENT**

*СТАТТЯ 1.*
**ПРЕДМЕТ ДОГОВОРУ**

1.1. The Initial Creditor assigns and the New Creditor receives any and all rights of claim (including proceeds and interest) under the following documentary instruments and all the related documentation as applicable (further – the **"Claims"**):

1.1. Первісний Кредитор передає, а Новий Кредитор одержує всі та будь-які права вимоги (включаючи права на отримання надходжень та процентів) за наступними документарними інструментами та іншими пов'язаними з ними документами (надалі – **«Права вимоги»**):

1

1) all claims of the creditor (beneficiary) under the Irrevocable letter of credit No. LC/IM/09/092013 in the amount of 4,999,280.00 US Dollars issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the *"Debtor"*, for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto;

2) 10.3963658% undivided interest in all claims of the creditor (beneficiary) under the Irrevocable letter of credit No. LC/IM/08/092013 in the amount of 5,498,790.00 US Dollars issued by the Debtor for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto;

1.2. The assignment of the Claims becomes effective on the date set forth above;

1.3. In consideration of the aforementioned assignment, the New Creditor agrees to make a payment in favour of the Initial Creditor of the face value of the Claims in United States Dollars (*"USD"*) (*i.e.* USD 5,570,954.32) within five (5) years from the date of execution of this Agreement under the conditions to be agreed by the Parties in a separate agreement.

## ARTICLE 2.
## RIGHTS AND OBLIGATIONS OF THE PARTIES

**2.1. Initial Creditor shall:**

2.1.1. subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, transfer to the New Creditor all documents which confirm the Claims assigned hereunder to be reflected in a certificate of

---

1) всі права кредитора (бенефіціара) за Безвідкличним акредитивом № LC/IM/09/092013 на суму 4 999 280,00 доларів США, випущеним ПУБЛІЧНИМ АКЦІОНЕРНИМ ТОВАРИСТВОМ «ДЕЛЬТА БАНК», надалі за текстом – *«Боржник»*, на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до нього;

2) частина прав вимоги кредитора (бенефіціара) у розмірі відносної частки 10,3963658% за Безвідкличним акредитивом № LC/IM/08/092013 на суму 5 498 790,00 доларів США, випущеним Боржником на користь Первісного Кредитора, як бенефіціара, з урахуванням всіх змін до нього;

1.2. Відступлення Прав вимоги набирає чинності з дати зазначеної вище;

1.3. В якості оплати за вищезазначене відступлення Прав вимоги Новий Кредитор погоджується сплатити на користь Первісного Кредитора кошти у розмірі номінальної вартості Прав вимоги в доларах США (*«USD»*) (а саме 5 570 954,32 доларів США) впродовж 5 (п'яти) років з дати укладення цього Договору на умовах, що будуть погоджені Сторонами в окремому договорі.

## СТАТТЯ 2.
## ПРАВА ТА ОБОВ'ЯЗКИ СТОРІН

**2.1. Первісний Кредитор зобов'язаний:**

2.1.1. за умови укладення Сторонами окремого договору згідно з п. 1.3 Договору, передати Новому Кредитору всі документи, що підтверджують Права вимоги, що передаються за цим Договором, про що Сторонами складається відповідний акт приймому-передачі документів, у

2

transfer and acceptance of documents to be signed by the Parties, unless such documents have been transferred by the Initial Creditor to the New Creditor before this Agreement came in to force;

2.1.2.   inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor;

2.1.3.   perform other obligations as set out by the applicable laws.

**2.2.   New Creditor shall:**

2.2.1.   subject to the execution by the Parties of the separate agreement in accordance with clause 1.3 hereof, accept from the Initial Creditor all documents confirming the Claims assigned hereunder in accordance with the respective certificate of transfer and acceptance of documents;

2.2.2.   inform the Debtor about the assignment in favor of the New Creditor of the Claims no later than 3 (three) business days from the effective date of this Agreement by sending to the Debtor a joint notice signed by the Initial Creditor and the New Creditor.

*ARTICLE 3.*
**REPRESENTATIONS**

випадку, якщо такі документи не були передані Первісним Кредитором Новому Кредиторові до моменту набрання чинності цим Договором;

2.1.2.   повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором;

2.1.3.   виконувати інші обов'язки, передбачені законодавством, що застосовується.

**2.2.   Новий Кредитор зобов'язаний:**

2.2.1.   за умови укладання Сторонами окремого договору згідно з п. 1.3 Договору, прийняти від Первісного Кредитора всі документи, які підтверджують Права вимоги, що відступаються за цим Договором, за відповідним актом прийому-передачі документів;

2.2.2.   повідомити Боржника про відступлення на користь Нового Кредитора Прав вимоги не пізніше 3 (трьох) робочих днів з дати набрання цим Договором чинності шляхом надсилання Боржнику спільного повідомлення, підписаного Первісним Кредитором та Новим Кредитором.

*СТАТТЯ 3.*
**ЗАЯВИ**

3

3.1. The Parties are companies duly established and validly existing under the laws of countries of their incorporation;

3.2. The Parties have full power and authority to conclude, execute and deliver this Agreement and to fully perform their obligations hereunder, and the persons signing this Agreement on their behalf are legally authorised by the Parties to do so;

3.3. All corporate consents required for the execution and performance of the Parties' obligations under this Agreement have been unconditionally and irrevocably granted and are in full force and effect;

3.4. The Initial Creditor represents that the Claims are valid and assignable; the Initial Creditor represents that it has provided notices of acceleration to the Debtor on the Claims for which the respective maturity date is beyond the effective date of this Agreement to make the Claims due;

3.5. The Parties entered into this Agreement and were induced to do so relying solely on the representations stated in Article 3;

3.6. The New Creditor acknowledges that it has made its own analysis of the Debtor and the above details and has reached its own decision to enter into this Agreement without reliance on the Initial Creditor or any Cargill entity, except for the representations contained in this Article 3;

3.7. The Parties hereby agreed that no recourse to the Initial Creditor shall apply in relation to the Claims assigned hereunder, except for by operation of law and/or if any of

3.1. Сторони є юридичними особами, належним чином створеними та існуючими відповідно до законодавства країн їх реєстрації;

3.2. Сторони мають повний обсяг повноважень на укладення цього Договору та виконання в повному обсязі своїх обов'язків за цим Договором; особи, що підписують цей Договір від імені Сторін, уповноважені на вчинення таких дій Сторонами;

3.3. Всі корпоративні погодження, необхідні для укладення та виконання зобов'язань Сторін за цим Договором, були безумовно та безвідклично отримані та є повністю чинними;

3.4. Первинний Кредитор заявляє, що Права вимоги є чинними та такими, що можуть бути відступлені; Первісний Кредитор заявляє, що ним надано Боржникові вимоги про дострокове виконання стосовно Прав вимоги, строк виконання яких знаходиться поза датою укладення цього Договору, зробивши їх такими, строк виконання яких настав;

3.5. Сторони при укладенні цього Договору покладались виключно на заяви, вказані в Статті 3;

3.6. Новий Кредитор підтверджує, що ним було зроблено власний аналіз Боржника та вищезазначених деталей, та прийнято самостійне рішення укласти цей Договір не покладаючись на Первинного Кредитора або будь-яку особу групи Каргілл, за виключенням заяв викладених в Статті 3;

3.7. Підписанням цього Договору Сторони погоджуються з тим, що по відношенню до Первісного Кредитора не застосовується право регресу у зв'язку з Правами вимоги, відступленими за цим

4

the representations stipulated by Article 3 have been breached by the Initial Creditor.

Договором, крім як в силу закону та/або якщо будь-яка із заяв, визначених в Статті 3, буде порушена Первісним Кредитором.

## ARTICLE 4.
## DISPUTE RESOLUTION

4.1. Any dispute arising out of or in connection with this Agreement including its validity or termination shall be referred to and finally settled by London Court of International Arbitration in accordance with its Rules which shall be incorporated into this Agreement by reference. The number of arbitrators – three (3), place of arbitration – London (the United Kingdom of Great Britain and Northern Ireland), language of proceedings – English. The arbitration award shall be final and binding on all Parties.

## СТАТТЯ 4.
## ВРЕГУЛЮВАННЯ СПОРІВ

4.1. Будь-який спір, що виникає з цього Договору або у зв'язку з ним, включаючи будь-які питання стосовно його дії або розірвання, мають бути передані та остаточно вирішені Міжнародним арбітражним судом Лондону (London Court of International Arbitration) у відповідності до його Регламенту, який вважається включеним шляхом послання у цьому пункті. Кількість арбітрів – 3 (три), місце арбітражного розгляду – Лондон (Сполучене Королівство Великобританії та Північної Ірландії), мова розгляду – англійська. Арбітражне рішення є остаточним та обов'язковим для всіх Сторін.

## ARTICLE 5.
## FINAL PROVISIONS

5.1. This Agreement comes into effect from the moment of its conclusion and remains in effect until complete fulfillment of liabilities by the Parties.

## СТАТТЯ 5.
## ЗАКЛЮЧНІ ПОЛОЖЕННЯ

5.1. Цей Договір набирає чинності з моменту його укладення та діє до остаточного виконання Сторонами прийнятих на себе зобов'язань;

5.2. All appendices, amendments and/or addendums to the present Agreement have to be executed in the written form, signed by duly authorized representatives of the Parties and sealed with the stamp (if required/applicable) with obligatory reference to this Agreement. Such appendices, amendments and/or addendums shall be an integral part of the present Agreement from the moment of their execution in the abovementioned order;

5.2. Усі додатки, зміни та/або доповнення до цього Договору мають бути вчинені в письмовій формі, підписані належним чином уповноваженими на те представниками Сторін та скріплені відбитками печаток якщо вимагається/застосовується), з обов'язковим посиланням на цей Договір. Такі додатки, зміни та/або доповнення з моменту їх вчинення у вищевказаному порядку є невід'ємними частинами даного Договору;

5.3. All notices under this Agreement shall be considered properly served in case they are made in writing and sent by courier, facsimile or hand delivered to the addresses of

5.3. Усі повідомлення за цим Договором будуть вважатися зробленими належним чином у разі, якщо вони здійснені у письмовій формі та надіслані кур'єром, факсом або вручені особисто за

5

the Parties mentioned herein. The date of receipt of such notices shall be the date of their hand delivery or the date when transmitted electronically;

5.4. This Agreement shall be governed by and construed in accordance with the laws of New York (excluding conflicts of laws principles);

5.5. The New Creditor represents that it is registered as a payer of corporate profit tax on general terms in accordance with the Tax Code and applicable laws of Ukraine. The Initial Creditor represents that it is a tax resident of the United States of America;

5.6. The invalidity of any separate provision of this Agreement shall not cause invalidation of the whole Agreement as long as the Agreement might have been concluded without such provisions. In case any provision of this Agreement is recognized invalid or contradictory to applicable laws of New York by the court or any competent state authority in each individual case this shall not impact the application of such provisions in all other cases and the validity of other provisions of the Agreement. In such case the Parties shall draft in good faith a new provision of the Agreement to reflect to the fullest extent the intention of the Parties at the time of making this Agreement;

5.7. Each Party shall notify in writing another Party about change of any of its details within three (3) days;

5.8. This Agreement is made in three (3) original copies in English and Ukrainian languages, having equal legal force. In case of any discrepancies the English version prevails;

---

зазначеними адресами Сторін. Датою отримання таких повідомлень буде вважатися дата їх особистого вручення або дата передачі електронними засобами;

5.4. Цей Договір регулюється та тлумачиться згідно з правом Нью-Йорку (за виключенням колізійних норм);

5.5. Новий Кредитор підтверджує, що він є платником податку на прибуток на загальних умовах відповідно до Податкового Кодексу України та застосовного законодавства України. Первісний Кредитор підтверджує, що він є податковим резидентом Сполучених Штатів Америки;

5.6. Недійсність окремих положень цього Договору не спричиняє недійсність Договору в цілому, оскільки можна припустити, що цей Договір міг би бути укладений без включення до нього таких положень. Якщо будь-яке з положень цього Договору буде визнано судом чи іншим уповноваженим державним органом недійсним чи таким, що суперечить чинному праву Нью-Йорку, в кожному конкретному випадку, таке визнання не буде впливати на застосування таких положень у всіх інших випадках та на дійсність інших положень Договору. В такому випадку, Сторони зобов'язуються сумлінно розробити нове положення Договору такого змісту, який би у повній мірі відображав ті наміри, що існували в них в момент укладання цього Договору;

5.7. У разі зміни реквізитів однієї з Сторін відповідна Сторона зобов'язана в триденний строк письмово повідомити про це другу Сторону;

5.8. Цей Договір укладено в 3 (трьох) оригінальних примірниках українською та англійською мовою, які мають однакову юридичну силу. У випадку виникнення розбіжностей, переважну силу матиме текст, викладений

6

5.9. All payments made under this Agreement, including but not exclusive to payments under a separate agreement to be entered into by the Parties as provided in clause 1.3 above, shall be made in immediately available funds, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority;

5.10. This Agreement represents the whole and only agreement between the Parties in relation to the Claims assignment and supersedes any previous agreement (whether written or oral) between the Parties in relation to its subject matter;

5.11. The Parties accept the legal power and validity of the signed Agreement received via fax or via e-mail, as well as of all the document related to it (annexes, additions, protocols, amendments, schedules, etc.), signed and received in the same manner, with subsequent confirmation by means of originals.

**IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as a Deed on the day, month and year first written above.**

### PARTY 1:

### INITIAL CREDITOR
**Cargill Financial Services International, Inc.**

Address: 9350 Excelsior Boulevard, MS142-4B, Hopkins, MN 55343, USA

Account No.: CITIBANK N.A., NEW

---

англійською мовою;

5.9. Усі платежі, що мають бути вчинені згідно з цим Договором, включаючи але не обмежуючись платежами на підставі окремого договору, що має бути укладений Сторонами згідно з п. 1.3 цього Договору, повинні бути здійснені вільними грошовими коштами без відрахувань та зобов'язань по відрахуванню будь-яких існуючих або майбутніх податків, мит, зборів, включаючи збори, мита або податки на прибуток нерезидентів, встановлені урядом України або будь-якими іншими державними або податковими органами;

5.10. Цей Договір становить повний та єдиний договір між Сторонами щодо відступлення Прав вимоги, а також замінює собою будь-які попередні договори (письмові та усні) між Сторонами щодо його предмета;

5.11. Сторони визнають юридичну силу та чинність підписаного Договору, отриманого за допомогою факсу або електронної пошти, так само як і будь-яких пов'язаних документів (додатків, доповнень, протоколів, графіків тощо), які підписані та отримані таким же шляхом, з подальшим підтвердженням оригіналами.

**НА ПІДТВЕРДЖЕННЯ ЦЬОГО Сторони належним чином уклали цей Договір в спеціальній письмовій формі у день, місяць і рік, зазначені на початку цього Договору.**

### СТОРОНА 1:

### ПЕРВІСНИЙ КРЕДИТОР
**Каргілл Файненшіал Сервісіз Інтернешнл, Інк.**
**(Cargill Financial Services International, Inc.)**

Місцезнаходження: бульв. Екселсіор, 9350, MS 142-4В, Хопкінс, Міннесота 55343, США (9350 Excelsior Boulevard, MS 142-4B, Hopkins, MN 55343, USA)

Рахунок: CITIBANK N.A., NEW YORK, ABA

7

YORK, ABA 021000089, ACCOUNT No. 38490869, SWIFT CITIUS33

021000089, ACCOUNT No. 38490869, SWIFT CITIUS33

**Authorized person**

**Уповноважена особа**

*Kristin Wessel* / **Kristin Lee Wessels /**

*Kristin Wessel* / **Крістін Лі Весселс /**

In the presence of witness:
(name)
(address)
(occupation)

В присутності свідка:
(ім'я)
(адреса)
(вид занять свідка)

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA*

*Nancy L. Nelson*
*Nancy Lou-Larsen Nelson*
*Trade Finance Specialist*
*Hopkins, MN USA*

**PARTY 2:**

**СТОРОНА 2:**

**NEW CREDITOR**
**Limited Liability Company**
**"TANK TRANS"**

**НОВИЙ КРЕДИТОР**
**Товариство з обмеженою відповідальністю**
**«ТАНК ТРАНС»**

Registered address: 2Г Ivasiuka Str., Gorodok, Gorodotskiy district, Lviv region, 81500, Ukraine
Identification code 32115067
Current Account № 2600900021345
in PJSC "Credit Agricole Bank"
MFO 300614

Місцезнаходження: Україна, 81500, Львівська обл., Городоцький район, місто Городок, вул. Івасюка, будинок 2Г
Ідентифікаційний код 32115067
Поточний рахунок № 2600900021345
в ПАТ «Креді Агріколь Банк»,
МФО 300614

**Authorized person**

**Уповноважена особа**

/Igor Kulak/

/Ігор Кулак/

In the presence of witness:
(name) *Oleksiy Busarov*
(address) *Kyiv reg., Vyshgorodskyi dist., Nov*
(occupation) *advocate Petrivtsi, m/u 2206*

В присутності свідка:
(ім'я) *Олексій Бусаров*
(адреса) *київська обл., Вишгородський й-н, с.Н.Пе*
(вид занять свідка) *адвокат Петрі, б'12. 2206 "Л"*

8

**ANNEX 1 TO THE ASSIGNMENT AGREEMENT NO. AA9**
**EXECUTED BY THE PARTIES AS OF FEBRUARY 5, 2015**

July 07, 2015

This Annex 1 ("Annex") to the Assignment Agreement (the **"Assignment Agreement"**) is made by and between among:

1)      Cargill Financial Services International, Inc., a Delaware USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA ("CFSI" or "Initial Creditor") and

2)      Limited Liability Company "TANK TRANS", a legal entity duly incorporated under the laws of Ukraine, having its registered address 2-G, V.Ivasyuka st., Gorodok, Lvivs'ka oblast', 81500, Ukraine ("TankTrans" or "New Creditor"),

CFSI and TankTrans are collectively referred to as the **"Parties"** and each individually as a **"Party"**.

**WHEREAS:**

•      CFSI and TankTrans are the Parties to the Assignment Agreement,

•      In accordance with Article 1.3 of the Assignment Agreement the Parties have agreed to execute the explicit payment terms under the Assignment Agreement in a separate agreement,

•      TankTrans has requested CFSI to provide deferred payment terms under the Assignment Agreement and CFSI is willing to provide such deferred payment terms on the conditions stipulated in this Annex 1 (the "Senior Debt Facility").

**NOW THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## I. DEFINITIONS

**TankTrans** Limited Liability Company "TANK TRANS", a legal entity duly incorporated under the laws of Ukraine, having its registered address 2-G, V.Ivasyuka st., Gorodok, Lvivs'ka oblast', 81500, Ukraine

**Dar Assets**     Means TankTrans assets pledged in favour of Delta Bank as of February 5, 2015.

**Delta Bank**     means PUBLIC JOINT-STOCK COMPANY "DELTA BANK", a bank duly registered under the laws of Ukraine.

Capitalized terms used herein but not defined shall have the same meanings as defined in the Assignment Agreement between the Parties.

## II. SUBJECT MATTER OF THE AGREEMENT

The Parties agree to amend and restate Clause 1.1. of Article 1 of the Assignment Agreement as follows:

1.1.     The Initial Creditor assigns and the New Creditor receives any and all rights of claim

© 2015 Cargill Financial Services International, Inc. All rights reserved.      1

(including proceeds and interest) (the "Claims") under

1.a) the following documentary instruments and all the related documentation as applicable:

all claims of the creditor (beneficiary) under the Irrevocable letter of credit No. LC/IM/09/092013 in the amount of 4,999,280.00 US Dollars issued by PUBLIC JOINT-STOCK COMPANY "DELTA BANK", hereinafter – the "Debtor", for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto; and

10.3963658% undivided interest in all claims of the creditor (beneficiary) under the Irrevocable letter of credit No. LC/IM/08/092013 in the amount of 5,498,790.00 US Dollars issued by the Debtor for the benefit of the Initial Creditor, acting as a beneficiary, including any amendments thereto

1.b) CFSI's 100% interest, which is equal to USD 4,999,280.00 in the outstanding payment claims of CFSI on the Limited Liability Company "YABLUNEVIY DAR", Gorodok, Ukraine in relation to the Trade Related Loan Agreement 1644 2013 dated August 30, 2013, including any amendments thereto;

CFSI's 10.3963658% proportionate interest, which is equal to USD 571,674.32 in the outstanding payment claims of CFSI on the Limited Liability Company "YABLUNEVIY DAR", Gorodok, Ukraine in relation to the Trade Related Loan Agreement 1643 2013 dated August 21, 2013, including any amendments thereto.

## II. PAYMENT TERMS

In consideration for the assignment of the Claims, TankTrans agrees to pay in favour of CFSI the amount of USD 5,570,954.32 (US Dollars Five Million Five Hundred Seventy Thousand Nine Hundred Fifty Four and 32/100) (hereinafter – the "Senior Debt Amount" or "Consideration") in accordance with the terms and conditions set out below:

The repayment of the Senior Debt Amount shall be made in instalments on the following repayment dates (further collectively referred to as the "Repayment Dates"):

| | |
|---|---|
| 05 May 2018 | USD 278 547,72 |
| 05 Aug 2018 | USD 278 547,72 |
| 05 Nov 2018 | USD 278 547,71 |
| 05 Feb 2019 | USD 278 547,71 |
| 05 May 2019 | USD 278 547,72 |
| 05 Aug 2019 | USD 278 547,72 |
| 05 Nov 2019 | USD 278 547,71 |
| 05 Feb 2020 | USD 278 547,71 |
| 05 May 2020 | USD 835 643,15 |
| 05 Aug 2020 | USD 835 643,15 |
| 05 Nov 2020 | USD 835 643,15 |
| 05 Feb 2021 | USD 835 643,15 |

TankTrans further agrees and acknowledges and hereby expresses its consent that upon the successful arrangement and provision of working capital financing by CFSI to T.B. Fruit Polska Sp. Z o.o. S.K.A., 109 Sandomierska str., 27-620 Dwikozy, Poland, the Polish affiliate of TankTrans ("TB Fruit Poland") the Senior Debt Amount shall become interest bearing. The interest rate and interest periods shall be agreed by the Parties but in no case the interest rate shall be lower than 5% per annum and the interest period shall start to accrue on the outstanding Senior Debt Amount as of the date when the volume of working capital financing arranged for and/or provided to TB Fruit Poland reaches USD 40 million ("Interest Period

© 2015 Cargill Financial Services International, Inc. All rights reserved.

Starting Date") and shall be payable every 180 days from the interest period starting date until the repayment of the Senior Debt Amount.

TankTrans also agrees and acknowledges that TankTrans shall be deemed to fulfil its payment obligations only when CFSI gets money to its respective accounts.

TankTrans shall bear the risk and costs of getting all external authorizations for payments out of Ukraine (including but not limited to licenses, permits, registrations, approvals or any other authorizations needed under the applicable legislation or bank practice at the time of payment). In case payments under the Assignment Agreement and this Annex become explicitly restricted or forbidden by the law at the time of payment and shall stay restricted or forbidden more than 15 consecutive days from the scheduled date of payment, TankTrans shall immediately procure such payments by and from its affiliate: Francoso Corporation Limited, a legal entity duly registered under the laws of Cyprus having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus. The Parties hereto have agreed that any restriction or ban on payments outside Ukraine shall not be considered a force majeure event and such restriction or ban shall not extend, suspend or stop TankTrans obligation to pay.

## II. SECURITY OF PAYMENT

To secure TankTrans's Senior Debt Amount payment obligations under the Assignment Agreement and this Annex, TankTrans hereby undertakes and commits to cause TankTrans Assets to be pledged in favour of CFSI to be of sufficient collateral value  with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "Pledge"). TankTrans undertakes to arrange for the said pledge as soon as reasonably possible after the release of the TankTrans Assets from the current liens made in favour of  Delta Bank but in any case, no later than the first of the Repayment Dates. The collateral value shall be determined based on the following formula: market value of the respective complexes (based on most recent independent appraisal which shall be updated annually)*0.8.

TankTrans undertakes to take all necessary actions required under the applicable legislation of Ukraine to cause the TankTrans Assets to be pledged in favour of CFSI and all necessary actions to perfect such Pledge.

TankTrans undertakes that the TankTrans Assets to be pledged in favour of CFSI shall be made free and clear of any liens and/or any encumbrances.

If for any reason the Pledge cannot be arranged by TankTrans by the first of the Repayment Dates, TankTrans shall procure that CFSI receives no later than the said Repayment Date one other adequate security in the form of either:

- Standby letter of credit issued in the form acceptable to CFSI by a financial institution acceptable to CFSI in the amount equal to the obligations of TankTrans under the Assignment Agreement and this Annex with an expiry date of no earlier than the last of the Repayment Dates plus 30 calendar days; OR

- Irrevocable first demand payment guarantees to be issued by a guarantor or guarantors acceptable to CFSI and in the form acceptable to CFSI covering the amount equal to the payment obligations of TankTrans under the Assignment Agreement and this Annex and with a validity period equal to the last of the Repayment Dates plus 30 calendar days; OR

- TankTrans shall pledge or cause any of the Guarantors to pledge in favour of CFSI its/their sales proceeds from the contracts with third parties in the amount equal to or greater than the payment obligations of TankTrans under the Assignment Agreement and this Annex on each of the Repayment Dates.

© 2015 Cargill Financial Services International, Inc. All rights reserved.

TankTrans shall also procure the issuance of the following guarantees to CFSI by the following guarantors (hereinafter "the Guarantors") no later than 5 days from the date of this Annex:

- First Demand suretyship to be issued by Mr. Taras Barshchovskyy, covering 100% of obligations of TankTrans under the Assignment Agreement and this Annex and in the format acceptable to CFSI;

- First Demand payment guarantee to be issued by T.B. Fruit Polska Sp. z o.o. S.K.A., a legal entity duly registered under the laws of Poland having its registered address at 109 Sandomierska str., 27-620 Dwikozy, Poland, covering 100% of obligations of TankTrans under the Assignment Agreement and this Annex and in the format acceptable to CFSI;

- First Demand payment guarantee to be issued by Francoso Corporation Limited, a legal entity duly incorporated under the laws of Cyprus, having its registered address at Pandoras, 21 Hadjimatheou-Yiannouri Court, 2nd floor, Flat/Office 10, P.C. 6042, Larnaca, Cyprus ("Francoso Corporation Limited"), covering 100% of obligations of TankTrans under the Assignment Agreement and this Annex and in the format acceptable to CFSI.

## V. REPRESENTATIONS & WARRANTIES

In addition to the Representations in the Assignment Agreement, TankTrans hereby further represents and warrants that:

a.    this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be TankTrans's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof and thereof, and such obligations rank at least <u>pari passu</u> in all respects with all their other similar obligations;

b.    it has disclosed all of its material liabilities, contingent or otherwise to CFSI;

c.    this Annex and the Assignment Agreement and any other document to be furnished hereunder or thereunder are and will be in proper legal form under the laws of Ukraine for the enforcement thereof against it in the courts of Ukraine, and to ensure the legality, validity, enforceability or admissibility in evidence of such documents in Ukraine, it is not necessary that such documents be filed or recorded with any court or other authority in Ukraine or that any stamp or similar tax be paid on or in respect of such documents;

d.    it has or will take all required measures to assure that it can effect timely repayment of the Senior Debt Amount as contemplated herein, in United States Dollars, and assure that this Annex and the Assignment Agreement, and all documents to be delivered hereunder, remain in effect, enforceable and in compliance with all applicable laws and regulations;

e.    there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to TankTrans's knowledge) threatened against TankTrans either (i) with respect to or arising out of this Annex or the Assignment Agreement, or the transactions related thereto;

f.    neither it nor any of its revenues or properties have any right of immunity from suit, court jurisdiction, attachment prior to judgment, execution of a judgment or

© 2015 Cargill Financial Services International, Inc. All rights reserved.

from set-off, banker's lien, counterclaim or any other legal process or remedy with respect to its obligations hereunder or under the Assignment Agreement

g.   there are no legal or arbitral proceedings, or any proceedings by or before any governmental or regulatory authority or agency, now pending or (to TankTrans's knowledge) threatened against TankTrans;

h.   TankTrans has good and clear title to its production and operational assets and land, free and clear of any liens or encumbrances except for those created or granted under any security documents in favour of TankTrans's lenders;

i.   it will provide evidence to CFSI that it has obtained all required licenses, consents and authorizations for the TankTrans Assets and those assets are in compliance with all applicable environmental and safety standards normally applied to such type of assets;

j.   it will provide evidence to CFSI of its ownership of the land (or the terms of any lease rights) related to the TankTrans production and operations facilities;

k.   it will maintain insurance on the TankTrans's properties and assets in at least such amounts, against at least such risks and with such risk retention as are generally maintained, insured against or retained by other companies of established reputation engaged in the same or similar business;

l.   it will keep proper books of record and account in which full and correct entries in conformity with local GAAP shall be made of all dealings and transactions in relation to its business and activities.

m.   it will cause Francoso Corporation Limited to produce consolidated group financial statements under IFRS for each of the financial years from 2015 through 2021 (both years inclusive) and have them audited by of the reputable international audit firm agreed by the Parties;

n.   to provide CFSI with the financials at first request as well as to provide any such additional financial and other information related to the performance of TankTrans that may be reasonably requested by CFSI;

u.   not to directly or indirectly, create, assume or suffer to exist any lien upon any property or asset now or hereafter acquired by TankTrans to secure any debt which is *pari passu* with or subordinate in right of payment under the Senior Debt Amount unless the Senior Debt Amount is secured equally and rateably prior to the creation, incurrence or assumption of such lien. Notwithstanding the foregoing provisions of this section, the TankTrans shall not permit, create, assume or suffer to exist any lien on the capital stock of TankTrans.

## VI. DEFAULT

If TankTrans or any of its affiliates alternatively shall:

a.   breach any representation or warranty made by TankTrans (or any of its officers) under or in connection with this Annex or in any financial statement shall prove to have been incorrect, false or misleading in any material respect when made and such condition (if capable of remedy) remains unremedied for a period of thirty

© 2015 Cargill Financial Services International, Inc. All rights reserved.

(30) days after the TankTrans or CFSI obtains knowledge thereof;

b.    fail to perform or observe any other term, covenant or agreement contained in Section V. (a) through and including (u) and/or referred to in this Annex;

c.    generally not pay or admit its inability to pay its respective debts as such debts become due;

d.    shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail to generally pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing;

e.    become subject to an involuntary case or other proceeding shall be commenced against TankTrans seeking liquidation, reorganization, or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 days; or an order for relief shall be entered against TankTrans under any bankruptcy laws as now or hereafter in effect;

f.    any event shall occur that could be reasonably expected to have a Material Adverse Effect on the: (i) property, businesses, operations, financial condition, liabilities or capitalization of TankTrans; (ii) ability of TankTrans to perform any of its respective obligations under this Annex, (iii) validity or enforceability of this Annex, or (iv) timely payment of the principal or any interest amount due hereunder;

g.    a Change of Ownership or sale or any other disposition of assets of total value equal or greater USD 1,000,000 shall occur, without a prior written consent of CFSI;

h.    TankTrans shall (i) default in the payment when due of any principal of or interest on any of its Debt (other than the Senior Debt Amount or (ii) any event specified in any note, agreement, indenture or other document evidencing or relating to any such debt shall occur, the result of which is to cause, or (with the giving of any notice or lapse of time or both) to permit the holder or holders of such debt (or a trustee or agent on behalf of such holder or holders) to cause such debt to become due and payable prior to its stated maturity; provided, however, that the aggregate amount of such Debt falling within (i) above (as to which the time for payment has not been extended by the relevant creditors) and any relevant payments falling within (ii) above equals or exceeds USD1,000,000 (US Dollars one million) for TankTrans in aggregate;

i.    one or more judgments or orders from which no further appeal is permissible

© 2015 Cargill Financial Services International, Inc. All rights reserved.

6

under applicable law for the payment of money aggregating in excess of USD1,000,000 (one million US dollars) (or its equivalent in another currency) shall be rendered against TankTrans, and such judgment or order shall continue unsatisfied and in effect until the date by which payment must be made pursuant to such judgment or order;

j.    at any time during the term of this Annex, it is or becomes unlawful for the TankTrans to perform its respective obligations pursuant to the terms and conditions contained in this Annex, or any of such obligations are not, or cease to be, legal, valid and binding on it and enforceable against TankTrans;

j.    If any of the following events have occurred:

    (i)    the whole or a substantial part of the assets of the TankTrans, or any of its affiliates is confiscated or attached;

    (ii)    any change occurs in the ownership or control of the TankTrans or any of its affiliates, which, in the reasonable opinion of the CFSI, constitutes a material adverse change affecting the financial condition or operations of the TankTrans or any of its affiliates respectively;

    (iii)    any competent governmental authority takes any action to condemn, seize, requisition or otherwise appropriate any substantial portion of the properties or assets of TankTrans or any of its affiliates (either with or without payment of compensation), or any action relating to TankTrans or any of its affiliates, which in the opinion of CFSI, adversely affects TankTrans's ability to pay its indebtedness under the Assignment Agreement,

then, in any such event CFSI, may immediately proceed to protect and enforce its rights by an action at law, or other appropriate proceeding, including but not limited to, demanding and declaring this Annex, including all interest accrued thereon and all other amounts payable under this Annex to be forthwith due and payable, whereupon all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by TankTrans. TankTrans hereby agrees to indemnify CFSI for (i) all reasonable costs and expenses (including but not limited to attorney's fees) incurred by CFSI in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom. Said indemnification shall survive the repayment in full of the Senior Debt Amount.

## VII. GENERAL PROVISIONS

a.    Any provision of this Annex that is prohibited or unenforceable in any jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

b.    The section headings in this Annex are for convenience of reference only and shall not affect the interpretation hereof.

c.    This Annex may be signed in counterparts with each counterpart deemed an original and both counterparts together constituting one and the same document.

d.    The parties hereto acknowledge to have had previous access to the contents of this Annex and that notwithstanding its English language have perfectly understood its exact content.

© 2015 Cargill Financial Services International, Inc. All rights reserved.

e.   All payments under this Annex are to be made in immediately available funds in United States Dollars, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any nature imposed by the government of Ukraine or any other political or taxing authority. The Parties agree that, in the event of any such deduction, withholding or tax payment, TankTrans shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment CFSI will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon TankTrans's request, CFSI agrees to provide such documentation, which to its best knowledge but without any assurances on its part, is required by to classify CFSI as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and Ukraine. Payments are to be made to CFSI's account as per Assignment Agreement.

If payments under this Annex are not made in full when due, then any outstanding amount due but unpaid hereunder shall accrue late interest at 11 % calculated per annum from the date relevant payment should have been made until the date payment is received in full.

f.   Any and all information in connection with the transaction(s) under the Assignment Agreement shall be treated as confidential by the TankTrans, its officers, employees and representatives, and any of the TankTrans's affiliates and shall not be disclosed to any third party in any form whatsoever without the CFSI's prior express written consent, unless required by law or court order. If the TankTrans is required by law or court order to disclose any such information, the TankTrans  shall provide the CFSI prompt written notice of such requirement.

This Annex is executed on the first date written above and comes into force as of the effective date of the Assignment Agreement.

All the changes, annexes, additional agreements and amendments to the Assignment Agreement and this Annex will be valid only in done in writing and signed by the authorized representatives of all Parties.

This Annex supplements the Assignment Agreement and represents its integral part.  All the provisions of the Assignment Agreement remain in full legal power and force unless specifically amended or ruled out by this Annex.

[SIGNATURE PAGE FOLLOWS]

8

© 2015 Cargill Financial Services International, Inc. All rights reserved.

## SIGNATURE PAGE

**Limited Liability Company "TANK TRANS"**
2-G, V.Ivasyuka st., Gorodok, Lvivs'ka oblast', 81500, Ukraine
Identification code 32115067
Current Account № 26009000021345
in PJSC "Credit Agricole Bank"
MFO 300614

**Cargill Financial Services International, Inc.**
1209 Orange Street, Wilmington, County of New Castle, State of Delaware with principal offices at 9350 Excelsior Boulevard, MS142-4B, Hopkins, Minnesota 55343, USA
Bank Details:
Beneficiary bank: Citibank, NA, New York , U.S.A.
SWIFT: CITIUS33XXX
ABA: 021000089
Bank Account: 38490869

By: _____

Name: Shpak Andrij

Title: Director

By: _____

Name: Nancy L. Nelson
Authorized Signer

Title:

9

© 2015 Cargill Financial Services International, Inc. All rights reserved.

# SURETYSHIP AGREEMENT

This Suretyship Agreement (this "**Suretyship Agreement**") is made on July 07, 2015 by

1. **Taras Barshchovskyy,** a Ukrainian national, residing at Bratkovychi, Ukraine, passport number KB076181 (which expression shall include any personal representatives, receiver, trustee in bankruptcy or any other person acting on his behalf) (the "**Surety**")

   in favour of

2. **Cargill Financial Services International, Inc.,** a Delaware, USA corporation, registered at 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, with a principal place of business at 9350 Excelsior Boulevard, MS 142-4B, Hopkins, Minnesota 55343, USA (the "**Beneficiary**")

## 1  SURETYSHIP AND INDEMNITY

1.1     In consideration of the Beneficiary having (i) entered into Assignment Agreement No AA9 as of **February 05, 2015**, with Limited Liability Company "Yabluneviy dar", a legal entity incorporated under the laws of Ukraine, and having its registered office at 274a, Lvivs'ka str., Gorodok, Lvivs'ka oblast', Ukraine 81500 (the "**Obligor**"), as amended, modified and/or supplemented from time to time (the "**Assignment Agreement**") and (ii) extended payment terms in accordance with the terms of the Assignment Agreement to the Obligor, the Surety, as primary obligor and not merely as surety, irrevocably and unconditionally secures by this Suretyship Agreement the due and punctual payment of all amounts payable by the Obligor to the Beneficiary under the Assignment Agreement (the "**Secured Obligations**") when the same shall become due and payable.  Upon each or any failure by the Obligor to pay punctually the Secured Obligations or any part thereof as provided under the Assignment Agreement, and upon first written demand (the "**Demand**") by the Beneficiary to the Surety, the Surety agrees to immediately pay the Secured Obligations to the Beneficiary.  Surety hereby acknowledges and agrees that the Secured Obligations may increase in amount due by reason of any modifications of the Assignment Agreement, Secured Obligations or otherwise.

1.2     Notwithstanding any provision in this Suretyship Agreement, the aggregate amount the Surety shall be required to pay under this Suretyship Agreement shall not exceed USD **5,570,954.32 (US Dollars Five Million Five Hundred Seventy Thousand Nine Hundred Fifty Four and 32/100)** plus the amount of any unpaid interest, fees and/or unpaid late payment interest as defined in the Assignment Agreement and the reasonable costs of enforcing the obligations of the Surety hereunder. In this connection, any payment to be made by the Surety to the Beneficiary, its successors and assigns under this Suretyship Agreement shall be made in US dollars without set-off or counterclaim whatsoever and free and clear of and without withholding or deduction for, or on account of, any present or future taxes, including interest, penalties and additions thereto, imposed, levied collected, withheld or assessed by or on behalf of or within Surety's Home State (as defined below) or by any other competent authority, unless required by law. The parties agree that, in the event of any such deduction, withholding or tax payment, the

© 2015 Cargill Financial Services International, Inc. All rights reserved.

Surety shall increase (gross-up) the sum or payment due by such amount as is necessary to ensure that after such deduction, withholding or tax payment the Beneficiary will receive a net sum equal to the sum which it would have received had no such deduction, withholding or tax payment been required to be made. Upon Surety's written request, the Beneficiary agrees to provide such documentation, which to the Beneficiary's best knowledge but without any assurances on its part, is required by Surety's Home State legislation or authorities to classify the Beneficiary as a U.S. tax resident for the purpose of the applicable Double Tax Treaty between the United States of America and the Surety's Home State. Failure by the Beneficiary to provide such documentation shall not release the Surety of its obligations under this Clause 1.2. "**Surety's Home State**" means any country in which the Surety has its domicile, or is considered to be a tax resident.

1.3     The Surety's obligations under this Suretyship Agreement shall be absolute, irrevocable and unconditional irrespective of the validity or enforceability of any provision of the Assignment Agreement or any other provision of this Suretyship Agreement. This Suretyship Agreement is a continuing suretyship for payment and not collection and shall apply to all Secured Obligations.

1.4     If the Secured Obligations are not recoverable from the Obligor by reason of illegality, incapacity, the lack of authority, ineffectiveness of execution or any other reason, the Surety shall, notwithstanding any of the foregoing, remain liable under this Suretyship Agreement as if he were a principal obligor. The Surety, as principal obligor and as a separate and independent obligation and liability from his obligations under Clause 1.1 above, irrevocably and unconditionally agrees to indemnify the Beneficiary in full immediately and on demand against all losses, costs and expenses suffered or incurred by the Beneficiary arising from or in connection with the Assignment Agreement.

1.5     The Surety hereby expressly waives to the fullest extent permitted by applicable law any requirement for promptness, diligence, presentment, or protest and any requirement that the Beneficiary assert, exercise, refrain from exercising or exhaust any right, power, remedy or process against the Obligor under any promissory note or other agreement or instrument, or against any other person under any other suretyship of, or security for, any of the Secured Obligations.

1.6     The Surety agrees that, in the event of a formal dissolution or insolvency of the Obligor, or filing of any petitions or commencement of any actions relating to same, whether by the Obligor or any third party, the declaration by the Obligor or the Surety of its inability or failure to pay any amounts under the Assignment Agreement, or this Suretyship Agreement, (as applicable) as they become due or an assignment by the Obligor or the Surety for the benefit of creditors, or the commencement of any case or proceeding in respect of the Obligor or the Surety under any bankruptcy, insolvency, or similar laws, which if commenced by a party other than the Obligor or the Surety is not dismissed within sixty (60) days of its filing, and if such event shall occur at a time when any of the Secured Obligations of the Obligor may not then be due and payable, the Surety will pay to Beneficiary forthwith the full amount which would be payable hereunder by the Surety if all such Secured Obligations were then due and payable.

2     PRESERVATION OF RIGHTS

2

© 2015 Cargill Financial Services International, Inc. All rights reserved.

2.1 Neither the obligations of the Surety herein contained nor the rights, powers and remedies conferred upon the Beneficiary by law shall be discharged, impaired or otherwise affected by:

> 2.1.1 the bankruptcy or insolvency of the Obligor or any similar or equivalent proceedings against him;

> 2.1.2 time or other indulgence being granted or agreed to be granted to the Obligor in respect of obligations under the Assignment Agreement and/or in relation to the Secured Obligations in which circumstances the obligations of the Surety shall be varied by the extent of the time or other indulgence;

> 2.1.3 any amendment or supplement to, termination, novation or any variation, waiver or release of or in respect of the Assignment Agreement and/or any of the Secured Obligations; or

> 2.1.4 any act or omission which would not have discharged or affected the liability of the Surety had it been a principal debtor instead of Surety or indemnitor or by anything done or omitted by any person which but for this provision might operate to exonerate or discharge the Surety or otherwise reduce or extinguish his liability under this Suretyship Agreement.

2.2 Insofar as the Surety acquires rights against the Obligor in consequence of the Surety performing its obligation hereunder, the Surety undertakes that it will not exercise such rights or seek to obtain collateral in respect of such rights while the Obligor is under any actual or contingent obligation under the Assignment Agreement. The Surety further undertakes that it will not seek to take any steps to obtain collateral in anticipation of acquiring such rights.

2.3 The obligations of the Surety under this Suretyship Agreement shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Obligor in respect of the Secured Obligations is rescinded or must be otherwise restored by the Beneficiary, whether as a result of any proceedings in bankruptcy or insolvency or otherwise, and the Surety agrees that he will immediately indemnify the Beneficiary on demand for all reasonable costs and expenses (including, without limitation, fees of counsel) incurred by the Beneficiary in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

2.4    Without limitation of the foregoing, when requested by the Beneficiary (if so required by applicable laws), the Surety shall apply for and shall obtain a license of the National Bank of Ukraine enabling him to make cross-border payments to the Beneficiary under this Suretyship Agreement.

## 3   DURATION OF SURETYSHIP

3

© 2015 Cargill Financial Services International, Inc. All rights reserved.

This Suretyship Agreement will terminate on **31 May 2021**; provided, however, that such expiration shall not release the Surety from any obligation to the Beneficiary under this Suretyship Agreement until all amounts due under the Assignment Agreement have been paid in full or expire in accordance with the terms of the Assignment Agreement.

## 4 REPRESENTATIONS, WARRANTIES AND COVENANTS

The Surety represents, warrants and covenants that:

4.1 it is an adult individual and has the legal authority and capacity to enter into and perform this Suretyship Agreement;

4.2 the execution, delivery and performance of this Suretyship Agreement will not contravene any law or regulation to which the Surety is subject, and all governmental or other consents requisite for such execution, delivery and performance are in full force and effect. The execution, delivery and performance of this Suretyship Agreement does not require receipt of any regulatory authorizations (licenses, approvals, permits, etc.) which are required by applicable law;

4.3 the execution, delivery and performance of this Suretyship Agreement will not cause the Surety to be in breach or default under any agreement binding on it or any of its assets or require any consent under any indenture, note, mortgage, agreement or other instrument or arrangement to which the Surety is a party or by which it is bound;

4.4 this Suretyship Agreement constitutes and at all times shall constitute, a direct, unsecured and unsubordinated obligation of the Surety, ranking pari passu with all other present and future unsecured and unsubordinated obligations of the Surety;

4.5 this Suretyship Agreement has been duly executed by it and constitutes a valid obligation of the Surety, legally binding on it and enforceable in accordance with its terms in the courts of its place of incorporation;

4.6 the Surety has disclosed to the Beneficiary in writing all financial reports, other written information and other material information relevant to assure full and true disclosure required to permit the Beneficiary to evaluate the making of payment terms to the Obligor. All documents, reports and other written information pertaining to the Obligor or the Surety that have been furnished to the Beneficiary were prepared with due care and in good faith, are true, complete and correct in all material respects and do not contain any material misstatement of fact or omit to state a material fact or any fact necessary to make the statements contained therein not materially misleading. There is no fact relating the Surety that is known to, or which by the exercise of due diligence could be known to, the Surety, the existence of which could reasonably be expected to cause the Beneficiary not to provide the payment terms to the Obligor;

4

© 2015 Cargill Financial Services International, Inc. All rights reserved.

4.7 in acting as the Surety under this Suretyship Agreement it has complied and will continue to comply for the duration of this Suretyship Agreement with all necessary and applicable anti-money laundering procedures required for it to act as a Surety hereunder;

4.8 it has been provided with, and hereby acknowledges receipt and review of a duly certified copy of the Assignment Agreement; and

4.9 it will procure that, at all times during this Suretyship Agreement, the amount of Surety's own USD funds standing to the credit of its bank accounts is sufficient to perform the Surety's obligations hereunder.

## 5   CONTINUING SECURITY

The obligations of the Surety herein shall constitute and be continuing obligations and shall not be considered satisfied by any intermediate payment or other settlement of account. The said obligations shall continue in full force and effect until final payment in full of all amounts owing by the Obligor under the Assignment Agreement.

## 6   DEMANDS AND NOTICES

6.1  Any Demand or notice shall be written and in the English language.

6.2  Any Demand shall be accompanied by a statement from the Beneficiary stating that the sum demanded is due and payable but unpaid and such demand shall, in the absence of manifest error, be binding on the Surety.

6.3  Any Demand or notice shall be hand delivered to or sent by courier by way of a first-class international courier company to the recipient at its address stated in this clause (or such other address as may be notified in writing from time to time):

(A) In the case of the Surety:
2g Ivasyuka Str., 81500 Gorodok,
Lviv Region, Ukraine

(B)  In the case of the Beneficiary:
9350 Excelsior Blvd.
Hopkins, MN  55343

Attention: Jennifer Campbell

6.4  Any notice, not being a Demand, may be sent by fax to the following fax numbers:

(A) In the case of the Surety:
Fax No: 38 - 03231 - 321 - 21

(B)  In the case of the Beneficiary:
Fax No: 1-952-249-4416

5

© 2015 Cargill Financial Services International, Inc. All rights reserved.

6.5 Any Demand or notice shall be deemed to have been duly served:-

    6.5.1  if delivered by hand, when delivered at the address referred to in Clause 6.3 above; or

    6.5.2  if sent by courier on the day of delivery to the address referred to in Clause 6.3 above; or

    6.5.3  in the case of a notice other than a Demand, if sent by facsimile, at the time when sent to the recipients fax number referred to in Clause 6.4 above.

## 7  PARTIAL INVALIDITY

If at any time any one or more of the provisions of this Suretyship Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction neither the legality, validity or enforceability of the remaining provisions of this Suretyship Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall be in any way impaired as a result.

## 8  AMENDMENT

No term or provision of this Suretyship Agreement shall be amended, modified, altered, waived or supplemented except in a written document signed by the Surety and the Beneficiary.

## 9  COSTS

Subject to Clause 1.2 above, the Surety shall immediately, on demand by the Beneficiary and on a full indemnity basis, pay to the Beneficiary the amount of all costs and expenses which the Beneficiary incurs under or in connection with this Suretyship Agreement.

## 10 Bank Details

Any payments under this Suretyship Agreement shall be made by the Surety to the following bank account of the Beneficiary, unless otherwise specified by the Beneficiary in writing:

Beneficiary bank: Citibank, NA, New York, U.S.A.
SWIFT: CITIUS33XXX
ABA: 021000089
Bank Account: 38490869

## 11 CONSENT TO SERVICE OF PROCESS

The Surety further irrevocably consents for himself, if for any reason there is no authorized agent for service of process in London, England, to the service of process out of the said courts by mailing copies thereof by registered air mail postage prepaid to it at its address specified herein; and in such a case the Beneficiary shall also

6

© 2015 Cargill Financial Services International, Inc. All rights reserved.

send facsimile, or shall procure that there is also sent by facsimile, a copy of such process to the Surety.

## 12 ASSIGNMENT

The Surety may not assign its rights, interests or obligations hereunder to any other person. The Surety unconditionally agrees and consents that the rights of the Beneficiary under this Suretyship Agreement may be freely assigned by the Beneficiary in its sole discretion together with its rights under the Assignment Agreement with written notification to the Surety by the Beneficiary within three (3) Business Days of such assignment or transfer.

## 13 GOVERNING LAW AND ARBITRATION

Any dispute arising out of or in connection with this Suretyship Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the London Court of International Arbitration Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitral proceedings shall be English. The governing law of this Suretyship Agreement shall be the substantive law of England and Wales.

**IN WITNESS WHEREOF,** this Suretyship Agreement has been executed as a deed by the Surety and has been signed by or on behalf of the Beneficiary with the intention that it be delivered on the date appearing at the beginning of this Suretyship Agreement.

EXECUTED as a Deed

**The Surety**

by [_____]
acting by [_____];

.................................................. Toros Barsychovsky

[ADD NOTARY SIGNATURE BLOCK]

**The Beneficiary**

by Cargill Financial Services International, Inc.
acting by [_____];

..................................................
[Title]

Nancy L. Nelson
Authorized Signer

7

© 2015 Cargill Financial Services International, Inc. All rights reserved.

### Amendment № 1 to Assignment Agreement №AA9 as of 05 February 2015

**November 08, 2018**

This Amendment № 1 (the "**Amendment № 1**") to Assignment Agreement №AA9 as of February 05, 2015 (the "**Assignment Agreement**") and to Annex 1 thereto of July 07, 2015 (the "**Annex**") is made on November 08, 2018 (the Assignment Agreement and the Annex, together, the "**Agreement**") by and between:

**Cargill Financial Services International, Inc.,** registered at Corporation Trust Center, 1209 Orange Street, Citi of Wilmington, County of New Castle, DE, 19801, U.S.A. with principal place of business at 9320 Excelsior Boulevard, MS142, Hopkins, MN 55343, U.S.A. , hereinafter referred to as "**CFSI**" or the "**Initial Creditor**", on one side, and

**LIMITED LIABILITY COMPANY "TANK TRANS" (ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ТАНК ТРАНС"),** 2-G, V.Ivasyuka st., Gorodok, Lvivska oblast', 81500, Ukraine, identification number 32115067 duly represented by Mr. Andriy Shpuk, acting based on Charter, hereinafter referred to as "**TT**" the "**New Creditor**", on the other side.

The Initial Creditor and the New Creditor are individually referred to in this Amendment № 1 as a "**Party**" or collectively as the "**Parties**".

**WHEREAS:**

A.  Under the Assignment Agreement the Initial Creditor assigned to the New Creditor and the New Creditor received the Claims. In consideration of the assignment of the Claims, the New Creditor agreed in the Annex to pay in favour of the New Creditor the Consideration in the amount of US Dollars 5,570,954.32 in 12 installments until February 05, 2021 with the first installment payable on May 05, 2018.

B.  To secure the New Creditor's payment obligations under the Assignment Agreement, the New Creditor agreed in the Annex to provide the Initial Creditor with one or more pledges over the New Creditor's physical assets (collectively, "**Pledge**") then and currently subject to liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", with a total collateral value of more than 100% of the Consideration amount. The Annex required the New Creditor to provide the Pledge as soon as reasonably possible upon release of the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK", but in any case, no later than May 05, 2018.

C.  As of the date of this Amendment № 1 the New Creditor's physical assets have not yet been released from the liens in favor of PUBLIC JOINT-STOCK COMPANY "DELTA BANK" nor pledged to the Initial Creditor.

D.  The New Creditor has requested that the Initial Creditor extend the payment terms of the Consideration amount under the Agreement and the terms for provision of the Pledge to the Initial Creditor and the Initial Creditor is willing to provide the requested extension on the basis of the terms and conditions outlined in this Amendment № 1 below.

Taking the above into account, the Parties hereby have agreed as follows:

**AGREED TERMS:**

1.  The Parties have agreed to supplement the Agreement with the following Definitions section.

DEFINITIONS:

Capitalized terms used herein but not defined shall have the same meanings as defined in the Agreement.

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

"**Affiliate**" means with respect to any Person, another Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

"**Asset Disposition**" of any Person means the sale, lease or conveyance or other disposition of assets (including, without limitation, any capital stock of any TB Fruit Group company or subsidiary of such Person held directly or indirectly by such Person), whether owned on the date hereof of hereafter acquired, in one or more related transactions, outside of the ordinary course of business (other than a sale, lease, conveyance or other disposition by such Person or a subsidiary of such Person to such Person or a wholly owned subsidiary of such Person, including any such disposition by means of a merger, consolidation or similar transaction).

"**Business Day**" shall mean any day, other than a Saturday or Sunday, on which banks are not authorised to close in Kyiv (Ukraine) and New York (USA).

"**Cargill Entity**" shall mean any company or legal entity which from time to time directly or indirectly controls, is controlled by, or is under common control of the Initial Creditor, whether or not such company or other legal entity is in existence at the time this Amendment № 1 is signed by the Parties.

"**Change of Control Event**" means an event or series of events which:

    (i)    any Person, either individually or acting in concert with one or more other Persons, shall have acquired beneficial ownership (provided that a Person shall not be deemed to be the beneficial owner of shares tendered pursuant to a tender offer made by that Person or its Affiliate until the tendered shares are accepted for purchase), directly or indirectly, of equity interests of TB Fruit Holding Establishment (Lichtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company, or

    (ii)    *(1)* another corporation merges into of TB Fruit Holding Establishment (Lichtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company or *(2)* Mr. Taras Barshchovskyy, TB Fruit Holding Establishment (Lichtenstein) and/or its direct or indirect subsidiaries, and/or any other TB Fruit Group company conveys, transfers or leases all or substantially all its assets to any Person or group, in one transaction or a series of transactions, or

    (iii)    the failure at any time of TB Fruit Holding Establishment (Lichtenstein) legally and beneficially to own and control 100% of the issued and outstanding shares of capital stock of its subsidiaries held by TB Fruit Holding Establishment (Lichtenstein) as of the date of this Amendment №1, or the failure at any time of TB Fruit Holding Establishment (Lichtenstein) to have the ability to elect all the majority of the board of directors or other governing bodies of any of its subsidiaries, or

    (iv)    the failure of, at any time, Mr. Taras Barshchovskyy to legally and beneficially own and/or control 100% of the issued and outstanding share of capital stock of TB Fruit Holding Establishment (Lichtenstein), and/or any other TB Fruit Group company directly or indirectly owned or subsequently acquired by Mr. Taras Barshchovskyy.

"**Person**" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"**TB Fruit Group**" means and includes any and all Persons that directly or indirectly through one or more intermediaries, is controlled by *Mr. Taras Barshchovskyy* and/or controls, is controlled by, or is under common control with TT and/or any of the Guarantors. "Control" (including the terms "controlled by" and "under common control with") means the direct or indirect ownership or control of more than 50% of the voting rights or equity shares of such Persons.

Any reference in the Assignment Agreement to "this Agreement" and in the Annex to "this Annex" shall be deemed to be a reference to the Assignment Agreement and the Annex as amended, modified and/or supplemented from time to time (including by this Amendment № 1).

## 2. AMENDMENT TO THE ASSIGNMENT AGREEMENT:

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

Subject to terms and conditions of this Amendment № 1 the Parties agree:

2.1. To amend and restate clause 5.3 of the Assignment Agreement as follows:

"5.3. (i) Subject to sub-clause (iv) of this clause 5.3., any notice or communication given to a Party under or in connection with this Agreement (and any amendment or supplement) shall be in writing and shall be delivered by hand, by third party courier service, by fax and/or by electronic mail, in each case to that Party's address, fax number or electronic mail address specified in, as applicable to that Party, as specified in this clause 5.3. (or to such other address, fax number or electronic mail address as that Party may notify to the other Party in accordance with this clause 5.3.).

a. If to the Initial Creditor:
For the attention of Nancy Nelson
Address: 9320 Excelsior Boulevard, Hopkins, MN 55343, U.S.A.
Fax number: + 41 22 703 2841
E-mail address: Nancy_Nelson@cargill.com

b. If to the New Creditor:
For the attention of Olena Semotiuk
Address: 2-G, V.Ivasyuka st., Gorodok, Lvivska oblast', 81500, Ukraine
Fax number: +38 03231 3-21-21
Email: o.semonova@tbfruit.com

(ii) Subject to sub-clause (iii) of this clause 5.3., delivery of a notice is deemed to have taken place (provided the requirements of sub-clause (i) of this clause 5.3. have been satisfied):

a. if delivered by hand, on the day and time the notice is delivered;
b. if sent by third party courier service, on the third Business Day after depositing such notice with the courier (excluding the date of deposit);

c. if sent by fax, on the earlier of the day and time shown in a transmission report indicating a satisfactory transmission and a confirmation of receipt obtained from the sender's facsimile machine; and

d. if sent by electronic mail, on the day and at the time that the electronic mail was read as shown in a read receipt, on the day and at the time the electronic mail was delivered as shown in a delivery receipt or on the day and at the time of receipt of an acknowledgement from the recipient indicating a satisfactory transmission (whichever is the earlier).

(iii) In the case of delivery by hand, by fax or by email, if the deemed receipt does not take place inside business hours (meaning 9.00 am to 5.30 pm on any day, other than a Saturday or Sunday, on which banks are not authorized to close in the place of deemed receipt), then deemed receipt will occur when business next starts in the place of receipt (and all references to time are to local time in the place of receipt).

(iv) This clause 5.3. does not apply to the service of any proceedings or other documents in any legal action."

2.2. To change numbering of Section II (*Payment Terms*) of the Annex to Section III (*Payment Terms*);

2.3. To change numbering of Section II (*Security of Payment*) of the Annex to Section IV (*Security of Payment*);

2.4. The table of Repayment Dates specified in the second paragraph of Section III (*Payment Terms*) of the Annex shall be replaced in its entirety and supplemented as follows:
"

| Repayment Date | Consideration amount due, USD |
|---|---|
| 15 February 2022 | *$371,396.96* |
| 15 May 2022 | *$371,396.96* |
| 15 November 2022 | *$371,396.96* |
| 15 February 2023 | *$371,396.96* |

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

| 15 May 2023 | $371,396.96 |
|---|---|
| 15 November 2023 | $371,396.96 |
| 15 February 2024 | $371,396.96 |
| 15 May 2024 | $371,396.95 |
| 15 November 2024 | $371,396.95 |
| 15 February 2025 | $371,396.95 |
| 15 May 2025 | $371,396.95 |
| 15 November 2025 | $371,396.95 |
| 15 February 2026 | $371,396.95 |
| 15 May 2026 | $371,396.95 |
| 15 November 2026 | $371,396.95 |

The New Creditor irrevocably and unconditionally acknowledges and confirms its payment obligation as envisaged in the table above in the total amount of US Dollars 5,570,954.32, without prejudice to the Conditional Discount provisions as stated below."

2.5.     The provisions of Clause 2.4 of this Amendment № 1 and any reference to the Conditional Discount shall come into effect upon satisfaction (or waiver by the Initial Creditor) of each of the conditions precedent specified in Section 3 hereof .

2.6. To add a the following at the end of Section III (*Payment Terms*) of the Annex as follows:

"In the event the Repayment Date falls on a non-Business Day, the next following Business Day shall be considered as the Repayment Date.

Notwithstanding the above, if (a) the New Creditor fails to make any payment of Consideration when due for payment hereunder, or (b) any Affiliate of the New Creditor fails to make any payment of any indebtedness to any Cargill Entity when due, or (c) any other event of default as specified in Section VII (*Default*) of the Annex has occurred, then the Repayment Dates as specified in the Annex prior to the effectiveness of Amendment № 1 to the Assignment Agreement and this Annex shall be reinstated without any demand, protest or notice of any kind, all of which are hereby expressly waived by the New Creditor. The Initial Creditor retains full rights to enforce any and all payments in accordance to such an original payment schedule.

Subject to the provisions of this paragraph, the Initial Creditor agrees to provide a discount in the amount up to 15% of the Consideration ("**Conditional Discount**"). The Conditional Discount will be proportionally applied to the instalments of the Consideration payable by the New Creditor to the Initial Creditor in 2026 as follows:

| **Repayment Date** | **Consideration amount due, USD** | **Conditional Discount amount, USD** |
|---|---|---|
| 15 February 2026 | $371,396.95 | $278,547.72 |
| 15 May 2026 | $371,396.95 | $278,547.72 |
| 15 November 2026 | $371,396.95 | $278,547.71 |

The provision of the Conditional Discount is subject to **(a)** the full and timely repayment of (i) all amounts due on each and every Repayment Date up to and including the Repayment date of 15 November 2025, and (ii) all other indebtedness of TB Fruit Group companies to the Initial Creditor and/or any Cargill Entity, including the payment obligations of FRANCOSO CORPORATION LIMITED under the Raw Materials Purchase, Inventory and Receivables Financing Agreements No 02 2017 and No 03 2017 dated January 30, 2017 (as further amended) ("**RMPIR Financing Agreements**"); and **(b)** there having been no event of default as specified in Section VII (*Default*) of Annex."

2.7. The first paragraph of Section IV (*Security of Payment*) of Annex shall be replaced in its entirety with the following:

"To secure TT's payment obligations under the Assignment Agreement and this Annex, TT hereby undertakes and commits to cause the assets (located at:
1. 274-a Lvivska str., Gorodok, Lviv region, 81500, Ukraine
2. 62 Kopitka str., Lypovets, Vinnytska region, 22500, Ukraine

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

3. 7 Gagarina str., New Ushitsya, Novouushitsky district, Khmelnytsky region, 32600, Ukraine
4. 3 Kamenetsky highway, Slobokivtsi, Yarmolinetsky district, Khmelnytsky region, 32162, Ukraine
5. 5 Kharkiv str., Zatishya, Kharkiv district, Kharkiv region, 62406, Ukraine)
or any other assets satisfactory to CFSI ("**TT Assets**") to be pledged in favour of CFSI with a total collateral value of more than 100% (but not higher than 150%) of the Senior Debt Amount outstanding (the "**Pledge**").

TT undertakes to arrange for the Pledge as soon as reasonably possible after the release of the TT Assets from the current liens in favour of Delta Bank but in any case, no later than December 31, 2019. The collateral value shall be determined based on the following formula: 80% of market value of the respective TT Assets (based on independent appraisal executed by an appraiser satisfactory to CFSI at or immediately before the execution of the Pledge)".

2.8. The fourth paragraph of Section IV (*Security of Payment*) of Annex commencing with the words "If for any reason the Pledge" and ending with the words "and this Annex on each of the Repayment Dates", shall be replaced in its entirety with the following:

"If for any reason (a) the assets subject to the Pledge do not have a total collateral vale of more than 100% of the Senior Debt Amount outstanding, or (b) the Pledge, duly perfected, is not provided to Cargill by December 31, 2019, TT shall provide CFSI with an additional and/or a substitute pledge acceptable to CFSI".

2.9. To add Section VI (*Covenants*) right after Section V (*Representation and Warranties*) of the Annex as follows:

(a) "Unless CFSI agrees in writing, TT, the Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entities shall not be permitted to cause or permit a Change of Control Event.

If a Change of Control Event is agreed with CFSI, Mr. Taras Barshchovskyy, TT and/or the respective TB Fruit Group entity shall give a written notice to CFSI at least 30 days before such Change of Control Event stating:

i.    that a Change of Control Event is to occur and that CFSI has the right to require repayment of all the outstanding amounts under RMPIR Financing Agreements and the outstanding Consideration and other amounts under the Assignment Agreement at the time of the Change of Control Event. If, as a result of the Change of Control Event any of TT, Guarantors, Mr. Taras Barschovskyy or any other TB Fruit Group entity are to receive any cash proceeds, such cash proceeds shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts comprising the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

ii.    the circumstances and relevant facts regarding the Change of Control Event,

iii.    the purchase date in relation to such Change of Control Event (which shall be no earlier than 30 and no later than 60 days after such notice is given),

iv.    whether the tenders will be irrevocable and the purchase price offered in relation to such Change of Control Event.

Failure to give the requisite notice to CFSI within the time provided above shall constitute an event of default and an acceleration event under the Assignment Agreement allowing CFSI to exercise all of its rights in the last paragraph of Section VII (*Default*) of the Annex.

(b) Unless CFSI agrees in writing, TT, Guarantors, Mr. Taras Barshchovskyy and any other TB Fruit Group entity shall not be permitted to make Significant Asset Sales, where such Significant Asset Sale means an Asset Disposition involving assets with a fair market value in excess of US Dollars 5,000,000.00 and which is paid in cash or cash equivalents including payments in respect of deferred payment obligations when received in the form of cash or cash equivalents ("**Net Cash Proceeds**"). Net Cash Proceeds shall be net of (i) taxes payable as a result of such Significant Asset Sale, and (ii) payments made to retire indebtedness where payment of such indebtedness is secured by assets or properties which are the subject of such Significant Asset Sale. If an Asset Disposition occurs, the Net Cash Proceeds from such

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

Significant Asset Sale shall be applied in the following priority to repay (i) any past due amounts outstanding under the RMPIR Financing Agreements, (ii) any principal amortization payments not yet due under the RMPIR Financing Agreements in reverse order of chronological maturity, (iii) any past due amounts under the Consideration Amount and (iv) any principal amortization payments not yet due under the Consideration Amount.

(a) Unless CFSI agrees in writing, TT, the Guarantors, Mr. Taras Barshchovskyy and any of their Affiliates shall not together incur any capital expenditures in the in excess of US Dollars 2,500,000.00 per calendar year according to International Financial Reporting Standards effective on the date of this Amendment № 1. Notwithstanding the foregoing, this limitation does not cover the on-going investment projects in relation to the pectin production line (with its total planned investment of Euro 5.2 million of which Euro 4.77 million has already been reported as invested as of January 31, 2017) or construction of the management office building (with its total planned investment of Euro 0.5 million, of which Euro 0.43 million has already been reported as invested as of January 31, 2017).

2.10. To change numbering of Section VI (*Default*) of the Annex to Section VII (*Default*).

2.11. To amend and restate part b. of Section VII (*Default*) of the Annex as follows:

"b. fails to perform or observe any other term, covenant or agreement contained in Section V (*Representations & Warranties*) (a) through and including (u), in Section VI (*Covenants*) or breaches any other term, covenant, agreement or undertaking under the Assignment Agreement or the Annex or any other assignment or annex to which any Cargill Entity and any member of the TB Fruit Group are party".

2.12. To amend and restate part g. of Section VII (*Default*) of the Annex as follows:

"g. a Change of Control Event or Significant Asset Sale has occurred without prior written consent of CFSI";

2.13. To change numbering of Section VII (*General Provisions*) of the Annex to Section VIII (*General Provisions*).

## 3. CONDITIONS PRECEDENT

The provisions of Clause 2.4 to this Amendment № 1 and the Conditional Discount are subject to the satisfaction (or waiver by the Initial Creditor) of each of the following conditions ("**Conditions Precedent**")

3.1.    The Initial Creditor has received from the Guarantors the originals of the duly executed amendments to the existing guarantees (guaranteeing the New Creditor's obligations under the Agreement) extending the term of the guarantees in a substance and form acceptable to the Initial Creditor.

3.2.    The Initial Creditor has received the original of the duly executed first-demand unconditional irrevocable guarantee issued by Mr. Taras Barschovskyy in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor in replacement of the existing Suretyship Agreement made on July 07, 2015.

3.3.    The Initial Creditor has received the originals of the duly executed first-demand unconditional irrevocable guarantees issued by the following companies of TB Fruit Group in favour of the Initial Creditor and guaranteeing the New Creditor's obligations under the Agreement in a substance and form acceptable to the Initial Creditor.
   - "T.B. FRUIT" S.R.L. (Moldova*)*;
   - TB Fruit Polska Sp. z o.o. S.K.A. (Poland);
   - LLC "Tank Trans Ukraine" (Ukraine);
   - Tank Trans Polska Sp z o.o. (Poland);
   - AMELIANA HOLDINGS LTD (Cyprus).

Collectively "T.B. FRUIT" S.R.L. (Moldova),  TB Fruit Polska Sp. z o.o. S.K.A. (Poland), LLC "Tank Trans Ukraine" (Ukraine), Tank Trans Polska Sp z o.o. (Poland), AMELIANA HOLDINGS LTD (Cyprus) are further referred to as "**New Guarantors**", each of them – "**New Guarantor**".

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

3.4.    The Initial Creditor has received the originals of the duly executed amendments to the Deed of Pledge of Shares in FRANCOSO CORPORATION LIMITED dated January 30, 2017 and Deed of Pledge of Shares in AMELIANA HOLDINGS LTD dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein) and Cargill Financial Services International, Inc. expanding the scope of the secured obligations and securing the New Creditor's payment obligations in favour of the Initial Creditor in a substance and form satisfactory to the Initial Creditor (each - "**Amendment to the Deed of Pledge of Shares**", collectively - "**Amendments to the Deeds of Pledge of Shares**").

3.4. The Initial Creditor has received the originals of the duly executed amendments to Escrow Agreement dated January 30, 2017 and Escrow Agreement dated June 28, 2017 concluded between TB Fruit Holding Establishment (Liechtenstein), Cargill Financial Services International, Inc. and Dr. K. Chrysostomides & Co. LLC (Cyprus) in a substance and form satisfactory to the Initial Creditor.

3.5. Within ten (10) calendar days after the date of execution of this Amendment № 1 the New Creditor undertakes that it will cause Dr. K. Chrysostomides & Co. LLC (Cyprus) to submit a certified copy of each Amendment to the Deed of Pledge of Shares to the Commissioner of Stamp Duty of the Republic of Cyprus for the obtainment of an verbal ruling as to whether stamp duty is payable thereon and if so, to which amount. At the request of the Initial Creditor the New Creditor shall furnish to the Initial Creditor a written confirmation of the above mentioned submission made to the Commissioner of Stamp Duty of the Republic of Cyprus.

## 4. GENERAL PROVISIONS, MUTUAL ACKNOWLEDGMENTS AND ASSURANCES

4.1. The Parties make the following representations and acknowledgements, as applicable, as of the date of this Amendment № 1:

(i) no Change of Control Event has occurred or is occurring in relation to the New Creditor and the New Creditor continues to be fully beneficially owned and controlled by Mr. Taras Barshchovskyy;

(ii) the New Creditor confirms that it has received and accepted from the Initial Creditor all the documentation (originals, certified copies and copies) in relation to the Claims assigned under the Agreement to the New Creditor's full and final satisfaction.

(iii) The New Creditor acknowledges that there are no other documents expected or pending to be provided by the Initial Creditor to the New Creditor;

(iv) the New Creditor confirms that it has obtained all necessary and material information and disclosures from the Initial Creditor in relation to the Claims and, without relying on the Initial Creditor, made its own analysis of the Claims and all such obtained information to the New Creditor's full and final satisfaction;

(v) the Parties further confirm and acknowledge, that the Initial Creditor in addition to the transfer of the documentation outlined in sub-clause ii) above has performed the following actions:

   (a) served a default and acceleration notice dated February 05, 2015 to the Debtor; and

   (b) informed the Debtor about the assignment in favour of the New Creditor no later than 3 (three) Business Days from the effective date of the Assignment Agreement.

Both Parties acknowledge and agree that the Initial Creditor with its above actions fully satisfied, complied with and performed all of its obligations under the Agreement in connection with the Claims and that no other actions were or are required or intended to be performed by the Initial Creditor under the Agreement.

4.2. This Amendment № 1 shall come in force on the date of its signing by the authorized persons of the Parties.

4.3. All other terms and conditions of the Agreement remain unchanged.

4.4. This Amendment № 1 shall be signed in two copies in English, one for each Party, both copies having equal legal power.

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.

5.4. Any dispute arising out of or in connection with Amendment № 1 including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the London Court of International Arbitration (LCIA), which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three. The seat, or legal place, of arbitration shall be London. The language to be used in the arbitration shall be English. The governing law of the Amendment № 1 shall be the substantive laws of New York (excluding conflicts of laws principles).

5.5. This Amendment № 1 is an integral part of the Agreement.

**The Initial Creditor:**
**Cargill Financial Services International, Inc.**
9320 Excelsior Boulevard,
MS142, Hopkins, MN 55343, U.S.A.
Receiving Bank: JP Morgan Chase, N.A., New York
Swift Code: CHASUS33XXX
ABA:   021000021
Account No: 878359491


_____

Authorized Signatory

**The New Creditor:**
**LIMITED LIABILITY COMPANY  "TANK TRANS"**
**(ТОВАРИСТВО З ОБМЕЖЕНОЮ ВИДПОВІДАЛЬНІСТЮ "ТАНК ТРАНС")**
2-G, V.Ivasyuka st.,
Gorodok, Lvivska oblast',
81500, Ukraine
Identification number: 32115067

US Dollars Account: 2600040384840
Intermediary Bank :
RAIFFEISEN BANK  INTERNATIONAL AG,
Wien, Austria
SWIFT: RZBAATWW
Beneficiary's Bank :
acc. № 07055078273
PJSC JSB  "LVIV", Lviv , Ukraine
SWIFT: LVIVUA2X

_____

Authorized Signatory

© 2018 Cargill Financial Services International, Inc. All Rights Reserved.